UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
UNITED STATES OF AMERICA

       -against-

TAIROD NATHAN WEBSTER PUGH,

       Defendant.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**15-CR-116 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Tairod Nathan Webster Pugh ("Pugh" or "Defendant") brings this pretrial omnibus

motion (Not. of Mot. (Dkt. 28)), seeking: (1) dismissal of Count One of the Indictment

(Indictment (Dkt. 11)), on the ground that Count One fails to state an essential element of the

offense, (2) dismissal of Count Two of the Indictment, on the separate grounds of insufficiency

of the evidence and duplicity, (3) suppression of the evidence obtained from three search

warrants, on the grounds that the warrants were overbroad, lacked particularity, and were

supported by stale probable cause, (4) a bill of particulars, (5) early disclosure of <u>Brady</u> and

<u>Giglio</u> material, and (6) early disclosure of Rule 404(b) evidence.  Pugh later filed a second

motion seeking additional <u>Brady</u> material.  (Suppl. Mot. for Release of <u>Brady</u> Materials

(Dkt. 44).)  For the reasons discussed below, Pugh's motions are DENIED in full.

I.     **BACKGROUND**

     A.     **Alleged Facts**

          1.     <u>Pugh's Personal Background</u>

Pugh is a United States citizen who served in the U.S. Air Force from 1986 to 1990.

(Mem. in Supp. of Def.'s Pre-Trial Mot. ("Def.'s Mem.") (Dkt. 29) at 2.)  As an avionics

instrument system specialist, he received training in the installation and maintenance of aircraft

engine, navigation, and weapons systems. (Id.) After moving to San Antonio, Texas in 1998, Pugh converted to Islam. (Id.) In 2001, while working for American Airlines, Pugh allegedly expressed anti-American and pro-terrorist sentiments to a coworker. (Id.) The next year, Pugh allegedly expressed his desire to travel to the Middle East to fight Jihad. (Id.) From October 2009 through March 2010, Pugh worked in Iraq as an Army contractor for a company called DynCorp. (Id.) During 2013 and 2014, Pugh worked in the Middle East as an avionic specialist and airplane mechanic. (Id.) In December 2014, Pugh was fired from his job as a commercial airplane mechanic in Kuwait. (Id.)

### 2. Pugh's Arrest

On January 6, 2015, Pugh purchased a one-way ticket for January 10, 2015, from Cairo, Egypt, to Istanbul, Turkey. (Mem. in Opp'n to Def.'s Mot. ("Gov't's Opp'n") (Dkt. 41) at 3.) Upon his arrival at Instanbul's Atatürk Airport on January 10, Pugh was stopped for questioning by Turkish authorities. (Def.'s Mem. at 2.) He allegedly told the Turkish officials that he was a pilot in the U.S. Special Forces and that he was visiting Turkey for vacation. (Id.) He also withheld consent to a search of the laptop he had in his possession. (Id.) Pugh was denied entry into Turkey and was placed on a return flight to Cairo that same day. (Id.)

Upon returning to Egypt on the evening of January 10, Pugh was detained by Egyptian officials. (Id. at 3.) In response to questioning, Pugh told the officials that he had traveled to Turkey in search of work and disclaimed any desire to travel to Syria. (Id.) Egyptian officials found various electronic devices in Pugh's possession, including a laptop, two cell phones, an iPod, and five USB thumb drives (collectively, the "Electronic Devices"). (Id.) The laptop was determined to be water-damaged and inoperable (id.), the iPod appeared to have been wiped clean of data (id.), and "many of the USB thumb drives appeared damaged and were missing

2

their outer casings" (id. (quoting Aff. of Ghailan Stepho in Supp. of Arrest Warrant ("Compl.") (Dkt. 1) ¶ 15)). Pugh provided the Egyptian officials with the password for one of his cell phones, which contained photographs of a machine gun,[1] airplanes, an airplane toilet, and the area under an airplane seat. (Id.) Pugh was also in possession of two backpacks. (Gov't's Opp'n at 3.) Inside the backpacks, law enforcement officials viewed, but did not seize, broken bits of plastic consistent with outer casings of USB thumb drives, travel documents, notes, and other papers. (Id.) Egyptian authorities told Pugh that he was likely to be deported to the United States; Pugh responded that he would prefer to remain in Egyptian custody or be sent anywhere in the Middle East. (Def.'s Mem. at 3.) Nevertheless, Pugh was placed on a flight to the United States, which arrived at New York City's JFK Airport on January 15, 2015. (Id.) Pugh did not have access to the backpacks or their contents during the flight. (Id. at 4.)

Soon after his arrival at JFK Airport, Pugh was selected by U.S. Customs and Border Protection for secondary inspection and for an interview by U.S. Department of State officials concerning his deportation from Egypt. (Gov't's Opp'n at 7.) During the secondary inspection, Pugh explained that he had attempted to enter Turkey in search of work (id.), and that he had researched job opportunities and requirements prior to going to Turkey (id. at 8). Pugh explained that when he arrived at Atatürk Airport in Turkey, he was denied entry and told that he fit the "profile" of Islamic fighters based on his appearance and the fact that he lacked hotel reservations or any plan as to where he would go upon entering the country. (Id.)

Following his secondary inspection, but prior to his interview with the Department of State, an undercover government agent (the "UC") approached Pugh and engaged him in conversation for approximately one hour. (Id.) According to the UC, Pugh discussed the series

---

[1] When Turkish officials asked Pugh why he had this photograph, he explained simply that "he liked [it]." (Def.'s Mem. at 3.)

3

of events leading to his removal from Turkey, and explained that he believed that he had been denied entry into Turkey because Turkish officials took issue with his appearance. (Id.) Later in the conversation, the UC asked Pugh if he had a Facebook account, which Pugh confirmed. (Id.) The UC then opened a Facebook page that he claimed was his own, and showed it to Pugh. (Id.) The Facebook page featured the ISIL flag as a banner, which the UC showed to Pugh. (Id.) This sight caused Pugh to "appear[] pleased." (Id.) Subsequently, Pugh allegedly stated that he had traveled to Turkey in an attempt to join ISIL. (Id.) The UC then told Pugh that he had similar desires, allegedly leading Pugh to provide the UC with advice on how to enter Syria through Turkey—such as by disguising one's appearance to resemble a hiker or tourist. (Id. at 9.) In addition to these statements, Pugh allegedly told the UC that: (1) he told Egyptian authorities that he would rather be deported anywhere but the United States; (2) he had expected to be arrested upon his arrival on American soil; (3) he had recently married an Egyptian woman; (4) he had worked as an airplane mechanic in the Middle East, (5) he gained experience working with airplanes during his service in the U.S. Air Force; and (6) he avoids talking on phones because of security concerns. (Def.'s Mem. at 7.)

Pugh subsequently left JFK Airport.[2] (Gov't's Opp'n at 9.) At that time, the two backpacks were in his possession. (Id.) Law enforcement officers kept Pugh under surveillance until they were able to obtain an arrest warrant the following day, January 16, 2015. (Id.) Pursuant to that arrest warrant, issued by United States Magistrate Judge Steven I. Locke, Pugh was arrested in New Jersey on the evening of January 16. (Id.; Def.'s Mem. at 2)

---

[2] It is not clear if the interview with the Department of State ever occurred.

4

3.    The Search Warrants

a.    *The Electronic Devices Warrant*

On January 11, 2015, the FBI obtained the Electronic Devices—the laptop, two cell phones, the iPod, and five USB thumb drives—that were seized by Egyptian authorities following Pugh's return flight from Atatürk Airport the previous night. (Def.'s Mem. at 4.) While Pugh was still in Egyptian custody, the FBI sought and obtained a search warrant, dated January 14, 2015, which authorized a search of these devices. (Id.; see Search Warrant Issued January 14, 2015 ("Electronic Devices Warrant") (Decl. of Eric M. Creizman in Supp. of Def.'s Pre-Trial Mot. ("Creizman Decl.") (Dkt. 30), Ex. C (Dkt. 30-3)).) Specifically, the warrant authorized a search for evidence of the crime of conspiracy to provide material support to a foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339A. (Electronic Devices Warrant at 1.) The warrant application also sought evidence relating to a violation of 18 U.S.C. § 1519, which prohibits obstructing or attempting to obstruct an official proceeding, but that section of the application was crossed out by Magistrate Judge James Orenstein without further explanation. (Id.)

The Electronic Devices Warrant incorporated two attachments: Attachment A, which described the property to be searched, and Attachment B, which described the particular things to be seized. Attachment B included a non-exhaustive list of the types of evidence whose seizure was authorized by the warrant, restricting the target to information "that constitutes fruits, evidence and instrumentalities of the provision of or conspiracy to provide material support for terrorist activity" in violation of 18 U.S.C. § 2339A, and the "destruction of evidence relating to such crimes," in violation of 18 U.S.C. § 1519.[3] (Electronic Devices Warrant, Attach. B.)

---

[3] As noted above, the face of the Electronic Devices Warrant contains a line crossing out the crime of destroying evidence relating to a charge under 18 U.S.C. § 2339A. Thus, it is unclear why that offense (18 U.S.C. § 1519)

Attachment B permitted law enforcement officers to search the Electronic Devices for, among other things, online contacts and communications, email addresses, travel records, Islamic extremist videos and images, weapons training, information relating to the Electronic Devices, and evidence indicating the destruction or attempted destruction of evidence that may be contained on the Electronic Devices. (Id.)

The execution of the Electronic Devices Warrant revealed that the internal hard drives had been removed from four of the five USB thumb drives seized from Pugh, rendering their contents unreadable.[4] (Gov't's Opp'n at 6.) Additionally, the search uncovered an email sent from the email address tairod.pugh@outlook.com, dated December 11, 2014, in which the writer notified the recipient that he had been fired from his job. (Id.) The search of the laptop also uncovered a letter addressed to "My Misha" (Pugh's wife) (id.), which was created on January 3, 2015, and most recently modified on January 5, 2015. The letter states, in pertinent part:

> I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to establish and defend the Islamic State. There is only 2 possible outcomes for me. Victory or Martyr. If Allah gives us Victory we will have a home in Al-sham. I will send for you when it is safe. You will have a nice home around believers. If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land. The land under a whip is worth more than the world and all it contains.
>
> I calculated my worth in Dunya. I would usually sell myself for $1,000 dollars a week, that would be ½ a million dollars for 10

---

appears in Attachment B. Moreover, it is unclear why that is the particular obstruction violation cited and not 18 U.S.C. § 1512, the obstruction offense for which Pugh was ultimately charged in Count Two. Both Pugh (Def.'s Mem. at 5, 18, 22) and the Government (Gov't's Opp'n at 18 n.5, 31 n.11) offer speculation on these matters, but ultimately, neither party articulates a conclusive rationale. Nevertheless, the distinction is of no issue to the resolution of Pugh's various motions, as is explained below, see infra Part II.B.

[4] Additionally, lab reports produced during discovery revealed evidence suggesting that the Electronic Devices had, in fact, been intentionally damaged. (Def.'s Mem. at 7.)

years. If I sell myself to Allah: 1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

(Id.)

The laptop search further revealed over 100 terrorist propaganda videos that had been downloaded between September 22, 2014, and December 18, 2014. (Id.) One video showed members of ISIL capturing and executing prisoners. (Id.) Additionally, the laptop search revealed that on or about October 13, 2014, an individual using the username "Tairod" logged onto Facebook and accessed a video link entitled "video shows Islamic state recruits with US equipment at training in Iraq," and that on October 15, 2014, an individual using the same username once again accessed Facebook and an internet link entitled "the beginning of the end— why the west can never beat ISIS." (Id. at 7.) Finally, the laptop search uncovered a chart of crossing points between Turkey and Syria, which was downloaded on January 5, 2015. (Id.) The chart, dated December 12, 2014, included specific geographic locations, information relating to the presence and level of security on the Turkish side of the border, and information relating to the particular groups in control of the territory on the Syrian side of the border. (Id.) ISIL is listed as one such group in many of the locations listed on the chart. (Id.)

### b. The Backpacks Warrant

As previously noted, law enforcement officers executed Pugh's arrest warrant on January 16, 2015. (Def.'s Mem. at 7.) At the time of Pugh's arrest, law enforcement officers seized one of the backpacks that he had carried with him throughout his attempted entry into Turkey and his subsequent deportation to the United States. (Id.) That backpack was subject to an inventory search, which revealed "clothing, a hydration pouch, loose paper, and a book that [Pugh] referred to as a Qur'an." (Affidavit in Support of Search Warrant Issued January 14, 2014 (Creizman Decl., Ex. F (Dkt. 30-6)) ¶ 26.) The second backpack which was

seized from Pugh's father the following day, January 17, 2015 (Gov't's Opp'n at 7), was not subject to an inventory search (id.), and was placed in FBI custody until a search warrant was obtained for both backpacks on January 21, 2015 (id.; see Search Warrant Issued January 21, 2015 (the "Backpacks Warrant") (Creizman Decl., Ex. E (Dkt. 30-5)).)

