UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
   UNITED STATES OF AMERICA

          -against-

   TAIROD NATHAN WEBSTER PUGH,

               Defendant.
----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**15-CR-116 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are the Government's and Defendant's respective first motions in limine.

(See Gov't's First Mot. in Limine ("Gov't's Mem.") (Dkt. 61); Def.'s First Mot. in Limine

("Def.'s Mem.") (Dkt. 62).)

Defendant Tairod Nathan Webster Pugh (alternatively, "Pugh" or "Defendant") seeks to

exclude from trial (1) communications between Pugh and his wife ("M.H.S."), including a draft

letter addressed to M.H.S. found on Pugh's laptop, and (2) videos and photographs depicting

violence or acts of terrorism that are not directly related to the charged conduct. (Def.'s Mem.

at 3.) The Government moves to admit certain Islamic State of Iraq and the Levant ("ISIL")

propaganda videos and documents found on Pugh's laptop. (Gov't's Mem. at 1.)

For the reasons stated below, the court holds that (1) the draft letter found on Pugh's

laptop is ADMISSIBLE and (2) the ISIL propaganda videos that the Government disclosed in its

reply brief (see Reply in Supp. of Gov't's First Mot. in Limine ("Gov't's Reply") (Dkt. 73)) are

ADMISSIBLE except for the video entitled

09DDA5171C0F30D64151B38E2F35CB6A214572B5 (the "Obama Video"). The court further

RESERVES ruling on (1) whether any marital communications, other than the draft letter, would

be admissible, and (2) whether any videos or photographs, not disclosed in the Government's

reply brief, would be admissible.

1

## I.    BACKGROUND

### A.    Charged Conduct

Defendant is charged by a two-count indictment with attempting to provide material support to a terrorist organization in violation of 18 U.S.C. § 2339B, and obstruction of justice in violation of 18 U.S.C. § 1512(c). (Indictment (Dkt. 11).) The court has previously, and extensively, discussed the Government's allegations in a Memorandum and Order approving an anonymous, partially sequestered jury (see Dec. 9, 2015, Mem. & Order (Dkt. 49)), and in a Memorandum and Order denying Defendant's omnibus pre-trial motions (see Dec. 21, 2015, Mem. & Order (Dkt. 53)); the court refers to those decisions for a detailed description of the allegations. Below, the court will only briefly describe the allegations relevant to the Government's and Pugh's respective motions in limine.

#### 1.    Attempted Material Support

The Government intends to prove at trial that Pugh attempted to provide material support to a terrorist organization by attempting to join ISIL. (Gov't's Mem. at 1.)

Accordingly, the Government intends to prove that ISIL is a designated terrorist organization. (Id. at 2.) The Government further seeks to show that ISIL aggressively sought to recruit foreign fighters. (Id. at 4.) To this end, ISIL produced a significant amount of propaganda, examples of which the Government intends to show were found in Defendant's possession. (Id.)

The Government also intends to introduce evidence recovered from Pugh's laptop (Def.'s Mem. at 1; Gov't's Mem. at 5-7), including a draft letter to Pugh's wife—M.H.S.—in which Pugh expresses a desire to join ISIL (Def.'s Mem. at 1). Pugh married M.H.S., an Egyptian citizen, in April of 2014. (Id.) Pugh met M.H.S. just a few weeks before marrying her. (Gov't's

2

Opp'n (Dkt. 68) at 2.) Pugh speaks and reads English, whereas M.H.S. speaks and reads Egyptian Arabic. (Id.) Thus, they communicated using either Google Translate to translate text messages, or through an ad hoc network of friends, family, and strangers who served as translators. (Id. at 4.)

### 2. Obstruction of Justice

The Government further seeks to introduce evidence at trial showing that once Pugh was denied entry into Istanbul, he sought to—and did—destroy a number of electronic devices in his possession. (Id. at 5.)

## II. LEGAL STANDARDS

### A. Motion in Limine

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." United States v. Brown, 606 F. Supp. 2d 306, 311 (E.D.N.Y. 2009); see also United States v. Barret, No. 10-CR-809 (KAM), 2011 WL 6704862, at *3 (E.D.N.Y. Dec 21, 2011). "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." United States v. Ozsusamlar, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006); see also United States v. Midyett, 603 F. Supp. 2d 450, 454 (E.D.N.Y. 2009); United States v. Chan, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002). Thus, "[t]he movant has the burden of establishing that the evidence is not admissible for any purpose." United States v. Goodale, 831 F. Supp. 2d 804, 808 (D. Vt. 2011).

A court considering a motion in limine may reserve judgment until trial in order to place the motion in the appropriate factual context. See United States v. Ferguson, 246 F.R.D. 107, 116 (D. Conn. 2007) (Droney, J.). "Further, a court's ruling regarding a motion in

3

limine is 'subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the movant's proffer.'" Ozsusamlar, 428 F. Supp. 2d at 165 (quoting Luce v. United States, 469 U.S. 38, 41 (1984)).

## B. Marital Communications Privilege

Federal Rule of Evidence 501 provides:

> The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court.

Fed. R. Evid. 501. Accordingly, where—as here—a party asserts a marital privilege, the court looks to federal common law to determine the scope and applicability of the privilege. See, e.g., Engelmann v. Nat'l Broad. Co., No. 94-CV-5616 (MBM) (AJP), 1995 WL 214500, at *2 (S.D.N.Y. Apr. 10, 1995).

"At common law, there are two marital testimonial privileges available to preclude certain statements from entering into evidence." Scott v. Woodworth, No. 12-CV-0020 (LEK) (CFH), 2013 WL 3338574, at *8 (N.D.N.Y. July 2, 2013). "The adverse spousal testimony privilege permits an individual to refuse to testify in a criminal proceeding against her or his spouse. . . . The second marital privilege—the confidential marital communications privilege—is narrower than the adverse spousal testimony privilege and seeks only 'to protect the intimacy of private marital communications,' but it can be invoked by either spouse to prevent the revelation of such communications." United States v. Premises Known as 281 Syosset Woodbury Rd., 71 F.3d 1067, 1070 (2d Cir. 1995) (quoting In re Grand Jury Subpoena, 755 F.2d 1022, 1027 (2d Cir. 1985), vacated on other grounds sub nom. United States v. Koecher, 475 U.S. 133 (1986)).

4

The marital communications privilege "provides that '[c]ommunications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged.'" In re Reserve Fund Sec. & Derivative Litig., 275 F.R.D. 154, 157 (S.D.N.Y. 2011) (quoting Wolfle v. United States, 291 U.S. 7, 14 (1934)). There are three prerequisites to the application of the spousal communications privilege:

> (1) a valid marriage at the time of the communication; (2) the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other; and (3) the communication must have been made in confidence, which is presumed.

Id. at 157 (internal quotation marks and citations omitted); see also Lorber v. Winston, No. 12-CV-3571 (ADS) (ETB), 2012 WL 5904522, at *12 (E.D.N.Y. Nov. 26, 2012) (citing the three requirements identified in Reserve Fund Securities); L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc., No. 10-CV-02868 (MSK) (KMT), 2014 WL 183303, at *5 (D. Colo. Jan. 12, 2014) (report and recommendation of special master) (same); Engelmann, 1995 WL 214500, at *4 ("There are three prerequisites to the assertion of the communications privilege: (1) at the time of the communication, there must have been a marriage recognized as valid by state law; (2) there must have been a communication with respect to which the privilege is asserted; and (3) the communication [must have been] made in confidence." (internal quotation marks, alterations, and citations omitted)); United States v. Estes, 609 F. Supp. 564, 571 (D. Vt. 1985) ("To be privileged, the marital communications must be confidential and they must have occurred during the marriage.").

