# LAW OFFICES OF SUSAN G. KELLMAN

### 25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
### (718) 783-8200 • FAX (718) 783-8226 • SGK@KELLMANESQ.COM
### FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

May 8, 2017

**Via ECF and U.S. Mail**
Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     United States v. Tairod Pugh
        Docket No. 15 Cr. 116 (NGG)

Dear Judge Garaufis:

This letter is respectfully submitted to aid your Honor in the sentencing of my client, Tairod Pugh. Mr. Pugh is scheduled to be sentenced on May 31, 2017.

This is an unusual case. I am Mr. Pugh's third attorney, and was appointed after trial for the purposes of assisting Mr. Pugh and the Court with a myriad of issues related to sentencing. Since Mr. Pugh intends to appeal his conviction, this letter does not address acceptance of responsibility, remorse, insight into criminal behavior, or any topic common to a traditional sentencing submission that could be read to further inculpate Mr. Pugh. Rather, this submission addresses why a non-guidelines sentence is sufficient, but not greater than necessary to meet the goals of sentencing as outlined in 18 U.S.C. § 3553(a), in this unique case.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 2 of 35

Prior to trial, Mr. Pugh was offered a plea to 18 U.S.C. § 2339B(a)(1), with an effective applicable advisory Guidelines range of 180 months, the statutory maximum.[1] Now, after trial, Probation has calculated his actual Guidelines range to be 360 to 420 months, or 30 to 35 years. At the low end, such a sentence is twice as high as the maximum (and Guidelines) sentence in the plea offer initially viewed by government counsel as an appropriate disposition.  As addressed more fully below, given: (1) Mr. Pugh's history and characteristics, including his service in the United States Air Force, his age and lack of criminal history; (2) a ███████████████████████, which led to distrust of his attorneys and poor decision-making; (3) the fact that the government viewed a sentence of 180 months to be reasonable for this defendant in a pre-trial context; and (4) a review of the sentences received by similarly situated defendants in attempted material support cases across the country,  it is respectfully submit that a non-guidelines sentence is reasonable and appropriate in this case.

## I.       Objections to the Pre-Sentence Report

Mr. Pugh intends to appeal his conviction. As such, there are a number of facts outlined in the offense conduct section of the PSR to which he objects. We have elected not to contest these facts at sentencing. However, our failure to raise these objections to

---

[1]    With an adjusted offense level of 37 and a Criminal History Category of VI, the original range of imprisonment was 360 months to life; however because the statutory maximum sentence was 15 years, pursuant to 18 U.S.C. § 2339B(a)(1), the defendant's effective applicable advisory Guidelines range was 180 months.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 3 of 35

the PSR should not be construed as a waiver of Mr. Pugh's right to contest these facts on

appeal.

**a.      Probation Applies the Wrong Guideline to Establish the Base Offense**

Probation relies upon U.S.S.G. § 2M5.3 to determine the base offense level in this

case; however, an "attempt" to violate 18 U.S.C. § 2339B(a)(1) is not covered by this

Guideline. Accordingly, the base offense level must be determined under U.S.S.G. §

2X1.1, which covers "attempts, solicitations and conspiracies" that are not specifically

covered by another Guideline provision.

Unlike U.S.S.G. § 2M5.3, § 2X1.1 considers the inchoate nature of Mr. Pugh's

offense in two ways. First, under subsection (b), if the offense was an attempt, the level is

decreased by 3 levels, "unless the defendant completed all the acts the defendant believed

necessary for successful completion of the substantive offense or the circumstances

demonstrate that the defendant was about to complete all such acts but for apprehension

or interruption by some similar event beyond the defendant's control." Neither exception

applies here. Assuming *ex arguendo* that Mr. Pugh is guilty of attempt under 18 U.S.C. §

2339B(a)(1), as we do throughout this submission, there is no evidence that he

"completed all the acts [he] believed necessary for successful completion of the

substantive offense." Further the evidence does not "demonstrate that [he] was about to

complete all such acts but for apprehension or interruption by some similar event beyond

[his] control." U.S.S.G. § 2X1.1(b)(1). Second, if our analysis proceeds, as it should,

May 8, 2017
Hon. Nicholas G. Garaufis
Page 4 of 35

under §2X1.1, there is no 2-level upward adjustment per § 2M5.3(b)(1)(E) as

contemplated in paragraph 21 of the PSR.

### b.  Objection to the Terrorism Enhancement

We also object to the application of the Terrorism Enhancement under U.S.S.G.

§3A1.4 in this case. Our objection to the application of this enhancement is discussed in

further detail below.

### c.  Other Objections

**Paragraph 53** states that there is no record of Mr. Pugh's divorce from Sheila

Anderson on file with the South Carolina Vital Records office. Upon information and

belief, a copy of the divorce decree was among the belongings seized from Mr. Pugh

incident to his arrest.

**Paragraph 53** further states that Mr. Pugh was "in arrears" on child support

payments and could not pay the required $667 per month. Mr. Pugh states that he often

made many of his child support payments directly to Ms. Anderson through Western

Union. He now understands that these payments were never deducted from the total owed

because he did not make them through the court, but at the time, he made the payments in

good faith with the intention of legitimately contributing to the support of his children.

Mr. Pugh has provided counsel with Westerner Union MCTN tracking numbers that

reveal that between February 10, 2014 and January 6, 2015, Mr. Pugh wired a total of

May 8, 2017
Hon. Nicholas G. Garaufis
Page 5 of 35

$3,780 to Ms. Anderson for child support. Additionally, from January 2014 through

August 2014, Mr. Pugh was employed by STS Services, and his employer automatically

deducted an agreed-upon amount ($137/week) for child support.

We have no further objections to the PSR.

## II.   Procedural History

On January 17, 2015, Mr. Pugh was arrested on the basis of a complaint charging

him with attempting to provide material support to a foreign terrorist organization. On

that date, Michael K. Schneider of Federal Defenders was assigned to represent him. Mr.

Schneider represented Mr. Pugh until June 9, 2015, when CJA attorney Eric M. Creizman

was appointed in his place.

On March 16, 2015, Mr. Pugh was indicted on two counts: (1) Attempt to Provide

Material Support to a Designated Foreign Terrorist Organization under pursuant to 18

U.S.C. § 2339B(a)(1); and, (2) Obstruction and Attempted Obstruction of an Official

Proceeding, pursuant to 18 U.S.C. § 1512(c)(1).

On March 9, 2016, after a four-day trial, Mr. Pugh was convicted on both counts.

At a status conference held on April 21, 2016, present counsel was appointed. The

government was directed to inform the Court whether a de-radicalization program might

be appropriate for Mr. Pugh. Reasoning that 'the Minnesota de-radicalization initiative is

still in the very early stages of development', the government took "no position

May 8, 2017
Hon. Nicholas G. Garaufis
Page 6 of 35

concerning its potential application to the defendant, Tairod Pugh." The appropriateness

of such a placement for Mr. Pugh is discussed in further detail below.

**III.    The Psychological Report**

Shortly after my appointment, I asked the Court to appoint Dr. Sanford Drob, a

psychologist, to evaluate Mr. Pugh's mental state. In my discussions with my client, it

was my sense that he ███████████████████████████████████████████

███████████████████████████████. It was my hope that a psychological

evaluation would provide us with a better understanding of the challenges that Mr. Pugh

might be facing. Dr. Drob's report is attached as Exhibit A.

