

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SDD:SPN/TAD/MEB
F. #2015R00079

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 24, 2017

By Hand and ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Tairod Nathan Webster Pugh
>        Criminal Docket No. 15-00116

Dear Judge Garaufis:

The government respectfully submits this letter in connection with the defendant's sentencing, scheduled for May 31, 2017, and in response to the defendant's request for a below-Guidelines sentence. The defendant was convicted on March 9, 2016, following a jury trial, of attempting to provide material support to the Islamic State of Iraq and the Levant ("ISIL"), in violation of 18 U.S.C. § 2339B(a)(1), and obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(1) and (c)(2). The crimes of conviction arose from the defendant's attempt to travel to Syria to join ISIL and his subsequent destruction of various electronic devices that were in his possession after he was stopped by Turkish authorities at the airport in Istanbul. For the reasons set forth below, the government respectfully submits that a sentence within the applicable sentencing range of 360 to 420 months' imprisonment under the United States Sentencing Guidelines (hereinafter "USSG" and the "Guidelines") is sufficient but not greater than necessary to satisfy the statutory sentencing factors. (Pre-Sentence Investigation Report ("PSR") at ¶ 82.)

I.   Background

   A.   ISIL

ISIL is a foreign terrorist organization that has existed, in various iterations, since approximately 2004, when it was known as al-Qa'ida in Iraq or Jam'at al Tawhid

wa'al-Jihad.  (See PSR ¶¶ 4-5; Tr. at 850:25-851:24; GX 34.[1])  The group was formally designated a foreign terrorist organization by the United States Department of State in October 2004 and again, under the alias ISIL, among other names, in May 2014.  (PSR ¶ 4; Tr. at 852:4-25; GX 34.)  Abu Bakr al-Baghdadi is the self-proclaimed leader of ISIL.  (Tr. at 859:16-860:5.)  In late June 2014, the official spokesperson for ISIL released an audio recording declaring a "caliphate" consisting of territory under ISIL's control in Iraq and Syria.  (Tr. at 861:14-:16-862:4.)  In a separate video recording released in early July 2014, Baghdadi announced the caliphate, called himself its caliph, and told all Muslims that it was necessary for them to pledge allegiance to the caliphate, and to come and join it.  (Tr. at 862:5-25; 1032:19-1033:19.)

Since 2013, ISIL has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq.  (Tr. at 860:23-861:9.)  ISIL has gained control of large swaths of territory in Syria, as well as areas of Iraq.  (PSR ¶ 5.)  ISIL has distinguished itself from other terrorist organizations by its violence and brutality, using beheadings and indiscriminate massacres to promote terror.  (PSR ¶ 5.)  ISIL has publicly executed individuals that the group believed were spies seeking to infiltrate the organization, and then posted the videos online.  (Tr. at 880:4-7.)  In other instances, ISIL has executed reporters and aid workers in retaliation for perceived Western aggression.  For example, in mid-November 2014, ISIL claimed responsibility for the execution of Peter Kassig, an American humanitarian worker.  (Tr. at 869:16-23; 1016:5-1017:17.)

B.  History and Characteristics of the Defendant/Offense Conduct

As established at trial, the defendant is a United States citizen and former member of the U.S. Air Force who attempted to join the designated foreign terrorist organization ISIL and, after his attempt was thwarted, obstructed justice by destroying various electronic storage devices.

The defendant is 49 years old and was born in Manhattan.  (PSR ¶¶ 7, 47.)  The defendant's father was in the United States military, and the defendant lived with his family near military bases during his early childhood.  (PSR ¶ 51.)  The defendant reportedly felt neglected by his mother as a child.  (PSR ¶¶ 49, 51.)  In 1986, at age 18, the defendant joined the U.S. Air Force, and served from 1986 to 1990, during which time he worked as an avionics instrument system specialist and received training in the installation and maintenance of aircraft engine, navigation, and weapons systems.  (PSR ¶ 52; Tr. at 599:5-603:16; GX 1, 4.)

---

[1] References to "Tr." are to the trial transcript; references to "GX" are to the government's trial exhibits.  Relevant portions of document-based exhibits referenced herein are attached as Exhibit A to this submission.  Video exhibits are enclosed on the disk attached hereto as Exhibit B.

