17-1889
United States v. Pugh

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2018

No. 17-1889

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

TAIROD NATHAN WEBSTER PUGH,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of New York.
No. 15-cr-00116 — Nicholas G. Garaufis, *Judge*.

---

ARGUED: FEBRUARY 4, 2019
DECIDED: AUGUST 29, 2019
AMENDED: DECEMBER 10, 2019

17-1889
United States v. Pugh

Before: CALABRESI and DRONEY, *Circuit Judges*, and UNDERHILL, *Chief District Judge*.[*]

_____

Appeal from a judgment of conviction and sentence of the United States District Court for the Eastern District of New York (Garaufis, *J.*).  Pugh was charged with attempting to provide material support to a foreign terrorist organization (count one) and obstruction of justice (count two). At trial, the government admitted into evidence, over Pugh's objection, a draft letter that Pugh had purportedly written to his wife which, *inter alia*, professed his allegiance to the Islamic State. Pugh was convicted by a jury on both counts and sentenced to 180 months of incarceration on count one, and 240 months of incarceration on count two, the sentences to run consecutively, for a total effective sentence of 420 months of incarceration, the maximum allowable sentence.  Pugh contends that the letter addressed to his wife should have been excluded from evidence pursuant to the marital communications privilege and, therefore, he is entitled to a new trial.  Pugh also contends that neither of his two convictions was supported by sufficient evidence and, therefore, should be vacated.  Lastly, Pugh contends that his sentence was procedurally and substantively unreasonable because the court (1) failed to sufficiently articulate its reasoning for imposing the statutory maximum sentence, and (2) failed to provide Pugh sufficient opportunity to address the court.  We disagree with most of Pugh's arguments, but agree that further articulation of the sentence determination is required.

Accordingly, we **AFFIRM** the district court's judgment of conviction, **VACATE** the sentence, and **REMAND** for resentencing.

_____

[*] Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

17-1889
United States v. Pugh

Judge Calabresi concurs in a separate opinion.

—————————

JO ANN M. NAVICKAS, SAMUEL P. NITZE, MARK E. BINI, ASSISTANT UNITED STATES ATTORNEYS, *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

SUSAN G. KELLMAN, SARAH KUNSTLER, Brooklyn, New York, *for Defendant-Appellant*.

UNDERHILL, *District Judge*:

Defendant-appellant Tairod Nathan Webster Pugh appeals from a judgment of conviction entered by the United States District Court for the Eastern District of New York (Garaufis, *J.*), after a jury found him guilty of attempting to provide material support to a foreign terrorist organization and obstruction of justice.  Pugh advances three arguments in this appeal: (1) the district court erred in denying his motion to exclude from evidence a draft letter

3

17-1889
United States v. Pugh

purportedly written to his wife; (2) the evidence was insufficient to support either conviction; and (3) his sentence was procedurally and/or substantively unreasonable.  We disagree with most of Pugh's arguments, but agree that the court's articulation of its reasoning for imposing the maximum permissible sentence was insufficient.

Accordingly, the judgment of conviction is **affirmed**, the sentence is **vacated**, and the case is **remanded** for resentencing.

## BACKGROUND

The jury could have found the following facts. Pugh is a United States citizen and Air Force Veteran who moved to the Middle East to work as a civilian contractor for different aerospace companies after he left the military.  While living overseas, Pugh began researching the Islamic State of Iraq and the Levant ("ISIL" or "ISIS") and downloading propaganda materials, as well as discussing ISIS tactics and activities online via Facebook.  While

17-1889
United States v. Pugh

abroad, Pugh also met and married an Egyptian woman, referred to as "M.H.S."  On January 10, 2015, Pugh flew from Cairo, Egypt to Istanbul, Turkey.  Upon arrival at the Turkish airport, Pugh was denied entry into the country and was returned to Cairo, where Egyptian and United States law enforcement officers discovered several electronic media devices in his luggage.  Pugh attempted to destroy, or succeeded in destroying, some of the electronic devices he was carrying with him, including a computer, multiple USB drives, and an iPod.  A search of his laptop revealed internet searches, videos, and pictures relating to ISIS and its presence in, *inter alia*, Turkey and Syria, as well as a letter purportedly drafted by Pugh to his wife in which he pledges his allegiance to ISIS.  On January 15, 2015, Pugh was returned to the United States where he was briefly detained for questioning in Customs, and was released that day.  He was arrested the next day at his father's home in New Jersey.

17-1889
United States v. Pugh

Pugh was arraigned on March 18, 2015 on a two-count indictment charging him with attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (count one); and obstruction and attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(1) and (c)(2) (count two).  Pugh pleaded not guilty and elected to go to trial. A seven-day jury trial was conducted, and at the close of the government's case, Pugh moved for a judgment of acquittal on both counts, pursuant to Federal Rule of Criminal Procedure 29.  Pugh renewed his motion at the close of his case.  The district court denied the motion on both occasions.  On March 9, 2016, the jury found Pugh guilty on both counts, and he once again renewed his Rule 29 motion post-verdict, which the court again denied.  Pugh was sentenced on May 31, 2017 to 180 months of incarceration on count one and 240 months of incarceration on count two, the maximum

17-1889
United States v. Pugh

sentence under each statute[1], to run consecutively, for a total effective sentence of 420 months.  This appeal followed.