The affidavit in support of the Backpacks Warrant contained the facts listed in the Electronic Devices affidavit and a description of the evidence that the Electronic Devices Warrant revealed (Def.'s Mem. at 8), including the draft of Pugh's letter in which he termed himself a "mujahid" and expressed his desire to "establish and defend the Islamic State." (Gov't's Opp'n at 9.) The affidavit noted that Pugh had no opportunity to tamper with the contents of the two backpacks from the time of his detention in Egypt on January 10, 2015, until his arrival in the United States on January 15, 2015, and that Pugh was under continuous law enforcement surveillance during the period between leaving JFK Airport and his arrest. (Id. at 10.) The affidavit stated that a search of the backpacks would possibly yield camping gear, clothing and footwear suitable for the outdoors as well as travel documents, the missing memory chips from one or more of the damaged USB thumb drives, a notebook that a law enforcement officer observed Pugh using on his flight to JFK, and other evidence of a violation of 18 U.S.C. § 2339B, which prohibits the provision of material support or resources to an FTO. (Id.)

On January 21, 2015, Magistrate Judge Lois Bloom issued a warrant to search the two backpacks and the contents thereof. (Def.'s Mem. at 7.) The search revealed the following items: two compasses, a solar power source, a solar powered key-chain flashlight, two pairs of sandals and one pair of walking shoes, plastic fragments consistent with the outside plastic shell of a USB thumb drive, camping clothing, three head scarves, and a notebook. (Gov't's Opp'n at 10.)

8

### c. The Facebook Warrant

During the course of their investigation, law enforcement officers learned that Pugh had a Facebook account and obtained a warrant for its search on February 17, 2015. (Def.'s Mem. at 8; see Search Warrant Issued February 17, 2015 (the "Facebook Warrant") (Creizman Decl., Ex. G (Dkt. 30-7)).) The Government premised probable cause on the facts set out in the Electronic Devices Warrant, the fruits discovered pursuant to that warrant's execution, and numerous public Facebook posts made by Pugh in which he allegedly expressed support for terrorist organizations and their causes. (Gov't's Opp'n at 10.)

The Facebook Warrant, issued by Chief Magistrate Judge Steven Gold, required Facebook to disclose to the Government a substantial amount of information, including the following:

> (i) all identity, profile, and contact information of Pugh's account; (ii) all IP logs relating to each login to the account; (iii) all activity logs for the account showing Pugh's posts and other Facebook activities; (iv) all information about Pugh's "friends" and any posts referencing Pugh or his posts; (v) all privacy and account settings; (vi) all data and information accessed and deleted by Pugh; (vii) all past and present lists of friends created by Pugh's account; (viii) all records of Pugh's Facebook searches; (ix) all information about Pugh's use of Facebook Marketplace; (x) the length of service for Pugh's account, types of service, and means and source of any payments associated with the service of the account; and (xi) all records pertaining to communications between Pugh and other Facebook users, between Pugh and Facebook, and any users concerning Pugh's account.

(Facebook Warrant, Attach. B.)

Moreover, the Facebook Warrant authorized law enforcement officers to seize information relating to a violation of 18 U.S.C. § 2339B, including, "by way of example only":

> (a) communications and photographs concerning the use and procurement of explosive devices and other weapons; (b) communications and photographs concerning the

transportation, safe-housing and activities of terrorist operatives; (c) communications concerning terrorist financing, the location of terrorist groups, and/or methods of traveling to join designated foreign terrorist organizations; and (d) records relating to who created, used, or communicated with [Pugh], including records about their identities and whereabouts.

(Id.)

The ensuing search of Pugh's Facebook account revealed numerous communications regarding terrorist organizations (including ISIL), photographs of jihadists and the ISIL flag, and, among other communications, the following message, written on December 7, 2014, to another Facebook user:

Peculiar situation— Idon't [sic] speak arabic, she don't speak english. I have trying to get her to emigrate to "you know where". [It] is difficult to make a strong argument. Soooo I need a little help from the Muslimahs who can pass on the positive message of dawla and there [sic] videos. To counter the negative publicity in the news. Does that make sense.[5]

(Gov't's Opp'n at 11.) The Facebook user responded, "I wouldn't have a clue, I'm not into that stuff." (Id.)

4.    The Indictment

On March 16, 2015, a grand jury returned a two-count indictment charging Pugh with (1) attempting to provide material support and resources to an FTO, and (2) obstruction and attempted obstruction of an official proceeding. (Indictment.) Count One reads as follows:

On or about and between May 15, 2014 and January 12, 2015, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant TAIROD NATHAN WEBSTER PUGH did knowingly and intentionally attempt to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, including PUGH himself, to a foreign terrorist organization, to wit: the Islamic State of Iraq

---

[5] As the Government explains in its memorandum, "[t]he Arabic name for ISIL is: ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham. 'Dawla' translates to 'the State,' which is commonly used as shorthand for the Islamic State. The term 'Muslimahs' refers to Muslim women." (Gov't's Opp'n at 11 n.2.)

and the Levant. (Title 18, United States Code, Sections 2339B(a)(1), 2339B(d) and 3551 et seq.)

(Indictment ¶ 1) Count Two of the Indictment reads as follows:

> On or about and between January 10, 2015 and January 16, 2015, within the Eastern District of New York and elsewhere, the defendant TAIROD NATHAN WEBSTER PUGH did knowingly, intentionally and corruptly: (a) alter, destroy, mutilate and conceal one or more records, documents and objects, to wit: four USB thumb drives bearing the numbers 20071464R5, NMC850160, AR212W and 484R1, and the files and images contained thereon, and attempt to do so, with the intent to impair such items' integrity and availability for use in an official proceeding, to wit: a proceeding before a federal grand jury in the Eastern District of New York relating to the commission and possible commission of one or more terrorism offenses, including the offense charged in Count One (the "Grand Jury Terrorism Investigation"); and (b) obstruct, influence and impede an official proceeding, to wit: the Grand Jury Terrorism Investigation, and attempt to do so. (Title 18, United States Code, Sections 1512(c)(1), 1512(c)(2) and 3551 et seq.)

(Id. ¶ 2.)

## B. Procedural History

On January 16, 2015, the Government filed a sealed complaint against Pugh. (Compl. (Dkt. 1).) On the same day, Magistrate Judge Locke, issued an arrest warrant. (Arrest Warrant (Dkt. 2).) On March 16, 2015, the grand jury issued a two count indictment charging Pugh with (1) attempting to provide material support for a foreign terrorist organization in violation of 18 U.S.C. § 2339B, and (2) obstruction and attempted obstruction of an official proceeding in violation of 18 U.S.C. § 1512. (Indictment.)

On October 23, 2015, Pugh filed his omnibus pre-trial motion. (Not. of Mot.) The Government opposed. (Gov't's Opp'n.) On November 25, 2015, Pugh filed a supplemental motion seeking additional Brady material. (Suppl. Mot. for Release of Brady Materials.)

## II.    DISCUSSION

### A.    Pre-Trial Dismissal of an Indictment

Federal Rule of Criminal Procedure 7 provides that an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." United States v. Gotti, 457 F. Supp. 2d 411, 420 (S.D.N.Y. 2006) (quoting United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992)). Accordingly, as a general matter, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks and citation omitted).

Federal Rule of Criminal Procedure 12 allows a party to raise "by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "On a motion to dismiss pursuant to Rule 12(b), a court must accept all factual allegations in the indictment as true." Gotti, 457 F. Supp. 2d at 421. "In reviewing the sufficiency of the evidence, the court must view all of the evidence in the light most favorable to the Government and determine if there is any evidence 'upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

### 1.    Motion to Dismiss Count One of the Indictment

Count One of the Indictment charges Pugh with knowingly and intentionally attempting to provide material support in the form of personnel (namely, himself), to ISIL. (Indictment ¶ 1.)

Pugh contends that Count One should be dismissed on the ground that it fails to allege an essential element of that offense. (Def.'s Mem. at 10.) Specifically, Pugh argues that Section 2339B(h) is an essential element of the material support statute and, accordingly, must be pleaded in an indictment. (Id. at 11-12.) The Government counters that Section 2339B(h) is not an essential element, but is instead an affirmative defense, which need not be pleaded in an indictment. (Gov't's Opp'n at 14.) Neither party is correct. Instead, Section 2339B(h) is simply a clarification of the word "personnel" contained in the definition of "material support or resources" defined in Section 2339B(g)(4). As an indictment need not plead definitional provisions, Pugh's motion to dismiss Count One is DENIED.

<em>a.    Affirmative Defense, Element, or Definition?</em>

The determination of whether Section 2339B(h) is an essential element of the material support offense, an affirmative defense, or merely a definition of the term "personnel," has potentially profound implications. First, if Section 2339B(h) creates an essential element—but not if it provides for an affirmative defense or defines a term in the statute—it must be pleaded in the indictment. Second, if § 2339B(h) is either an essential element or defines an element of the crime, it must be proven by the Government beyond a reasonable doubt. Patterson v. New York, 432 U.S. 197, 210 (1977) (due process requires that the prosecution prove all elements of a crime beyond a reasonable doubt). But, on the other hand, if § 2339B(h) sets forth an affirmative defense, the defendant may bear the burden of proof. See, e.g., Dixon v. United States, 548 U.S. 1, 8 (2006) (explaining that at common law, the burden of proving an affirmative defense rested on the defendant, and that statutory language to the contrary is needed to place the burden on the prosecution); 1 Wharton's Criminal Law § 39 (15th ed. 1993) ("In respect of an affirmative defense, the defendant not only has the burden of going forward with evidence

13

raising the defense, but also has the persuasion burden of establishing such defense by a preponderance of the evidence.").

"The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." Liparota v. United States, 471 U.S. 419, 424 (1985) (citing United States v. Hudson, 7 Cranch 32, 34 (1812)). Likewise, "[i]n deciding whether [a statutory provision] is an element of the offense or an affirmative defense, [courts] look[] first to the language and structure of the statute as well as the legislative history." United States v. Roper, No. 03-MJ-361 (CLP), 2003 WL 24017061, at *15 (E.D.N.Y. Nov. 24, 2003) (citing, inter alia, United States v. Durrani, 835 F.2d 410, 420 (2d Cir. 1987)). Accordingly, the question before the court necessarily turns on the performance of statutory interpretation.

The provision of material support to an FTO is prohibited by Section 2339B(a)(1),[6] which provides:

> Unlawful conduct.—Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned . . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339B(a)(1). Section 2339B(g), titled "Definitions", defines the critical terms of the offense. Among other definitions, it provides that "the term 'material support or resources' has

---

[6] 18 U.S.C. § 2339A also criminalizes material support to terrorist organizations, but unlike Section 2339B, "Section 2339A only criminalizes the provision of material support 'knowing and intending that it is to be used in preparation for, or in carrying out' a violation of specific statutes." United States v. Sattar, 314 F. Supp. 2d 279, 301 (S.D.N.Y. 2004) (quoting 18 U.S.C. § 2339A (alteration in original)), aff'd sub nom. United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

the same meaning given that term in section 2339A." <u>Id.</u> § 2339B(g)(4).  Section 2339A, in turn,

defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, <u>personnel (1 or
> more individuals who may be or include oneself)</u>, and
> transportation, except medicine or religious materials . . . .

<u>Id.</u> § 2339A(b)(1) (emphasis added).  Accordingly, the provision of material support or resources

to an FTO in the form of one's person is prohibited under Section 2339B(a)(1).

However, the apparent breadth of the material support statute was qualified in 2004,

when Congress passed the Intelligence Reform and Terrorism Prevention Act ("IRTPA").

IRTPA amended Section 2339B in several ways, including by clarifying the concept of

providing material support in the form of "personnel."  Specifically, to address vagueness and

overbreadth concerns, IRTPA added Section 2339B(h) to the statute.  That section clarifies the

definition of "personnel" as follows:

> Provision of Personnel—No person may be prosecuted under this
> section in connection with the term "personnel" unless that person
> has knowingly provided, attempted to provide, or conspired to
> provide a foreign terrorist organization with 1 or more individuals
> (who may be or include himself) to work under that terrorist
> organization's direction or control or to organize, manage,
> supervise, or otherwise direct the operation of that organization.
> Individuals who act entirely independently of the foreign terrorist
> organization to advance its goals or objectives shall not be
> considered to be working under the foreign terrorist organization's
> direction and control.

<u>Id.</u> § 2339B(h); <u>see generally</u> <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1 (2010).

As always, statutory interpretation begins with the statutory text.  "Our starting point in

statutory interpretation is the statute's plain meaning, if it has one."  <u>United States v. Dauray</u>, 215

F.3d 257, 260 (2d Cir. 2000). "But oftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" King v. Burwell, 135 S. Ct. 2480, 2489 (2015) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000)). Accordingly, "when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" Id. (quoting Brown & Williamson, 529 U.S. at 133).

The fairest reading of Section 2339B(h) suggests that its limitations on the meaning of "personnel" are definitional—not, as Pugh argues, an essential element, nor, as the Government argues, an affirmative defense. In making this determination, the court recognizes that plausible alternative readings of the statute are defensible.

Turning to the text of Section 2339B(h), three statutory features indicate that subsection (h) sets forth a clarification of the definition of "personnel" found in Section 2339A.