"Because the marital privilege deprives fact-finders of potentially useful information," United States v. Etkin, No. 07-CR-913(KMK), 2008 WL 482281, at *2 (S.D.N.Y. Feb. 20, 2008), "[t]he party asserting . . . the marital communications privilege, bears the burden

of establishing all of the essential elements involved," In re Reserve Fund, 275 F.R.D. at 158

(S.D.N.Y. 2011) (quoting United States v. Acker, 52 F.2d 509, 514-15 (4th Cir. 1995)); see also

Campinas Found. v. Simoni, No. 02-CV-3965 (BSJ) (KNF), 2005 WL 1006511, at *3 (S.D.N.Y.

Apr. 27, 2005) ("The burden of establishing that all of the essential elements of a privilege exist

is upon the party asserting the privilege, in this case the defendants."). However,

"[c]onversations between spouses are presumed confidential," and therefore, the party opposing

the applicability of the marital communication privilege bears "the burden of defeating this

presumption by showing that the communication was not made privately." United States v.

Taylor, 92 F.3d 1313, 1332 (2d Cir. 1996).

### C.     General Rules of Admissibility

Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible unless any

of the following provides otherwise: the United States Constitution; a federal statute; these rules;

or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible." Fed. R.

Evid. 402. Thus "unless an exception applies, all '[r]elevant evidence is admissible.'" United

States v. White, 692 F.3d 235, 246 (2d Cir. 2012) (quoting Fed. R. Evid. 402). Rule 401 then

defines relevant evidence; it provides that "[e]vidence is relevant if: (a) it has any tendency to

make a fact more or less probable than it would be without the evidence; and (b) the fact is of

consequence in determining the action." Fed. R. Evid. 401. The Second Circuit has described

the relevance standard as "very low." See United States v. White, 692 F.3d 235 (2d Cir. 2012)

(quoting United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008)). Indeed, "[t]o be

relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it

beyond a reasonable doubt." United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010).

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Old Chief v. United States, 519 U.S. 172, 184 (1997). Moreover, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Id. at 180.

In short, Rule 403 requires "the district court [to] make a conscientious assessment of whether unfair prejudice substantially outweighs probative value" with regard to each piece of proffered evidence. Al-Moayad, 545 F.3d at 160 (quoting United States v. Salameh, 152 F.3d 88, 110 (2d Cir. 1998) (per curium)).

## III.    DISCUSSION

### A.    Marital Communications Privilege

Although Pugh moves to exclude "all confidential communication between Pugh and M.H.S.," (Def.'s Mem. at 3), both Pugh and the Government focus their discussion on the draft letter (see id. at 5 ("[W]e anticipate that the government will seek to introduce at trial the draft letter from Pugh to M.H.S. that was found on Pugh's laptop. The Court should preclude the government from doing so."); Gov't's Opp'n at 14 ("The draft letter is not covered by the marital communications privilege.").) Thus, the court limits its discussion and conclusions to the admissibility of the draft letter. To the extent that the Government seeks to admit any other marital communications, the court will consider any objections at that time.

7

1. Existence of Marriage

The Government contends that Defendant "has not established that his marriage to M.H.S., even if valid under Egyptian law, would be recognized in the United States," because "[w]hen the defendant sought authorization to marry M.H.S. in Egypt, he does not appear to have obtained or submitted a certified divorce decree concerning his marriage to his South African wife to Egyptian authorities." (Gov't's Opp'n at 15-16.) Pugh responds that "the government ignores the very records it seized from Pugh that demonstrate that this second marriage ended in divorce. As set forth in Pugh's passport application, on or about December 19, 2005, Pugh married a South African citizen, F.B., in Johannesburg. They were divorced on or about June 1, 2007." (Def.'s Reply at 2.)

The Government has presented no evidence to support its claim that Pugh and F.B. never divorced. Indeed, the only evidence thus far in the record indicates that Pugh and F.B. were divorced well before Pugh married M.H.S., (see Passport App. (Def.'s Reply, Ex. 2); Aff. of Eligibility to Marry (Gov't's Mem., Ex. 1) at ECF p. 15 (indicating that Pugh's marital status is divorced)), and that Pugh indicated that he was divorced to the Egyptian authorities (Aff. of Eligibility to Marry). Thus, the court concludes, based on the evidence currently proffered, that Pugh's marriage was valid when entered.

2. Separation

The Government next argues that "[t]he marital communications privilege does not apply to the draft letter because the defendant's marriage to M.H.S. was moribund at the time he departed Egypt for Syria, and would have been destroyed had the defendant sent the draft letter." (Gov't's Opp'n at 17.) Pugh responds that "the evidence, in full context, demonstrates that Pugh

and M.H.S. still had a viable marriage when he left Egypt for Turkey." (Def.'s Reply at 4.) Based on the proffered evidence before the court, Pugh is correct.

"The Second Circuit has held that the confidential communications privilege does not apply to statements made between spouses who are permanently separated." United States v. Palmieri, No. 97-CR-0356 (JG), 1998 WL 765138, at *2 (E.D.N.Y. Apr. 20, 1998) (citing In re Witness, 791 F.2d 234, 238 (2d Cir. 1986)). This is because "society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth." In re Witness, 791 F.2d at 238 (quoting United States v. Byrd, 750 F.2d 585, 594 (7th Cir. 1984)); see also Etkin, 2008 WL 482281, at *2-3.

When determining whether a couple is separated, the Second Circuit has instructed district courts to "rely primarily on the duration of the couple's physical estrangement, which is the guiding factor in determining permanent separation," and to further consider "special circumstances that render more or less likely the objective possibility of reconciliation." In re Witness, 791 F.2d at 238; see also Palmieri, 1998 WL 765138, at *2 ("In making that determination, I may rely primarily on the duration of the couple's physical estrangement. In addition, however, either party may bring forward special circumstances that render more or less likely the objective possibility of reconciliation." (internal citations and quotations marks omitted)). Other circuits engage in substantially the same inquiry. See, e.g., United States v. Singleton, 260 F.3d 1295, 1301 (11th Cir. 2001) ("A district court should focus upon the following three objective factors as especially important: (1) Was the couple cohabiting?; (2) if they were not cohabiting, how long had they been living apart?; and (3) had either spouse filed for divorce? A district court may, of course, consider other objective evidence of the parties' intent or lack of intent to reconcile."); United States v. Brown, 605 F.2d 389, 396 (8th Cir. 1979)

9

("Where, as here, [the wife] was with her husband for two weeks and had not seen him for the entire eight months between his leaving her and the date of trial, it is difficult to visualize how preservation of that value would have required the total exclusion of [the wife] from the witness stand.").

The Government argues that Pugh and M.H.S. effectively separated because, for one, "the defendant's marriage to M.H.S., to the extent it was lawful, was built on the shakiest of foundations. The defendant and his wife married before they knew each other, lived thousands of miles apart for all but a handful of brief visits during the course of the entire marriage, and were unable to communicate in the same language." (Gov't's Opp'n at 18.) Additionally, the Government argues that given M.H.S.'s professed opposition to fighting jihad, the draft letter makes clear that Pugh "was, in effect, leaving M.H.S. for good." (Id. at 18-19.) Neither claim, even in combination, is sufficient to prove that Pugh and M.H.S. were effectively separated at the time when the draft letter theoretically would have been sent.