Dr. Drob administered a number of psychological tests. According to the results of

the Millon Clinical Multiaxial Inventory III (MCMI III), Mr. Pugh has ████████

███████████████. Dr. Drob explained:

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████.

While Dr. Drob ███████████████████████████," he found that Mr.

Pugh ██████████████████████████████████████████

May 8, 2017
Hon. Nicholas G. Garaufis
Page 7 of 35



████████████". [2] (Exhibit A, p. 10.) ████████████████

████████████████████████████████████.

Dr. Drob also administered the Rorschach Inkblot Method (RIM), which is used
to assess "the logic and coherence of the examinee's thinking, his/her reality testing, and
the manner in which the examinee processes information from the environment."
(Exhibit A, p. 10.) Based on Mr. Pugh's responses to this test, and consistent with his
clinical and other test findings, Dr. Drob found indications that Mr. Pugh ██████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████." (Exhibit A, p. 11.) Dr. Drob further explained:

████████████████████████████████████████

After examining Mr. Pugh and conducting these and other tests, Dr. Drob
interviewed Mr. Pugh's father, Horace Pugh, and his aunt, Mary Wilson-Freeland,

---

[2]   This may help to explain Mr. Pugh's letter to your Honor in which he asks the Court to
purchase an extraordinarily expensive yacht for his wife, so that need not worry about
her while he serves his sentence. See Exhibit E – listing of yachts for sale provided by
Mr. Pugh to aid the Court in its selection.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 8 of 35

and reviewed approximately a dozen letters written by Mr. Pugh to counsel. Dr.

Drob reached the following conclusion[3]:



(Exhibit A, p. 12.)

## IV.   The History and Characteristics of Tairod Pugh

Tairod Pugh is 48 years old. He was born at Mt. Sinai Hospital in New York on

June 11, 1968. Mr. Pugh's parents are divorced. His father, Horace Pugh, age 67, is

retired after a career with the United States Air Force, and lives in Asbury Park, New

---

[3]   As indicated in his report, Dr. Drob also conducted the DSM-V Severity of
Posttraumatic Stress Symptoms Inventory and the Dissociative Experiences Scale
(DES).

May 8, 2017
Hon. Nicholas G. Garaufis
Page 9 of 35

Jersey. Mr. Pugh's mother, Barbara Wilson, age 65, lives in Iffingham, South Carolina.

Mr. Pugh has two younger sisters, Selena, age 46, and Katrina, age 41, who live in South

Carolina with their mother.

When Mr. Pugh was growing up, his father was in the military, and the family

moved around a great deal, living on military bases in the United States and Europe. In

interviews with Dr. Drob, Tairod Pugh revealed a childhood history of ███████████

███ According to Dr. Drob's report,

[Mr. Pugh] reports a history of ███████████████████
███████████████████████████████

(*See* Drob Report, p. 2.) ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████████

███████████████ ████ ███████████████

───────────────

4 ███████████████████████████████

███████████████████

May 8, 2017
Hon. Nicholas G. Garaufis
Page 10 of 35



May 8, 2017
Hon. Nicholas G. Garaufis
Page 11 of 35

██████████████████████████ Ms. McCray describes a patient big brother who

let her follow him everywhere. (Id.) She also recalls the day she said goodbye to him at

the airport before he left for New York, the day he ████████████████████████████

███████████ :

    So the day at the airport my brother said bye to me, his road dog ████████

████████ .

(Id.)

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

May 8, 2017
Hon. Nicholas G. Garaufis
Page 12 of 35

████████████████████████████████████████

███████████████████████

Mr. Pugh got his first job in New York at age 15, lying about his age to get a

position at an Orange Julius store. His age notwithstanding, he worked hard and was

ultimately promoted to manager. For as long as he can remember, Mr. Pugh has loved

working and hated being idle. Whenever he had time on his hands, he would get

depressed and think about his bad experiences. Working – getting a job done, having a

purpose – was a respite from his often-overwhelming sadness.

In 1986, after graduating from Julia Richman High School in Manhattan, Mr.

Pugh enlisted in the Air Force. He was 18 years old. The military was familiar, and

joining the military felt comfortable and cognizable. Mr. Pugh enjoyed the rigors and

structure of military life and threw himself into whatever was asked of him, striving to do

the best job possible. Mr. Pugh was 20 years old and stationed in England when his

grandmother died. Her death was devastating for him. Ms. Wilson was "the most

important person" to him, and the only parental figure in his life that seemed to love him

and show any interest in his well-being. Mr. Pugh came back to the United States for the

funeral. He would serve for six more months in England, before being transferred to a

base in Tuscon, Arizona. While in the military, Mr. Pugh earned a journeyman's

certificate in Avionic Systems, which certified that he could work independently on

May 8, 2017
Hon. Nicholas G. Garaufis
Page 13 of 35

avionic computer systems. In all, Mr. Pugh served four years, from 1986 to 1990, and

was honorably discharged as a class E-4 Senior Airman.

After leaving the military, Mr. Pugh returned to Harlem, New York, where he

lived with his aunt Mary Wilson Freeland and got a job as a toll booth operator for the

Triborough Bridge and Tunnel Authority, an affiliate agency of the Metropolitan

Transportation Authority. He held that job for six months, before taking a commission-

based position with Kirby Vacuums, selling vacuums door-to-door. After only selling

three vacuums in one month's time, Mr. Pugh decided to go back to school. He attended

trade school from 1991-1995, first in Utica, New York, and then in Conway, South

Carolina, studying aircraft maintenance and earning certificates that qualified him to

work on aircraft engines, electronics, and other aircraft systems.

Mr. Pugh was raised in the Hebrew Pentecostal faith, and consistent with this, was

given a Bar Mitvah at age 13.  He never felt an affinity for the religion, which appeared

to discourage searching or questioning, and was presented instead as a take-it-or-leave-it

proposition. As he grew into adulthood, Mr. Pugh found himself looking for God. He had

always been attracted to Jerusalem and Middle Eastern Culture, and Islam made sense to

him because, as he understood it, adherents were encouraged to think, search, and debate

religious principles, and to accept them consciously rather than blindly. Mr. Pugh

converted to Islam in 1995.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 14 of 35

Since 1995, and for the next twenty years, Mr. Pugh worked steadily on airplanes as an independent contractor. He reports earning a good living, taking on assignments that would last anywhere from a few days to 6-7 months at a time. His favorite jobs were the ones in which he was contracted by the U.S. military to work on military aircraft.[5] In contrast with his work in civilian aviation, Mr. Pugh felt that the military demanded and appreciated quality work. He liked the military because it gave his life the structure he required, set high standards, set out well defined objectives, didn't cut corners, and gave him sufficient time to do his best. Even today, he remains proud of the contribution he made to the United States military effort.