Following his military service, the defendant worked as an airplane mechanic at various companies, and eventually moved to the Middle East. (PSR ¶¶ 7, 52, 56.) From approximately late 2013 to August 2014, the defendant worked in Dubai for Kalitta Air, an air carrier and air cargo transportation company. (Tr. at 619:2-4; 621:4-7; 623:7-9.) While at Kalitta Air, a co-worker observed the defendant viewing his Facebook account and viewing images accompanied by messages such as, "If fighting for my religious freedom makes me a terrorist, I am a terrorist." (Tr. at 625:9-19.) From approximately August 31, 2014 until mid-December 2014, the defendant worked as an airplane mechanic for Gryphon Airlines ("Gryphon"), a commercial charter airline in Kuwait City, Kuwait. (Tr. at 661:7-9; 665:6-7.) The defendant was fired from Gryphon in or about the middle of December 2014. (Tr. at 665:3-7.) While working at Gryphon, the defendant made a number of pro-ISIL comments that drew the attention of his co-workers. Following news coverage of ISIL's execution of an American, the defendant, referring to ISIL, remarked to co-workers that "every group has a right to defend themselves." (Tr. at 663:6-23.) On another occasion, the defendant told a co-worker that he had seen an advertisement that ISIL "was looking for pilots and mechanics, and they are paying big salaries." (Tr. at 664:9-22.)

From approximately October 2014 through early January 2015, the defendant began extensively viewing and downloading ISIL propaganda videos, performed web searches related to traveling to Syria to join ISIL, and drafted a letter to his wife referring to himself as a "mujahid" who intended to "establish and defend the Islamic State" and martyr himself for that cause if necessary. (GX 64.)

With respect to ISIL propaganda videos, for example, searches of the defendant's laptop revealed that on December 18, 2014, he downloaded a video showing ISIL executing multiple prisoners by lining them up and shooting them in the head. (Tr. at 1371:20-1372:8; GX 66a-n.) In addition, the defendant's laptop contained a video that showed maps of various regions of the world being swallowed up by spreading black ink, followed by the words, "Islamic State of Iraq and Sham," an alias of ISIL. (GX 66b, 67a-f.) The text "Virtues Of Seeking Martyrdom. Pledge To Die" appeared next to an image of the ISIL flag. (GX 66b, 67d.) Another ISIL propaganda video on the defendant's laptop provided a detailed history of ISIL's formation and its ambitions, and depicted a man dressed in black known as "Jihadi John" standing over the severed head of American humanitarian aid worker Peter Kassig, stating, among other things, "We are eagerly waiting for the remainder of your armies to arrive." (Tr. at 1375:5-1376:13; GX 48j, 66e.)

The defendant's laptop showed that on December 19, 2014, the defendant performed multiple web searches for "borders controlled by Islamic State." (Tr. at 1398:1-17; GX 54a.) On or about January 5, 2015, the defendant downloaded a chart of crossing points between Turkey and Syria; the chart indicated which borders were controlled by ISIL. (Tr. at 1405:19-1407:24; GX 37, 53.) On or about that same day, the defendant drafted an unsent letter to his Egyptian wife, stating, in relevant part:

> I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to

3

establish and defend the Islamic State.  There is only 2 possible outcomes for me.  Victory or Martyr.  If Allah gives us Victory we will have a home in Al-sham.  I will send for you when it is safe.  You will have a nice home around believers.  If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land.  The land under a whip is worth more than the world and all it contains.

. . .

I calculated my worth in Dunya.  I would usually sell myself for $1,000 dollars a week, that would be ½ a million dollars for 10 years.  If I sell myself to Allah: 1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

(GX 64.)

On January 6, 2015, the defendant paid cash for a one-way ticket to fly on January 10, 2015 from Cairo, Egypt to Istanbul, Turkey.  (Tr. at 700:6-702:17; GX 16.)  On January 10, 2015, the defendant flew from Cairo to Istanbul.  (GX 16.)  When he arrived at the airport in Istanbul, Turkey, however, the defendant was denied entry, and he was sent back to Cairo, Egypt that same day, where he was detained.  (Tr. at 715:12-19; GX 18a-d, 19, 38.)

The defendant's possessions at the time of his detention in Egypt included various electronic media devices, including an HP laptop computer, an Apple iPod, a Samsung Galaxy S4 mobile telephone, a Pixel mobile telephone, and five USB thumb drives (the "Electronic Devices").  (Tr. at 776:8-17; GX 21, 22, 24a-f, 25, 26, 27, 28, 29.)  Four of the five USB thumb drives were damaged and were missing their outer casings.  (Tr. at 779:9-24; 780:13-784:24.)  On or about January 11 and 12, 2015, FBI agents obtained the defendant's Electronic Devices.  (Tr. at 776:8-17, 779:9-24; GX 21, 22, 24b-e, 25, 26, 27, 28, 29.)  In addition, FBI agents photographed the two backpacks in the defendant's possession and noted broken pieces of USB thumb drives in one of the backpacks.  (Tr. at 788:20-790:13; GX 23a-e.)  On January 12, 2015, an FBI agent transported the Electronic Devices to the United States, where the Electronic Devices were searched pursuant to a warrant.  (GX 92.)