## DISCUSSION

Pugh filed the instant appeal in which he argues: (1) the district court erred in denying his motion to exclude a draft letter purportedly written to his wife; (2) the evidence was insufficient to support either conviction; and (3) his sentence was procedurally and/or substantively unreasonable.   Additional facts will be set out below where necessary.

**I.     Admission of the Letter**

Pugh argues first that the district court erred in denying his motion in limine to exclude, pursuant to the marital communications privilege, the use of a draft letter found on his laptop.  We disagree.

---

[1] At the time of the commission of the offense, the statutory maximum for count one pursuant to 18 U.S.C. § 2339B(a)(1) was 180 months.  It has since been increased to 240 months.

17-1889
United States v. Pugh

The following additional facts are relevant to this claim. Pugh, who speaks only English, met and married an Egyptian woman, M.H.S., who speaks only Egyptian Arabic.  The couple communicated mostly via Facebook Messenger with the help of Google Translate and/or bilingual acquaintances who would translate messages between the pair.  When Pugh's laptop was searched, pursuant to a search warrant, authorities found a saved document which purported to be a draft letter, addressed to M.H.S., which the parties refer to as the "My Misha Letter."  In the letter, Pugh expressed a desire to "use [his] talents and skills . . . to establish and defend the Islamic State."  App'x at 55.  Further, the letter states, in relevant part: "I will escort you into Paradise and when you see the home paid for by my blood and your tears you will know it was all worth it"; "I defied my friends and family to

8

17-1889
United States v. Pugh

become a Muslim, now I will defy Muslims to be a Mujahid[2]"; and

"I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed." *Id.*

Pugh's attorney moved to preclude the draft letter pursuant to the marital communications privilege. The government, in opposition, argued that Pugh failed to establish that the letter was protected by the privilege because: (1) Pugh failed to establish that his Egyptian marriage would be recognized by the United States; (2) Pugh failed to establish that he intended the draft letter to be a marital communication; and (3) because Pugh and M.H.S. needed the assistance of interpreters to communicate, the letter was not intended to be kept confidential, even if Pugh did intend to send it.

The district court issued a ruling on February 12, 2016 in which it rejected the government's argument that there was no

---

[2] Mujahid means "one who struggles" and, in the context of a jihad, "holy warrior." Gov't App'x at 131.

17-1889
United States v. Pugh

marital privilege because Pugh's marriage was not valid or, even if it was valid, the couple was separated, breaking the privilege.

Ultimately, though, the court denied Pugh's motion and found the "My Misha Letter" admissible for two reasons: (1) the draft letter was not intended to be a communication; and (2) even if it was, it was not intended to be confidential. The court determined that Pugh failed to establish that he intended to send the draft letter to his wife and, therefore, it was not a communication. As support, the court highlighted that Pugh and his wife routinely communicated via Facebook, and that there was "no indication that Pugh even once, much less regularly, typed his messages using a program on his laptop and then copied them into Facebook." App'x at 87. Further, the court stated that there was "no indication that Pugh had sought to have the letter translated (either by a third-party or using translation software), as would have been required for M.H.S. to understand the document." *Id*. The court further found that "the

10

17-1889
United States v. Pugh

draft letter [was] inconsistent with Pugh's professed reasons for travelling to Turkey," to find employment. *Id.*

Alternatively, the district court found that, even if the draft letter was intended to be a communication, it was not intended to be kept confidential. The court concluded that using "an ad hoc network of informal translators destroys the marital communication privilege" and is "inconsistent with the scope of the marital communications privilege." App'x at 95, 99. As support, the court found that the letter, if sent, was likely to be translated by a translator, rather than Google Translate, given its length and contents, and that the couple was "unlikely to employ a trusted, confidential translator" to translate the message for them. *Id.* at 90-91. The court determined that "where a married couple evidences an intent to disclose communications to an ad hoc network of family, friends, and strangers for translation, the privilege is forfeited." *Id*. at 92.

17-1889
United States v. Pugh

On appeal, Pugh argues that the district court erred in both of its determinations: that the letter was not a communication and, even if it were, that the letter was not intended to be confidential.

The parties disagree about the standard of review we should apply in reviewing the district court's ruling.  The government asserts that a claim of privilege should be reviewed for abuse of discretion.  Pugh asserts that the applicable standard of review is that which applies to a denial of a suppression motion: factual findings are reviewed for clear error, and legal conclusions are reviewed *de novo*.  We need not decide which standard applies, because the tests are very similar and lead to the same result in this case.