First, subsection (h) begins: "No person may be prosecuted under this section in connection with the term 'personnel'[.]" The use of the phrase "the term 'personnel,'" with personnel in quotation marks, indicates that subsection (h) was intended to piggy-back on the statutory term "personnel" as used in the defined term "material support or resources." Subsection (h) then goes on to limit the scope of that definition. It appears, therefore, that Section 2339B(h) was intended by Congress to be definitional.

Second, the structure of subsection (h) suggests that it was not intended to be an affirmative defense or an element of the statute, but rather was intended to be definitional. Subsection (h) provides that, in the context of a prosecution for a defendant's material support in the form of "personnel" (only one type of material support criminalized by the statute), no individual may be convicted under Section 2339B unless "that person has knowingly provided,

16

attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization." That language materially tracks the substantive offense outlined in Section 2339B(a)(1), which begins "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so" shall have committed the offense. Of course, "material support or resources" is a defined term that includes the provision of "personnel." The only material difference, then, between Section 2339B(h) and Section 2339B(a), in the context of "personnel," is that Section 2339B(h) pulls back on the breadth of the term "personnel." Put another way, subsection (h) is doing nothing more than limiting the breadth of Section 2339B(a)(1) with regard to "personnel" offenses.

Third, Section 2339B(h) would not function like a typical affirmative defense. As discussed above, Section 2339B(h) does not add any additional factual considerations that would tend to negate a crime (i.e., the affirmative defense of insanity adds facts, namely facts showing insanity, that negate the criminal element of mens rea). Rather, it simply circumscribes the breadth of a term defined in the substantive offense. Accordingly, Section 2339B(h) overlaps with an element of the crime—specifically, the element of material support or resources. Affirmative defenses generally do not overlap with substantive elements of the offense. See, e.g., Martin v. Ohio, 480 U.S. 228, 233 (1987) (finding that insanity could be made an affirmative defense to murder because it did not shift the burden of proof to the defendant to disprove any elements of the offense); Patterson v. New York, 432 U.S. 197, 206-07 (1977) (noting that legislatures can create an affirmative defense unless doing so requires the defendant

17

to negative an element of the crime).[7] Because Congress is presumed to have legislated against the backdrop of judicial understanding of affirmative defenses, see Midlantic Nat. Bank v. N.J. Dep't of Env't Prot., 474 U.S. 494, 501 (1986), the court concludes that Section 2339B(h)'s departure from normal principles of affirmative defenses indicates that it is, in fact, not an affirmative defense.

The court recognizes that it is not fatal to the affirmative-defense-theory that the evidence tending to prove both the offense and the defense might overlap. See Martin v. Ohio, 480 U.S. 228, 234 (1987) (self-defense can be an affirmative defense even though in some cases evidence of self-defense will negate the mens rea element and vice versa). Nonetheless, as explained above, as a general matter, affirmative defenses call for proof outside the elements of the substantive offense. Because Congress is assumed to legislate against the backdrop of this general common law rule, absent clear intent to the contrary, traditional understandings of affirmative defenses indicate that Section 2339B(h) is not an affirmative defense.

The court's conclusion regarding the definitional nature of Section 2339B(h) is bolstered, if not compelled, by appellate and other district courts' interpretation of Section 2339B(h) as defining personnel. For example, in Holder v. Humanitarian Law Project, the Supreme Court described Section 2339B(h) as definitional; it noted that "Congress also took care to add narrowing definitions to the material-support statute over time. These definitions increased the

---

[7] See also Claire Oakes Finkelstein, When the Rule Swallows the Exception, 19 Quinnipiac L. Rev. 505, 527 (2000) ("In the case of self-defense and assault, it seems natural to treat the defense provision as an affirmative defense. To put the matter intuitively, this is because we think the prosecution's prima facie case should consist of having to show that the defendant intentionally attacked the victim."); Richard A. Bierschbach & Alex Stein, Mediating Rules in Criminal Law, 93 Va. L. Rev. 1197, 1243 (2007) (noting that affirmative defenses place the burden of proof on the defendant, but stating that "[c]onstitutional criminal procedure requires only that jurisdictions not remove from the prosecution the burden to prove all elements of a crime beyond a reasonable doubt"); Jonathan Levy, Note, A Principled Approach to the Standard of Proof for Affirmative Defenses in Criminal Trials, 40 Am. J. Crim. L. 281, 281-82 (2013) ("An affirmative defense is distinct from other defenses in part because it typically assumes the truth of other elements of the crime. Thus, instead of 'I didn't shoot him,' it is 'I shot him but in self-defense' or 'I shot him but I was insane at the time.'").

clarity of the statute's terms. See . . .18 U.S.C. § 2339B(h) (clarifying the scope of 'personnel')." 561 U.S. 1, 21 (2006) (emphases added); see also id. at 23 ("As for 'personnel,' Congress enacted a limiting definition in IRTPA that answers plaintiffs' vagueness concerns. Providing material support that constitutes 'personnel' is defined as knowingly providing a person 'to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.'" (emphases added) (quoting 18 U.S.C. § 2339B(h))).

Likewise, in United States v. Stewart, 590 F.3d 93 (2d Cir. 2009), the Second Circuit described Section 2339B(h) as defining the term "personnel." It stated:

> In December 2004, the term personnel was changed to personnel (1 or more individuals who may be or include oneself). By the same act, the term was defined in more detail for purposes of section 2339B:
>
> [full text of § 2339B(h) omitted].
>
> This amended definition applies to section 2339B but not to section 2339A.[8]

Id. at 118 n.21 (emphases added) (internal quotation marks and citations omitted).

Two years later, the Second Circuit took the same approach in United States v. Farhane, 634 F.3d 127 (2d Cir. 2011). There, the court described Section 2339B(h) as "clarifying that what is proscribed is the provision of personnel 'to work under' the 'direction or control' of a terrorist organization." Id. at 150. Judge Dearie, sitting by designation, dissented. Nonetheless, he too understood that Section 2339B(h) was definitional, noting that:

> [Section 2339B(h)], . . . prohibits a person from providing (or attempting to provide) "himself" as personnel to a terrorist

---

[8] The court notes that the issue in Stewart, whether the limitation contained in Section 2339B(h) applies in a 2339A prosecution, is not relevant here, because Pugh has only been charged under Section 2339B. Nevertheless, the fact that the Second Circuit described 2339B(h) is directly relevant here.

organization, and adds the requirement that personnel must work under the organization's "direction or control." "Statutory definitions control the meaning of statutory words, of course, in the usual case." . . . The language in § 2339B(h), moreover, is not a traditional definition, which appear in § 2339B(g) (defining "classified information," "financial institution," "training," "expert advice and assistance" and other terms).

Id. at 181 n.7 (emphases added) (internal citations omitted).

In conformity with these decisions viewing Section 2339B(h) as definitional, other courts have also described subsection (h) as modifying the definition of "personnel." See, e.g., United States v. Augustin, 661 F.3d 1105, 1121 (11th Cir. 2011) ("[W]e first observe that it is not clear that the definition of personnel provided under § 2339B applies equally to § 2339A. Indeed, the terms of § 2339B(h)—insofar as they refer to 'foreign terrorist organization[s]'—do not fit neatly with § 2339A . . . ." (emphasis added)); Estate of Parsons v. Palestinian Auth., 952 F. Supp. 2d 61, 68 (D.D.C. 2013) ("Furthermore, as the Abu–Jihaad court also noted, Congress provided a more detailed definition of 'personnel' in Section 2339B following the 2004 Amendment, whereas the definition in Section 2339A was merely changed to specify that 'personnel' could include '1 or more individuals who may be or include oneself.'" (emphasis added) (internal citation omitted)); United States v. Kashmiri, No. 09-CR-830-8, 2012 WL 3779107, at *4 (N.D. Ill. Aug. 30, 2012) ("18 U.S.C. § 2339B refines the definition of 'personnel.' There is uncertainty among the Circuits as to whether this limitation applies to § 2339A." (emphasis added)); United States v. Abu-Jihaad, 600 F. Supp. 2d 362, 397 (D. Conn. 2009) ("IRTPA added a definition of 'personnel' to § 2339B." (emphasis added)), aff'd 630 F.3d 102 (2d Cir. 2010); United States v. Afshari, 635 F. Supp. 2d 1110, 1120 (C.D. Cal. 2009) ("[T]he plain text of IRTPA goes further in defining 'personnel' as providing '1 or more individuals to work under that terrorist organization's direction or control' in all

circumstances, not just advocacy." (alteration in original) (emphasis added) (internal citation omitted)); United States v. Warsame, 537 F. Supp. 2d 1005, 1018 n.9 (D. Minn. 2008) ("Moreover, the Court notes that Congress subsequently amended § 2339B in 2004 to clarify the term 'personnel.'"); United States v. Abdi, 498 F. Supp. 2d 1048, 1063 (S.D. Ohio 2007) ("Congress, as part of IRTPA promulgated in 2004, clarified the term 'personnel' as it is employed in § 2339B by adding a new subsection (h) defining the term, as it is used in the definition of 'material support.'" (emphases added)); United States v. Shah, 474 F. Supp. 2d 492, 495 (S.D.N.Y. 2007) ("the IRTPA defined 'personnel,' which was previously undefined, to mean the provision of '[one] or more individuals (who may be or include himself) to work under [a foreign] terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.'" (emphasis added)), aff'd sub nom. United States v. Farhane, 634 F.3d 127 (2d Cir. 2011).[9]

Thus, based on the text of Section 2339B(h), the context of Section 2339B as a whole, and the prior descriptions of the subsection by other courts, the court concludes that Section 2339B(h) further defines "personnel" and is not an affirmative defense or an essential element of the offense of providing material support to an FTO.[10]

---

[9] By contrast, the court has only found one case holding that Section 2339B(h) provides an affirmative defense as the Government argues. See United States v. Ahmed, Memorandum of Law and Order, No. 15-CR-49 (MJD) (FLN) (D. Minn. Sept. 1, 2015), Dkt. No. 239. The court has found no cases holding that Section 2339B(h) states an essential element, as Pugh argues.

[10] The court recognizes that there is an argument—perhaps even a strong argument—that Section 2339B(h) creates an affirmative defense. Indeed, the court recognizes that Congress chose not to place Section 2339B(h) in the section titled "Definitions." However, that structural fact ultimately does not persuade the court. Even if Section 2339B(h) created an affirmative defense, neither the Government nor Defendant have briefed whether the burden of proof for the defense would fall on the Government or Defendant. See United States v. Kloess, 251 F.3d 941, 947-48 (11th Cir. 2001) (finding that 18 U.S.C. § 1512(c)—which excepts bona fide legal representation from the obstruction of justice statute—creates an affirmative defense, but nonetheless finding that the prosecution bears the burden of proof on the affirmative defense). If the burden of proof does, in fact, fall upon the Government, there appears to be little distinction between finding that Section 2339B(h) creates an affirmative defense or that it defines "personnel."

b.    *Application*

Having found that Section 2339B(h) modifies the definition of "personnel" within the definition of "material support or resources," the court must still determine whether the Indictment sufficiently alleged a crime.

Count One of the Indictment reads as follows:

> On or about and between May 15, 2014 and January 12, 2015, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant TAIROD NATHAN WEBSTER PUGH did knowingly and intentionally attempt to provide material support and resources, as defined in 18 U.S.C. § 2339A(b), including personnel, including PUGH himself, to a foreign terrorist organization, to wit: the Islamic State of Iraq and the Levant.    (Title 18, United States Code, Sections 2339B(a)(1), 2339B(d) and 3551 et seq.)

(Indictment ¶ 1.)

Courts have "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 165 (E.D.N.Y. 2008) (quoting United States v. Pirro, 212 F. 3d 86, 92 (2d Cir. 2000)).

The substantive offense of a material support to an FTO claim is set out in Section 2339B(a)(1), which provides in relevant part that, "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall [have committed the offense] . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . ." Accordingly, the elements of a Section 2339B offense are:

> First, that the defendant "provide[d] material support or resources to a foreign terrorist organization . . . or attempt[ed] or conspire[d] to do so";

> Second, that the foreign terrorist organization was a designated FTO;
>
> Third, that the defendant acted "knowingly," that is (1) the defendant acted "knowingly and intentionally" and (2) the defendant had "knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)"; and
>
> Fourth, the offense occurred in the extraterritorial jurisdiction of the United States.

United States v. Ahmed, 94 F. Supp. 3d 394, 423 (E.D.N.Y. 2015) (alterations and emphasis in orginal). Pugh argues that an additional essential element of the offense is that the "'personnel' supplied work under the direction of or direct the activities of the foreign terrorist organization." (Def.'s Mem. at 13.) The court disagrees for three reasons.

First, the actus reus element of a Section 2339B offense requires the government to prove that the defendant provided "material support or resources" to an FTO. The presumption is therefore that an indictment need only charge the defendant with providing "material support or resources"—that is, the indictment must track the statute. Pirro, 212 F.3d at 92. True, there are exceptional cases, where, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." Id. at 93.