First, that Pugh and M.H.S. were only briefly married, did not live in the same city for the vast majority of their marriage, and did not speak the same language, is simply not relevant to the separation inquiry. True, the Second Circuit has instructed district courts to "rely primarily on the duration of the couple's physical estrangement." In re Witness, 791 F.2d at 238. However, this statement was made in the context of a couple whose marriage had begun to fail. The court is not aware—and neither party has suggested—that an otherwise functioning marriage should receive less protection because the spouses happen to live apart, been newly married, or speak different languages. Indeed, such a claim would be anathema to the purposes of both the confidential communication privilege and the separation exception. The reason that separated spouses are no longer afforded protection is "that while it is in the interests of society for courts

10

to protect the confidentiality of the marriage relationship, there is little societal interest in protecting the confidential relationship of permanently separated couples." Byrd, 750 F.2d at 593. A functional, although new and long-distance marriage, is not the same as a permanently separated couple, and, therefore, it should be protected.

Second, the draft letter was not a declaration of permanent separation. Most importantly, the draft letter was never sent. Therefore, even if Pugh perhaps contemplated that the draft letter would have precipitated a permanent separation, that separation never occurred.

In any event, the facts proffered so far belie the Government's claim that Pugh's alleged decision to attempt to join ISIL effectually ended the marriage. Instead, the communications the court has received thus far demonstrate that although Pugh and M.H.S. frequently argued—especially about Pugh's professed desire to wage jihad—their relationship continued. (See,e.g., Gov't's Opp'n at 7 (Pugh asking if M.H.S. wished to go to Syria, Iraq, or Palestine); id. at 8 (Pugh telling Suofy to tell M.H.S. that "[t]his past Ramadan [I] saw the photos of the dead Muslims in Palestine and I cried a lot. I am tired of being a sheep in Islam when I want to be a Lion for Islam. There is so many Ayats in Quran about making Hijr to Muslim Lands, I want to be like the sahaba and fight for this deen."); id. at 10 (M.H.S. telling Pugh "[i]t's unfair that you push a person to be a burden on others. You want to go to jihad, even if your wife doesn't agree. You are not going to heaven, and I have rights, so please, before you go to jihad, give me my right [divorce me]." (alteration in Government's translation)); id. at 11 (M.H.S. telling Pugh "[i]n the beginning of marriage we agreed not to divorce and we agreed you don't talk about jihad."); id. at 12 (Pugh telling M.H.S. "I want Paradise and I want you to be my wife in Paradise. I love you and I want what's best for you."); Def.'s Reply at 4 (M.H.S. telling Pugh "Baby, you're the best man I've seen in my life. You're a good man, faithful and pure. May God preserve you,

baby.").) Accordingly, the court concludes that despite previous fights about Pugh's desire to wage jihad, the marriage had not yet become moribund as the Government claims.

Indeed, a conclusion that Pugh's marriage had become moribund would be contrary to Second Circuit precedent. In In re Witness, 791 F.2d at 234, the Second Circuit cautioned district courts about inquiring into marriages "where the couple still regularly or occasionally cohabited, but where the government contended that the marital relationship had irrevocably deteriorated." 791 F.2d at 238 n.2. Likewise, other courts have rejected the view that the confidential communication privilege does not apply to extant but deteriorated marriages. See, e.g., Byrd, 750 F.2d at 592 ("Accordingly, we reject the government's argument that where the communications are made in a 'deteriorated marriage,' the communications privilege cannot apply."); United States v. Mavroules, 813 F. Supp. 115, 119 (D. Mass. 1993) ("The fact that the communications are made at the time when the marriage is deteriorating does not destroy the privilege." (internal citation and quotation marks omitted)).

Thus, although Pugh and M.H.S.'s marriage had problems, the court cannot conclude that they were permanently separated.

### 3. Communication

The Government argues that Pugh "has not established that a draft letter saved on his laptop constitutes a marital communication, or how or when he intended to send the letter to his wife." (Gov't's Opp'n at 16.) Pugh responds that "[i]t is no great stretch to infer that Pugh intended to deliver it in the same way as hundreds, if not thousands, of his other communications with his wife: via Facebook messenger." (Def.'s Reply at 3.) Pugh has failed to carry his burden to show that the draft letter was intended to be a communication.[1]

_____

[1] Despite Pugh's claim to the contrary (see Def.'s Sur-Sur Reply (Dkt. 78)), the fact that the Government believes that Pugh would have sent the letter is not relevant. As the party asserting the privilege, Pugh bears the burden of

Tautologically, in order for a letter to receive marital communications protection, it must be communicative. See, e.g., United States v. Estes, 793 F.2d 465, 467 (2d Cir. 1986) (marital communications privilege only protects utterances and communicative acts); United States v. Bahe, 128 F.3d 1440, 1443 (10th Cir. 1997) ("Thus, the majority rule among state and federal courts holds that all acts intended to convey a message are privileged." (internal citation and quotation marks omitted)); United States v. Evans, 966 F.2d 398, 401 (8th Cir. 1992) ("The privilege extends only to words or acts that are intended as a communication to the other spouse."); United States v. Smith, 533 F.2d 1077, 1079 (8th Cir. 1976) ("Extension of the privilege beyond acts intended as communications is unjustified."). That is, in order to invoke the privilege, there must be, at minimum, a manifested intent to communicate. See Developments in the Law, Privileged Communications, 98 Harv. L. Rev. 1563, 1572 (1985) ("As generally defined, 'communication' involves a subjective intent to transmit information.").

Here, there is no evidence that Pugh intended the letter to be a communication. Put in other words, there is no evidence that Pugh intended to send the draft. United States v. Moshen, 587 F.3d 1028 (9th Cir. 2009) (per curiam), is instructive. There, the defendant argued that "the district court abused its discretion by admitting into evidence a note found in [his] jail cell that had his wife's name at the top and no mailing address." Id. at 1032. The Ninth Circuit disagreed, it reasoning that the defendant "had presented no evidence whatsoever that he intended to deliver the message to his wife," and therefore, the defendant could not carry his burden of establishing the essential elements of the marital communications privilege. Id. (internal quotation marks omitted).

---

demonstrating that the draft letter was a communication. The Government's belief, based on its alignment with the Government's theory of the case, but unsupported by any proffered evidence, cannot carry that burden.

Much like the note in Moshen, Pugh has not demonstrated any intent to deliver the draft letter. Indeed, Pugh's only argument that the draft letter is a communication is that "it is no great stretch to infer" that Pugh intended to send the letter to M.H.S. (See Def.'s Reply at 3.) An inference devoid of evidentiary support is insufficient to carry Pugh's burden.