For Tairod Pugh, working overseas was a way of putting distance between himself and his miserable past. That said, it is important to Mr. Pugh that the Court knows that he forgives his parents ███████████████ ██████████████████████████ ████████████████████████████████████████████████. While it

---

[5]   As a contractor working for the U.S. military, Mr. Pugh worked on the following aircraft:

- Sikorsky S-92 (helicopter)
- OH-58 Kiowa Warrior (helicopter)
- UH-60 Black Hawk (helicopter)
- AH-64 Apache (helicopter)
- CH-47 Chinook (helicopter)
- AC-130 Gunship (airplane)
- KC-135 Stratotanker (refueling airplane)
- A-10 Warthog (airplane)
- E-8C (surveillance airplane)

May 8, 2017
Hon. Nicholas G. Garaufis
Page 15 of 35

still causes him great pain to reflect on his past, Mr. Pugh decided long ago that it was

easier to forgive than to hold onto negativity, and he has worked hard at cultivating adult

relationships with both of his parents. In addition to the letter of support from his sister

Selena McCray, mentioned above, we have received a letter from Mr. Pugh's mother,

Barbara Pugh, attached as Exhibit C, and a letter from Mr. Pugh's aunt, Mary Wilson

Freeland, attached as Exhibit D. These letters describe a loving brother, nephew and son

who cares about the well-being of his family. While we have not received a letter from

Mr. Pugh's father, he did respond telephonically to Dr. Drob's entreaties for insight into

his relationship with his son.

        In her letter to the Court, Mr. Pugh's sister, Selena McCray, writes that 22 years

ago when she was ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████. (See Exhibit B.) In contrast, Tairod Pugh made her feel loved. She

writes that he telephoned "constantly" and sent her money and herbs to build her immune

system every month. (Id.) And when he came home to visit, he treated Ms. McCray like a

human being, touching her, and letting her cook his food and wash his clothes. (Id.) Ms.

McCray also recalls her brother's total support of the family. "Any time we as a family

called he was there to lend a hand. Whatever we need he did arms + pocket wide open."

She views her brother as someone who needs help, and asks the Court to treat him with

May 8, 2017
Hon. Nicholas G. Garaufis
Page 16 of 35

mercy. (Id.) Similarly Barbara Pugh, Mr. Pugh's mother, makes a plea for help for her

son:

> I know Tairod need help and is asking for help for him. Tairod wanted a
> family and to belong. When Tairod marry fell apart and was not working
> running away was his answer. Tairod love family and when he do come
> home I saw a different in him, when all the family was around. Yes then the
> Tairod I know come out.

(*See* Letter from Barbara Pugh, attached as Exhibit C.)

## V.    The Offense Conduct

Mr. Pugh was convicted of attempting to provide material support and resources to

a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d)

(Count I). He was also convicted of obstruction and attempted obstruction of an official

proceeding, in violation of 18 U.S.C. §§ 1512(c)(1), and 1512(c)(2).

## VI.   An Analysis of Sentences Received by Similarly Situated Defendants

In sentencing Mr. Pugh, this Court is instructed to consider, among other things,

the need to avoid unwarranted sentencing disparities among defendants with similar

records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(6). A

review of the sentences that are generally imposed in attempted material support cases

across the country demonstrates that individuals convicted of the same offense as Mr.

Pugh largely receive sentences at or below 10 years.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 17 of 35

As a starting point, from September 2001 through July 2007, 108 defendants were charged with at least one count of violating 18 U.S.C. § 2339B.[6] At the time of Professor Chesney's report, thirty of the defendants had pled guilty and proceeded to sentencing.[7] The mean sentence of these thirty defendants was either 122.73 months or 118.73 months.[8] For the 23 defendants who entered guilty pleas, the mean sentence was either 107.91 months or 102.70 months.[9] For the 12 defendants who specifically pleaded guilty to conspiracy to provide material support – the mean sentence was 82.83 months.[10] And in 2012, the United States Sentencing Commission reported that the mean sentence imposed between 2008 and 2012 for providing material support to designated foreign terrorist organizations or for terrorist purposes was 111 months, a calculation that makes no distinction between defendants who pled guilty and those who were convicted after trial.[11]

Most recently, in 2016, the Center on National Security at Fordham Law School released a report analyzing the first 101 ISIS-related cases to proceed in U.S. Courts. Of

---

[6]   *See* Robert Chesney, *Federal Prosecution of Terrorism-Related Offenses: Conviction and Sentencing Data in Light of the "Soft Sentence" and "Data Reliability" Critiques*, 11 Lewis and Clark L. Rev. 851, 884 (2007) ("Chesney Analysis"), available at http://bit.ly/1R4Hf9H

[7]   *See* Chesney Analysis at 885.

[8]   *See* Chesney Analysis at 886, T.7.Two means are calculated because some defendants received different sentences on two separate counts of violating 2339B. The first mean is calculated using the high sentence; the second is calculated using the low sentence.

[9]   *See* Chesney Analysis at 886, T. 8.

[10]   *See* Chesney Analysis at 888.

[11]   *See* United States Sentencing Commission, *Quick Facts: Offenses Involving National Defense* (2012), at p. 2, available at http://bit.ly/1HkM5xv

May 8, 2017
Hon. Nicholas G. Garaufis
Page 18 of 35

the 14 defendants who had been sentenced at the time the report was issued, the mean

sentence received was 9.2 years.[12]  Since that report was issued, at least 29 more

defendants listed in the report have been sentenced, raising the total number sentenced to

43. The mean sentence of all 43 defendants is 10.5 years.

Finally, we conducted our own review of *attempted* material support cases under

18 U.S.C. § 2339B in all circuits, as well as material support *conspiracy* cases when the

offense conduct was comparable to the conduct for which Mr. Pugh was convicted,

namely, traveling or taking substantial steps toward travel overseas, with a goal of joining

ISIL or another designated foreign terrorist organization. Of the 22 such cases we

identified, three involve defendants who cooperated with the government. For this reason,

we excluded their sentences from our calculations. Among the remaining 18 defendants,

the mean sentence was 133.8 months, or a little more than 11 years, with 50% (9 out of

18) defendants receiving sentences of 10 years or less, 5 receiving sentences between 11

and 13 years, and 4 receiving sentences of 15 years. Further, among the 4 who received

180 month sentences – only two received the statutory maximum. (*See Table A-1*;

Attempted Material Support Cases, All Circuits attached as Exhibit E.)

---

[12]  See *Case by Case: Isis Prosecutions in the United States*, *March 1, 2014 – June 30, 2016*, Center on National Security at Fordham Law School, available at http://www.centeronnationalsecurity.org/research

May 8, 2017
Hon. Nicholas G. Garaufis
Page 19 of 35

A survey of the alleged conduct in these cases, included below, demonstrates that

a sentence far below the guidelines for Mr. Pugh is sufficient, but not greater than

necessary to meet the goals of sentencing under 18 U.S.C. §3553(a).

**Cases Surveyed**

1. *U.S. v. Mohamed Bailor Jalloh*, 16 Cr. 163, Eastern District of Virginia, February 10, 2017. Mr. Jalloh, age 26, made several attempts to join ISIL; the first, in his native Sierra Leone, where he met with an ISIL facilitator, the second in Niger where he met with the same facilitator. He also provided $ to a facilitator, to another ISIL figure plotting attacks on the U.S., participated in a plot to murder U.S. military personnel, and purchased an AR-15 for that purpose. Mr. Jalloh pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Liam O'Grady to 132 months (11 years) in prison. He faced a maximum of 20 years.