The defendant was deported from Egypt and arrived in the United States on January 15, 2015.  (Tr. at 1053:4-20; 1054:23-1055:5.)  At John F. Kennedy International Airport ("JFK"), the defendant was detained by U.S. Customs and Border Protection for secondary inspection and for an interview by Department of State concerning his deportation from Egypt.  (Tr. at 1054:23-1055:5.)  While waiting to be interviewed, the defendant began speaking to an individual who, unbeknownst to the defendant, was an undercover agent ("UC") from the FBI.  (Tr. at 1055:19-1056:1.)  The UC and the defendant spoke for approximately one hour.  (Tr. at 1056:20-22.)  They agreed to have a coffee together, and met at a Dunkin' Donuts at JFK Airport.  (Tr. at 1057:23-1058:8.)  During the conversation, the UC opened his own (undercover) Facebook page on his smart phone.  (Tr. at 1080:23-

4

1082:21.)  The UC's Facebook page included the ISIL flag as a banner.  (Tr. at 1070:16-25.)
The defendant looked at the UC's Facebook page, including the ISIL flag banner, and
indicated that he and the UC were "compatible."  (Tr. at 1071:8.)  The UC sent the defendant
a friend request via Facebook.  (Tr. at 1071:10-14.)  The defendant explained, in substance,
that he had been turned around by Turkish authorities because they did not like the way the
defendant looked.  (Tr. at 1085:25-1086:13.)  The defendant proceeded to give the UC
advice on how to "get through" Turkey, including that it was essential to "blend in."  (Tr. at
1074:8; 1082:24-1083:11; 1084:22-1085:4.)  The UC and the defendant discussed keeping in
touch in the future.  (Tr. at 1069:24-1071:9; 1078:24-1080:18; GX 33f.)

Agents seized one backpack from the defendant on the night of his arrest on
January 16, 2015, and one the following day.  (Tr. 1146:22-1149:8; 1255-1256:15; 1265:4-
1269:13; GX 100, 119.)  The backpacks matched the ones that were in the defendant's
possession when he was detained in Egypt.  Both backpacks were searched pursuant to
warrants.  The backpacks contained items that appeared consistent with travel through, or
living in, rugged areas such as war-torn Syria, including: (1) 2 compasses; (2) 1 solar
powered key-chain flashlight; (3) a solar-powered power source; (4) identification
documents; (5) a "Certificate of Embracing Islam"; (6) 2 pairs of gloves; (7) cargo pants;
(8) boxer shorts; (9) multiple tunic shirts; (10) a green fatigue jacket; (10) 2 thermal shirts;
and (11) 3 scarves/head covers, including a balaclava.  (Tr. at 1255, 1269:18-1289:13.)

C.  Arrest, Trial Conviction

The defendant was arrested near his father's residence in New Jersey on
January 16, 2015 without incident pursuant to an arrest warrant.  (PSR ¶ 13.)  On March 16,
2015, the defendant was indicted by a grand jury of one count of Attempt to Provide Material
Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. §§ 2339B and
2339B(d), and one count of Obstruction and Attempted Obstruction of an Official
Proceeding, in violation of 18 U.S.C. §§ 1512(c)(1) and 1512(c)(2).  (Docket No. 11.)

From February 29, 2016 until March 9, 2016, a jury trial was held before Your
Honor.  The government called 19 witnesses, including the agents who had recovered the
Electronic Devices from the defendant, FBI examiners who were involved in the forensic
examination of the defendant's Electronic Devices, the UC, and an expert witness regarding
ISIL.  The defendant put on a case, calling his own expert witness regarding ISIL.  On March
9, 2016, the jury convicted the defendant on all counts.

II.  The Guidelines Calculation

The Probation Department has determined that the defendant's total offense
level is 42, his criminal history category is VI, and the advisory Guidelines range is 360
months to life imprisonment.  (PSR at ¶¶ 18-42, 82).  The government concurs with this
calculation.  Because the counts of conviction have a combined statutory maximum sentence
of 35 years, the defendant's effective Guidelines range is 360 to 420 months' imprisonment.
As set forth further below, the defendant disputes the range set forth in the PSR.

III.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider, among other factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

2) the need for the sentence imposed –

   (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)     to afford adequate deterrence to criminal conduct; and

   (C)    to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

6

IV.    Analysis

On May 8, 2017, the defendant submitted a sentencing memorandum ("Def. Mem.") in which he challenges the Guidelines calculation set forth in the PSR and requests a sentence of time served on the grounds that: (1) the defendant, whose competency to stand trial and ability to assist in his own defense has never been disputed, allegedly had a "host of psychological impairments, which led to . . . poor decision-making"; (2) the defendant's age and prior service in the U.S. Air Force should be considered mitigating factors; (3) the defendant was previously offered a plea agreement to Count One of the Indictment (the material support charge); and (4) "similarly situated" defendants have received non-Guidelines sentences.  (Def. Mem. at 2.)  The arguments are meritless.