"A court abuses its discretion if (1) it relies on an erroneous view of the law, (2) its decision rests on a clearly erroneous finding of fact, or (3) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located

12

17-1889
United States v. Pugh

within the range of permissible decisions." *United States v. Yannai*,

791 F.3d 226, 242 (2d Cir. 2015). A review of the district court's

evidentiary rulings is deferential. *United States v. Hendricks*, 921 F.3d

320, 326 (2d Cir. 2019). Issues of law are reviewed *de novo*. *United*

*States v. Sewell*, 252 F.3d 647, 650 (2d Cir. 2001). Questions of fact are

reviewed for "clear error," which is "deferential" and "does not

entitle [a reviewing court] to overturn a finding simply because [the

court is] convinced that [it] would have decided the case

differently." *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015) (internal

quotation marks omitted).

"[T]he applicability of a privilege is a factual question, [but]

determining the scope of a privilege is a question of law." *United*

*States v. Mejia*, 655 F.3d 126, 131 (2d Cir. 2011) (internal quotation

marks omitted). The distinction, then, is "whether the district court

based its decision on a consideration of the application of the

privilege to the communication or on an understanding of the

17-1889
United States v. Pugh

privilege's scope." *Id.* A determination is factual when it "involves the application of the . . . privilege as our case law has already developed it to the novel set of facts before us . . . [rather than] address[ing] the scope of the privilege itself in a novel way." *Id.* (question of whether communicating through client's sister waived attorney-client privilege was factual).

"The confidential communications privilege . . . [shields] communications made in confidence during a valid marriage. . . ." *In re Witness Before Grand Jury*, 791 F.2d 234, 237 (2d Cir. 1986). The purpose of the privilege is to provide "assurance that all private statements between spouses—aptly called the best solace of human existence—will be forever free from public exposure." *Id.* (internal citations and quotation marks omitted). Courts have noted, however, that "privileges contravene the fundamental principle that the public . . . has a right to every man's evidence. . . . As such, they must be strictly construed and accepted only to the very limited

14

17-1889
United States v. Pugh

extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 49 (1980) (internal citation and quotation marks omitted).

The marital communications privilege applies when (1) the parties were in a valid marriage at the time of the communication[3]; (2) the "utterances or expressions" were "intended to convey information between spouses" (communication prong); and (3) the communications were intended to be confidential (confidentiality prong). *In re Witness Before Grand Jury*, 791 F.3d at 237-39. "[T]he party invoking a privilege bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas*, 318 F.3d 379, 384 (2d Cir. 2003). However, confidentiality is presumed, and, therefore, the party challenging the applicability of the

---

[3] The court determined that Pugh and M.H.S. had a valid marriage at the time of the draft letter, and neither party takes issue with that ruling.

15

17-1889
United States v. Pugh

privilege "[bears] the burden of defeating this presumption by showing that the communication was not made privately." *United States v. Taylor*, 92 F.3d 1313, 1332 (2d Cir. 1996).

"It is well settled that the communications to which the privilege applies have been limited to utterances or expressions intended by one spouse to convey a message to the other." *United States v. Smith*, 533 F.2d 1077, 1079 (8th Cir. 1976) (citing *Pereira v. United States*, 347 U.S. 1, 6 (1954)). The confidential communications privilege applies "where the conduct was intended to convey a confidential message from the actor to the observer." *United States v. Estes*, 793 F.2d 465, 467 (2d Cir. 1986); *see also United States v. Sykes*, 697 F.2d 87, 98 n.1 (2d Cir. 1983) (citing cases, including *Smith*, that hold "the marital communication privilege applies only to communications or acts intended to convey a message").

A person seeking to invoke the marital privilege must show that he actually intended to convey the message to his spouse. *See*

16

17-1889
United States v. Pugh

*Smith*, 533 F.2d at 1079; *United States v. Mohsen*, 587 F.3d 1028, 1032-33 (9th Cir. 2009) (privilege did not apply where there was "no evidence whatsoever" that an inmate intended to send a letter to his wife where the letter had her name on top but no mailing address); *United States v. Montgomery*, 384 F.3d 1050, 1056 (9th Cir. 2004) (letter left by wife for husband on kitchen counter was communication because it was left in a place where husband could find it).

The district court found "no evidence that Pugh intended the letter to be a communication" because there was "no evidence that [he] intended to send the draft." App'x at 86. Pugh argued (as he does on appeal) that it was "no great stretch to infer" that he intended to send M.H.S. the letter, but the court found that to be an "inference devoid of evidentiary support" that was "insufficient to carry Pugh's burden." *Id*. at 87. Given that there was no evidence that M.H.S. had access to Pugh's computer where the letter was found, there was no evidence that Pugh ever typed his messages in

17-1889
United States v. Pugh

another format before sending them via Facebook Messenger, and the letter had not yet been translated, it was not error for the court to determine that Pugh failed to prove that he intended the letter to be a marital communication.  Accordingly, the court's ruling is affirmed, and we need not reach Pugh's second argument, that the court's determination on the confidentiality prong was erroneous.