Indeed, Pugh may be correct that Section 2339B is such a statute that requires more, but in any event, it does not require the Government to plead the additional element that Pugh posits. In United States v. Awan, 459 F. Supp. 2d 167, 175 (E.D.N.Y. 2006), aff'd 384 F. App'x 9

23

(2d Cir. 2010) (summary order), Judge Sifton rejected an indictment alleging violations of Section 2339A because it only used "the generic expression 'material support,' as defined in 18 U.S.C. § 2339A(b), without specifying which of a variety of activities, any one of which would be criminal, that the defendant must defend against or which the grand jury considered." Specifically, Judge Sifton worried that, as between money and personnel, the two material support theories the government was pursuing, "there [was] no way of knowing whether the grand jury considered both categories (or, for that matter, either) of those activities under the general heading of material support." Id.

However, all <u>Awan</u> holds is that an indictment under Section 2339A (and likely 2339B too, because they share a definition of "material support or resources") must specify the material support theory it pursues. That is, if the prosecution intends to show that the defendant provided personnel to a terrorist organization, it must say so. The <u>Awan</u> case illustrates this point. There, the prosecution filed a superseding indictment that provided more detail regarding the distinct categories of support allegedly provided, including "currency, monetary instruments, financial services and personnel." Superseding Indictment ¶ 14, <u>United States v. Awan</u>, No. 06-CR-154 (E.D.N.Y Oct. 25, 2006), Dkt. No. 86. The defendants again moved to dismiss the indictment. Mot. to Dismiss, <u>United States v. Awan</u>, No. 06-CR-154 (E.D.N.Y Nov. 9, 2006), Dkt. No. 100. However, the court found that the superseding indictment sufficiently alleged a crime. Min. Entry, <u>United States v. Awan</u>, No. 06-CR-154 (E.D.N.Y Nov. 16, 2006), Dkt. No. 106.

Pushing beyond <u>Awan</u>, Pugh argues that more is required here. The court disagrees; indeed, courts have routinely accepted indictments that, with regard to the "material support or resources" element only allege that the defendant provided personnel to an FTO. <u>See, e.g.</u>, <u>United States v. Naseer</u>, 38 F. Supp. 3d 269, 273 (E.D.N.Y. 2014) ("[T]he indictment is

24

sufficient: it tracks the statutory language, identifies the terrorist organization in question (al-Qaeda) and other members of the conspiracy, and explains that the proscribed conduct occurred between September 2008 and January 2010 in this District and elsewhere, including the extraterritorial jurisdiction of the United States." (internal quotation marks omitted)); Taleb-Jedi, 566 F. Supp. 2d at 165 (finding indictment charging defendant with "knowingly providing material support and resources, including personnel, to [a named FTO] and [which] provides the approximate time span and locations of the offense" met "the standard for specificity and provid[ed] defendant with adequate notice of the charges"); Ahmed, 94 F. Supp. 3d at 424-25 (finding sufficient an indictment that "track[ed] the language of the relevant statutes, identifie[d] the terrorist organization in question . . . and state[d], in approximate terms, the time in which the offenses charged are alleged to have occurred, and the place . . . of the alleged crimes"); United States v. Hashmi, No. 06-CR-442 (LAP), 2009 WL 4042841, at *3-4 (S.D.N.Y. Nov. 18, 2009) (finding that an indictment that enumerated specific types of resources that the defendant allegedly provided, "provide[d] ample notice as to what acts are at issue," and allowed the defendant to "prepare a defense based on the information provided"); cf. United States v. Warsame, 537 F. Supp. 2d 1005, 1011 (D. Minn. 2008) (finding that a bill of particulars that identified that the material support alleged was personnel, currency, and training, was sufficient). Accordingly, the court finds that an indictment need not say more, with regard to the provision of material support, than that the defendant provided an FTO with material support in the form of personnel.

That courts do not require an indictment to plead beyond the term "personnel" is unsurprising. In fact, it follows the longstanding rule that an indictment need not plead statutory definitions. As discussed above, Section 2339B(h) does not set forth an element of the offense;

25

instead, it further defines the term "personnel." The failure to reference or expressly cite the text of a definitional provision of an offense in an indictment count does not render that count insufficient or warrant its dismissal. See United States v. Wells, 826 F. Supp. 2d 441, 443-44 (N.D.N.Y. 2011) ("[A] legal term of art that is further defined in the statute provides sufficient notice to the defendant of the charge against him, and the various component parts of the legal definition need not be alleged in the indictment" (citing Hamling v. United States, 418 U.S. 87, 118-19 (1974))); see also United States v. Resendiz-Ponce, 549 U.S. 102, 107-08 (2007) (holding that because the word "attempt" has a definite legal meaning that requires an overt act and intent, an indictment under the illegal reentry statute need only state that the defendant attempted to reenter; it need not plead the component parts of overt act and intent). This is because "it generally suffices for 'an indictment [to] set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly . . . set forth all the elements necessary to constitute the offence intended to be punished.'" United States v. Jackson, 513 F. App'x 51, 54 (2d Cir. 2013) (summary order) (quoting Hamling, 418 U.S. at 117). Therefore, the Indictment did not need to expand upon the meaning of the statutorily defined term "personnel."

Accordingly, and for the reasons stated above, Pugh's motion to dismiss Count One is DENIED.

### 2. Motion to Dismiss Count Two of the Indictment

Pugh next moves to dismiss Count Two of the Indictment, which reads as follows:

> On or about and between January 10, 2015 and January 16, 2015, within the Eastern District of New York and elsewhere, the defendant TAIROD NATHAN WEBSTER PUGH did knowingly, intentionally and corruptly: (a) alter, destroy, mutilate and conceal one or more records, documents and objects, to wit: four USB thumb drives bearing the numbers 20071464R5, NMC850160,

26

AR212W and 484R1, and the files and images contained thereon, and attempt to do so, with the intent to impair such items' integrity and availability for use in an official proceeding, to wit: a proceeding before a federal grand jury in the Eastern District of New York relating to the commission and possible commission of one or more terrorism offenses, including the offense charged in Count One (the "Grand Jury Terrorism Investigation"); and (b) obstruct, influence and impede an official proceeding, to wit: the Grand Jury Terrorism Investigation, and attempt to do so. (Title 18, United States Code, Sections 1512(c)(1), 1512(c)(2) and 3551 et seq.)

(Indictment ¶ 2).

Pugh puts forth two separate bases in support of his motion to dismiss Count Two: first, insufficiency of the evidence, and second, duplicity. For the reasons discussed below, these arguments are both without merit, and as such, Pugh's motion to dismiss Count Two is DENIED.

a.    *Insufficiency of the Evidence*

Pugh challenges as insufficient the evidence supporting Count Two of the Indictment, which alleges a violation of 18 U.S.C. § 1512(c)(1) and (2).[11] (Def.'s Mem. at 16.) Specifically, Pugh argues that "at the time he allegedly destroyed the thumb drives, Pugh was unaware of any U.S. investigation or proceeding." (Id. at 17.) The court disagrees; a reasonable jury, viewing the allegations made thus far in a light favorable to the Government and drawing reasonable inferences therefrom, could convict on the Section 1512 charge.

---

[11] As a preliminary matter, this portion of Pugh's motion is premature, and accordingly, it could be denied for that reason alone. In general, "[a] defendant may not contest the sufficiency of the government's proof in a pre-trial motion '[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial.'" United States v. Urso, 369 F. Supp. 2d 254, 259 (E.D.N.Y. 2005) (quoting United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998)). While Pugh contends that "the allegations of the Complaint and the search warrant affidavits proffer all the evidence relevant to the obstruction of justice charge in Count Two," (Def.'s Mem. at 16), the Government responds that it has not, in fact, made a full proffer (Gov't's Opp'n at 20). While in subsequent briefing Pugh contests this assertion, he offers no basis to substantiate his claim that a full proffer has been made. (Reply Br. in Supp. of Omnibus Pre-Trial Mot. (Dkt. 47) at 7.) See also United States v. Alfonso, 143 F.3d 772 (2d Cir. 1998) (noting that a full proffer occurred where the prosecution filed an affidavit listing all of its evidence). Therefore, the portion of Pugh's motion seeking dismissal of Count Two for insufficiency of evidence is premature, and is denied on that ground. Nonetheless, even on the merits, Pugh's argument fails.

Section 1512(c)(1) punishes anyone who "corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," and Section 1512(c)(2) punishes anyone who "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." For the purposes of Section 1512, an "official proceeding" includes "a proceeding before a judge or court of the United States . . . or a Federal grand jury." United States v. Ortiz, 367 F. Supp. 2d 536, 541 (S.D.N.Y. 2005) (quoting 18 U.S.C. § 1515(a)(1)(A)).

It is well-established that Section 1512(c)(2) has a "nexus" requirement, that is "the defendant's conduct must 'have a relationship in time, causation, or logic with the judicial proceedings'; in other words, 'the endeavor must have the natural and probable effect of interfering with the due administration of justice.'" United States v. Reich, 479 F.3d 179, 185 (2d Cir. 2007) (Sotomayor, J.) (quoting United States v. Aguilar, 515 U.S. 593, 599 (1995)); see also United States v. Desposito, 704 F.3d 221 (2d Cir. 2013) ("[W]e have previously incorporated Aguilar's 'nexus requirement' into § 1512(c)(2)."). Courts in this circuit routinely apply the nexus requirement to Section 1512(c)(1) as well. See, e.g., United States v. Ortiz, 220 F. App'x 13, 16-17 (2d Cir. 2007) (summary order); United States v. Jahedi, 681 F. Supp. 2d 430, 434-35 & n.29 (S.D.N.Y. 2009).

In order to establish a nexus, there must be a relationship between the defendant's actions and the official proceeding. In other words, an offender "must believe that his actions are likely to affect a particular, existing or foreseeable proceeding." United States v. Persico, 645 F.3d 85, 107 (2d Cir. 2011) (quoting United States v. Kaplan, 490 F.3d 110, 125 (2d Cir. 2007)). However, the proceeding "need not be pending or about to be instituted at the time of the

offense." Id. (citing 18 U.S.C. § 1512(f)(1)). "Rather, [courts] have found the nexus requirement satisfied where a grand jury proceeding was 'foreseeable' because the defendant was aware 'that he was the target of an investigation.'" United States v. Binday, 804 F.3d 558, 590-91 (2d Cir. 2015) (quoting Persico, 645 F.3d at 108)).

Pugh contends that Count Two of the Indictment is insufficient because it fails adequately to plead the nexus necessary to bring him within the purview of the statute. (See Def.'s Mem. at 16.) Specifically, Pugh argues that the Complaint accused him of destroying the flash drives in the period between his denial of entry into Turkey at the Atatürk Airport and his detention in Egypt. (Id. at 17.) He then contends that it was only after his detention by the Egyptian authorities that he "was advised of the possibility that he could be deported to the United States." (Id.) This fact, he concludes, coupled with the Government's admitted efforts to obfuscate their investigation into Pugh's activities prior to his arrest, "demonstrate that Pugh could not possibly have had the requisite mens rea to violate either of the statutes identified in [Count Two]." (Id. at 16).

However, other statements uttered by Pugh belie the notion that the grand jury proceedings were entirely unforeseeable to him upon his denial of entry into Turkey. For example, in a conversation Pugh had with an undercover government agent following his return to the United States, Pugh allegedly "stated that he had been kicked out of Turkey because the Turkish authorities thought [he] was affiliated with ISIL." (Compl. ¶ 29.) He added that he regretted not shaving his beard and changing into pants before trying to enter Turkey in order to avoid drawing suspicion. (Id.) Thus, Pugh likely knew that he had been turned away from Turkey due to suspicions about his affiliation with ISIL, an organization whose adherents were already subject to U.S. prosecution, and about whom he allegedly possessed significant

29

inculpatory electronic information. The fact that Pugh was not expressly informed about his imminent detention by American officials and the court proceedings that would follow does not render such events unforeseeable. See Binday, 804 F.3d at 590-91 ("That every inquiry from the FBI might not render a grand jury investigation reasonably foreseeable is of no avail to [defendant], as there was sufficient evidence of foreseeability in this case. [Defendant] knew that the subject of the FBI's inquiries was in fact a large insurance fraud scheme in which he participated and about which he possessed incriminating documents. That a grand jury had not been commenced or specifically discussed with [defendant] at the time of the destruction does not render a grand jury proceeding unforeseeable."). Accordingly, Pugh's alleged destruction of the thumb drives following his denial of entry into Turkey, and his conceded beliefs as to the reason for that denial, provides, at least at this stage, a sufficient basis for the conclusion that his conduct had "the natural and probable effect of interfering with a judicial or grand jury proceeding." Id. at 591 (quoting United States v. Quattrone, 441 F.3d 153, 171 (2d Cir. 2006)); see also United States v. Misla-Aldarondo, 478 F.3d 52, 70 (1st Cir. 2007) (finding that defendant charged with obstruction could foresee judicial proceedings based on his belief that he was the target of an ongoing investigation); United States v. Frankhauser, 80 F.3d 641, 652 (1st Cir. 1996) (finding that pending judicial proceedings were sufficiently foreseeable to criminal defendant who learned through subterfuge of an ongoing investigation into his associate, with whom he had collaborated on numerous crimes). Ultimately, Pugh may succeed at trial in convincing the jury that he did not possess the required state of mind to merit a conviction on Count Two; however, viewing the allegations made thus far in favor of the Government, a reasonable jury could convict.