In any event, it is a significant stretch to infer that Pugh intended to deliver the letter to M.H.S. First, unlike much of Pugh's communication which was delivered over Facebook, the draft letter was recovered as a file on Pugh's laptop. (Gov't's Opp'n at 4, 13.) Moreover, there is no indication that Pugh even once, much less regularly, typed his messages using a program on his laptop and then copied them into Facebook. Second, there is no indication that Pugh had sought to have the letter translated (either by a third-party or using translation software), as would have been required in order for M.H.S. to understand the document. Finally, the draft letter is inconsistent with Pugh's professed reasons for travelling to Turkey. Pugh has repeatedly claimed to Turkish and American law enforcement officials and to this court that he intended to travel to Turkey to seek work. (See Gov't's Sur-Reply (Dkt. 76) at 1.) That claim is inconsistent with Pugh's argument that the draft letter was meant to be sent to M.H.S., because a person travelling to Turkey for work likely would not send a letter to their spouse saying that they had left home to join ISIL in Syria.[2] Thus, there is no objective indication that Pugh ever intended to send the letter. Without any evidence that he intended to send the draft letter, Pugh cannot carry his burden to show that each essential element of the marital communications privilege applies.

Pugh's citation to United States v. Montgomery, 384 F.3d 1050 (9th Cir. 2004) (see Def.'s Mem. at 3-4), is inapposite. In Montgomery, the Ninth Circuit excluded under the marital communications privilege a letter from a wife to her husband. Id. at 1057. The letter in

---

[2] The court at this stage expresses no view on whether Pugh actually travelled to Turkey for work. Instead, the court only cites the inconsistency in Pugh's position because the inconsistency makes it more likely that the letter was not intended to be sent.

Montgomery "was left on the kitchen counter of the couple's home." Id. The letter, therefore, was left in a place suggesting that it was intended to be transmitted from one spouse to another. Indeed, in Montgomery, both parties agreed that the letter was plainly a communication. Id. at 1056. Thus, Montgomery stands for nothing more than the uncontested proposition that a communicative intent is required in order to assert the privilege and that such intent can be suggested by the evidentiary record. Montgomery does not help Pugh, because Pugh's draft letter was not left in a location where it was likely to be discovered by M.H.S. Indeed, there is no indication in the record that M.H.S. had access to Pugh's laptop at all.

Accordingly, the court finds that because there is no indication that the draft letter would ever be sent to M.H.S., Pugh has failed to carry his burden to prove the essential elements of the marital communications privilege, and, consequently, the draft letter is admissible.[3]

---

[3] Pugh argues that if the letter was not intended to be sent to M.H.S. then it should be excluded under Rule 403. (Def.'s Reply at 4.) The court disagrees.

First, Pugh's position misstates both the Government's position and the court's holding concerning whether the draft letter was a communication. To be clear, the court does not hold that Pugh would not have sent the draft letter. Instead, all the Government argued and all the court holds is that Pugh has not pointed to sufficient evidence to show that he would have sent the draft letter. This does not mean that Pugh did not at one point contemplate sending the letter nor that the letter is not an accurate reflection of Pugh's thoughts at the time.

The draft letter is highly probative because it speaks to Pugh's state of mind right before he flew to Turkey. Indeed, the Federal Rules of Evidence explicitly recognize contemporaneous statements of future intent as being reliable and important evidence. See Fed. R. Evid. 803(3) (hearsay exception for then-existing mental state).

"Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Quattrone, 441 F.3d 153, 186 (2d Cir. 2006) (internal citation omitted). Accordingly, courts in this Circuit have routinely admitted a Defendant's statements supporting terrorist groups in terrorism cases. See, e.g., United States v. Abu-Jihaad, 630 F.3d 102, 132-33 (2d Cir. 2010) ("[W]e conclude that the recorded discussions were both highly probative of the charged crime and, to the extent they referenced uncharged contemporaneous support for jihad, no more inflammatory than the charges alleged in the indictment.") United States v. Mostafa, 16 F. Supp. 3d 236, 257 (S.D.N.Y. 2014) ("[T]he statement's potentially prejudicial impact does not outweigh its high probative value. While it is prejudicial that the defendant has stated that he supports violent jihad, this is similar to, and no more prejudicial than, the crimes with which he has been charged."); id. at 258 ("Here, the defendant is charged with precisely the type of conduct described in this—his own—statement. His statement is no more prejudicial than that with which he has already been charged.").

Thus, the court rejects Pugh's Rule 403 challenge to the admissibility of the draft letter.

4. Confidentiality

The above discussion concerning communicative intent is sufficient to dispose of Pugh's claim of marital privilege. Nonetheless, in the interest of completeness, the court addresses the government's alternative argument that the draft letter is not privileged because it was not intended to be confidential.

The Government argues that even if the letter could be considered a communication, it was not intended to be confidential "because the defendant and M.H.S. did not speak the same language, and based on their history of using third-party intermediaries to translate important communications, it is clear that, to the extent the defendant intended to send the draft letter to M.H.S., he also intended to disclose it to a third party to have it translated or expected that M.H.S. would disclose it for translation." (Gov't's Opp'n at 21.) Pugh responds that "the government has not overcome the presumption that the letter was confidential," because "Pugh and M.H.S. were in the unusual situation of sometimes needing the assistance of third parties to communicate with each other because of the language barrier between them." (Def.'s Reply at 5.)

a. *Did Pugh Manifest an Intent to Disclose the Draft?*

As a preliminary matter, the court must determine whether Pugh would have used a third-party translator to communicate the letter. The Government cites numerous examples where Pugh relied on a third-party translator to convey "his desire to fight jihad to M.H.S." (See Gov't's Opp'n at 22 (citing communications where Pugh sought translators to help him communicate to M.H.S. his desire to move to ISIL controlled lands).) Pugh argues that "notwithstanding the government's cherry-picked communications, a more fulsome review of the couple's communications demonstrates that Pugh was fully capable of delivering lengthy,

16

complicated messages via Facebook and Google Translate (even if he risked losing some of the sense of his original message)." (Def.'s Reply at 3.)

As evidence, Pugh cites a lengthy January 5, 2015, Facebook message that Pugh sent to M.H.S. (Id.) This message, written "in both English and Arabic, the latter by means of Google Translate" (id.), is indeed lengthy. However, it does not dispel the Government's claim that Pugh and M.H.S. required and regularly used third-party translators to communicate long messages. (See Gov't's Opp'n at 21 (citing conversation where Pugh asked Galal A. to pass a message to M.H.S.).) Indeed, the fact that Pugh sent a lengthy English and Arabic message to M.H.S. strengthens the claim that Pugh or M.H.S. would have needed to consult a third-party translator in order to understand the draft letter. There is no doubt that Pugh was capable of sending a long English message to M.H.S. Instead, the question is what M.H.S. would do when she received the message. Pugh knew that M.H.S. did not speak English, and accordingly, when he sent her long messages in English he knew that she often consulted with a translator. (Id. at 21-22 (indicating that Pugh told M.H.S. to talk to Jalal to translate his messages). Indeed, Pugh appears to admit that communication of the draft letter would have required a third-party translator. (See Def.'s Reply at 5 ("Pugh and M.H.S. could not communicate their deepest feelings without the assistance of another person who knew both of their languages." (internal quotation marks removed)).)

Moreover, even if the court credited Pugh's argument that he did occasionally send M.H.S. long messages using Google Translate, the court would still find that the draft letter was likely to be translated. Where Pugh sought to communicate his views regarding jihad, he regularly relied on translators. (See Gov't's Opp'n at 22 (citing numerous examples); Aug. 18, 2014, Message from Pugh to Suofy (Gov't's Opp'n, Ex. 1) at ECF p. 39) (Pugh asks

Suofy to tell M.H.S. that "I am not happy being a Muslim I want to be a believer. I want to follow Quran and Sunnah. I can not [sic] sit by and [sic] the unbelievers kill us any more [sic]. I want to be a brick in building the Islamic State").) This makes sense: Pugh and M.H.S. often fought about jihad, so Pugh may have wanted a more exact translation of these conversations than Google Translate would provide.