2. *U.S. v. Joshua Van Haften*, 15 Cr. 37, Western District of Wisconsin, February 17, 2017. Mr. Van Haften, age 36, was arrested on his way to Syria to join ISIS. Federal anti-terrorism agents were tracking the defendant for some time, before immigration officials caught him in Turkey in 2014. He was sent back to the U.S., where he was arrested at Chicago's O'Hare Airport. Some of the evidence against him includes an online post swearing allegiance to ISIS, saying "the only thing that matters to me is joining my brothers for the war against America liars." Mr. Van Haften pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge James D. Peterson to 120 months (10 years) in prison. He faced a maximum of 15 years.

3. *U.S. v. Justin Kaliebe*, 13 Cr. 72, Eastern District of New York, January 20, 2016. Mr. Kaliebe, age 18, attempted to travel from the United States to Yemen for the purpose of joining AQAP and waging violent "jihad." The defendant was arrested on January 21, 2013 as he attempted to board a flight from John F. Kennedy Airport ("JFK Airport") in Queens, New York to the Middle East for the purpose of joining AQAP. Evidence included frequent meetings with undercovers in which he expressed this intent. Mr. Kaliebe pled guilty to two counts of attempted material support under 18 U.S.C. § 2339B and was sentenced by Denis R. Hurley to 156 months (13 years) in prison. He faced a maximum of 30 years.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 20 of 35

4. *U.S. v. Joseph Hasan Farrokh*, 16 Cr. 64, Eastern District of Virginia, July 15, 2016. Mr. Farrokh, age 29, conspired with co-defendant Mahmoud Amin El Hassan to travel to Syria to join and fight for ISIL. Farrokh and Elhassan had numerous communications, using secure apps, about their plans. Farrokh was arrested as he went down the jet way to catch his flight. He pled guilty to one count of attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Anthony J. Trenga to 102 months (8.5 years) in prison. He faced a maximum of 20 years.

5. *U.S. v. Mahmoud Elhassan,* 16 Cr. 64, Eastern District of Virginia, February 24, 2017. Mr. Elhassan, age 25, recruited co-defendant Joseph Farrokh to join the Islamic State and aided his efforts to travel to Syria and Iraq to join the terrorist organization. The government believed he planned to join Farrokh at a later date or to continue to operate as a sleeper cell supporting the cause remotely. Mr. Elhassan pled guilty to attempted material support under 18 U.S.C. § 2339B and to 18 U.S.C. 1001 for making false statements to the FBI about his conduct and was sentenced by Judge Anthony J. Trenga to 132 months (11 years) in prison. He faced a maximum of 28 years.

6. *U.S. v. Alaa Saadeh*, 15 Cr. 558, District of New Jersey, May 10, 2016. Mr. Saadeh, age 24, planned to travel overseas to join, and fight for, ISIL. The defendant also helped his brother successfully travel overseas for the same purpose, letting him purchase airline tickets using Saadeh's credit card, removing the SIM card from his brother's smartphone and resetting the smartphone in an effort to avoid detection, and giving his brother contact information for an individual who would facilitate his travel from Turkey to ISIL in Syria. Mr. Saadeh pled guilty to material support under 18 U.S.C. § 2339B and was sentenced by Judge Susan Wigenton to 180 months in prison (15 years). He faced a maximum of 20 years.

7. *U.S. vs. Nicholas Teausant*, 14 Cr. 87, Eastern District of California, June 7, 2016. Mr. Teausant, age 20, was apprehended at the Canadian border allegedly on his way to join ISIS in Syria, after authorities saw posts he made on social media sites about his desire to conduct violent jihad. Mr. Teausant pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge John A. Mendez to 144 months (12 years) in prison. He faced a maximum of 15 years.

8. *U.S. v. Zacharia Yusuf Abdurahman*, 15 Cr. 49, District of Minnesota, November 14, 2016. Mr. Abdurahman, age 19, and three other men (Hanad Musse, Hamza Ahmed, and Mohamed Farah)—took a Greyhound bus from Minneapolis to New

May 8, 2017
Hon. Nicholas G. Garaufis
Page 21 of 35

York in November 2014 and were stopped by federal agents as they tried to travel overseas from JFK Airport. Prosecutors said they were part of a group of friends who began inspiring and recruiting each other to join the Islamic State group in the spring of 2014. Some of their friends made it to Syria, but the nine who were prosecuted did not. Three went to trial and were convicted of a conspiracy to commit murder outside of the United States in addition to material support, receiving lengthier sentences. Mr. Abdurahman and three others did not cooperate, pleading guilty to conspiring to provide material support under 18 U.S.C. § 2339B. Mr. Abdurahman and two others (Hanad Musse, age 19 and Adnan Farah, age 19) were sentenced by Judge Michael J. Davis to 120 months (10 years) in prison. All three faced maximums of 15 years. The fourth, Hamza Naj Ahmed, age 21, was charged with an additional count of financial aid, and was sentenced to 180 months (15 years) in prison. Mr. Ahmed faced a maximum of 20 years.

9. *U.S. v. Jaelyn Young*, 15 Cr. 98, Northern District of Mississippi, August 12, 2016. Jaelyn Young, age 19, an American from Vicksburg, Mississippi, attempted to move to Syria with her fiancé Mohammad Dakhlalla, age 22, to join ISIS to work as a medic. Ms. Young and Mr. Dakhlalla engaged in numerous conversations on social media sites with FBI agents disguised as ISIS recruiters. They were apprehended on their way to the airport, and pled guilty to conspiring to provide material support under 18 U.S.C. § 2339B. Ms. Young who admitted to being the mastermind of the plan, was sentenced by Judge Sharion Aycock to 144 months (12 years) in prison. Mr. Dakhlalla was sentenced to 96 months (8 years). Both faced maximums of 15 years.

10. *U.S. v. Adam Dandach*, 14 Cr. 109, Central District of California, July 25, 2016. Mr. Dandach, age 22, was initially charged with falsely claiming he lost his passport, and later indicted for attempting to travel to Syria to support terrorists. Mr. Dandach communicated with two people in Syria, and made two attempts to travel and join ISIL; the first time, a family member took his passport and money so he couldn't go; the second time, he obtained a duplicate expedited passport. Mr. Dandach also engaged in post-arrest obstruction - seeking his family's help in deleting internet postings. And while detained, he composed several pro-terror writings. He pled guilty to attempted material support under 18 U.S.C. § 2339B and making a false statement on a passport application under 18 U.S.C. § 1542, and was sentenced by Judge James V. Selna to 180 months (15 years) in prison. Mr. Dandach faced a maximum of 25 years.

11. *U.S. v. Rahatul Khan*, 14 Cr. 212, Western District of Texas, September 25, 2015. Between March 2011 and January 2012, Mr. Khan, age 24, identified an individual in an Internet chatroom and began assessing that individual for overseas

May 8, 2017
Hon. Nicholas G. Garaufis
Page 22 of 35

violent jihadist travel. That individual was actually an FBI confidential source. After Khan screened the confidential source, he made arrangements to insert him into an al-Shabaab pipeline. Khan also led a group of individuals in the Austin area who pledged loyalty to the now-deceased Taliban and terrorist leader, Mullah Omar. Michael Wolfe, whose case is discussed below, was a part of Khan's group. Mr. Khan pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Sam Sparks to 120 months (10 years) in prison. He faced a maximum of 15 years.