A.  The Guidelines Range Set Forth in the PSR is Correct

The defendant argues that the Probation Department erred in relying on U.S.S.G. § 2M5.3 (Providing Material Support or Resources to Designated Foreign Terrorist Organizations) instead of § 2X1.1 (Attempt, Solicitation, or Conspiracy) to determine the base offense level applicable to the defendant's conduct.  (Def. Mem. at 3.)  Assuming, arguendo, that the defendant is correct, the argument should have no effect on the Court's sentencing analysis because application of U.S.S.G. § 2X1.1 results in the same Guidelines range as that calculated in the PSR.

Section 2X1.1 of the Guidelines provides that the base offense level for an attempt is the same as the base offense level under the guideline section applicable to the substantive offense "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."  Here, as set forth in the PSR, the base offense level under U.S.S.G. § 2M5.3 is 26, and, among other adjustments, an additional 2 points are warranted because the offense was committed with the intent, knowledge, or reason to believe that the material support would be used to commit or assist in the commission of a violent act.  See U.S.S.G. § 2M5.3(b)(1)(E); PSR ¶ 21.[2]

The defendant argues his offense level should be reduced by 3 points pursuant to U.S.S.G. § 2X1.1(b)(1) because he was convicted of an attempt.  (Def. Mem. at 3.)  But the attempt reduction does not apply if "the circumstances demonstrate that the defendant was about to complete all [acts necessary for successful completion of the substantive offense] but for apprehension or interruption by some similar event beyond the defendant's control."  U.S.S.G. § 2X1.1(b)(1).  Such circumstances clearly are present here.  The defendant took all of the steps necessary to place himself under ISIL's control and contribute personnel and skills, in the form of himself and his military training, to the terrorist group except for the final step of crossing the Turkish border into Syria, as many thousands of people had done before him.  The defendant had been indoctrinated through his immersion in

---

[2] The total adjusted offense level is 42, based in part on a twelve-point Victim Related Adjustment and a two-point enhancement for obstruction of justice.   (PSR ¶¶ 20-25.)

ISIL's violent propaganda, prepared for life in war-torn Syria, purchased and packed equipment and supplies, gathered documents to establish himself as a Sunni Muslim, downloaded border maps and related information, and flew from Cairo to Istanbul.  But for the intervention of the Turkish and, subsequently, U.S. authorities, the defendant would have completed the final acts necessary to the provision of material support to ISIL.  See U.S.S.G. § 2X1.1 Background note (observing that reduction is appropriate only if "the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense").

B.  The Terrorism Enhancement Applies to the Defendant's Conduct

The defendant objects to the imposition of the terrorism enhancement set forth in U.S.S.G. § 3A1.4 on the theory that the government has not proven that the defendant's offense—attempting to join ISIL, to work under its direction and control—was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." (Def. Mem. at 25.)   The defendant is wrong.  As explained below, his argument is premised on a flawed reading of § 3A1.4 and Second Circuit precedent.

Section 3A1.4 of the Sentencing Guidelines applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4 & comment n.1.  There is no question that attempting to provide material resources to ISIL "involve(s) . . . a federal crime of terrorism."  See 18 U.S.C. § 2332b(g)(5)(B) (listing 18 U.S.C. § 2339B).  Section 2332b(g)(5), which defines the term "federal crime of terrorism," also requires that the offense be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332(b)(g)(5)(A).

In United States v. Awan, 607 F.3d 306, 317 (2010), the Second Circuit held that Section 2332(b)(g)(5)(A) "does not require proof of a defendant's particular motive." "Motive" refers to "the rationale for an actor's particular conduct," whereas "calculation"— the word used in § 2332(b)(g)(5)(A)—refers to "the object that the actor seeks to achieve through planning or contrivance."  Awan, 607 F.3d at 317.  Because Section 2332(b)(g)(5)(A) focuses not on the defendant, but on his "offense," "the section is better understood as imposing a requirement 'that the *underlying felony* [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'"  Id. (quoting United States v. Stewart, 590 F.3d 93, 138 (2d Cir. 2009)) (emphasis in original).  Thus, "a person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation."  Id.  The "involved" prong of the terrorism enhancement is therefore satisfied where: (1) a defendant commits a crime listed in 2332(b)(g)(5)(B); and (2) the government shows by a preponderance of the evidence that a defendant had the "'specific intent' to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'"  Id. at 317; 18 U.S.C. § 2332b(g)(5)(A).