**II.    Sufficiency of the Evidence**

Pugh claims next that there was insufficient evidence to support either of his two counts of conviction, and, therefore, they should be reversed.

This Court reviews a sufficiency of the evidence challenge using the same standard utilized by the district court in ruling on a Rule 29 motion. *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008).  Rule 29(a) of the Federal Rules of Criminal Procedure provides: "[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is

18

17-1889
United States v. Pugh

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged. . . . The court must make that determination with the evidence against a particular defendant . . . viewed in [the] light . . . most favorable to the government, . . . and [with] all reasonable inferences . . . resolved in favor of the government." *Eppolito*, 543 F.3d at 45 (internal citations and quotation marks omitted). "The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." *Id*. A court will "overturn a conviction . . . only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, [it determines] that no rational trier of fact could have concluded that the Government met its burden of proof." *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (internal quotation

19

17-1889
United States v. Pugh

marks omitted).  The reviewing court must "defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) (internal quotation marks omitted).

In sum, "[a] defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'"  *Glenn*, 312 F.3d at 63 (quoting *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994)).

a.  Count One: Attempt to Provide Material Support to a Foreign Terrorist Organization

Pugh argues first that there was insufficient evidence that he took a substantial step in furtherance of the intended crime, as required to sustain his conviction for attempt to provide material support to a foreign terrorist organization.  We disagree.

"In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct

20

17-1889
United States v. Pugh

amounting to a substantial step towards the commission of the crime." *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003) (internal quotation marks omitted). "For a defendant to have taken a 'substantial step,' he must have engaged in more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime." *Id.* (quoting *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir. 1993)). "A defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed." *Id.* A substantial step "is conduct planned to culminate in the commission of the substantive crime being attempted." *United States v. Farhane*, 634 F.3d 127, 147 (2d Cir. 2011) (internal quotation marks omitted).

Because the substantial step need not be the "last act necessary" before commission of the crime, "the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the

17-1889
United States v. Pugh

substantive crime." *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980).  Further, "[i]n order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Id*. at 987-88.  For purposes of the statute under which Pugh was charged, "a substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm." *Farhane*, 634 F.3d at 148.

Pugh argues that the evidence was insufficient to sustain a finding that he took a substantial step toward providing material support to ISIS because he only indulged in an online interest in ISIS propaganda, expressed his political views, and bought a ticket to

17-1889
United States v. Pugh

Turkey from Egypt. The evidence, however, supports a different conclusion, particularly when viewed in the light most favorable to the government. When Pugh's electronic devices were searched, authorities recovered ISIS propaganda videos and materials, as well as research into ISIS' control of border crossings between Turkey and Syria and its presence in both countries. Among those materials were maps and articles titled "The secret jihadi smuggling route through Turkey," "Where ISIS is Gaining Control in Iraq and Syria," and "Syria's border posts and who controls them." Gov't. App'x at 424, 446-47, 454. Further, the jury heard evidence that at the time of his arrival in Turkey, Pugh was carrying with him a "tactical backpack" filled with materials that would be unnecessary in a large city like Istanbul, but would be beneficial in traveling through Turkey to the Syrian border. Further, Pugh was not equipped with materials that would be suitable for searching for work, his alleged reason for traveling to Turkey, nor did he have a Turkish work visa.

17-1889
United States v. Pugh

Pugh argues that without an ISIS contact in Turkey and/or Syria to help him cross the border, he could not have taken a substantial step toward providing material support.  The jury heard testimony, however, that although most people seeking to join ISIS make connections ahead of time, it is not necessary for someone to secure assistance in Turkey before reaching Syria.

The evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Pugh engaged in a substantial step toward providing material support to ISIS.  Although he was apprehended by Turkish officials before he was able to complete his plan, the evidence supports the finding that he was traveling to Turkey to cross the Syrian border in an effort to join ISIS.  Although he did not have an ISIS contact, nor had he sworn a formal oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were "planned to culminate" in his support of ISIS.

24

17-1889
United States v. Pugh

*Farhane*, 634 F.3d at 147.  But for the interference of Turkish officials, there is no indication that Pugh would not have completed his journey to Syria to join ISIS.  Accordingly, there was sufficient evidence to sustain the jury's conclusion that Pugh took a substantial step toward providing material support to a foreign terrorist organization.  His conviction on count one is affirmed.

　　　　　　b.  Count Two: Obstruction of Justice

Pugh argues next that there was insufficient evidence of a nexus between his obstructive conduct and official proceedings in the United States to support his conviction for obstruction of justice.  Specifically, Pugh argues that when he was denied entry into Turkey, "there was no reason for him to believe that any judicial proceeding had been initiated . . . [or] would be initiated in the future."  Appellant's Br. at 49.  The government asserts that Pugh destroyed, or attempted to destroy, USB thumb drives and the files contained thereon in order to preclude the government from being

25

17-1889
United States v. Pugh

able to use the materials at a federal grand jury proceeding to indict Pugh for his attempt to provide material support to ISIS.