30

The case Pugh cites is inapposite. In his reply, Pugh relies on United States v. Aguilar, 515 U.S. 593 (1995). (Reply Br. in Supp. of Omnibus Pre-Trial Mot. ("Def.'s Reply") (Dkt. 47) at 7.) Aguilar came to the Supreme Court on a direct appeal of a jury verdict. Aguilar, 515 U.S. at 595. Accordingly, on a full evidentiary record, the Court was asked to determine whether the Government had sufficiently shown a nexus between Aguilar's false statements and a judicial proceeding. Indeed, the Court closely parsed the trial transcript, id. at 600 (quoting the trial transcript), and concluded that the Government had not met its burden, id. at 601 ("We think the transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury."). "The problem with [Pugh's] argument at this stage is that it conflates pleading with proof." United States v. Ring, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (internal quotation marks and citation omitted) (distinguishing Aguilar because it was not a sufficiency of the indictment case); see also United States v. Triumph Capital Grp., Inc. 260 F. Supp. 2d 470 (D. Conn. 2003) (distinguishing Aguilar on the grounds that it was not a pre-trial motion). Here, unlike in Aguilar, but like in Ring, the court does not have the benefit of a full record. As explained above, on a pre-trial motion to dismiss an indictment, the court must assume the prosecution's allegations will be proven at trial and draw all reasonable inferences from those allegations. The court then asks whether any jury could convict. Drawing all reasonable inferences from the Government's allegations, it appears that Pugh may have known that he was likely to be under a grand jury investigation when he allegedly destroyed the flash drives. As such, Pugh's motion to dismiss Count Two for insufficient evidence is DENIED.

### b.    *Duplicity*

Pugh next contends that "Count Two should be dismissed on the separate and independent ground that it is duplicitous." (Def.'s Mem. at 18.) "An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). "In deciding whether an indictment includes a duplicitous count, the criminal statute alleged to have been violated must be examined." United States v. Ahmed, 94 F. Supp. 3d 394, 432 (E.D.N.Y. 2015). "[The Federal Rules of Criminal Procedure] permit[] allegation in a single count that an offense has been committed in a multiplicity of ways; such a count is not duplicitous." United States v. Droms, 566 F.2d 361, 363 (2d Cir. 1977); see also United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980) ("On the other hand, the allegation in a single count of the commission of a crime by several means should be distinguished from the allegation of several offenses in the same count. Although drawing the line between these two concepts may be difficult in practice, in theory the latter type of allegation is duplicitous, while the former is not."). Accordingly,

> The court's determination turns on whether the statute creates
> several distinct offenses or merely describes different means by
> which a single crime may be committed. If the statute at issue
> creates separate offenses, a count charging multiple offenses will
> be considered duplicitous. However, the Second Circuit has held
> that where there are several ways to violate a criminal statute, a
> charge alleging two distinct ways to violate a statute, is not only
> permissible but required.

Ahmed, 94 F. Supp. 3d at 431. See also United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) ("[w]here there are several ways to violate a criminal statute . . . federal pleading requires . . . that an indictment charge [be] in the conjunctive to inform the accused fully of the

32

charges. A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged." (alterations in original) (quoting United States v. McDonough, 56 F.3d 381, 390 (2d Cir. 1995)); United States v. Berardi, 675 F.2d 894, 897 (7th Cir. 1982) ("A count is not duplicitous, however, if it simply charges the commission of a single offense by different means."); United States v. Hatfield, No. 06-CR-0550 (JS), 2009 WL 2182593, at *3 (E.D.N.Y. July 22, 2009) ("Where . . . the statute defining the offense defines disjunctively, i.e., through the use of the conjunctive 'or,' the means by which the statute may be violated, it is permissible to allege the offense in the indictment conjunctively, i.e., through the use of the conjunctive 'and.'" (alteration in original) (quoting United States v. Parker, 165 F. Supp. 2d 431, 448 (W.D.N.Y. 2001)). Accordingly, in United States v. Crisci, 273 F.3d 235, 239 (2d Cir. 2001), the Second Circuit cautioned courts to note the distinction "between improperly charging separate offenses in one count and properly charging separate means of committing a single crime in a single count."

Section 1512(c) provides in full:

> Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

Three textual features reveal that Section 1512(c) sets out two different ways by which an individual may criminally obstruct an official proceeding, not two offenses.[12] Accordingly, charging both Section 1512(c)(1) and Section 1512(c)(2) in the same count is not duplicitous.

First, the statute is written with the disjunctive "or," which indicates that it merely provides two ways of committing a single crime. See Crisci, 273 F.3d at 239 ("Because the two subsections of Section 1344 are written in the disjunctive, these circuits have interpreted Section 1344 as defining different ways in which a defendant may commit the offense of bank fraud."); United States v. Stewart, 433 F.3d 273, 319 (2d Cir. 2006) (finding no duplicity problem because "[t]he several different types of fraudulent conduct proscribed by section 1001 are not separate offenses, . . . rather they describe different means by which the statute is violated."); United States v. Sugar, 606 F. Supp. 1134, 1145 (S.D.N.Y. 1985) ("Although the statute, 21 U.S.C. § 841(a)(1), reads in the disjunctive, i.e., it is violated by either possession with intent to distribute or distribution, the indictment reads in the conjunctive. This is the standard form used to set out the means by which the single offense may be committed." (internal citation and quotation marks omitted)); see also United States v. LeFebvre, 189 F. App'x 767, 772 (10th Cir. 2006) (unpublished) (no duplicity concerns where statute sets out multiple means to commit an offense in the disjunction and in a single count the indictment charges each theory in the conjunctive). "In fact, it is 'regular practice for prosecutors to charge conjunctively, in one count, the various means of committing a statutory offense, in order to

---

[12] Such a finding also precludes application of Blockburger, 284 U.S. 299 (1932), which Pugh contends controls. (See Def.'s Reply at 11.) "The Blockburger test is a tool for determining whether Congress intended to separately punish violations of distinct statutory provisions, and is therefore inapplicable where a single statutory provision was violated. In other words, distinct statutory provisions are a condition precedent to applying the Blockburger test." United States v. Rigas, 605 F.3d 194, 204 (3d Cir. 2010); see also United States v. McCourty, 562 F.3d 458, 474 (2d Cir. 2009) ("We note that it is immaterial that Count Three charged [defendant] with both possession of an unspecified amount of cocaine, in violation of 21 U.S.C. § 841(b)(1)(C), and possession of 5 grams or more of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(B)(iii). While the offenses arise under separate statutory provisions and the latter requires proof of an element not required by the former, the two are nevertheless considered a single offense for purposes of double jeopardy and duplicity." (internal citations omitted)).

avoid the pitfalls of duplicitous pleading[s].'" Hatfield, 2009 WL 2182593, at *3 (quoting

Griffin v. United States, 502 U.S. 46, 51 (1991)).

Second, the language of subsection (2), which begins with the word "otherwise,"

indicates that it is enumerating a means of the same type of obstruction defined in subsection (1).

See United States v. Singleton, No. 06-CR-080, 2006 WL 1984467, at *3 (S.D. Tex.

July 14, 2006) ("Section 1512(c)(2) is the 'catch all' that follows the prohibition in § 1512(c)(1)

that a person may not 'corruptly' alter, destroy, or conceal records, documents or tangible objects

with the intent to impair the object's integrity or its availability for use in an official

proceeding."); United States v. Hutcherson, No. 05-CR-0039, 2006 WL 270019, at *2 (W.D. Va.

Feb. 3, 2006) ("Section 1512(c)(1) lists specific conduct that is prohibited under this subsection;

while § 1512(c)(2) is intended to account for unenumerated conduct that violates the

subsection."). This structure suggests that Section 1512(c) articulates a single offense. That is,

Section 1512(c)(1) is intended to enumerate conduct that violates the statue, Section 1512(c)(2)

does not state a separate offense, but instead, is meant to criminalize difficult to enumerate

conduct that would otherwise slip past Section 1512(c)(1)'s specific proscription.

Third, the statute's mens rea element—"corruptly"—is not reproduced in subsection (1)

or (2), but rather precedes both subsections. This structure mimics the bank fraud statute, which

the Second Circuit held in Crisci sets out multiple ways to commit the offense of bank fraud.

That statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or
> artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or
> other property owned by, or under the custody or control of, a

> financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. Section 1512(c) and Section 1344 thereby each set out the mens rea element above two alternative actus reus theories. Accordingly, this structure suggests that subsections (1) and (2) of Section 1512(c) outlining two separate ways that a person can corruptly violate the statute.

This interpretation conforms with that given to other provisions of Section 1512. Indeed, indictments brought under other subsections of Section 1512—which likewise enumerate multiple means of violating the statute—have not presented duplicity concerns when the particular indictment simply tracks the statutory language conjunctively in one count. See, e.g., United States v. Espy, 989 F. Supp. 17, 31-32 (D.D.C. 1997), rev'd in part on other grounds 145 F.3d 1369 (D.C. Cir. 1998). Likewise, this interpretation mirrors that given to other obstruction of justice statutes. For example, Sections 1503 and 1510 have been read to list multiple means by which a defendant can influence or injure a court officer or juror. See United States v. Abrams, 543 F. Supp. 1184, 1189-90 (S.D.N.Y. 1982), rev'd in part on other grounds sub nom. United States v. Siegel, 717 F.2d 9 (2d Cir. 1982); cf. United State v. Coiro, 922 F.2d 1008, 1014-15 (2d Cir. 1991) (charging the same scheme to obstruct as two counts under Section 1510 (obstruction of criminal investigations) is multiplicitous).

Thus, it was neither inappropriate nor duplicitous to allege both subsections of Section 1512(c) in Count Two of the Indictment.[13] Moreover, even if Count Two were

---

[13] The court further notes that other indictments have charged violations of Section 1512 as if it were one offense. For example, in United States v. Potts, the indictment did not specify which subsection of Section 1512(c) was being charged. United States v. Potts, No. 07-CR-85 (PAM) (SRN), 2007 WL 2219392, at *8 (D. Minn. July 30, 2007)

duplicitous, dismissal of the charge would not be the proper remedy. "Duplicitous pleading . . .

is not presumptively invalid." United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006). "The

vice of a duplicitous charge is that it risks to impair 'a defendant's rights to notice of the charge

against him, to a unanimous verdict, to appropriate sentencing and to protection against double

jeopardy in a subsequent prosecution.'" Crisci, 273 F.3d at 238 (quoting United States v.

Murray, 618 F.2d 892, 896 (2d Cir. 1980)). Accordingly:

> Even if an indictment includes a duplicitous count, duplicity is
> only a pleading rule and would in no event be fatal to the count.
> Prior to a defendant's conviction the government can elect to
> proceed based upon only one of the distinct crimes included within
> a duplicitous count, or the Court can give a jury instruction that
> ensures that the jury is unanimous as to the conduct underlying the
> conviction.

Ahmed, 94 F. Supp. 3d at 431-32 (alterations removed) (internal citations and quotation marks

omitted). In the event that it appears a jury instruction on unanimity is necessary, the court will

give such an instruction.

Pugh's motion to dismiss Count Two of the Indictment is DENIED.

## B. Suppression of the Fruits of the Search Warrants

Pugh next moves to suppress the evidence obtained pursuant to the three search warrants

issued in connection with this case. (See Def.'s Mem. at 19-27.) The three warrants at issue are:

> (1) the January 14, 2015, warrant authorizing the search and
> seizure of five thumb drives, a laptop computer, and two cell
> phones (the "Electronic Devices Warrant"),
>
> (2) the January 21, 2015, warrant authorizing the search and
> seizure of Pugh's two backpacks (the "Backpack Warrant"),
> and
>
> (3) the February 17, 2015, warrant authorizing the search and
> seizure of Pugh's Facebook account (the "Facebook Warrant").

("Defendant's final argument is that the Indictment fails to specify whether he is charged with violating § 1512(c)(1) or § 1512(c)(2)."). The court nonetheless found the indictment sufficient. Id.

(Id.)

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Compliance with the Warrants Clause therefore "requires particularity and forbids overbreadth." United States v. Cioffi, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "Although somewhat similar in focus, [overbreadth and particularity] are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." United States v. Hernandez, No. 09-CR-625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010).

The prohibition on overbreadth necessitates that "the scope of the warrant be limited to the probable cause on which the warrant is based." Id. "In other words, a warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" United States v. Romain, No. 13-CR-724 (RWS), 2014 WL 6765831, at *7 (S.D.N.Y. Dec. 1, 2014) (quoting United States v. Galpin, 720 F.3d 436, 446 (2d Cir. 2013)).