Thus, the January 5, 2015, letter does nothing to dispel the claim that Pugh would seek a translator when he expressed his views on jihad, because it does not related to jihad. Accordingly, the court concludes, based on the evidence currently available, that Pugh or M.H.S. would have needed to consult a third-party translator in order to communicate the draft letter.

Moreover, the court concludes that Pugh and M.H.S. were unlikely to employ a trusted, confidential translator. Indeed, the couple appears to have relied on an ad hoc network of friends, family, acquaintances, and even strangers to translate messages for them. For example, on December 7, 2014, Pugh sent a message to another Facebook user whom he had recently "friended" asking for Pugh's new "friend" to help him find people who could help Pugh communicate to M.H.S. his desire to emigrate to ISIL-controlled lands. (Gov't's Opp'n at 11; see also id. at 4; id. at 10 (Pugh requesting that Mohamed G., an acquaintance, translate a message).)

### b.  *Disclosure and the Privilege*

The question, then, is whether Pugh and M.H.S.'s intent to reveal the draft letter to a third-party translator destroy the marital communications privilege. The court holds that it does. However, it is important to clarify the scope of the court's holding. As explained more fully below, this case does not require the court to determine whether disclosure to an internet translator (such as Google Translate) destroys the confidential marital communications privilege. Likewise, this case does not require the court to determine whether disclosure to a trusted

translator waives the privilege. Instead, the court decides that where a married couple evidences an intent to disclose communications to an ad hoc network of family, friends, and strangers for translation, the privilege is forfeited.

"[M]arital communications are presumptively confidential." Blau v. United States, 340 U.S. 332, 333 (1951). However, as a general matter, "where the alleged confidential information is disclosed to a third party, the privilege is eliminated." United States v. Marcos, No. 87-CR-598 (JFK), 1989 WL 135256, at *4 (S.D.N.Y. Oct. 31, 1989); see also Pereira v. United States, 347 U.S. 1, 6 (1954) ("Although marital communications are presumed to be confidential, that presumption may be overcome by proof of facts showing that they were not intended to be private."); Campinas Found. v. Simoni, No. 02-CV-3965 (BSJ) (KNF), 2005 WL 1006511, at *4 (S.D.N.Y. Apr. 27, 2005) ("The Court is aware that communications between spouses are presumed to be confidential. However, that presumption can be rebutted when the communicant is aware that the information was or might be disclosed to a third-party or to the public.").

In Wolfle v. United States, 291 U.S. 7 (1934), the Supreme Court held that communications from a husband to a wife, via a stenographer, were not protected by the marital communications privilege, because "[n]ormally husband and wife may conveniently communicate without stenographic aid, and the privilege of holding their confidences immune from proof in court may be reasonably enjoyed and preserved without embracing within it the testimony of third persons to whom such communications have been voluntarily revealed." 291 U.S. at 16-17.[4] However, the Supreme Court explained that "communications between husband

---

[4] Wolfle is "the leading marital communications privilege case to have reached the Supreme Court." See United States v. Hamilton, 701 F.3d 404, 407 (4th Cir. 2012).

and wife may sometimes be made in confidence even though in the presence of a third person." Id. at 15.

Therefore, the court in this case must determine whether the use of Pugh's ad hoc translation network was vital to the efficacy of the marital communications such that the privilege should be extended to the translator's communication. See id. at 15-16 (explaining that communication between a patient and doctor is privileged, even when a nurse is present, because otherwise, the privilege could not be effective; further explaining that communication between an attorney and client is privileged, even when a law clerk is present, for the same reason); Hamilton, 701 F.3d at 404. The court concludes that, like the stenographer in Wolfle, the use of an ad hoc translation network was not vital to Pugh's marital communication.

Indeed, Pugh and M.H.S. regularly used internet translation services, such as Google Translate, to communicate short messages to each other.[5] (Gov't's Opp'n at 21.) Moreover, Pugh and M.H.S. could have potentially sought the use of other confidential translation software. Finally, even if a translator were required, Pugh and M.H.S. could have turned to a trusted agent with a duty of confidentiality, rather than an ad hoc network of translating friends, acquaintances, and strangers.[6] Thus, the court concludes that Pugh could have communicated with M.H.S. without resort to this ad hoc network of third-party translators.

Indeed, although neither the court nor the parties have found a case that directly addresses the applicability of the confidential marital communications privilege in the context of a translator, closely analogous cases show that similar disclosure destroys the privilege. Grulkey v. United States, 394 F.2d 244 (8th Cir. 1968), is instructive. There, the defendant mailed a letter

---

[5] Neither party has suggested that the use of Google Translate would itself be a disclosure. While it is certainly possible that the use of Google Translate is a disclosure, the court does not reach that question.

[6] Likewise, the court need not decide whether a couple would waive the marital communication privilege if they employed a trusted agent as a translator.

20

to his wife threatening to kill her with a shotgun. Id. at 245. The wife testified against the defendant and he was convicted. Id. On appeal, the defendant argued that his wife's testimony was improper, apparently under both spousal privileges. Id. at 246. The Eight Circuit first found that the testimony was proper because there is no privilege where one spouse is the victim of the charged criminal act. Id. It then analyzed whether the testimony concerned confidential communications at all. Id. The court found that it did not, noting that:

> [T]he communications testified to by [the wife] were not confidential in nature and were not intended so to be. [The wife] had difficulty reading and this fact was known to her husband. He therefore anticipated that the communications would be read to her and even suggested this in one of the communications. They were in fact read to her by her stepfather, and under these circumstances obviously were not confidential or intended to be confidential.

Id. at 246; see also State v. Fiddler, 360 P.2d 155, 157 (Wash. 1961) (holding that a letter from a husband to a wife was not confidential where, because the wife could not read, the letter would have needed to be read to her by a third party).

Moreover, the fact that communication would perhaps have been difficult without the aid of Pugh's ad hoc translation network, is beside the point. Wolfle makes clear that marital communications delivered through an intermediary are not privileged simply because the use of an intermediary is expedient. 291 U.S. at 16-17. Thus, for example, courts have held that marital communications made by employee-spouses on their work computers or over employer-owned-and-operated email servers are not protected by the marital communications privilege. See, e.g., United States v. Hamilton, 701 F.3d 404, 408 (4th Cir. 2012) ("But just as spouses can 'conveniently communicate without' use of a stenographer, they can also 'conveniently communicate without' using a work email account on an office computer." (quoting Wolfle, 291 US at 16)); In re Reserve Fund Sec., 275 F.R.D. 164-65; Etkin, 2008 WL 482281, at * 5; United States v. Ramsey, 786 F. Supp. 2d 1123, 1126 (E.D. Va. 2011); In re Oil Spill by the Oil Rig

"Deepwater Horizon", No. MDL 2179, 2011 WL 1193030, at *3 (E.D. La. Mar. 28, 2011).