12. *U.S. v. Michael Wolfe*, 14. Cr. 213, Western District of Texas, June 5, 2015. Mr. Wolfe, age 23 attempted to travel to the Middle East to lend his support to ISIL. He admitted at his change of plea hearing that in preparation, he applied for and acquired a U.S. passport, participated in physical fitness training, practiced military maneuvers, concealed his preparations, and bough an airline ticket for travel to Europe, which he believed would be the first leg of a trip to the Middle East. Instead, he was arrested on the jet way at the Houston, Texas airport as he attempted to board a flight to Toronto, Canada. Mr. Wolfe was part of a group led by Mr. Khan (see above) that pledged loyalty to a deceased Taliban leader. He pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge Sam Sparks to 82 months (6 years, 10 months) in prison. He faced a maximum of 15 years.

13. *U.S. v. Leon Nathan Davis*, 15 Cr. 59, Southern District of Georgia, July 28, 2015. Mr. Davis, age 37, was arrested at the Hartsfield-Jackson Atlanta International Airport as he attempted to board a flight to Turkey. The defendant had been under investigation for more than a year before he was arrested, after communicating with ISIL members via social media. At the time of his arrest, Mr. Davis was on parole for cocaine trafficking. Mr. Davis was initially charged with possession of illegal firearms by a convicted felon, and reportedly had six rifles, four handguns, and two shotguns, but that charge was later dropped. He pled guilty to attempted material support under 18 U.S.C. § 2339B and was sentenced by Judge J. Randall Hall to 180 months (15 years), the maximum.

The vast majority of these defendants, like Mr. Pugh, faced Guidelines ranges of 360-life, before the operation of any statutory caps. Yet most of them received sentences that were significantly lower than the statutory maximums. This pattern suggests that these cases, as a group, fall well *outside* the heartland of cases to which the Terrorism

May 8, 2017
Hon. Nicholas G. Garaufis
Page 23 of 35

Enhancement was intended to apply. Or perhaps it suggests something else; namely, that no such heartland exists, and the Sentencing Commission's wholesale failure to develop this guideline based upon empirical data, national experience, or some rational policy basis has rendered it essentially meaningless.[13]

At 48, Mr. Pugh is concededly older than the defendants whose cases are analyzed above. In addition, Mr. Pugh went to trial, while the above defendants were sentenced after guilty pleas. These facts can cut both ways. At 48, he poses an ever-decreasing risk of recidivism; on the other hand, he proceeded to trial, which might support a longer sentence. A look beneath the surface demonstrates that a sentence below the 10-12 year range received by the majority of the defendants above is appropriate here.

First, Mr. Pugh's decision to go to trial must be viewed within the context of



---

[13]  This failure is addressed below in the discussion of our objection to the application of the Terrorism enhancement.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 24 of 35



. Had he pleaded guilty to Count I, Mr. Pugh's maximum sentence

would have been capped at 15 years; however, his conviction on both counts after trial is

now 35 years.[14]

Second, Mr. Pugh's case is distinguishable from the majority of the cases outlined

above, in which defendants made contact with or received instructions and/or funding

from ISIL recruiters or fighters or others in Syria whom they believed could facilitate

their travel or connection with the terrorist group, or joined with others who shared

---

[14] The dramatic disparity between Mr. Pugh's exposure before and after trial is based
upon his conviction for obstruction of justice under Count II, was the result of damage to
electronic devices in his possession that allegedly transpired during the period between
his denial of entry into Turkey at the Ataturk Airport and his detention in Egypt. In pre-
trial motions, Mr. Pugh argued that this count was insufficient because he was not
informed of the possibility of proceedings against him, and therefore, could not have the
requisite *mens rea*. This Court found – and we do not dispute – that "[t]he fact that Pugh
was not expressly informed about his imminent detention by American officials and the
court proceedings that would follow does not render such events unforeseeable." *United
States v. Tairod Nathan Webster Pugh*, No. 1:15-CR-00116-NGG, 2015 WL 9450598, at
*15 (E.D.N.Y. Dec. 21, 2015). Nor for the purposes of this sentencing submission, do we
dispute that Mr. Pugh was wrongfully convicted. Nonetheless, the conduct for which Mr.
Pugh was convicted is not the same as that of defendant who is expressly aware of a
proceeding, and destroys evidence to make it unavailable for that proceeding, even if
both types of conduct fall under the breadth of the same statute. It also must be viewed in
the context of his precarious mental stability, including narrow attentional focus and poor
decision-making capabilities.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 25 of 35

similar goals, and whose goals to join ISIL they helped further. Here, there is no evidence that Mr. Pugh made any connection with ISIL recruiters or members, or had any ability to do so, whatever his goals might have been when he bought a ticket for Turkey.

Third, Mr. Pugh is unique in that he is 48 years old, has no criminal record, and spent decades living a meaningful, productive, law-abiding life, after serving his country bravely and productively for four years with the U. S. Air Force. The absence of a criminal record at age 48 is more significant than it is at age 19 or 20, because it demonstrates the complete aberrance of the offense for which Mr. Pugh was convicted in the context of the rest of a long and productive life.

Fourth, the offense must be viewed in the context of the ████████████████ ████████████████████████████████████████████ ████████████████████████████████

## VII.    The Terrorism Enhancement

**a. the terrorism enhancement does not apply here, as the government has not proven that Mr. Pugh's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct".**

The adjustment at § 3A1.4 (Terrorism) does not apply to this case. That section provides, "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32." It also provides for a Criminal History VI in all cases.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 26 of 35

Application note 1 to § 3A1.4 states that "federal crime of terrorism" is defined in 18

U.S.C. § 2332b(g)(5): the crime must be (1) "an offense that is calculated to influence or

affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct"; and (2) listed in section 2332b(g)(5)(B).

Title 18 U.S.C. § 2339B is one of the enumerated crimes. However, the

government has not proven (and cannot prove) that Mr. Pugh's conduct was calculated to

influence or affect the conduct of a government by intimidation or coercion, or to

retaliate against government conduct. *See United States* v. Stewart, 590 F.3d 93, 138 (2d

Cir. 2009) (affirming the district court's decision not to apply the sentencing

enhancement for a defendant convicted under 18 U.S.C. § 2339B when there was no

evidence that he "sought to influence or affect the conduct of a government.") In this

case, there is no evidence that Mr. Pugh was in contact with members of ISIL, that he had

any ability to make such contact, or that he had any specific intent to harm the United

States or its citizens. Further, the offense conduct for which Mr. Pugh was convicted –

purchasing a one-way ticket to Turkey and attempting to fly there – was not calculated to

influence or affect the conduct of any government by intimidation or coercion, and it was

not to retaliate against government conduct.

The terrorism enhancement has an extreme effect on Mr. Pugh's sentencing

guidelines, especially with respect to his criminal history. It erases the substantive

difference between an attempt and a completed act. It also increases Mr. Pugh's criminal

May 8, 2017
Hon. Nicholas G. Garaufis
Page 27 of 35

history category from I to VI, a jump that is completely irrational and unsupported by any

evidence or sentencing factor, and unwarranted for a man who volunteered to serve this

country and was honorably discharged from the Air Force, worked hard and consistently

from age 15 through 48, and has never been convicted of a crime.