8

Here, the defendant was convicted of attempting to join ISIL, in violation of 18 U.S.C. § 2339B.  In rendering a guilty verdict on that charge, the jury found that the defendant: "knowingly attempted to provide one or more individuals, which may include himself, <u>to work under ISIL's direction and control</u>."  (Docket No. 113 at 24.) (emphasis added).  The jury also found that the defendant knew: (1) ISIL had been designated by the Secretary of State as a foreign terrorist organization ("FTO");[3] (2) ISIL engaged in "terrorist activity"; or (3) ISIL engaged in "terrorism."   The jury was instructed that "terrorism" meant "premeditated, politically motivated violence perpetrated against noncombatant targets by sub-national groups or clandestine agents."  (<u>Id.</u> at 25.)

At trial, the government presented overwhelming evidence that ISIL committed acts calculated to influence and affect government conduct by intimidation and coercion, and that it retaliated against government conduct by United States and other state actors.  In one of the many gruesome ISIL videos the defendant saved to his laptop, an ISIL fighter known as "Jihadi John" stood above the severed head of Peter Kassig, a former Army Ranger who worked for an aid organization in Syria that helped refugees.  (Tr. 1605-1607.)   Waving a large knife, Jihadi John addressed then-President Barack Obama, stating:

> A U.S. citizen of your country, Peter, who fought against the Muslims in Iraq while serving as a soldier under the American army, doesn't have much to say.  His previous cellmates have already spoken on his behalf.
>
> But we say to you Obama, like our Sheikh, Abu Hamdala Al Adnani said, you claim to have withdrawn from Iraq four years ago.  We said to you then, that you were liars, that you had not withdrawn, and that if you had withdrawn, that you would return, even if after some time.
>
> *You* would return.  Here you are.  You have not withdrawn.  Rather, you hid some of your forces behind your proxies and [sic] withdrawn the rest.  Your forces will return greater in number than they were before.  You will return, and your proxies will not benefit you.  And we also remind you of the haunting words that our Sheikh Abu Musab Al-Zarqawi told you: "the spark has been lit here in Iraq and its heat will continue to intensify by Allah's permission until it burns the Crusader army . . ."

(GX 66e at 9:14-10:31.)

That the defendant saved this video, among many others, establishes his knowledge that ISIL committed acts calculated to influence or affect the conduct of

---

[3] Embedded within the State Department's designation of any organization as an FTO is the determination, required by Section 219 of the Immigration and Nationality Act of 1965 as amended ("INA"), that the organization: (1) is foreign; (2) engages in "terrorist activity" as defined in the INA; and (3) "the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(A)-(C).

government by intimidation or coercion, and it retaliated against government conduct. The defendant commented on ISIL's politically motivated acts of violence. Responding to a Facebook post about Peter Kassig's beheading, the defendant wrote: "why the sad (smiley) face? The American died with shahada and Daesh is doing the best they can."[4] (GX 13m.) The defendant added: "Whatever the reason IS has for executing him I am not in a position to judge." (Id.)

Months before Peter Kassig's brutal execution, the defendant sent a Facebook message demonstrating his full awareness of ISIL's goals, including waging war against the United States:

> people think they (Islamic State) can just walk over to the [sic] boarder and say let me in. People the Mujahid must fight for new ground while defending their home ground. Islamic state is fighting a coalition of America, Syrian, British and many more. Quit putting the brothers down. Support them with your Bodies, if not your bodies then your money and if you can't help them with your money then give your prayers. The least, the very least you can do is Stop talking ill of them, stop insulting them, stop spreading the the juda-christian lies in other words "shut the hell up" war is not fought in a day. One of the hadith of our Prophet talks about a war lasting 40 plus years. This may be that war. The believers will win, Islam will prevail. Do your part, Strive (put forth effort) for victory of Islam.

(GX 15b).

In addition, days before the defendant flew to Turkey with the intention of traveling to Syria to join ISIL, he drafted a letter to his wife, "Misha," stating precisely what he intended to do once he reached ISIL-controlled territory. The defendant referred to himself as a "mujahid," stated he would "use the talents and skills given to me by Allah to establish and defend the Islamic State," and that the "only 2 possible outcomes" for him were "[v]ictory or [m]artyr." (GX 54.)

Clearly, the defendant had the specific intent to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A); see Awan, 607 F.3d at 317. The defendant attempted to join ISIL. He referred to himself as a "mujahid," or "holy warrior," which strongly suggests he intended to fight for ISIL. (Tr. 888.) The defendant recognized he might be "made a martyr." (GX 64.) Before attempting to join ISIL, the defendant was fully aware that the group committed horrific acts of terrorism

---

[4] Expert witnesses for the government and the defense testified that "shahada" means "martyr," and "Daesh" is another name for ISIL. (Tr. 851, 889, 1622)

calculated to affect United States government conduct through intimidation and that it retaliated against government conduct.