Pugh was charged in count two of the indictment with obstruction of justice pursuant to 18 U.S.C. § 1512(c)(1), which criminalizes altering, destroying, mutilating, or concealing information "with the intent to impair the object's integrity or availability for use in an official proceeding." He was also charged pursuant to 18 U.S.C. § 1512(c)(2), which criminalizes obstructing, influencing, or impeding any official proceeding, or attempting to do so.  An "official proceeding" includes "a proceeding before a judge or court of the United States … or a Federal grand jury."  18 U.S.C. § 1515(a)(1)(A). The government need not prove that a defendant knew that the proceeding was or would be federal. 18 U.S.C. § 1512(g)(1).  "[T]he government must prove that such a proceeding was reasonably foreseeable to the defendant." *United*

17-1889
United States v. Pugh

*States v. Martinez*, 862 F.3d 223, 237 (2d Cir. 2017), *vacated on other grounds by Rodriguez v. United States*, 139 S. Ct. 2772 (2019).

In order to prove obstruction of justice in violation of section 1512(c)(2), "the government must show that there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding."[4] *Id*. "[T]he existence of a nexus between [a defendant's] action and the proceeding does not depend on the defendant's knowledge. . . . Rather, the existence of a nexus, for obstruction-of-justice purposes, is determined by whether the defendant's acts have a relationship in time, causation, or logic with the judicial proceedings." *Id*. (internal citations and quotation marks omitted). "[I]n other words, 'the endeavor must have the natural and probable effect of interfering with the due administration of

---

[4] "We have previously assumed without deciding that the requirement of a nexus between the obstructive act and the official proceeding that is required under subsections (b)(2) and (c)(2) of § 1512 likewise applies to subsection (c)(1). *See United States v. Ortiz*, 220 F. App'x 13, 16 (2d Cir. 2007). Because [Pugh's] claim fails in any event, we likewise assume here that the nexus requirement applies." *United States v. Binday*, 804 F.3d 558, 590 n.33 (2d Cir. 2015).

27

17-1889
United States v. Pugh

justice.'" *United States v. Reich*, 479 F.3d 179, 185 (2d Cir. 2007) (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

Moreover, "[t]he actions of the defendant need not have directly impeded, or attempted to impede directly, the official proceeding." *Martinez*, 862 F.3d at 238. Further, the defendant's actions need not be "successful in impeding or obstructing justice . . . so long as his acts had the natural and probable consequence of interfering with an official proceeding that was foreseeable even if not then pending." *Id.* (internal citations omitted). "[A]n official proceeding need not be pending or about to be instituted at the time of the offense[.]" 18 U.S.C. § 1512(f)(1). "Rather, we have found the nexus requirement satisfied where a grand jury proceeding was 'foreseeable' because the defendant was aware 'that he was the target of an investigation.'" *United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015) (quoting *United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011)).

28

17-1889
United States v. Pugh

Here, Pugh has "failed to show that the evidence was insufficient to establish a nexus between his actions and obstruction of the proceeding." *Reich*, 479 F.3d at 186.  The evidence supports the jury's conclusion that Pugh acted with intent to destroy his devices to impair their use in a reasonably foreseeable official proceeding.

The jury heard testimony from a number of witnesses, including United States officials and experts on foreign terrorist organizations, about the cultural climate in America regarding terrorist organizations, including the prevalence of American citizens becoming radicalized via social media and attempting to join ISIS and other terrorist groups overseas, as well as the United States' response to and handling of those types of situations.  On the basis of the evidence presented, the jury reasonably could have concluded that at the time Pugh was detained, it was or should have been reasonably foreseeable to Pugh that being returned to Cairo

29

17-1889
United States v. Pugh

after being denied entry into Turkey, a well-known and frequently utilized pathway to Syria, while attempting to travel to Syria to join ISIS would subject him to official proceedings in the United States. Further, the government introduced evidence of Pugh's knowledge, before he was denied entry into Turkey, of at least one other American citizen who was arrested at JFK Airport for attempting to join ISIS in Syria and criminally charged in the United States with providing material support to a foreign terrorist group (and thus subjected to an official proceeding).   Accordingly, the jury could have reasonably concluded that a similar proceeding was foreseeable to Pugh at the time he was denied entry.

Moreover, the evidence supports a conclusion that when Pugh was denied entry into Turkey, and while still at the Turkish airport, he wiped his iPod of all contents and destroyed his USB thumb drives.  Given the reasonable foreseeability of an official proceeding against him, the jury was also free to infer that Pugh destroyed his

30

17-1889
United States v. Pugh

electronic devices with the intent to impair their integrity and render

the contents, which included ISIS propaganda and evidence of

Pugh's support of ISIS, unavailable for use against him in a future

official proceeding.