The particularity requirement dictates that "the warrant . . . clearly state what is sought." United States v. Jacobson, 4 F. Supp. 3d 515, 521 (E.D.N.Y. 2014) (quoting Cioffi, 668 F. Supp. 2d. at 390). "The Second Circuit recently identified 'three components' to the particularity requirement." Id. (citing Galpin, 720 F.3d at 445). "First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by

38

their relation to designated crimes." Galpin, 720 F.3d at 445 (internal citations and quotation marks omitted). Ultimately, "[a] warrant must be sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." United States v. Scully, No. 14-CR-208 (ADS) (SIL), 2015 WL 3540466, at *28 (E.D.N.Y. June 8, 2015) (quoting United States v. Liu, 239 F.3d 138, 140 (2d Cir. 2000)). However, "a warrant need not describe the items to be seized in such detail as to eliminate the executing officer's discretion completely." United States v. Lustyik, 57 F. Supp. 3d 213, 227 (S.D.N.Y. 2014); see also United States v. Young, 745 F.2d 733, 759 (2d Cir. 1984) ("Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."). Finally, "[t]he level of specificity required by the Fourth Amendment depends on many factors. The nature of the crime, for example, may require a broad search." Jacobson, 4 F. Supp. 3d at 522 (quoting United States v. Dupree, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011)).

Suppression is the appropriate remedy for the fruits of a warrant that features one or both of these infirmities. However, there are numerous exceptions to the warrant requirement. Two merit explanation here: the plain-view and good faith exceptions.

"The plain view exception authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." Lustyik, 57 F. Supp. 3d at 231 (quoting United States v. Gamble, 388 F.3d 74, 76 (2d Cir. 2004)). "Probable cause exists to believe that a certain item is evidence of a crime if 'the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may

be . . . useful as evidence of a crime.'" United States v. Juliano, No. 99-CR-1197 (AGS), 2000 WL 1206745, at *3 (S.D.N.Y. Aug. 24, 2000) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). "A practical, nontechnical probability that incriminating evidence is involved is all that is required." Brown, 460 U.S. at 742.

"Under the good faith rule set forth in United States v. Leon, the exclusionary rule does not apply to 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" Jacobson, 4 F. Supp. 3d at 522 (quoting Leon, 468 U.S. 897, 922 (1984)); see also United States v. Raymonda, 780 F.3d 105, 118 (2d Cir. 2015) ("When an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, and thus nothing to deter [by excluding the evidence].") (internal citation and quotation marks omitted). Importantly, the officer's reliance on the warrant must be "objectively reasonable," Raymonda, 780 F.3d at 118, and the government bears the burden of demonstrating this objectivity,[14] Jacobson, 4 F. Supp. 3d at 522. The Second Circuit has identified four circumstances in which an officer's reliance cannot be found to be in good faith:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

Raymonda, 780 F.3d at 118 (quoting United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)). Ultimately, "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was

---

[14] "In assessing whether it has carried that burden," courts must be "mindful that, in Leon, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." Jacobson, 4 F. Supp. 3d at 522 (quoting United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)).

unconstitutional under the Fourth Amendment.'" Illinois v. Krull, 480 U.S. 340, 348-49 (1987) (quoting United States v. Peltier, 422 U.S. 531, 542 (1975)).

In assessing the warrants at issue here, the court is mindful that "a court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.'" Clark, 638 F.3d at 93 (quoting Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007)). "Thus, the task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." Id. (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

As stated above, Pugh contends that each of the three challenged warrants possess fatal deficiencies that justify the suppression of the evidence obtained therefrom. The court disagrees, and, for the reasons set out below, DENIES this portion of Pugh's motion in full.

### 1.    The Electronic Devices Warrant

Pugh first claims that the Electronic Devices Warrant "violates the Fourth Amendment because it suffers from both lack of particularity and overbreadth." (Def.'s Mem. at 22.) Pugh identifies a number of elements of the warrant that he claims lack particularity, are overbroad, or both. First, he notes that Judge Orenstein struck the obstruction offense (18 U.S.C. § 1519) from the face of the warrant, thus, according to Pugh, indicating that Judge Orenstein "did not find probable cause to search for evidence relating to any attempt to destroy evidence of the Section 2339A offense." (Def.'s Mem. at 22.) Moreover, Pugh argues that Attachment B of the warrant essentially authorized "an unbridled search," thereby allowing law enforcement officers to search his electronic devices for evidence of crimes despite lacking probable cause that such a search would uncover inculpatory evidence of those particular crimes. (Id.) Pugh thus

41

concludes that these facts render the Electronic Devices Warrant both unparticularized and overbroad. Pugh's argument is without merit.

First, the Electronic Devices Warrant is not overbroad. As previously stated, a warrant is overbroad if it permits a search for evidence of crimes for which there is no probable cause. Judge Orenstein properly found probable cause to search Pugh's devices for evidence of a Section 2339A violation; thus, the warrant would only be overbroad if it permitted a search for evidence unrelated to that crime. It does not. The fact that Judge Orenstein struck the obstruction offense from the face of the warrant is beside the point; the categories of evidence listed in Attachment B which might constitute evidence of obstruction also constitute evidence of a violation of Section 2339A. For example, subsection M of Attachment B lists a permissible category of evidence as "[r]ecords or information reflecting efforts to destroy or conceal evidence contained on the [Electronic] Devices"; while this evidence would clearly fall under the purview of Section 1519, it would also be probative of a Section 2339A violation, as it pertains to state of mind, including consciousness of guilt. Indeed, Pugh himself admits that the limitations in Attachment B are relevant to the material support offense. (See Def.'s Mem. at 23 ("[A]n argument can be made that many of the categories listed in Attachment B might yield evidence of providing material support for a crime of terrorism . . . .").)

Pugh's argument, properly construed, does not relate to the striking of the obstruction offense from the face of the warrant, but rather he complains that the limits in Attachment B are "so broad that without any search protocols designed to limit the search in any way." (Id.) But, they are not; Attachment B properly limits the warrant to evidence related to the crime alleged. Moreover, the warrant contains a separate limitation, namely, that the only items that could be seized were those that "constitute[d] fruits, evidence and instrumentalities of the provision of or

42

a conspiracy to provide material support for terrorist activities." (Electronic Devices Warrant, Attach. B.) The combination of the illustrative list in Attachment B and the focus on a specific crime properly limited the warrant to the probable cause adduced in the warrant affidavit. See, e.g., Lustyik, 57 F. Supp. 3d at 228-29 (finding that a warrant that limited the search to evidence of a particular crime, and that employed other limiting measures similar to those applied in the Electronic Devices Warrant, was not overbroad); United States v. Willis, No. 13-CR-5013 (FPG) (MWP), 2014 WL 6791386, at *16 (W.D.N.Y. Nov. 5, 2014) (report and recommendation) (same), adopted, 2015 WL 1915123 (W.D.N.Y. Apr. 27, 2015); United States v. D'Amico, 734 F. Supp. 2d 321, 359, 363 (S.D.N.Y. 2010) (A challenge that a search is too broad is really a particularity challenge; a limitation specifying a crime being investigated and with an exemplary list of evidence is sufficiently particular). Accordingly, the court finds that the Electronic Devices Warrant was not overbroad.

Second, the Electronic Devices Warrant is sufficiently particularized. As stated above, the particularity requirement dictates that a warrant clearly state the goals of the search it authorizes. Attachment B sufficiently limited the search to the parameters of the crime alleged. The Electronic Devices Warrant listed the specific statute under investigation at that time—18 U.S.C. § 2339A[15]—and indicated that Judge Orenstein found probable cause that the devices

---

[15] That Pugh was ultimately prosecuted for a violation of 18 U.S.C. § 2339B, and not § 2339A, is of no import. It is well-established that evidence seized pursuant to a valid search warrant may be eventually used to prosecute the target of the search for a crime other than that which was listed in the affidavit supporting the warrant. See Gouled v. United States, 255 U.S. 298, 311-12 (1921) ("We see no reason why property seized under a valid search warrant, when thus lawfully obtained by the government, may not be used in the prosecution of a suspected person for a crime other than that which may have been described."), abrogated on other grounds by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967); cf. United States v. Masciarelli, 558 F.2d 1064, 1067 (2d Cir. 1977) ("The countervailing principle is that where a law enforcement officer lawfully engaged in a search for evidence of one crime inadvertently comes upon evidence of another crime the public interest militates against his being required to ignore what is in plain view."); United States v. Giordano, 259 F. Supp. 2d 146, 154 (D. Conn. 2003); United States v. Barbanell, 231 F. Supp. 200, 205 (S.D.N.Y. 1964) ("Where a warrant of arrest is based upon the allegation of one crime and a search is made incidental to the execution of the warrant, the means and instrumentalities of a totally unrelated crime can be seized, so long as they are discovered through a search based only on the crime for which the arrest is made.").

would contain evidence of a violation of that statute. Attachment B, incorporated by reference and attached to the Electronic Devices Warrant, authorized a search of evidence related to that crime, and set forth a list of types of evidence the police might encounter. In general, warrants that limit a search to evidence relating to a particular crime, and which provide a list of examples as a means of limiting the items to be seized, are upheld when confronted with a particularity challenge. See, e.g., United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990) ("In upholding broadly worded categories of items available for seizure, we have noted that the language of a warrant is to be construed in light of an illustrative list of seizable items."); Lustyik, 57 F. Supp. 3d at 227 ("The Warrants at issue here meet that standard. Although each Warrant broadly describes the items to be seized as 'evidence, fruits, or instrumentalities' of specified federal crimes, each also sets forth an illustrative list of items to be seized. The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters."); Jacobson, 4 F. Supp. 3d at 524 ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); D'Amico, 734 F. Supp. 2d at 363 ("Moreover, Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize."). Thus, because the Electronic Devices Warrant limited the permissible search to evidence relating to a violation

That is not to say that the police can obtain a warrant on one ground in order to discover evidence of a wholly unrelated crime. They cannot. United States v. Marion, 535 F.2d 697, 701 (2d Cir. 1976) ("Otherwise, the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. Such "subterfuge searches", in addition to their dissonance with Title III, would indeed run afoul of the Fourth Amendment."); see generally 2 Search & Seizure § 4.11(f) (5th ed. 2012).

However, there is no reason to believe that the search here was a "subterfuge search." There is significant overlap between the elements of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B. It is therefore reasonable to believe that law enforcement engaged in a legitimate search for evidence of a Section 2339A violation and simply came across evidence that better fit Section 2339B.

of 18 U.S.C. § 2339A, and provided an illustration of forms of evidence such a search might uncover, it is not unparticularized.

Pugh disagrees, but the cases he cites are inapposite. In United States v. Galpin, 720 F.3d 436 (2d Cir. 2013), law enforcement officers were investigating the defendant's failure to register a MySpace username, which was a condition of his probation due to a prior sex offense. Id. at 440. The search warrant at issue permitted the local sheriff's office to search the defendant's "residence, person and vehicles for, inter alia, cameras, computers, cell phones, and any and all computing data processing software which may reveal evidence which substantiates violations of Penal Law statutes, Corrections Law statutes, and/or Federal Statutes." Id. Thus, the warrant did not state the specific offense for which the police had probable cause to search— in fact, it stated no particular offense whatsoever. To the contrary, here the warrant stated an offense for which the law enforcement had probable cause to search, namely 18 U.S.C. § 2339A.

Other courts have found Galpin inapplicable where the warrant specifies a crime for which the police have probable cause to search. United States v. Reed, No. 13-CR-29-1 (WKS), 2013 WL 5503691, at *4 (D. Vt. Oct. 2, 2013) ("The warrant in this case provided adequate guidance limiting the scope of the search for evidence of a specific crime, so the reasoning of Galpin does not apply."). This court agrees with the distinction drawn in Reed.

Likewise, the case cited in Pugh's reply brief (Def.'s Reply at 10), United States v. Cioffi, 668 F. Supp. 2d 385 (E.D.N.Y. 2009), is distinguishable for the same reasons. There, Judge Block found that the warrant was overbroad because it had no limiting language at all: "The Warrant did not, on its face, limit the items to be seized from Tannin's personal email account to emails containing evidence of the crimes charged in the indictment or, indeed, any crime at all. Nor did it attach and incorporate the Affidavit." Cioffi, 668 F. Supp. 2d at 396. By

45

contrast, here the warrant specified the crime for which evidence was being searched and contained a list outlining the types of evidence to be seized.

Pugh further contends that lack of a "reasonable limitation on the search of the electronic devices" renders the Electronic Devices Warrant "nothing less than a general warrant that is invalid under the Fourth Amendment." (Def.'s Reply at 10.) Pugh further urges the court to adopt the reasoning applied in In re Cellular Telephones, a District of Kansas case, in which a Magistrate Judge opined in support of stronger search protocols in the context of digital searches. No. 14-MJ-8017 (DJW), 2014 WL 7793690, at *2 (D. Kan. Dec. 30, 2014). However, the Second Circuit has so far declined to adopt this position and, instead has routinely upheld warrants authorizing digital searches that lacked search protocol (e.g. specific keyword searches to be performed by law enforcement officers). See Galpin, 720 F.3d at 447 (noting that the Second Circuit has not "required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants"); Jacobson, 4 F. Supp. 3d at 526-27 (upholding search warrant similar to that at issue in the instant case, and which lacked any search protocol). Moreover, even if the court were inclined to require some ex ante search protocol,[16] "in the absence of controlling precedent requiring search protocols, it cannot be said the agents acted in bad faith." Lustyik, 57 F. Supp. 3d at 229. In other words, even if Pugh were correct that warrants seeking digital searches must include search protocols, the good faith exception would apply.