Moreover, the marital communication privilege is even inapplicable in situations where marital communication likely requires disclosure to a third party. For example, where one spouse is imprisoned, communication between the married couple on prison telephones is not protected. See United States v. Madoch, 149 F.3d 596, 602 (7th Cir. 1998) ("Thus, because the marital communications privilege protects only communications made in confidence, under the unusual circumstances where the spouse seeking to invoke the communications privilege knows that the other spouse is incarcerated, and bearing in mind the well-known need for correctional institutions to monitor inmate conversations, we agree with the district court that any privilege [the couple] might ordinarily have enjoyed did not apply." (internal citation omitted)); Watson v. Albin, No. 06-CR-7767 (RMW), 2008 WL 2079967, at *2-4 (N.D. Cal. May 12, 2008) (rejecting the defendant's argument that the marital communications privilege applies to phone calls from prison phones because the couple had no other means of communicating); see also State v. Rollins, 675 S.E.3d 334, 340 (N.C. 2009) (holding that communications between a husband and a wife in a prison visiting area are not protected under North Carolina marital communications privilege).

The court's conclusion that recourse to an ad hoc network of informal translators destroys the marital communications privilege is bolstered by the general narrowness of the marital communications privilege. Courts routinely emphasize that the privilege must be constructed narrowly because it inhibits the truth-seeking function of trials. See Estes, 793 F.2d at 468 ("[P]ublic policy may militate against subjecting a marriage to the possible disruptive influence of compelled adverse spousal testimony. However, testimonial privileges must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or

22

excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." (internal quotation marks and citation omitted); see also United States v. Breton, 740 F.3d 1, 11 (1st Cir. 2014) ("[L]ike all privileges, the marital privileges hamper the truth-seeking process and must be interpreted narrowly."); United States v. Banks, 556 F.3d 967, 974 (9th Cir. 2009) ("However, because the marital communications privilege 'obstructs the truth seeking process,' its use 'in criminal proceedings requires a particularly narrow construction because of society's strong interest in the administration of justice.'" (quoting United States v. White, 974 F.2d 1135, 1138 (9th Cir. 1992))); S.E.C. v. Lavin, 111 F.3d 921, 929 (D.C. Cir. 1997) ("Generally, the considerations that support a strict approach to waiver in the attorney-client context would appear to apply as well in the marital context: while both privileges serve to promote important public interests by encouraging full and frank communications within special relationships, they must be narrowly construed because of their adverse effect on the full disclosure of truth." (internal quotation marks and citations omitted)); United States v. Acker, 52 F.3d 509, 515 (4th Cir. 1995) ("The marital communications privilege is in derogation of the truth, as are other evidentiary privileges; and therefore the 'valid marriage' requirement must be interpreted strictly."); United States v. Marashi, 913 F.2d 724, 730 (9th Cir. 1990) ("[W]e have emphasized that we will narrowly construe the marital communications privilege because it obstructs the truth-seeking process."); United States v. Frank, 869 F.2d 1177, 1179 (8th Cir. 1989) ("We recognize that privileges are disfavored because they impede the search for truth."); Byrd, 750 F.2d at 589 ("Despite the importance of these privileges, the Supreme Court has held that they must be narrowly construed because they are in derogation of the search for truth which lies at the heart of a criminal trial."); United States v. Paulin, No. 11-CR-0381 (JCM) (GWF), 2015

WL 139388, at *3 (D. Nev. Jan. 12, 2015) ("The court further states that the marital communications privilege is construed narrowly, to promote marriage without thwarting the administration of justice."); In re Reserve Fund Sec., 275 F.R.D. at 157 ("As such, a privilege must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" (alteration removed) (quoting Trammel v. United States, 445 U.S. 40, 50 (1980))); United States v. Blaine, No. 11-CR-346 (BO), 2012 WL 4473073, at *2 (E.D.N.C. Sept. 26, 2012) ("Because of this competing public interest the privilege itself is quite narrow and the party asserting the privilege bears the burden of establishing all of its essential elements.").

Moreover, the narrowness of the marital communications privilege is particularly salient with regard to disclosure to third parties. Indeed, courts writing after Wolfle appear to take the view that any disclosure of marital communication destroys the privilege. See, e.g., Pereira v. United States, 347 U.S. 1, 6, (1954) ("The presence of a third party negatives the presumption of privacy. So too, the intention that the information conveyed be transmitted to a third person."); Evans, 966 F.2d at 401 ("[T]he communication must be made in confidence; in other words, it cannot be made in the presence of a third party, and the communicating spouse cannot intend for it to be passed on to others."); Marashi, 913 F.2d at 730 ("[T]he privilege does not extend to statements which are made before, or likely to be overheard by, third parties."); United States v. Lustig, 555 F.2d 737, 748 (9th Cir. 1977) ("Communications made to or in the presence of third parties are not intended to be confidential and are not privileged."); Stanfield v. Dart, No. 10-CR-06569 (VMK), 2011 WL 5301784, at *2 (N.D. Ill. Nov. 3, 2011) ("The marital communications privilege covers all confidential communications made during a valid marriage

24

with three exceptions: 1) communications not made in absolute confidence . . . .); United States v. Harrison, No. 05-CR-17 (HL), 2006 WL 1131938, at *6 (M.D. Ga. Apr. 26, 2006) ("Because [husband] made this statement to a third party, albeit over the telephone, in [the wife's] presence, this communication was not made in confidence. Therefore, [the husband] cannot assert the marital communications privilege to stop [the wife] from testifying to this communication."); Engelmann v. Nat'l Broad. Co., No. 94-CV-5616 (MBM) (AJP), 1995 WL 214500, at *3 (S.D.N.Y. Apr. 10, 1995) ("Because the job search and accident litigation activities were directed toward third parties, the communications privilege does not apply."); Fallowfield Dev. Corp. v. Strunk, No. 89-CV-8644, 1990 WL 52749, at *5 (E.D. Pa. Apr. 25, 1990) ("In sum, this Court will permit [the wife] to raise the privilege against revealing confidential marital communications, but only to the extent that . . . the communication was confidential and intended to remain so and not made in the presence of a third party or made with the intent that it be conveyed to a third party."); United States v. Neal, 532 F. Supp. 942, 946 (D. Colo. 1982) ("The first exception provides that communications made by a spouse who knows that a third person is present are not protected from disclosure. A spouse who is aware of a third party's presence cannot be said to intend his or her statements only for the other spouse; thus the essence of confidential marital communication is absent. No justification exists, therefore, to prevent anyone present during the conversation from testifying about what either spouse said to the other." (internal citations omitted), aff'd, 743 F.2d 1441 (10th Cir. 1984)). Although the court is hesitant to conclude that Wolfle's narrow allowance of third-party disclosure has faded into desuetude, broad statements that any disclosure destroys the privilege reinforce the court's conclusion that Pugh's intended disclosure waived the privilege.

Finally, the court rejects Pugh's claim that because the presence of a translator does not destroy the attorney-client privilege, it also must not destroy the marital communications privilege. (See Def.'s Reply at 5.) Wolfle explicitly recognized that the presence of third parties during the communication may not destroy other evidentiary privileges. 291 U.S. at 15-16. Nonetheless, Wolfle proceeded to analyze the specific need for the use of a stenographer in the context of marital communications. Id. at 16. Here too, the court cannot simply decide the case by analogizing to the need for a translator in the context of other privileged relationships. Rather, it must examine the need for a translator in the specific context of the marital relationship. See 281 Syosset Woodbury Road, 71 F. 3d at 1072 (noting that waiver of doctor-patient privilege in the medical malpractice context could not easily be analogized to waiver of the marital communication privilege in the civil forfeiture context). As explained above, extending the privilege to cover Pugh and M.H.S.'s use of an ad hoc translator network would be inconsistent with the scope of the marital communications privilege.