**b. In enacting the terrorism enhancement, the Sentencing Commission failed to develop guidelines based on empirical data.**

When the Sentencing Commission fails to fulfill "its characteristic institutional

role" of developing a particular guideline, or its later amendments, based upon empirical

data, national experience, or some rational policy basis, the district court has the

discretion to conclude that the resulting advisory range "yields a sentence 'greater than

necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *United States v.*

*Kimbrough*, 128 S. Ct. 558, 575 (2007); *Spears v. United States*, 129 S. Ct. 840, 843

(2009) (explaining that when the Commission fails to fulfill its institutional role, a district

court can vary from the guidelines "based on policy disagreement with them, and not

simply based on an individualized determination that they yield an excessive sentence in

a particular case").

Since there is no indication that, in establishing the terrorism enhancement, the

Commission took into account any "empirical data" or "national experience", the advice

that the benchmark sentence is the maximum sentence ought to be rejected as a matter of

policy. Cf. *Kimbrough*, 522 U.S. at 109 ("In formulating Guidelines ranges for crack

May 8, 2017
Hon. Nicholas G. Garaufis
Page 28 of 35

cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of `empirical data and national experience.'") (Citation omitted). Cf. *United States v. Ressam*, 679 F.3d 1069, 1107 (9th Cir. 2012) (Schroeder, J., dissenting), and *United States v. Jayyousi*, 657 F.3d 1085, 1133 (11th Cir. 2011) (Barkett, J., dissenting) (criticizing assumption that upon release from prison a particular defendant would engage in future terrorist conduct as speculative, unwarranted, and without basis in the record including any empirical studies about recidivism).

The terrorism enhancement is a creature of Congress. The Sentencing Commission enacted it pursuant to a Congressional directive and the Commission has amended it pursuant to other directives, each time recommending broader application and harsher penalties. In 1994, Congress directed the Sentencing Commission to create an adjustment for prison sentences resulting from felonies involving international terrorism. *Violent Crime Control and Law Enforcement Act of 1994*, Pub. L. No. 103-322, § 120004 (to be codified at 28 U.S.C. 994). Congress directed that the enhancement apply to crimes involving or intending to promote international terrorism, "unless such involvement or intent is itself an element of the crime." *Id.* In the wake of the Oklahoma City bombing, Congress directed that § 3A1.4 should apply to domestic terrorism offenses as well. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730 (to be codified at 28 U.S.C. 994 (2006). Prior to the terrorist attacks of September 11, 2001,

May 8, 2017
Hon. Nicholas G. Garaufis
Page 29 of 35

there were no base offense Guidelines for federal crimes of terrorism. U.S.S.G., App. C,

Amend. 637 (Nov. 1, 2002) (noting that amendments under the USA Patriot Act modify

existing Sentencing Guidelines "for a number of offenses that, prior to the enactment of

the Act, were enumerated in 18 U.S.C. § 2332b(g)(5) as predicate offenses for federal

crimes of terrorism but were not explicitly incorporated in the guidelines."). The

Sentencing Commission created a base offense guideline for providing material support

to a designated foreign terrorist organization in the wake of the attacks of September 11,

2001. *Id*. But it failed to restrict the sweeping coverage of § 3A1.4, which Congress

directed be created as a stop-gap measure to enhance sentences for felony crimes, unless

the crime itself related to or involved terrorism. VCCLEA, Pub. L. No. 103-322, §

120004.

Such a massive guideline increase must be applied sparingly. The failure by the

Commission to restrict the coverage of § 3A1.4 produces the irrational result that the

Guideline for attempting to provide material support to a designated organization is then

enhanced for terrorism itself – even in this inchoate stage. When combined with §

3A1.4's requirement that every defendant also be placed in Criminal History Category VI

– no matter the conduct involved – the lowest possible sentencing range is 292-365

months, which includes a three-point reduction for acceptance of responsibility. Since the

maximum penalty authorized by statute for providing material support to a designated

foreign terrorist organization was 180 months, a statutory maximum that will be

May 8, 2017
Hon. Nicholas G. Garaufis
Page 30 of 35

exceeded by the guideline in every case, ignores the inchoate gradations applicable to

virtually all offense, to wit, an "attempt" or an "agreement" and thus yields an absurd

result.

Section 3A1.4's placement of all defendants in Criminal History Category VI is

not based on any study of the recidivism of those convicted of material support or any

other empirical evidence that such offenders be treated as incorrigible recidivist

offenders. And it was implemented despite the empirical data and research regarding first

offenders such as Mr. Pugh who would otherwise be in Criminal History Category I. *See*

*U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation*

*of the Federal Sentencing Guidelines*, at Ex. 9 (May 2004); U.*S. Sentencing Commission,*

*Recidivism and the "First Offender,"* at 1314 (May 2004). Even if it made sense to

dramatically increase the offense level, it defies logic to assign every offender to

Criminal History Category VI – particularly a man like Tairod Pugh, who, his demons

notwithstanding, has no criminal past, has worked hard, legitimately and consistently for

decades and has served honorably in this country's military.

Without this huge adjustment, the applicable guideline range under § 2X1.1 at 23/I

is 46-57 months. Under § 2M5.3(a) the range at 26/I is 63-78 months. Even adding the 2-

level enhancement under 2M5.3(b)(1)(E), the range is 78-97 months, a fraction of Mr.

Pugh's guidelines exposure under 3A1.4(a).

May 8, 2017
Hon. Nicholas G. Garaufis
Page 31 of 35

**c. The application of the terrorism enhancement to this case over-represents the seriousness of Mr. Pugh's non-existent past criminal conduct as well as the likelihood that he will commit other crimes.**

In *United States v. Meskini*, the Second Circuit held that "[a] judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward in sentencing." 319 F.3d 88, 92 (2nd Cir.2003). *See also United States v. Benkahla*, 501 F. Supp. 2d 748 (E.D. Va. 2007), aff'd, 530 F.3d 300 (4th Cir. 2008); *United States v. Thurston*, 2007 WL 1500176, *18, 2007 U.S. Dist. LEXIS 38185, at *53 (D.Or., May 21, 2007) (stating in dicta that "even if § 3A1.4 is deemed to apply and raises defendant's criminal history category to VI, the court retains discretion to depart downward" under § 4A1.3).

The Supreme Court has charged all sentencing courts to impose individualized sentences in all cases. *Kimbrough v. United States,* 552 U.S. 85 (2007). Terrorism cases are not exempt from this mandate. Across the country, sentencing courts have imposed – and continue to impose sentences which have nullified or substantially reduced the impact of the terrorism enhancement. A downward variance is appropriate here as well.

**VIII.    Available Sentences**

As discussed above, at the April 21, 2016 status conference at which present counsel was appointed, this Court directed the government to look into the appropriateness of a de-radicalization program for Mr. Pugh. Reasoning that 'the

May 8, 2017
Hon. Nicholas G. Garaufis
Page 32 of 35

Minnesota de-radicalization initiative is still in the very early stages of development', the

government took "no position concerning its potential application" to this case. However,

the Court's inquiry, in this regard, is well placed.

The new interest into developing such programs for individuals who are caught

attempting to join a terrorist organization recognizes that they frequently come from

vulnerable populations – first or second generation young men who come to extremism

through depression and/or alienation, and others, like Mr. Pugh, who ███████████

██████████████████████.[15] The vulnerability of this

defendant pool suggests that the decision to buy a plane ticket, leaving behind their

families and eviscerating their lives, m███████████████████

████████████████.