Arguing against the terrorism enhancement, the defendant attempts to reframe his "offense conduct" as "purchasing a one-way ticket to Turkey and attempting to fly there." (Def. Mem. at 26.)  The defendant asserts that flying to Turkey "was not calculated to influence or affect the conduct of any government . . . ."  (Id.)[5]  This argument misses the mark.  The jury did not convict the defendant of the offense of flying to Turkey.  The jury convicted him of the offense of attempting to provide material support to ISIL, in the form of himself.   The government has proven that the defendant had the specific intent to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  The Court should apply the terrorism enhancement.

The defendant's remaining objections to the terrorism enhancement lack merit.  The defendant argues that the terrorism enhancement was enacted without taking into account any "empirical data" or "national experience," and the Court should downwardly vary from the applicable Guideline range based on a policy disagreement.  In United States v. Meskini, the Second Circuit explained the rationale behind the terrorism enhancement under § 3A1.4:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

The Second Circuit also rejected the argument that the enhanced criminal history level in § 3A1.4(b) over-represents the seriousness of a defendant's past criminal conduct or the likelihood that he will commit other crimes:

---

[5] The defendant incorrectly relies on United States v. Stewart, 590 F.3d 93, 138 (2009), for the proposition that the terrorism enhancement does not apply here.  In Stewart, the Second Circuit upheld the district court's determination that the terrorism enhancement did not apply to the offenses committed by Mohammed Yousry, a translator.  Stewart is readily distinguishable because "the government [] conceded [Yousry's] lack of motivation or purpose . . . to influence or affect the conduct of government by intimidation or coercion or to retaliate against government action."

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation. . . . Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases.

Id.

In sum, the policy behind the terrorism enhancement is sound, and the Court should apply it.

C. The Defendant's Prior Military Service and Lack of Criminal History Do Not Warrant a below-Guidelines Sentence

The defendant argues that his prior military service and lack of criminal history are factors warranting a below-Guidelines sentence. The argument is unpersuasive. While the defendant's military service is admirable, his decision to turn his back on his country to support a terrorist organization committed to the destruction of the United States and all it stands for represents a particularly stark betrayal in light of his prior military service and the training, support, and opportunities he received through his affiliation with the U.S. Air Force. As noted by Aaron Zelin, the government's expert witness, had the defendant successfully reached Syria and achieved his goal of joining ISIL, his recruitment would have been a significant achievement for the group, in part because he was a former member of the U.S. Air Force and because of his technical abilities. (See, e.g., Tr. at 1036 (confirming that recruitment of former U.S. servicemen would constitute propaganda coup for the group)).

The defendant's lack of criminal history also does not warrant a non-Guidelines sentence here. As the Second Circuit noted in 2010, "the Guidelines signal that any crime promoting terrorism is to be viewed as extremely serious." Stewart, 597 F.3d at 521. Indeed, "the strong need to deter terrorism is evident from the Guidelines recommendation that a terrorism defendant be accorded a criminal history of VI, the highest level possible, without regard to [a defendant's] actual criminal record." Id. Moreover, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92.

D. The Defendant's Alleged Psychological Impairments Warrant Consideration But Not a Sentence of Time Served

The defendant relies heavily on the report of Dr. Sanford Drob, a psychologist, in support of his argument that various psychological impairments warrant leniency in

sentencing.  (Def. Mem., Ex. A (the "Drob Report")).  The defendant concedes that he was competent to stand trial, but argues that his alleged psychological impairments may have contributed to his decision to go to trial and in any event lessen his culpability.  (Def. Mem. at 24.)  The report does not bear the weight the defendant puts on it.[6]

---

[6] In an abundance of caution, in light of the redactions in the defendant's sentencing submission concerning the defendant's psychological evaluation, the government has redacted references to the defendant's psychological evaluation in the ECF version of this letter.  However, the defendant has proffered Dr. Drob's psychological evaluation as a basis for a sentencing departure.  To the extent the Court deems the evaluation, as well as the redacted portions of defendant's sentencing letter and the redacted attachments, to be "relevant" and "useful" to the judicial process, these documents should not be redacted.  See United States v. Huntley, 943 F. Supp. 2d 383, 386 (E.D.N.Y. 2013) (unsealing sentencing memorandum filed by defendant because the redacted information was "relevant" and "useful" to determining the defendant's sentence, and such documents "are afforded a presumption of openness").

13

Whatever the truth about the defendant's upbringing, the record does not support an inference that the defendant suffers from psychological impairments material to his culpability for the offenses of conviction. The defendant had a long and relatively successful employment history as an avionics specialist and mechanic, indicating that he was capable of handling the demands of a field requiring specialized technical expertise. (See GX 5 (resume documenting 27-year employment history)). The defendant's sister and ex-wife both indicated that they have never known the defendant to have problems related to his mental health. (PSR ¶ 65.) The defendant's aunt, Mary Wilson Freeland, submitted a letter to the Court in which she indicates that she has known the defendant since his birth and that he is an "intelligent, capable, dedicated" young man who is "quick on his feet, with sensible reactions in all the circumstances [she has] seen him in." (Def. Mem., Ex D.) Ms. Wilson adds that the defendant "is capable of handling any situation with thoughtfulness and maturity." (Id.) In addition, MDC medical records reflect that the defendant underwent psychological evaluations on February 4 and March 10, 2015, and on both occasions no significant mental health concerns were observed. (PSR ¶ 63.)