Viewed in the light most favorable to the government, and

drawing all reasonable inferences in its favor, as we must, a rational

trier of fact could have viewed the evidence against Pugh and found

that an official proceeding regarding his actions abroad was

reasonably foreseeable and that he destroyed his electronic devices

in an effort to keep them from being used against him.  Accordingly,

Pugh's conviction on Count Two is affirmed.

**III.        Sentencing**

Pugh's last argument on appeal is that his sentence was both

substantively and procedurally unreasonable because the court did

not provide him with the opportunity to give his prepared

sentencing remarks and did not give adequate reasoning for

17-1889
United States v. Pugh

imposing the maximum permissible sentence.  We review sentencing decisions under a "deferential abuse-of-discretion standard of review."  *Gall v. United States*, 552 U.S. 38, 52 (2007).

a.  Right of Allocution

The following additional facts are relevant here. Pugh appeared for sentencing on May 31, 2017 and, after hearing from the government, the court allowed Pugh to deliver his prepared remarks in which he discussed the difficulty of being a black Muslim man in America, set out his own version of the facts of the case, and accused the government of lying and setting him up.  The amount of time Pugh was given to speak is unclear from the record, but after over seventeen uninterrupted transcript pages of Pugh's remarks, the court interrupted him to suggest that Pugh tailor his remarks to sentencing, rather than his version of the facts.  The court then allowed Pugh and his counsel a five-minute recess, and when they returned, Pugh's attorney continued with the sentencing argument,

17-1889
United States v. Pugh

rather than Pugh.  Pugh argues that the court's decision to stop him from finishing his remarks amounted to procedural unreasonableness.  We disagree.

A court is required to provide a defendant with an opportunity to speak at sentencing to offer mitigating information. Fed. R. Crim. P. 32(i)(4)(A)(ii).  That right, the right of allocution, is an "absolute right" ensuring that the defendant is "allowed a meaningful right to express relevant mitigating information before an attentive and receptive district judge." *United States v. Li*, 115 F.3d 125, 133 (2d Cir. 1997).  But the right of allocution "is not unlimited in terms of either time or content." *Id*.  Here, Pugh was provided substantial uninterrupted time to address the court.  The court only interrupted him when it deemed Pugh was no longer providing information relevant to mitigation and simply asked Pugh to refocus his statements. Further still, and very importantly, the court did not tell Pugh that he could not continue with his remarks

17-1889

United States v. Pugh

after the recess; Pugh chose not to do so. Accordingly, Pugh's argument that his sentence was procedurally unreasonable because he was denied his right of allocution fails.

b.  Statement of Reasons

Pugh also claims his sentence was procedurally unreasonable because the district court failed adequately to explain the chosen sentence.  He claims the sentence was substantively unreasonable because it cannot be located within the range of permissible sentencing decisions.

The Supreme Court has explained that a sentencing judge "should begin all sentencing proceedings by correctly calculating the applicable [Sentencing] Guidelines range."  *Gall*, 552 U.S. at 49 (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)).  In addition, before imposing a sentence, the district court has an obligation to weigh all the factors listed in section 3553(a).  *See United States v. Fernandez*, 443 F.3d 19, 26, 29 (2d Cir. 2006), *abrogated on other grounds*

34

17-1889
United States v. Pugh

by *Rita*, 551 U.S. at 346-47; *see also United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013) (per curiam).

In determining the "particular sentence to be imposed," the sentencing judge must consider: "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); "the kinds of sentences available," *id*. § 3553(a)(3); the range set out in the Sentencing Guidelines, *id*. § 3553(a)(4); "any pertinent policy statement," *id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id*. § 3553(a)(6); and "the need to provide restitution to any victims of the offense," *id*. § 3553(a)(7).

Another section 3553(a) factor requires the judge to consider the various purposes of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate

35

17-1889
United States v. Pugh

deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2). Having considered all of the section 3553(a) factors, the district court must reach "an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)).

Section 3553 also provides that the "court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence—

(1) is of the kind, and within the range, [called for by the Sentencing Guidelines], and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

17-1889
United States v. Pugh

(2) is not of the kind, or is outside the range, [called for by the Sentencing Guidelines], the specific reason for the imposition of a sentence different from that described . . . ."

18 U.S.C. § 3553(c).

Thus, a sentencing judge must comply with at least[5] four distinct statutory duties when imposing sentence:

(1)  to correctly calculate the applicable Sentencing Guidelines;

(2) to consider all of the section 3553(a) factors, including the advisory Guidelines range and the purposes of sentencing;

(3) based on consideration of those factors, to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing; and

(4) to "state in open court the reasons for its imposition of the particular sentence," including the reasons for imposing

---

[5] There are, of course, other statutory duties imposed on judges when imposing sentence. One obvious example is the duty to sentence a defendant within the statutory range of punishment established for the crime of conviction.