---

[16] The court notes that there is significant disagreement concerning whether and when ex ante search protocols must be used. See In re Warrant for xxxxxxx@gmail.com., 33 F. Supp. 3d 386, 390 (S.D.N.Y. 2014).

Accordingly, Pugh's motion seeking the suppression of the evidence discovered pursuant to the Electronic Devices Warrant is DENIED.[17]

### 2. The Backpacks Warrant

Pugh next seeks to suppress the evidence obtained during the search of his two backpacks on the theory that "the delay in the execution of the warrant rendered the information supporting the issuance of the warrant stale." (Def.'s Mem. at 24.) Pugh bases this contention on the fact that six or seven days passed between the time he was denied entry into Turkey and the time of the warrant's execution. (Id. at 24-25.) After reviewing the determination of Judge Bloom to issue the warrant, this court DENIES Pugh's motion to suppress the evidence obtained pursuant to the Backpacks Warrant.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Martin, 430 F.3d 73, 75 (2d Cir. 2005) (Mem.) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "Due to this subjective standard, a reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting our inquiry to whether the officer 'had a substantial basis' for his determination." United States v. Raymonda, 780 F.3d 105, 113 (2d Cir. 2015) (quoting United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993)); see also United States v. Gigliotti, No. 15-CR-204 (RJD), 2015 WL 6830675, at *9 (E.D.N.Y. Nov. 6, 2015). Moreover, "[t]he magistrate's finding that there was probable cause is itself 'a substantial factor tending to uphold the validity of [the]

---

[17] Even if the Electronic Devices Warrant was found to be in violation of the Fourth Amendment, suppression would still not be the appropriate remedy, as the good faith exception, outlined in Part II.B, supra, would apply. See, e.g., Jacobson, 4 F. Supp. 3d at 526-28 (finding good faith exception applicable when attachment to warrant limited search to evidence of a particular crime, similar to the effect of Attachment B in the instant case).

warrant." United States v. Erwin, No. 07-CR-556 (LEK), 2008 WL 4534058, at *4 (N.D.N.Y. Oct. 6, 2008) (quoting United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983)). This factor, coupled with the "presumption of validity with respect to the affidavit supporting the search warrant," id. (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)), mandates that "[a]ny doubt about the existence of probable cause is to be resolved in favor of upholding the warrant," id. (quoting United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998)).

As a general matter, in the context of a staleness analysis, "the magistrate is required to assess whether the information adduced in the application appears to be current, i.e., true at the time of the application, or whether instead it has become stale." United States v. Willis, No. 13-CR-6013 (FPG) (MWP), 2014 WL 6791386, at *15 (W.D.N.Y. Nov. 5, 2014) (report and recommendation) (quoting Rivera v. United States, 928 F.2d 592, 602 (2d Cir. 1991)), adopted, 2015 WL 1915123 (W.D.N.Y. Apr. 27, 2015). "The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular location." Id. (quoting United States v. Lamb, 945 F.Supp. 441, 459 (N.D.N.Y. 1996)). In Wagner, the Second Circuit expanded on this doctrine:

> While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past.

989 F.2d at 75.

Accordingly, "[t]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." Willis, 2014 WL 6791386, at *15 (quoting United States v. Diaz, 176 F.3d 52, 109

(2d Cir. 1999)). Additional relevant factors include "'[t]he currency and specificity of the information forming the basis' for probable cause, 'the reliability of the sources of information, the nature of the alleged illegal activity, the duration of that activity in the location in question, and the nature of the evidence being sought.'" United States v. Salomon-Mendez, 992 F. Supp. 2d 340, 347 (S.D.N.Y. 2014) (quoting United States v. McGrath, 622 F.2d 36, 41-42 (2d Cir. 1980)).

Here, the very facts contained in the affidavit support a finding that the facts justifying a search of Pugh's backpacks had not grown stale by the time the Backpacks Warrant was executed. Pugh possessed the two backpacks in question when he was denied entry into Turkey on January 10, 2015, and carried them with him when he was sent back to Egypt later that day. (Def.'s Mem. at 3.) Pugh did not have the opportunity to tamper with their contents between January 10 and January 15, 2015, while he was in Egyptian custody awaiting deportation to the United States. (Id.) The backpacks were checked during his flight back to the United States, and therefore, outside of Pugh's control for the duration of the flight. (Id. at 36-37.) When Pugh arrived on American soil, he was under continuous law enforcement surveillance until his arrest the next day, January 16, 2015. (Id. at 37.) Law enforcement officers seized one of the backpacks in question on the day of Pugh's arrest, and seized the other from Pugh's father the following day. (Id.) Therefore, six and seven days passed between the initial observation of the backpacks and their ultimate seizure. For five of those days, Pugh was in custody and was unable to tamper with the contents of the backpacks; for another, Pugh was under continuous law enforcement surveillance; for the seventh day, one backpack had been seized, and Pugh was American law enforcement custody. (Id.)

All of this information was available to Judge Bloom, whose decision to issue the resultant warrant is entitled to "substantial deference." Raymonda, 780 F.3d at 113. The court agrees with Judge Bloom's determination that the facts supporting probable cause to issue the warrant had not grown stale by the time the warrant was executed. See, e.g., United States v. Barlin, 686 F.2d 81, 87-88 (2d Cir. 1982) (finding that the facts supporting the issuance of a search warrant, discovered the day before the warrant was secured, had not grown stale); United States v. Rodriguez, 734 F. Supp. 116, 125 (S.D.N.Y. 1990) (finding that "the evidence would not have become stale after a mere seven day hiatus"). Moreover, Pugh has merely speculated that the backpacks could have conceivably been tampered with; however, this assertion alone is insufficient to support a finding of staleness. See, e.g., United States v. Defreitas, 701 F. Supp. 2d 297, 303 (E.D.N.Y. 2010) ("In the absence of any indication that the [target of the search] actually was accessed during [the] period [in which it was outside government control], the court has no reason to overturn the magistrate judge's probable cause finding on staleness grounds." (emphasis original)); United States v. Gomez, 495 F. Supp. 992, 1012 (S.D.N.Y. 1979) (court declined to overturn finding of probable cause on staleness grounds when warrant for search of apartment was executed forty days after being issued, reasoning that despite this delay, there was substantial evidence that nobody had accessed the apartment in the interim, and no evidence to the contrary, thus supporting the finding of probable cause).

In his reply brief, Pugh argues that "the question is whether the government's surveillance was sufficient to establish probable cause that Pugh's backpack still contained the same items he had during his travel to Turkey on June 10, his detention in Egypt from June 11 to June 14, and his arrival at JFK airport on June 15." (Def.'s Reply at 12.) Because this

determination is fact-based, Pugh suggests that the court hold a suppression hearing. (Id.) The court rejects the invitation.

First, for the reasons explained above, the court believes that Judge Bloom properly found probable cause to search the backpacks. Pugh's request for a suppression hearing misapprehends the staleness inquiry. The question is whether, despite the passage of time, there was still probable cause to believe that evidence would be found. See Willis, 2014 WL 6791386, at *15. This test does not require conclusive proof that the evidence will still be present. See United States v. Zoernack, No. 04-CR-868 (LTS), 2005 WL 1837962, at *2 (S.D.N.Y. Aug. 2, 2005) (noting that the standard is whether the information contained in the affidavit is sufficient to establish a fair probability that evidence will be uncovered). Here, the combination of the relatively short time period during which Pugh had control over the backpacks and law enforcement's surveillance indicated that there was a fair probability that the backpacks would still contain evidence. The fact that the surveillance may have been ineffective does not alter this calculus and therefore, does not require an evidentiary hearing.

In any event, Pugh has not properly raised a factual dispute requiring a hearing, because he has put forward no evidence raising a factual issue. See United States v. Fruchter, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000) ("In the absence of an affidavit of anyone with personal knowledge, an evidentiary hearing is unnecessary."); United States v. Longo, 70 F. Supp. 2d 225, 248 (W.D.N.Y. 1999) ("A defendant seeking the suppression of evidence is not automatically entitled to an evidentiary hearing on the claim, but must make a preliminary showing of facts which, if proved would require the granting of relief. To meet that burden a defendant must, at a minimum, present his or her claim through an affidavit of an individual with personal knowledge of the relevant facts." (internal citation omitted)).

51

Accordingly, Pugh's motion seeking the suppression of the evidence seized pursuant to the Backpacks Warrant is DENIED.[18]

### 3. The Facebook Warrant

Last, Pugh moves to suppress the evidence obtained from the search of his Facebook account, arguing—as he did in the context of the Electronic Devices Warrant—that the Facebook Warrant is overbroad and lacks particularity. (Def.'s Mem. at 25.) Specifically, Pugh contends that "the Facebook Warrant is overbroad because many of the categories identified for seizure in the warrant application were not supported by probable cause." (Id.) He argues that the warrant is insufficiently particularized, and that the search should have been limited to items (a)-(c) in Attachment B to the warrant.[19] (Id. at 25-26.) Further, Pugh contends that the items to be seized were not limited in any way by a search protocol, and consequently, the Government was permitted to search Pugh's entire Facebook. (Id. at 26-27.) The court disagrees.

First, the search was not overbroad. There was probable cause to support a search of Pugh's Facebook account. As made clear in the warrant application, by the time the Facebook Warrant was issued, the investigation team had learned that Pugh had a Facebook account, which he used to view ISIL videos (Aff. in Supp. of the Facebook Warrant (Creizman Decl., Ex. H

---

[18] Even if the Backpacks Warrant was found to be in violation of the Fourth Amendment, suppression would still not be the appropriate remedy, as the good faith exception, outlined in Part II.B., supra, would apply. Raymonda, 780 F.3d at 119 (finding good faith exception applicable when officer relied on search warrant based on information that was stale).

[19] Attachment B listed, by way of example, the following items to be seized.

> (a) communications and photographs concerning the use and procurement of explosive devices and other weapons; (b) communications and photographs concerning the transportation, safe-housing and activities of terrorist operatives; (c) communications concerning terrorist financing, the location of terrorist groups, and/or methods of traveling to join designated foreign terrorist organizations; and (d) records relating to who created, used, or communicated with [Pugh], including records about their identities and whereabouts.

(Facebook Warrant, Attach. B.)

(Dkt. 30-8)) ¶ 23.) The investigation team further knew that ISIL members often communicated on Facebook (id. at 26), Pugh has expressed interest in communicating on Facebook with the UC, who had feigned interest in ISIL (id. ¶ 27), and had viewed pro-terrorist post on Pugh's public Facebook page (id. ¶¶ 30-36). The Facebook Warrant properly identifies the items to be seized as "fruits, evidence and instrumentalities of violations of Section 2339B." (Facebook Warrant, Attach. B.)

Second, the warrant was sufficiently particular. Courts in this circuit have found warrants that allow a Facebook search limited by reference to an exemplary list of items to be seized and the crime being investigated to be sufficiently particularized. See, e.g., United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) ("[Defendant's] contention that the Government did not employ any minimization procedure is meritless. The Government set forth its minimization procedure in Attachment B to the Facebook Affidavit. For instance, the Government sought to seize information related to the scheduling of meetings among members of the racketeering enterprise, drug trafficking activity, and weapons. This description was sufficiently particular to allow the Government to examine the files it received from Facebook without violating the Fourth Amendment." (internal citations omitted)); see also United States v. Taylor, 764 F. Supp. 2d 230, 236-37 (D. Me. 2011) (allowing the search of a full email account where the warrant limited seizure to "records relating to business and/or financial and accounting matters, as well as all records relating to the purchasing and selling of goods and services"). This precedent is unsurprising, as courts in this circuit have routinely held that a warrant that specifies by the type of crime the evidence sought and provides examples of such evidence is sufficiently particular to satisfy the Fourth Amendment. See supra Part II.B.1.

Pugh's attack on category (d) is without merit. Category (d), as an example of evidence related to a Section 2339B violation, allowed law enforcement to seize "records relating to who created, used, or communicated with [Pugh], including records about their identities and whereabouts." (Facebook Warrant, Attach. B.) This evidence does not authorize a general search. Instead, it is narrowly tailored to the aim of the investigation; namely, determining whether Pugh had attempted to join ISIL. Plainly, knowledge regarding who Pugh communicated with, and the identities of those individuals, is pertinent to determining if Pugh attempted to join ISIL.

Finally, Pugh's argument that the Facebook Warrant should be suppressed because it lacked an ex ante search protocol and allowed the seizure of the full account is meritless. Ultimately, Pugh's argument on this issue largely parallels the argument he made in the context of the Electronic Devices Warrant, and it fails for the same reasons. As previously stated, the Second Circuit does not require a search protocol in the event of a digital search. See Galpin, 720 F.3d at 447. Moreover, courts in this circuit repeatedly have recognized that, in the context of such a search, avoiding the intrusiveness of a search while maintaining its efficacy is largely infeasible. See, e.g., United States v. Scully, No. 14-CR-208 (ADS) (SIL), 2015 WL 3540466, at *31-34 (E.D.N.Y. June 8, 2015) (upholding search of email account executed pursuant to particularized list of search targets despite awareness that entire contents of account might necessarily be searched in the course of the warrant's execution); United States v. Ulbricht, No. 14-CR-68 (KBF), 2014 WL 5090039, at *14-15 (S.D.N.Y. 2014) (noting the need for "some latitude" in the context of digital searches, which effectively permit the search of an entire Facebook account, and upholding such a search when the particular crime was specified and probable cause had been established). Moreover, the fact that the search allowed for the

temporary seizure of the entire Facebook account does not render the search invalid. "It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized." Ulbricht, 2014 WL 5090039, at *14; see also In re Warrant for xxxxxxx@gmail.com., 33 F. Supp. 3d 386, 390 (S.D.N.Y. 2014) ("Notably, every case of which we are aware that has entertained a suppression motion relating to the search of an email account has upheld the Government's ability to obtain the entire contents of the email account to determine which particular emails come within the search warrant.").