Accordingly, even if the draft letter were a communication, the letter would be admissible because it was not intended to be confidential.

### B.    ISIL Propaganda Videos and Documents Found on Pugh's Laptop

The dispute concerning whether and, if so, which terrorist propaganda videos are admissible has significantly narrowed throughout the briefing of the motions in limine. Thus, the court begins with a brief procedural history. At first, the Government moved to admit "certain terrorist propaganda videos, documents, and other materials recovered from the defendant's computer, as well as videos the defendant accessed via social media." (Gov't's Mem. at 1.) Simultaneously, Pugh moved to exclude, without limitation, "videos or photographs depicting violence or acts of terrorism that are not directly related to Pugh's alleged acts." (Def.'s Mem.

at 3.) The Government responded that it "proposes to play a limited selection of videos out of more than 100 recovered from the defendant's laptop." (Gov't's Opp'n at 24.) In his opposition, Pugh asked the court to order the Government to specifically identify the videos and documents, recovered from Pugh's laptop, which it intends to introduce. (Def.'s Opp'n (Dkt. 69) at 2.) The Government complied with Pugh's request (see Jan. 29, 2016, Order), and provided a list of the videos and documents it intended to introduce in its reply brief (see Gov't's Reply). Pugh now objects to only three videos: (1) a 34-second video that opens with a ISIL logo and depicts President Obama's face being blown apart by bullets, which Pugh contends should be wholly inadmissible; (2) excerpts from a video that depicts the lead up to a mass ISIL execution; and (3) excerpts from a second video that depicts the lead up to a mass ISIL execution. (Def.'s Sur-Reply (Dkt. 83).) Neither Pugh nor the Government has suggested which, if any, videos or documents—not referenced in the Government's reply—the Government would seek to introduce. Accordingly, the court restricts its analysis to the limited selection of videos and documents disclosed by the Government in its reply brief. (See Gov't's Reply.) To the extent that the Government seeks to admit other videos, photographs, or documents depicting terrorism, the court will consider any objections at that time.

1.    Relevance

As a preliminary matter, Pugh concedes that the propaganda videos and documents, which the Governments intends to introduce, are relevant. (See Def.'s Opp'n at 1 ("As a general matter, Pugh does not dispute that the fact that he possessed certain ISIS or Jihadist propaganda on his computer or social media is potentially relevant to the charged offenses."); Def's Sur-Reply (only challenging the videos under Rule 403).) Pugh's concession is sensible. The Second Circuit has regularly allowed terrorist propaganda to be admitted, particularly in the

27

context of material support offenses, in order to prove the <u>mens rea</u> element of the offense. <u>See, e.g.</u>, <u>United States v. Kaziu</u>, 559 F. App'x 32, 35 (2d Cir. 2014) (summary order); <u>United States v. Abu-Jihaad</u>, 630 F.3d 102, 133-34 (2d Cir. 2010).

Thus, the only question that remains is whether any of the three videos, to which Pugh objects are so highly prejudicial that their introduction would cause unfair prejudice that substantially outweighs their probative value.

2. <u>Prejudice</u>

  *a.*   *Discussion*

The court notes that it does not write against a blank canvas with regard to Rule 403 analyses of terrorist propaganda materials in the context of material support prosecutions. Although Rule 403 analyses are highly context-specific, <u>see</u> <u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 388 (2008) ("Applying Rule 403 to determine if evidence is prejudicial also requires a fact-intensive, context-specific inquiry."), the court begins with other decisions that have applied rule 403 to terrorist propaganda.

<u>United States v. Salameh</u>, 152 F. 3d 88 (2d Cir. 1998) (<u>per curiam</u>), is instructive. There, the trial court admitted certain terrorism propaganda documents, possessed by the defendants, which "bristled with strong anti-American sentiment and advocated violence against targets in the United States." <u>Id.</u> at 111. The defendants appealed their convictions, arguing, in part, that admitting the evidence violated Rule 403. <u>Id.</u> at 110. The Second Circuit disagreed; it reasoned that the materials performed two important functions: first, they evidenced motive and second, they "provided the jury with background and 'an explanation of the understanding or intent with which certain acts were performed.'" <u>Id.</u> at 111 (quoting <u>United States v. Daly</u>, 842 F.2d 1380, 1388 (2d Cir. 1988)). Accordingly, although the Second Circuit court acknowledged that "[t]he sulphurous anti-American sentiments expressed in the terrorist materials no doubt

threatened to prejudice the jury against the defendants," it found that it was not an abuse of discretion to admit the documents. Id.

Moreover, other courts confronting similar Rule 403 issues have found that jihadist propaganda videos and documents found in a defendant's possession are admissible to show intent in a material-support case, despite the fact that such videos and documents risk prejudice. See, e.g., United States v. Mehanna, 735 F.3d 32, 59-64 (1st Cir. 2013) (finding terrorist media admissible in material-support trial because it was highly probative to state of mind); United States v. El-Mezain, 664 F.3d 467, 508-511 (5th Cir. 2011) (admitting propaganda evidence in a material support case despite a Rule 403 challenge); United States v. Hammoud, 381 F.3d 316, 340-342 (4th Cir. 2004) (admitting evidence of terrorist propaganda videos found in defendant's home because they were relevant to motive and were not unduly prejudicial), vacated on other grounds, 543 U.S. 1097.

However, as noted by United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008), not all descriptions of terrorist acts and activities will survive a Rule 403 challenge. In Al-Moayad, the defendants were convicted of, among other charges, providing material support to terrorist organizations. Id. at 145. They appealed, arguing that the testimony of one witness, who gave a first-hand account of a suicide bombing of a bus in Tel-Aviv, and the testimony of another witness, who testified about an al-Qa'ida training camp, Osmama Bin Laden's visit to the camp, and a video showing al-Qa'ida training, were unduly prejudicial. Id. at 152-57. The Second Circuit agreed that the testimony should have been excluded citing the "highly charged and emotional nature of the testimony." Id. at 160. Moreover, the bus bombing testimony was only tangentially relevant because "[t]he defendants were not charged with planning or carrying out the Tel Aviv bus bombing." Id. Instead, the Government proposed that the bus bombing

testimony was only relevant to show that the defendants knew that Hamas engaged in terrorist activity, a fact which the defendants did not deny. Id. Likewise, the Second Circuit found that the terrorist training camp testimony should also have been excluded, characterizing it as "highly inflammatory." Id. at 163. Moreover, it was of exceedingly limited relevance because the testimony only served to further authenticate a document which had already been authenticated by other means. Id. at 162.

The above discussion yields two useful observations. First, courts are more likely to admit terrorist propaganda material when it bears a direct relationship to the allegations at issue in the trial. Second, where propaganda is introduced to show state of mind, courts will consider whether state of mind is at issue. Indeed, courts writing after Al-Moayad have been explicit in addressing these principles. For example, in Mehanna, the First Circuit found that Al-Moayad did not control:

> The evidence of which the defendant complains was (unlike the evidence challenged in Al-Moayad) central to the government's narrative: the government's case depended on proving that the defendant's actions emanated from views that, over time, had aligned with al-Qa'ida's. The media that he consumed en route to forming those views is a salient part of the story.