This, too, speaks to the inappropriateness of the terrorism enhancement as a one-

size-fits-all solution. The vulnerable population of "seekers" to which Mr. Pugh so

clearly belongs should not be treated the same as a committed extremist who flies a plane

---

[15]   See Case by Case, footnote 13, above, at p. 3. According to the Center on National
Security at Fordham Law School, more than 10% of the defendants they analyzed
"have been under some kind of treatment for mental illness, or have been diagnosed as
schizophrenic, bipolar or suspected of suffering from acute anxiety." Overall, the
report finds, "there is a sense of identity crises and alienation from society across the
wide range of cases. Anxieties over not fitting in, examples of personal isolation and
social anger are frequent."

May 8, 2017
Hon. Nicholas G. Garaufis
Page 33 of 35

into a U.S. government building, or bombs an embassy, or recruits young people to commit those acts. Reason and good judgment dictates otherwise.

**The Appropriate Sentence**

As the lion's share of defendants sentenced for the conduct for which Mr. Pugh was convicted received sentences between 8-12 years, this range should be the true starting point – or guideline range – for the Court's analysis. Starting at that point, there is much that sets Mr. Pugh apart, including his service to his country, and decades spent in productive work, as well as his traumatic upbringing and clear mental health issues. A lengthy prison sentence, during which he will not receive the treatment he so clearly needs, is just not appropriate here. The greater good is not served by warehousing Mr. Pugh until he is in his sixties, permitting his mental health to degrade to the point where he is of no use to anyone, including himself.

We respectfully ask the Court to impose a sentence of time served, to be followed by 20 years of supervised release, with mandated mental health treatment, including discharge directly to a mental health treatment program. In the alternative, we ask the Court to adjourn the sentence, and that the parties be directed to work out a bail package so that Mr. Pugh can attend such a program, and that the proper sentence be determined at such time when his participation in the program can be evaluated.

May 8, 2017
Hon. Nicholas G. Garaufis
Page 34 of 35


       Thank you for your kind consideration of this letter.


                    Respectfully submitted,


                    Susan G. Kellman
                    Sarah Kunstler
                    Attorneys for Tairod Pugh

                    Law Offices of Susan G. Kellman
                    25 Eighth Avenue
                    Brooklyn, NY 11217
                    (718) 783-8200
                    sgk@kellmanesq.com


CC:   AUSA Tiana A. Demas, Esq.
       USPO Shayna Bryant

       Tairod Pugh

May 8, 2017
Hon. Nicholas G. Garaufis
Page 35 of 35

EXHIBIT A

EXHIBIT B

April 9th 2017

Dear Judge Garafis:
      My name is Selena McCray I am
Tiarads Pugh younger sister. They call me
C.C. I myself have had a hard life. Now
in S.C. I am a supervisor at OMSHIPS.
a non profit Organization Speading the
Gospel. knowledge, help+ Hope around the
world. Florence is where the Book+Bible
warehouse is located. Been married for
4 years now. I have one child and now
10 months ago. She gave birth to my grand
daughter Hadassah, We call he haddy
I recently moved with my husband back
to my moms house.
      I am very aware that my brother
Tiarod, has been convicted of a serious
crime. Those days sitting in the courtroom
was the worse 4 me.
      So let me tell you about Tiarod.
My brother when younger got himself in
Trouble. Which made my father choose between
losing his credit in Airforse or his son
moving away to New York. He choose my
brother moving away. Befor that he was my
big brother. When I could follow him I
would and he had no problem with that.
Or at least he did not let me no. Halloween
was the best night of the year we had
together. Running everywhere so we can
get the most candy. So the day at
airport my brother said Bye to me his

read dog. ███████████████████████

███████████████████████████████

My Brother loves his family = 22 years

ago I was ████████████████████

██████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

Anytime we as family called he was
there to lend a hand. whatever we need
he did. arms + pocket wide open.

My little sister got pregnant gave
birth. wanted to start new Called Tiarod
and Tiarod sent ticket 4 her she got
herself together with place, job + transportion
and 1½ yr later wanted her ~~kid~~ child.

Dear Judge I'm asking to give
him a chance. You & I know the
good in Tiarod. I've seen it. We
should ~~see~~ e. the whole person.
In court I saw my brother. He was
hurt from the inside.

Can't you help him. Something
has hurt him. He needs help. I beleive
he does not need set in Jail with nothing
to help the inner soul. find peace.

Selena McCray

CHingham S.C.

29541

Thank you 4 your time

EXHIBIT C

Hon. Nicholas G. Garaufis
United State District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn N.Y. 11201

March 26- 2017

Dear Judge Garaufis

     My name is Barbara Pugh and I
am the mother of Tairod Pugh. After moving
around as a military family. I am now
living in Florence South Caroline. I have been
living here for the past 17 years. I now
work part time as a crossing guard for.
the City of Florence Police Dept. I have been
working with them. for the pass 5 years and
this help with my SSI check. I am a member
of Lamb Chapel Christian Center. which is a.
non denomination church. I have been with
them for the pass 16 years. My work there.
are with Children Church. (girl 6-12 yr), I also
do the coffee hostess on sunday. I belong.
to the women ministry and with the mission
field. My calling is the mission field and the
local needy.. I have travel a couple time to
Kenya to work over there.
    I realize that Tairod has been.
convicted of this crime. I have no answers-!
But being a military brat always moving
and all ways trying to belong. run though

my mind. I know Tairod need help.
and is asking for help for him. Tairod
wanted a family and to belong. when
Tairod marry fell apart and was not working.
running away was his answer. Tairod
love family and when he do come home,
I saw a different in him, when all the
family was around. yes then the Tairod
I know come out.

      I will alway be his mother and
will always love him. I know he is love.
also by many. All Tairod need is help
in finding hiself again.

      Tairod know he is love by his
family!

Barbara Pugh

Effingham S.C
29541

EXHIBIT D

Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

March 27, 2017

Dear Judge Garaufis,

I have had the pleasure of knowing Tairod Phugh since birth. Tairod has lived with me from the age of 14 until he joined the US Air Force. During those years, I have known Tairod in many capacities. Tairod excelled academically. He was a well mannered child who was focused on air planes.

Since that time, I would see him when he came to the states. I did not see Tairod often due to his constant travel because of work. However, our relationship remained strong. Through phone calls, and social media, we were able to stay in contact. Through the years, I've seen Tairod demonstrated great maturity and creativity.

Tairod is an intelligent, capable, dedicated, and personable young man. He is always quick on his feet, with sensible reactions in all the circumstances I've seen him in. I feel confident in saying that he is capable of handling any situation with thoughtfulness and maturity.

Please don't hesitate to contact me ███████████ with any other questions.