In sum, the defendant's upbringing and psychological limitations, while deserving of consideration by the Court, are outweighed by the seriousness of the defendant's conduct, and the need for the sentence to fulfill the objectives of 18 U.S.C. § 3553(a)(2)(A)-(C).[7] Should the defendant require mental health treatment or other support services, he can receive such treatment while serving an appropriate custodial sentence, with additional support to follow upon his release.

E. The Government's Plea Offer, Rejected Months Before Trial,
   is Not Relevant to The Court's Sentencing Analysis

The defendant repeatedly references a plea offer from the government pursuant to which the defendant could have pled guilty to Count One of the Indictment, charging attempt to provide material support to ISIL, with a statutorily prescribed maximum sentence of 15 years' imprisonment. In order to accept the plea, the defendant would have

---

[7] The defendant clearly fails to satisfy the Guidelines requirements for a reduction of sentence based on diminished capacity. The pertinent Guidelines policy statement provides, in relevant part, that "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13. Additionally, Application Note 1 states, "[f]or purposes of this policy statement, '[s]ignificantly reduced mental capacity means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power to reason; or (B) control behavior that the defendant knows is wrongful." Id. app. n.1. These elements are not satisfied in this case.

14

had to acknowledge his guilt under oath and accepted responsibility for his conduct. The conviction on Count One would have resulted in an advisory Guidelines range of 360 months' to life imprisonment, but the range would have been capped by statute at 15 years' imprisonment. Instead, the defendant rejected the government's plea offer more than eight months before trial and was subsequently convicted at trial. During its preparation for trial, the government developed additional evidence concerning the scope of the defendant's obstruction of justice, through forensic analysis of the destroyed media devices, and concerning the nature of the defendant's indoctrination by ISIL propaganda, through analysis of the contents of the defendant's laptop. In addition, the defendant has yet to accept responsibility for his offenses, even now, after conviction, and has expressed no remorse for his attempt to join a brutally violent terrorist organization. The question of specific deterrence thus remains a particularly important aspect of the sentencing analysis in this case. In sum, the 15-year sentencing cap that would have applied had the defendant accepted the government's plea offer is not relevant to the sentencing factors presently before the Court.

     F.  The Defendant's Survey of Terrorism Sentences
         Is Incomplete and Does Not Support the Requested Sentence

       In support of his request for a sentence of time served, the defendant cites to a number of other cases from around the country in which courts have sentenced defendants to terms of incarceration of less than 360 months. (Def. Mem. at 16-22.) While sentencing courts should seek to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), the information presented by the defendant does not compel such a result here. Notably, for the surveyed sentences imposed between September 2001 and July 2007, the defendant did not provide the actual sentences, and instead provided two "mean" sentences. (Def. Mem. at 17.) Notably, all of the 2001-2007 sentences were imposed after the defendants pled guilty, and it is unclear if any of the defendants were also charged with obstruction of an official proceeding. There is no information concerning the nature of the plea agreements (including whether they were made pursuant to Rule 11(c)(1)(C)), mitigating personal circumstances of those defendants, or substantial assistance to the government, which may have played a role in the sentencing analyses. For the more recent "cases surveyed" (Def. Mem. at 19-22), the defendant failed to include multiple terrorism sentences imposed in the Eastern District of New York, including one where the defendant was charged with attempting to provide material support to an FTO and obstruction of justice after he had been sent back to the United States from Heathrow Airport.

       Rather than speculating about why another court sentenced a particular defendant the way it did, the government respectfully submits that, as set forth above, the Court should use the defendant's advisory Guidelines range as the "starting point and the initial benchmark," Gall, 552 U.S. at 49, consider all of the § 3553(a) factors applicable to the defendant, and then "make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). A sentence of 360 months' imprisonment is not at odds with other cases in this district.

As a starting point, Judge Feuerstein's 25-year sentence of Marcos Alonso Zea is instructive because Zea pled guilty to – and therefore accepted responsibility for – attempting to join Al-Qaeda in the Arabian Peninsula ("AQAP") and obstruction of justice while under investigation by the Joint Terrorism Task Force. See United States v. Zea, No. 15-1531-CR, 2016 WL 4578749, at *2 (2d Cir. Sept. 1, 2016) (affirming conviction and sentence based on terms of plea agreement).  Zea pled guilty pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, with an agreed-upon term of imprisonment not to exceed 300 months.