37

17-1889
United States v. Pugh

sentence at a particular point in the Guidelines range when that range exceeds 24 months and the specific reasons for imposing any non-Guidelines sentence.

*See* 18 U.S.C. §§ 3553(a), (c); *Gall*, 552 U.S. at 49-50.[6]

Violation of the duties to correctly calculate the Guidelines, to consider the section 3553(a) factors, and to state the reasons for the particular sentence imposed can all give rise to an appellate determination of procedural unreasonableness.  Violation of the duty to impose a sentence that is sufficient, but not greater than

---

[6] The Supreme Court in *Gall* summarized those duties as follows:

> As we explained in *Rita*, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  *See* 551 U.S. at 347-48, 127 S. Ct. 2456. . . . [T]he Guidelines should be the starting point and the initial benchmark.  The Guidelines are not the only consideration, however. . . . [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  *See id.*, at 351, 127 S. Ct. 2456.  He must make an individualized assessment based on the facts presented. . . . After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.  *Ibid.*, 127 S. Ct. 2456.

552 U.S. at 49-50.

17-1889
United States v. Pugh

necessary, can give rise to an appellate determination of substantive

unreasonableness.  *See Gall*, 552 U.S. at 51.

Although incorrect calculation of the Sentencing Guidelines

and the determination of the resulting Sentencing Guidelines

advisory range are common grounds to vacate a sentence, Pugh

does not argue here that the Guidelines were incorrectly calculated.

Judge Garaufis correctly determined the Sentencing Guidelines

range was 360 to 420 months of imprisonment.

Nor does Pugh argue that Judge Garaufis violated his duty to

consider the section 3553(a) factors.  Successful assertions of a

violation of that duty are rare.   Indeed, this Court will "presume, in

the absence of record evidence suggesting otherwise, that a

sentencing judge has faithfully discharged her duty to consider the

statutory factors." *Fernandez*, 443 F.3d at 30 (citations omitted).  The

district judge is not obligated to discuss each section 3553(a) factor

on the record or even to note that those factors were considered

39

17-1889
United States v. Pugh

before imposing sentence.  *Id.* at 29-30 (quoting *United States v. Fleming*, 397 F.3d 95, 100 (2d Cir. 2005)) ("[N]o specific verbal formulations should be prescribed to demonstrate the adequate discharge of the duty to 'consider' matters relevant to sentencing.").

Pugh does argue, however, that Judge Garaufis violated the duty to state his reasons for the particular sentence imposed.  That argument has merit.  The district judge was obligated, at the time of sentencing, to "state in open court the reasons for its imposition of the particular sentence."  18 U.S.C. § 3553(c).  In addition, because the Guidelines range here, 360 to 420 months, was greater than two years, the district judge had a further obligation to "state in open court . . . the reason for imposing a sentence at a particular point within the [Guidelines] range . . . ."  *Id.* § 3553(c)(1).  Those statutory requirements were not met in this case.

The sentencing record must be sufficient for an appellate court to "be confident that the sentence resulted from the district court's

17-1889
United States v. Pugh

considered judgment as to what was necessary to address the various, often conflicting, purposes of sentencing." *Cavera*, 550 F.3d at 189-90. On review, "just as we do not insist upon 'robotic incantations,' we require more than a few magic words." *Corsey*, 723 F.3d at 376. Requiring judges to articulate their reasons for a specific sentence "is a precondition for 'meaningful appellate review'" and allows a reviewing court to "have confidence that the district court exercised its discretion and did so on the basis of reasons that survive our limited review." *Cavera*, 550 F.3d at 193 (quoting *Gall*, 552 U.S. at 50). "Without a sufficient explanation of how the court below reached the result it did, appellate review of the reasonableness of that judgment may well be impossible." *Id*.

The necessary degree of particularity in the statement of reasons provided by the district court "depends upon [the] circumstances." *Rita*, 551 U.S. at 356. When the parties agree on the appropriate sentence, for example, little or no explanation will be

41

17-1889
United States v. Pugh

necessary.  *Cf.* Fed. R. Crim. P. 11(c)(1)(C).  A lengthy explanation also is not generally necessary "when a judge decides simply to apply the Guidelines to a particular case."  *Rita*, 551 U.S. at 356. Similarly, if a sentence is imposed at a statutory maximum or mandatory minimum and the Guidelines range would otherwise have been substantially above the statutory maximum or substantially below the mandatory minimum, the sentence does not necessarily reflect the exercise of discretion by the district judge, so little explanation is necessary to enable review of that sentence.  *Cf.* U.S.S.G. §§ 5G1.1(a), (b); U.S.S.G. § 5G1.2, Application Note 3(B).