Accordingly, the portion of Pugh's motion seeking suppression of the fruits of the Facebook Warrant is DENIED.[20]

### C.    Bill of Particulars

Pugh seeks a bill of particulars that clarifies "the nature of the activities the government contends constitute the 'material support and resources' that he attempted to provide to ISIL." (Def.'s Mem. at 27.) He contends that "[w]here, as here, the charges in the Indictment are 'so general that they do not advise [him] of the specific acts of which he is accused,' a bill of particulars is warranted." Id. (quoting United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987)). However, the combination of the Indictment, the filings to date, and the discovery that Pugh has received supports the conclusion that a bill of particulars is not warranted. Accordingly, Pugh's motion for a bill of particulars is DENIED.

As previously stated in Part II.A, supra, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c). Rule 7(f) provides that "[t]he court may direct the government to file a bill of

---

[20] Even if the Facebook Warrant were found to be in violation of the Fourth Amendment, suppression would still not be the appropriate remedy, as the good faith exception, discussed in Part II.B, supra, would apply, for the same reasons that it would apply to the Electronic Devices Warrant.

particulars." Fed. R. Crim. P. 7(f). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Ahmed, 94 F. Supp. 3d 394, 435 (E.D.N.Y. 2015) (quoting United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004)). In other words, an indictment "may" be supplemented with a bill of particulars if the indictment is "insufficient to permit the preparation of an adequate defense." United States v. Rigas, 490 F.3d 208, 237 (2d Cir. 2007) ("A bill of particulars enabl[es] [a] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." (citation and internal quotation marks omitted)). However, a bill of particulars cannot be used by the defense as a discovery tool to obtain evidentiary detail. See United States v. Persico, 447 F. Supp. 2d 213, 216 (E.D.N.Y. 2006). Ultimately, the decision to grant or deny a bill of particulars is left to the broad discretion of the trial court. United States v. Tramunti, 513 F.3d 1087, 1113-14 (2d Cir. 1975).

"Even where an indictment is deficient, 'a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means.'" Ahmed, 94 F. Supp. 3d at 435 (quoting Chen, 378 F.3d at 163.) "Thus, in determining whether to order a bill of particulars, a court must examine the totality of the information available to defendant, both through the indictment and through pre-trial discovery." United States v. Mostafa, 965 F. Supp. 2d 451, 465 (S.D.N.Y. 2013) (citing United States v. Bin Laden, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000)); see also United States v. Hashmi, No. 06-CR-442 (LAP), 2009 WL 4042841, at *12 (S.D.N.Y. Nov. 18, 2009) (denying bill of particulars and stating that the defendant "ignore[d] the clear rule that a defendant's notice of the

specific acts for which he was charged must be evaluated in light of all the information he has received from the Government").

Here, the Government has adequately apprised Pugh of the acts he is accused of committing. First, the Government has provided substantial discovery. (See Apr. 3, 2015, Ltr. (Dkt. 17) (enclosing discovery material); Apr. 24, 2015, Ltr. (Dkt. 18) (same); June 10, 2015, Ltr. (Dkt. 22) (same); Nov. 12, 2015, Ltr. (Dkt. 36) (same).) Second, the Government has outlined its theory and the facts upon which it is based in numerous filings with the court. (See Compl. (containing detailed description of Government's investigation); Mem. in Supp. of Mot. for an Anonymous Jury (Dkt. 31) at 6-10 (describing the Government's theory of the case).) See also United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995) (Parker, J.) ("In deciding whether a bill of particulars is needed, the court must determine whether the information sought has been provided elsewhere, such as in other items provided by discovery, responses made to requests for particulars, prior proceedings, and the indictment itself.")); Ahmed, 94 F. Supp. 3d at 435 ("The Government sufficiently apprised Defendants of the acts that they are accused of committing, and with whom, by providing Defendants with voluminous discovery, . . . well in advance of trial, as well as providing detailed factual proffers in support of its motion for an anonymous jury and in opposition to the instant motion. Considered together, the Government's disclosures have more than adequately informed the Defendants of the evidence supporting the charges in the indictment."). Accordingly, and upon review of the Indictment, the parties' filings to date, and the discovery already provided, Pugh has not demonstrated that he is unable to determine the nature of the charges leveled against him. The motion for a bill of particulars is DENIED.[21]

---

[21] As an additional matter, Pugh's motion for a bill of particulars is procedurally infirm due to his failure to comply with Local Rule 16.1, which requires an "affidavit certifying that counsel has conferred with counsel for the

## D. Disclosure of Brady and Giglio Materials

Pugh next requests that the Government be ordered to produce any and all Brady and Giglio material. The Government responds that it "needs no order from the Court in order to produce Brady material," and that "[i]t is the policy of the Department of Justice to make disclosures of Brady material even beyond that which is constitutionally required." (Gov't's Opp'n at 41.) Accordingly, the Government pledges to provide Pugh with any and all exculpatory information it obtains "as soon as practicable." (Id. at 41-42.)

"[T]he Government has a constitutional duty [under Brady] to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or punishment." United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001); see Brady v. Maryland, 373 U.S. 83 (1963). This duty encompasses "not only exculpatory material, but also information that could be used to impeach a key government witness." Id. (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).[22] However, "'as a general rule, Brady and its progeny do not require

---

opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court and has been unable to reach agreement." See Local R. of Crim. P. 16.1.

[22] Pugh and the Government dispute whether Pugh has actually requested early disclosure of Jencks Act material. (Compare Def.'s Reply at 13, with Gov't's Opp'n at 42.) Brady and its progeny do not require the disclosure of all impeachment material before trial; instead, they require disclosure of material impeachment material. Coppa, 267 F.3d at 146. Insofar as Pugh is seeking all impeachment material, he is therefore making a Jencks Act request. Id. at 145 ("Because the District Court's order in this case included all impeachment materials, however, it implicated the Jencks Act."). Pugh disclaims seeking Jencks Act material. (Def.'s Reply at 13.) Accordingly, the court construes Pugh's motion as only seeking Brady and Giglio material.

Even if Pugh did seek Jencks Act material, his motion would be denied. The Jencks Act provides in relevant part:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
>
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to

58

immediate disclosure of all exculpatory and impeachment material upon request by a defendant."
United States v. Nogbou, No. 07-CR-814 (JFK), 2007 WL 4165683, at \*2 (S.D.N.Y.
Nov. 19, 2007) (quoting Coppa, 267 F.3d at 146); see also United States v. Jones,
No. 13-CR-193 (RJA), 2014 WL 2800780, at \*4 (W.D.N.Y. June 19, 2014). "Temporally, 'the
timing of a disclosure required by Brady is dependent upon the anticipated remedy for a
violation of the obligation to disclose: the prosecutor must disclose exculpatory and
impeachment information no later than the point at which a reasonable probability will exist that
the outcome would have been different if an earlier disclosure had been made." United States v.
Certified Envtl. Servs., Inc., 753 F.3d 72, 92 (2d Cir. 2014) (quoting Coppa, 267 F.3d at 142);
see also Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to
specify the extent or timing of disclosure Brady and its progeny require, except in terms of the
sufficiency, under the circumstances, of the defense's opportunity to use the evidence when
disclosure is made. Thus disclosure prior to trial is not mandated.").

In light of the Government's representation that it recognizes and will comply with its
obligations under Brady and Giglio, this portion of Pugh's motion is DENIED without
prejudice.[23] See, e.g., Jones, 2014 WL 2800780, at \*4; United States v. Mancuso,

---

the subject matter of the testimony of the witness, the court shall order it to be
delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a)-(b). Accordingly, the "Jencks Act prohibits a District Court from ordering the pretrial
disclosure of witness statements." Coppa, 267 F.3d at 145 (citing In re United States, 834 F. 2d 283, 286-87
(2d Cir. 1987); United States v. Percevault, 490 F.2d 126, 131 (2d Cir. 1974)). Therefore, to the extent Pugh seeks
the early release of Jencks Act material, his motion is DENIED.

[23] Subsequent to the filing of his motion, Pugh's counsel sent a letter to the court seeking further disclosure of Brady
material. (Suppl. Mot. for Release of Brady Materials.) The letter cites 50 U.S.C. § 1861, which permits the
Federal Bureau of Investigation to obtain various data involving the communications of a target by submitting a
request to the Foreign Intelligence Surveillance Court ("FISA"). The letter claims that Pugh has not received notice
from the Government that it possesses inculpatory information obtained in this manner. As a preliminary matter,
this claims fails for the same reasons that Pugh's general Brady claim fails; the Government has agreed to provide
Pugh all Brady material at the appropriate time.

No. 05-CR-060 (NGG), 2008 WL 2884397, at *3 (E.D.N.Y. July 23, 2008); United States v. Perez, 940 F. Supp. 540, 553 (S.D.N.Y.1996)).

### E.    Early Disclosure of Rule 404(b) Evidence

Pugh also requests that, pursuant to Federal Rule of Evidence 404(b), the court order the Government to provide notice, no later than thirty days prior to trial, of any evidence of other crimes, wrongs, or other acts that it plans to introduce at trial. (See Def.'s Mem. at 30.) See also Fed. R. Evid. 404(b). Federal Rule of Evidence 404(b) requires the Government to provide, upon request by the accused, "reasonable notice of the general nature of any . . . evidence [of crimes, wrongs, or other acts] that the prosecutor intends to offer at trial." Fed. R. Evid. 404(b)(2).

Pugh argues that the Complaint and search warrant affidavits refer to "unidentified sources" whose provision of information was central to the Government's case, and as such, he "should be apprised of this information as soon as practicable so that he can adequately prepare for trial" and address admissibility issues. (Def.'s Mem. at 31.)

"[C]ourts in the Second Circuit 'have generally interpreted reasonable notice to be ten days to two weeks before trial.'" United States v. Barret, 824 F. Supp. 2d 419, 458 (E.D.N.Y. 2011) (quoting United States v. James, No. 02-CR-0778 (SJ), 2007 WL 914242, at *8

---

Nonetheless, the court notes that at this stage, Pugh has not put forward any evidence suggesting that the Government has wrongfully withheld FISA records. First, there is no indication that the prosecution even possesses the phone records Pugh seeks. See, e.g., Miles v. Conway, 739 F. Supp. 2d 324, 340 (W.D.N.Y. 2010) ("[Defendant's] Brady claim must fail because he provides no evidence to support his allegations." (internal quotation marks and citation omitted)); Skinner v. Duncan, No. 01-CV-6656 (DAB) (AJP), 2003 WL 21386032, at *25 (S.D.N.Y. June 17, 2003) (report and recommendation) (there must be some evidence that alleged Brady material exists), adopted Order (S.D.N.Y. May 7, 2004), Dkt. 21; Chandras v. McGinnis, No. 01-CV-2519 (LBS), 2002 WL 31946711, at *5 (E.D.N.Y. Nov. 13, 2002) ("In the absence of credible evidence contradicting the ADAs' denials, Chandras's claims of prosecutorial misconduct are meritless."); United States v. Upton, 856 F. Supp. 727 (E.D.N.Y. 1994) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under Brady, is not enough to establish that the government has, in fact, failed to honor its discovery obligations." (internal citation omitted)). Moreover, the fact that the records might otherwise exist is irrelevant because "Brady does not require the prosecution to seek out exculpatory or impeachment evidence within the possession of all government agencies." Chandras, 2002 WL 31946711, at *8.

(E.D.N.Y. Mar. 21, 2007) (adopting report and recommendation)); see also United States v. Parris, No. 13-CR-17 (DAB), 2014 WL 2745332, at *15 (S.D.N.Y. June 17, 2014) ("Ten days has routinely been held in this Circuit to constitute sufficient notice under Rule 404(b).").

In reply, Pugh appears to concede that early production of Rule 404(b) material is not necessary, stating "[t]he defense takes the government at its word that it understands and will comply with its obligation to produce advance notice [of] other act evidence under Rule 404(b). Pugh reserves the right to raise with the Court any failure of the government to comply with its obligations." (Def.'s Reply at 13.)

Moreover, Pugh has not adduced any sufficient reason justifying a deviation from the standard interpretation of "reasonable notice." Accordingly, Pugh's motion for early disclosure of Rule 404(b) material is DENIED WITHOUT PREJUDICE.

## III.    CONCLUSION

For the reasons set forth above, Pugh's motions are DENIED IN FULL.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       December 21, 2015

NICHOLAS G. GARAUFIS
United States District Judge