> Moreover, that part of the story was fiercely contested. Although the defendant indicated a willingness to admit that he admired al-Qa'ida's ideals, he steadfastly disassociated himself from any anti-American actions involving violence. As he put it, his beliefs 'would prevent [him] from attacking fellow Americans within the United States or outside of it.' In the same vein, his counsel cast Yemen as nothing more than a 'free trip' for the defendant to 'do what he wanted to do'—seek out a scholarly community. The challenged evidence helped to tell a different tale—and it tended to make the defendant's account less believable.

> We summarize succinctly. On the pivotal issue of his state of mind with respect to his Yemen trip, the defendant refused to yield an inch. His objections [] largely overlooked (or, at least, implausibly discounted) the potential value of the challenged evidence in

30

undercutting his insistence that his motive in going to Yemen was benign. Al–Moayad is, therefore, distinguishable.

Mehanna, 735 F.3d at 62; see also El-Mezain, 664 F.3d at 509 (distinguishing Al-Moayad on similar grounds); United States v. Abu-Jihaad, 600 F. Supp. 2d 362, 402 (D. Conn. 2009) (distinguishing Al-Moayad because "the videos were directly relevant to Mr. Abu–Jihaad's intent and motive and also to Azzam's support for violent jihad. The Government did not show the jury videos that Mr. Abu–Jihaad had never seen before. Much of the communications between Azzam and Mr. Abu–Jihaad related to the videos that were shown to the jury. He had them and viewed them, and therefore the evidence related directly to his knowledge, intent, and motive"), aff'd, 630 F.3d 102 (2d Cir. 2010); United States v. El-Hindi, No. 06-CR-719, 2009 WL 1373268, at *2 (N.D. Ohio May 15, 2009) (distinguishing Al-Moayad on similar grounds).

### b.    *Application*

The court has performed an in-camera review of each of the videos and documents that the Government proposes to admit, including the three videos to which Pugh objects.

As a preliminary matter, the evidence proffered here is far different than the evidence rejected in Al-Moayad. First, the evidence here speaks directly to state of mind because it was found in Pugh's possession. That is, the evidence the Government proposes to admit shows the media that Pugh consumed before he flew to Turkey. Second, state of mind is a critical issue in dispute; if Pugh successfully proves that he flew to Turkey to seek work, then he would not have taken a substantial step to provide material support to terrorism.

That does not mean that the proffered videos are admissible per se. In fact, the court believes that Pugh's claims of unfair prejudice are not without some merit. For the reasons stated below, the court finds that the Obama Video is inadmissible because it would substantially prejudice Pugh, while providing little probative benefit to the jury. The court rejects Pugh's

challenges to the video entitled Facebook8.mp4, and to the second excerpt of the video entitled Facebook25.mp4.

First, the court concludes that the Obama Video is inadmissible. "This 34-second video, shows the ISIL flag, the sound of gunfire, and a poster-like image of President Obama, with bullet holes ripping into the image until President Obama's face is obscured, followed by the words, 'Kill Obama.'" (Gov't's Reply at 9.) The video was found in Pugh's cached internet files, meaning that Pugh visited a webpage that contained the video. (Def.'s Sur-Reply at 1-2.)

The video is broadly speaking relevant to the Government's case. The fact that Pugh visited a webpage that hosted the video offers some circumstantial evidence regarding Pugh's views of ISIL during the time period before he left for Turkey. However, the probative value of the video is quite limited. The video does not depict anything about ISIL's operations or goals in Syria. Consequently, the video is far removed from the charged offense. Moreover, except for the English writing saying "Kill Obama," the video is entirely in Arabic and does not contain subtitles. Thus, beyond the broad message that ISIL has the goal of killing the President, the video would have offered Pugh very little information about ISIL's organization, goals, or operation in Syria. Accordingly, the video has little probative value in showing that Pugh wished to join ISIL in Syria.

On the other hand, a jury is likely to have a viscerally negative reaction to an image of the shooting of an American President. The court believes that such an image seriously risks Pugh being unduly prejudiced in the eyes of the jury. Therefore, the court will not allow the Obama Video to be played.

Second, the court concludes that the Government's excerpted version of the video entitled Facebook8.mp4 is admissible. Pugh first argues that the video is unduly prejudicial

32

because it depicts "executions and beheadings." (Def.'s Sur-Reply at 2.) That argument is simply not true. As Pugh himself recognizes, the Government has edited the clip to stop before any execution or beheading is depicted. (Id.; see also Gov't's Reply at 7-8.) Instead, Pugh's argument appears to be that the excerpt impermissibly shows executioners, wielding knives, in the moments before an unseen execution. (Def.'s Sur-Reply at 2.) Defendant is correct that the scene is "viscerally disturbing." (Id.) However, the court does not believe that the scene is unduly prejudicial.

Preliminarily, the video is highly relevant. The video is plainly intended for an English-speaking audience; it recounts the history of ISIL and contains English subtitles. Thus, the fact that the video was found in Pugh's possession speaks strongly to his state of mind. Moreover, the video depicts the actions of ISIL fighters in a battlefield. Thus, the video speaks directly to the charged conduct (joining ISIL abroad). Pugh's argument that there is no legitimate reason to introduce the "gory excerpts" is misplaced. (Def.'s Sur-Reply at 2.) "Because this [is] a case about supporting terrorists, it is inescapable . . . that there [will] be some evidence about violence and terrorist activity. It cannot be denied that [such] evidence [will be] unfavorable to the defendant[], but [the court] cannot conclude that it [will be] unduly prejudicial." El-Mezain, 664 F.3d at 511. Here, the "gory excerpts" were part of the propaganda that the Government intends to show that Pugh consumed in the days leading up to his flight to Turkey. As explained above, the nature and content of the video speak strongly to Pugh's state of mind. Thus, although the excerpt likely will cause Pugh some prejudice, the court cannot conclude that such prejudice substantially outweighs the probative value of the video.

Third, and for many of the same reasons, the court concludes that the second excerpt from the video entitled Facebook25.mp4 is admissible. The excerpt the Government intends to

play "depicts ISIL fighters rounding up half-clothed prisoners and, ultimately, forcing them to lie down in a sprawling human pile. The excerpt leaves out scenes depicting the mass execution of the prisoners." (Gov't's Reply at 9.) As explained above, the video speaks directly to the charged conduct because it depicts ISIL fighters abroad. Accordingly, the video is highly probative of state of mind. Although the scene depicted is undoubtedly disturbing, the court cannot conclude that its likely prejudice significantly outweighs its probative value.

Finally, to the extent the risk of unfair prejudice arises at trial, the court will issue an appropriate limiting instruction at the appropriate time and at the request of the Defendant. See Abu-Jihaad, 630 F.3d at 134 (a proper limiting instruction minimizes the risk of undue prejudice).

## IV.    CONCLUSION

For the reasons state above, the court holds that (1) the draft letter found on Pugh's laptop is ADMISSIBLE, and (2) the ISIL propaganda videos that the Government disclosed in its reply brief are ADMISSIBLE, except for the Obama Video. The court further RESERVES ruling on (1) whether any marital communications, other than the draft letter, would be admissible, and (2) whether any videos or photographs, not disclosed in the Government's reply brief, would be admissible.


SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      February 12, 2016

NICHOLAS G. GARAUFIS
United States District Judge