Regards,

Mary Wilson Freeland

EXHIBIT E

| # | Year | Last Name | First Name(s) | Age | Plea/Trial | Statute of Conviction | Alleged Affiliation | Sentence | Maximum | District | Docket | Judge |
|---|------|-----------|---------------|-----|------------|----------------------|---------------------|----------|---------|----------|--------|-------|
| 1 | 2017 | Jalloh | Mohamed Bailor | 26 | Plea | 2339B (attempt) | ISIL | 132 months | 240 months | Virginia, Eastern District | 16-cr-00163-LO- | Liam O'Grady |
| 2 | 2017 | Van Haften | Joshua | 36 | Plea | 2339B (attempt) | ISIL | 120 months | 180 months (old law) | W.D. Wisconsin | 15-cr-00037 | James D. Peterso |
| 3 | 2017 | Qamar | Harris | | Plea | 2339B (attempt) | ISIL | 102 months, 20 years supervised release. | 240 months | E.D.V.A. | 1:16-cr-00227-LMB-1 | |
| 4 | 2017 | Kaliebe | Justin | 18 | Plea | 2339B (attempt); two counts | Al-Qaeda in the Arabian Peninsula | 156 months | 360 months | E.D.N.Y. | 13-cr-00072 | Denis R. Hurley |
| 5 | 2017 | Elhassan | Mahmoud Amin Mohamed | 25 | Plea | 2339B (attempt) and 18 U.S.C. 1001 (false statements) | ISIL | 132 months, 10 years supervised release. | 336 months | Virginia, Eastern | 16-cr-00064 | Anthony J Trenga |
| 6 | 2016 | Farrokh | Joseph Hasan | 27 | Plea | 2339B (attempt) | ISIL | 102 months | 240 months | Virginia, Eastern | 16-cr-00020 | Anthony J Trenga |
| 7 | 2016 | Saadeh | Alaa | 24 | Plea | 2339B | ISIL | 180 months | 240 months | New Jersey | 15 Cr. 558 (SDW) | Susan Wigenton |
| 8 | 2016 | Teausant | Nicholas | 20 | Plea | 2339B (attempt) | ISIL | 144 months, 25 years supervised release | 180 months (old law) | E.D. California | 2:14-cr-00087-JAM-1 | |
| 9 | 2016 | Yusuf | Abdullahi | 18 | Plea | 2339B | ISIL | Time served (21 months?), 20 years supervised release | 180 months (old law) | D. Minnesota | 0:15-cr-00046-MJD-1 | Michael J. Davis |
| 10 | 2016 | Abdurahman | Zacharia Yusuf | 19 | Plea | 2339B | ISIL | 120 months, 20 years supervised release | 180 months (old law) | D. Minnesota | 0:15-cr-00049-MJD-FLN-5 | Michael J. Davis |
| 11 | 2016 | Ahmed | Hamza | 21 | Plea | 2339B, 20:1097(a) | ISIL | 180 months, 20 years supervised release | 180 months (old law) | D. Minnesota | 0:15-cr-00049-MJD-FLN-5 | Michael J. Davis |
| 12 | 2016 | Musse | Hanad Mustafe | 19 | Plea | 2339B | ISIL | 120 months, 20 years supervised release | 180 months | D. Minnesota | 0:15-cr-00049-MJD-FLN-5 | Michael J. Davis |

| # | Year | Last Name | First Name (s) | Age | Plea/Trial | Statute of Conviction | Alleged Affiliation | Sentence | Maximum | District | Docket | Judge |
|---|------|-----------|----------------|-----|-----------|----------------------|---------------------|----------|---------|----------|--------|-------|
| 13 | 2016 | Farah | Adnan Abdihamid | 19 | Plea | 2339B | ISIL | 120 months, 20 years supervised release | 180 months (old law) | D. Minnesota | 0:15-cr-00049-MJD-FLN-5 | Michael J. Davis |
| 14 | 2016 | Warsame | Abdirizak | | Plea | 2339B | ISIL | 30 months, 20 years supervised release | 180 months (old law) | D. Minnesota | 0:16-cr-00037-MJD | Michael J. Davis |
| 15 | 2016 | Khan | Mohammed Hamzah | 19 | Plea | 2339B | ISIL | 40 months, 20 years supervised release | 180 months (old law) | Northern District Illinois | 1:2014-cr-00564 | John J. Tharp Jr. |
| 16 | 2016 | Young | Jaelyn Delshaun | 20 | Plea | 2339B | ISIL | 144 months, 15 years supervised release | 180 months (old law) | Northern District Mississippi | 1:2015-cr-00098 | Sharion Aycock |
| 17 | 2016 | Dandach | Adam | 20 | Plea | 2339B (attempt); 18 U.S. C. § 1542 (for making a false statemen on a passport application) | ISIL | 180 months | 25 years | C.D. California | 8:14-cr-00109-JVS-1 | James V. Selna |
| 18 | 2016 | Dakhlalla | Muhammad | 22 | Plea | 2339B | ISIL | 96 months, 15 years supervised release | 180 months (old law) | Northern District Mississippi | 1:2015-cr-00098 | Sharion Aycock |
| 19 | 2015 | Khan | Rahatul Ashikim | 24 | Plea | 2339B (attempt) | al-Shabaab | 120 months, 10 years supervised release | 180 months (old law) | W.D. Texas | 14-cr-00212 | Sam Sparks |
| 20 | 2015 | Conley | Shannon | 19 | Plea | 2339B (attempt) | ISIL | 4 years, 3 years supervised release | 180 months (old law) | D. Colorado | 1:14-cr-00163 | Raymond P. Moore |
| 21 | 2015 | Wolfe | Michael | 23 | Plea | 2339B (attempt) | ISIL | 82 months | 180 months | Texas, Western District | 14 Cr. 213 | Sam Sparks |
| 22 | 2015 | Davis | Leon Nathan | 37 | Plea | 2339B (attempt) | ISIL | 180 months | 180 months (old law) | Georgia, Southern District | 1:15-cr-00059-JRH-BKE-1 1:15-cr-00017-JRH-BKE-1 | J. Randall Hall |

EXHIBIT F

THIS PAGE 2008 OR 2010 Better *(handwritten)*

# OUTER REEF® YACHTS

**Corporate Office:** Fort Lauderdale FL | **954.767.8305** | info@outerreefyachts.com | **OuterReefYachts.com**

**2015 70' OUTER REEF | PENULTIMATE**
South Florida - $2,795,000



**2008 65' OUTER REEF | ONCE AROUND**
San Diego, CA - $1,750,000




**2008 65' OUTER REEF | FREED**
Flushing, NY - $1,645,000



**2009 65' OUTER REEF | GINGER**
Seattle, WA - $1,775,000



**2008 65' OUTER REEF | PRIMACY**
Palm Beach, FL - $1,595,000



**2007 65' OUTER REEF | CUN**
Auckland, NEW ZEALAND - $1,77



**2007 65' OUTER REEF | RISKY BUSINESS**
Jacksonville, FL - $1,695,000



**1986 65' SEA RANGER | DESTINY**
South Florida - $319,000



**2012 63' OUTER REEF | ICEB**
Queensland, AUSTRALIA - AU$2,



**2011 63' OUTER REEF | EREHWEMOS**
Auckland, NEW ZEALAND - $1,495,000



**2008 61' MARLOW EXPLORER**
Split, CROATIA - $1,500,000

**1996 50' SEA RAY | VIRTUAL F**
Buffalo, NY - $159,000

**NEW 2016 860 OUTER REEF DELUXBRIDGE SKYLOUNGE**



With the great success of the Outer Reef Yachts Series, a new full beam 860 Deluxbridge has construction and is available for viewing in ForL Florida.

The upgrades include 1140hp CAT C-18's, 55hp hy and stern thrusters, Trac Zero Speed stabilizers, Northern Lights gens, a very extensive electronics & plus a custom décor package. Her layout features owner & guest cabins, plus 2 crew cabins aft with he and galley.