Other sentences imposed in terrorism cases in the Eastern District of New York include:

- Betim Kaziu, 09 CR 660 (JG) **27 years** (American citizen convicted after trial who traveled from Brooklyn to Egypt and then Kosovo in connection with conspiracy and attempt to provide material support to terrorists)

- Agron Hasbajrami, 11 CR 623 (JG)  **16 years** (legal permanent resident of Brooklyn arrested at JFK airport for attempting to travel overseas to provide material support to terrorists; plea agreement)

- Adis Medunjanin, 10 CR 19 (JG) **Life** (defendant traveled overseas and received training and direction from al-Qaeda, apprehended in connection with conspiracy to detonate bombs on New York City subways)

- Quazi Mohammad Rezwanul Ahsan Nafis, 12 CR 720 (CBA) **30 years** (arrested in FBI sting operation after attempting to detonate what he believed to be an explosive device in lower Manhattan)

- Lawal Olaniyi Babafemi, 13 CR 109  (JG) **22 years** (Nigerian citizen convicted of conspiring to provide and providing material support to AQAP, the same group the defendant sought to support)

- Abdel Hameed Shehadeh, 10 CR 1020 (ENV) **13 years** (defendant from Staten Island convicted after trial of making false statements to FBI in connection with terrorism investigation)

- Russell Defreitas, 07 CR 543 (DLI) **Life** (plot to destroy infrastructure at JFK airport)

- Ali Yasin Ahmed, 12 CR 661 (JG) **11 Years** (defendant traveled from Sweden to Somalia to support al-Shabaab)

- Abid Naseer, 10 CR 19 (RJD) **40 years** (conspiracy to provide material support to al-Qaeda)

16

The defendant argues that his case is distinguishable from those listed in his survey of cases for several reasons, and that he should receive a sentence below those referenced in the survey.  The government agrees that the defendant's case is distinguishable from many of the cases summarized in his survey of terrorism sentences, but mostly in ways that support a more substantial term of incarceration.  The defendant's age, for example, suggests that the general rule that defendants are less prone to recidivate after a certain age is inapplicable to him, since he committed his offenses when he was 48 years old.[8]  Moreover, the defendant points to no empirical research concerning recidivism among terrorism defendants.  Cf. United States v. Hayes, 445 F.3d 536, 537 (2d Cir. 2006) (citing to congressional findings that "sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "recidivism rates do not appreciably decline as offenders age.")  One of the cases the defendant cites—United States v. Stewart—involved a terrorism defendant, Sheikh Omar Ahmad Ali Abdel Rahman, who, at age 62, committed additional terrorism-related crimes (for which he was not charged) while serving a life sentence.   590 F.3d at 101-108.

The defendant suggests that because (he claims) he made no contact with members of ISIL whom he believed could facilitate his travel to Syria, or joined with others who shared similar goals, he is less culpable than other terrorism defendants.  (Def. Mem. at 24-25.)  With his military training and years of working overseas, including in Kuwait and Egypt, the defendant did not need a smuggler or recruiter to explain to him how to get to the Turkish border with Syria.  The defendant had read multiple media accounts of the well-worn border-crossing routes, and had downloaded maps of key crossing points.  (See, e.g., GX 35b, 37, 51c, 51d.)  He was not a teenager traveling from the United States or another western country to the Middle East for the first time.  He was an adult military veteran with long experience in the region.  As to the argument that he did not meet with people who shared his goals, Pugh ignores his interaction with the undercover agent in the airport upon his return, when he readily provided advice to a person he believed to be a fellow supporter of ISIL eager for tips on how to travel to the caliphate.  (Tr. 1074; 1082-84.)

G.  The Statutory Sentencing Factors

The government respectfully submits that a custodial sentence within the applicable Guidelines range would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).  Specifically, a Guidelines sentence would properly reflect the seriousness of the defendant's conduct in attempting to provide material support to ISIL and obstruction of an official proceeding, as described above, see 18

---

[8] The commentary to Part A of Chapter Four of the Guidelines, which addresses criminal history, notes that age, among other factors that may correlate with recidivism, is not included as a relevant factor in the Guidelines for policy reasons, including uncertainty as to the reliability of existing data.  U.S.S.G. Ch. 4, Part A, Introductory Commentary.

U.S.C. § 3553(a)(1), (a)(2)(A), promote respect for the law, <u>see</u> <u>id.</u>, and provide adequate deterrence to others contemplating similar acts, <u>see</u> <u>id.</u> § 3553(a)(2)(B).

V.    <u>Conclusion</u>

For the reasons set forth above, the government respectfully submits that a sentence within the applicable Guidelines range of 30 to 35 years' imprisonment is necessary and appropriate to fulfill the objectives of sentencing.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:    /s/
Samuel P. Nitze
Tiana A. Demas
Mark E. Bini
Assistant U.S. Attorneys
(718) 254-7000

18