Greater particularity in the reasons given for a sentence is necessary, however, when the sentence reflects a more fulsome exercise of discretion.  As a general rule, the "sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."  *Rita*, 551 U.S. at

42

17-1889
United States v. Pugh

356 (citation omitted).  Thus, where a party "presents nonfrivolous

reasons for imposing a different sentence" or where the judge

imposes a sentence outside the Guidelines, "the judge will explain

why he has done so."  *Id.* at 357.  When a judge exercises discretion

within a broader sentencing range, or exercises discretion to impose

a longer sentence, *see United States v. Brooks*, 889 F.3d 95, 102 (2d Cir.

2018) ("there had to be a significant justification to support the

severity of that sentence"), he must do so "with a degree of care

appropriate to the severity of the punishment ultimately selected."

*United States v. Chartier*, 933 F.2d 111, 117 (2d Cir. 1991).

Here, the district judge exercised sentencing discretion within

a very broad statutory range, zero to 420 months' imprisonment,

and also within a fairly broad Guidelines range, 360 to 420 months'

imprisonment.  The sentence of 420 months' imprisonment

represents the statutory maximum, which fell at the top of the

Sentencing Guidelines range of 360 months' to 420 months'

17-1889
United States v. Pugh

imprisonment.  The district court, however, failed to "state in open

court the reasons for its imposition of the particular sentence."  18

U.S.C. § 3553(c).

At sentencing, after hearing from both sides, the district judge

stated that there was "ample evidence" admitted at trial for the jury

to find Pugh guilty of both counts and commented on portions of

the evidence, including Pugh's military service, which the court

called "commendable," Pugh's time overseas in the Middle East,

and ultimately Pugh's decision to attempt to join ISIS.  App'x at 570-

72.  The court mentioned Pugh's possession of videos taken from his

hard drive and maps of the border crossings into Syria.  After

roughly two pages of comments, the court stated that the case was

about Pugh's choice between standing up for or betraying the

United States, a country which had "done so much" for him.  *Id.* at

572.  The court addressed Pugh stating "You've made your choice,

sir. I have no sympathy."  *Id.*

17-1889
United States v. Pugh

The vast majority of the court's comments on the record relate to Pugh's guilt rather than to an appropriate sentence. Those comments do not provide a basis for understanding why the particular sentence was imposed, much less for understanding why a sentence at the top of the Sentencing Guideline range, which was also the statutory maximum, was imposed. The Supreme Court has identified as a "significant procedural error" the failure "to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51; *see also id.* at 50 ("After settling on the appropriate sentence, [the judge] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.") (citation omitted).

The fact that it was a Guidelines sentence may explain the district court's spare explanation of the sentence imposed. But district courts are not permitted to assume that a Guidelines sentence is substantively reasonable. *Rita*, 551 U.S. at 351 ("[T]he

17-1889
United States v. Pugh

sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.") (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)).  Indeed, a sentence within the properly-calculated Guidelines range can be substantively unreasonable.  *See United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010).

Moreover, when a defendant has been convicted of multiple counts, the sentencing judge should set forth why a sentence equal to the statutory maximum on one count will not produce a sufficient sentence within the meaning of 18 U.S.C. § 3553(a).  That principle is reflected in the Guidelines, which provide a presumption in favor of concurrent sentences except when consecutive sentences are required in order to impose a total sentence reflecting just punishment.  *See* U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall

46

17-1889
United States v. Pugh

run concurrently, except to the extent otherwise required by law.").

A district court should explain why the total punishment imposed is sufficient, but not greater than necessary, taking into account the particular characteristics of the defendant and the circumstances of the offense. That justification should guide the determination whether to impose sentences on multiple counts consecutively, partially consecutively, or concurrently. Explaining why concurrent sentences would not achieve a "sufficient" sentence is particularly appropriate where, as here, each statutory imprisonment range is quite long, the district court imposed the statutory maximum for each count, with the counts to run consecutively, and, therefore, the defendant was sentenced to the longest legal sentence available.

Ultimately, after consideration of the section 3553(a) factors, the district court must impose a sentence that is sufficient, but not greater than necessary, to fulfill the purposes of sentencing. In

47

17-1889
United States v. Pugh

doing so, if the court determines that a lower sentence will be just as effective as a higher sentence, it must choose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a district court were explicitly to conclude that two sentences equally served the statutory purposes of [section] 3553, it could not, consistent with the parsimony clause, impose the higher."). Whether the sentence is consistent with the parsimony clause of section 3553(a) is a question of substantive reasonableness.

The present record does not permit meaningful appellate review of Pugh's argument that his sentence is substantively unreasonable. Without more, we cannot be confident that the district court appropriately exercised its discretion in crafting the sentence. Accordingly, Pugh's sentence reflects procedural error and is vacated. We remand the case for resentencing. At that resentencing, the district court should state in open court the reasons for whatever sentence it imposes.

17-1889
United States v. Pugh

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of conviction, **VACATE** the sentence, and **REMAND** for resentencing.