# LAW OFFICES OF SUSAN G. KELLMAN

25 EIGHTH AVENUE • BROOKLYN, NEW YORK 11217
(718)783-8200 • FAX (718)783-8226 • SGK@KELLMANESQ.COM
FELLOW, AMERICAN COLLEGE OF TRIAL LAWYERS

October 1, 2021

**Via ECF and U.S. Mail**
Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   United States v. Tairod Pugh
        Docket No. 15 Cr. 116 (NGG)

Dear Judge Garaufis:

This letter is respectfully submitted to aid your Honor in the re-sentencing of our client, Tairod Pugh. Our initial sentencing submission, dated May 8, 2017 and its attachments, in unredacted form, can be found at Dkt. 157. (Hereinafter "2017 Memorandum".)

Following a jury trial, Mr. Pugh was found guilty of attempting to provide material support to a foreign terrorist organization and obstruction and attempted obstruction of a criminal proceeding.  Tairod Pugh is a 53-year-old Air Force veteran who was honorably discharged from the service and has no prior criminal history. His achievements are particularly noteworthy in light of the fact that Mr. Pugh is psychologically impaired, and suffered profound physical and sexual abuse as a child. In our initial sentencing submission, we argued that a Guidelines sentence was greater than necessary to meet the goals of sentencing under 18 U.S.C. §3553(a). This argument was based on Mr. Pugh's personal history and characteristics, the fact that the government had viewed a sentence of 180

October 1, 2021
Hon. Nicholas G. Garaufis
Page 2 of 32

months to be reasonable in a pre-trial context, and a review of the sentences received by

similarly situated defendants across the country, in attempted material support cases. We also

objected to the imposition of the Terrorism Enhancement under U.S.S.G. §3A1.4.

On May 31, 2017, your Honor sentenced Mr. Pugh to 180 months on Count I, and

240 months on Count II, to run consecutively for a total of 420 months. Mr. Pugh appealed

both his conviction and sentence. On February 28, 2020, the Second Circuit Court of

Appeals affirmed Mr. Pugh's conviction on each count, but vacated his sentence, remanding

the case back to your Honor for resentencing.

We remain hopeful that we can persuade your Honor that a sentence significantly

below the maximum sentence previously imposed is sufficient to meet the goals of

sentencing under 18 U.S.C. §3553(a).

## I.       The Second Circuit's Decision

The 420-month sentence imposed by the Court was the statutory maximum, and at

the very top of the Sentencing Guidelines range of 360 months to 420 months

imprisonment. But as the Second Circuit noted in its decision remanding Mr. Pugh's case for

resentencing, a Guidelines sentence is not presumptively reasonable. Notably the Circuit

held, that in a case like this one, "when a defendant has been convicted of multiple counts,

the sentencing judge should set forth why a sentence equal to the statutory maximum on one

count will not produce a sufficient sentence within the meaning of 18 U.S.C. § 3553(a)."

October 1, 2021
Hon. Nicholas G. Garaufis
Page 3 of 32

*United States v. Pugh*, 945 F.3d 9, 27 (2d Cir. 2019) The Circuit explained that this "principle is

reflected in the Guidelines, which provide a presumption in favor of concurrent sentences

except when consecutive sentences are required in order to impose a total sentence reflecting

just punishment." *Id. See also* U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the count

carrying the highest statutory maximum is adequate to achieve the total punishment, then

the sentences on all counts shall run concurrently, except to the extent otherwise required by

law.").

     In a concurring opinion, Justice Calabresi went further, finding it "potentially

dangerous…that the government was able to take what is already a very serious crime—

attempting to provide material support to a foreign terrorist organization—and, on the basis

of some not overly strong facts, bring an obstruction charge that more than doubled the

maximum sentence otherwise available." *Pugh*, 945 at 28.

     Because Mr. Pugh's conviction on the material support count was "the gravamen of

[Mr. Pugh's] criminal conduct," Judge Calabresi reasoned that "it should be the primary

determinant of Defendant's punishment." *Pugh*, 945 at 29. While Judge Calabresi agreed that

there was sufficient evidence to support the obstruction of justice charge, he questioned

whether it was justifiable to turn Mr. Pugh's 15-year sentence into a 35-year one, finding that

an additional 20 years on the obstruction count "seems incongruous." *Id.* at 29.   Judge

Calabresi concluded that a sentence for obstruction should be contextual, reflecting "the

severity of the obstruction of justice, in the context of a particular underlying crime, and not

October 1, 2021
Hon. Nicholas G. Garaufis
Page 4 of 32

prosecutorial or judicial dissatisfaction with the limits Congress placed on the gravity of that

underlying crime." *Id.* at 30.

## II.    Applying the Circuit's Decision to Mr. Pugh's Convicted Conduct

Mr. Pugh was convicted of attempting to enter Turkey with the goal of traveling to

Syria to provide material support to ISIL, in violation of 18 U.S.C. §2339B(a)(1) (Count

One); and with destroying his USB drives and wiping his iPod in an effort to obstruct an

official proceeding in violation of 18 U.S.C. § 1512(c)(1) and (c)(2) (Count Two).

Viewing the evidence presented at trial in the light most favorable to the government,

here are the facts the jury may have found:

- Beginning in approximately October, 2014, through early January 2015, Mr. Pugh, a civilian employee working for aerospace companies in the Middle East, began viewing and downloading ISIL propaganda videos, performed web searches related to traveling to Syria to join ISIL, and drafted a letter to his wife referring to himself as a "mujahid" who intended to "establish and defend the Islamic State" and martyr himself for that cause if necessary.

- On January 6, 2015, the Mr. Pugh paid cash for a one-way ticket to fly on January 10, 2015 from Cairo, Egypt to Istanbul, Turkey, a known transit hub for ISIL-supporters traveling to Syria. On January 10, 2015, Mr. Pugh flew from Cairo to Istanbul. When he arrived at the airport in Istanbul, Turkey, he was denied entry, and he was sent back to Cairo, Egypt that same day, where he was detained.

- At the time of his detention, Mr. Pugh's possessions included various electronic media devices, including an iPod and five USB thumb drives. The government was unable to pull any information from four of the five USB thumb drives as the drives had been damaged. In addition, the government presented evidence that Mr. Pugh's iPod was wiped to factory settings while Mr. Pugh was in the Turkish airport. From Mr. Pugh's laptop and the additional devices, the government recovered more than

October 1, 2021
Hon. Nicholas G. Garaufis
Page 5 of 32

100 terrorist propaganda videos and other material related to Turkish/Syrian border crossings controlled by ISIL as well the draft letter to his wife described above.

- Mr. Pugh was deported to the United States on January 15, 2015, where he was detained by U.S. Customs and Border Patrol for a secondary inspection. While awaiting inspection, he met an undercover agent (the "UC") who represented himself as an ISIL supporter. They met for an hour while awaiting inspection and then agreed to meet after for coffee. The two men exchanged contact information and Mr. Pugh gave the UC information on how to "get through" Turkey, including that it was essential to "blend in."

- Mr. Pugh was arrested on January 16, 2015 at his father's residence in New Jersey. One backpack was seized at the time of his arrest and one the following day. The backpacks contained (1) 2 compasses; (2) 1 solar powered key-chain flashlight; (3) a solar-powered power source; (4) identification documents; (5) a "Certificate of Embracing Islam"; (6) 2 pairs of gloves; (7) cargo pants; (8) boxer shorts; (9) multiple tunic shirts; (10) a green fatigue jacket; (10) 2 thermal shirts; and (11) 3 scarves/head covers, including a balaclava.

Looking at the evidence of obstruction presented at trial, Judge Calabresi noted that there was "no evidence to suggest that the destroyed USB drives or deleted iPod data contained information that was valuable or significant in itself or for ISIS. Indeed, the evidence at trial established that Defendant did not have a relationship with any current ISIS members, did not have an ISIS-affiliated handler supporting his recruitment, and did not succeed in his attempt to join the organization. To cross into ISIS-controlled territory, Defendant apparently planned to rely on a publicly-available map from a large-circulation newspaper." *Pugh*, 945, at 28-29.

It is our hope that your Honor will agree that, viewed in context, Mr. Pugh's conduct on the obstruction count does not support converting a 15-year sentence for attempted material support of a terrorist organization, into a 35-year sentence. At the time Mr. Pugh

October 1, 2021
Hon. Nicholas G. Garaufis
Page 6 of 32

was arrested, Congress, in its considered judgment, had set a 15-year maximum for violations

of 18 U.S.C. § 2339B, a maximum that has since been increased to 20 years.  In the words of

Judge Calabresi, as this conviction is the "gravamen" of Mr. Pugh's criminal conduct, it

should be the "primary determinant" of Mr. Pugh's punishment. Mr. Pugh's conviction for

destroying materials on his iPod and USB hard drives under 18 U.S.C. § 1512(c)(1) and (2),

cannot be used to increase his punishment for his attempted material support conduct,

which is covered by the fifteen-year sentence imposed by this Court for that conduct under

18 U.S.C. § 2339B.

### III.   The Use of the Material Support Statute to Prosecute Defendants for Attempt Crimes

Under 18 U.S.C. § 2339B, "Provision of personnel" is defined as:

> knowingly provided, attempted to provide, or conspired to provide a foreign
> terrorist organization with 1 or more individuals (who may be or include
> himself) to work under that terrorist organization's direction or control or to
> organize, manage, supervise, or otherwise direct the operation of that
> organization. Individuals who act entirely independently of the foreign
> terrorist organization to advance its goals or objectives shall not be considered
> to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B (h). Therefore, the material support statute "criminalizes providing

personnel through self-recruitment (i.e. volunteering oneself to serve under the direction of a

terrorist organization)." *United States v. Farhane*, 634 F.3d 127, 151 (2d Cir. 2011).  The

Second Circuit framed it as follows: "when a person supplies himself as the bomber or pilot

or doctor sought by the terrorist organization, he provides—or certainly attempts to

October 1, 2021
Hon. Nicholas G. Garaufis
Page 7 of 32

provide—material support in the form of personnel as soon as he pledges to work under the

direction of the organization." *Id.*  This is true, even when "they may not be called upon to

render any particular service for months, years, or at all." *Id.*  Using this reasoning, many of

the attempted material support cases involve persons who hope to or try to join ISIS even

though they may have actually done nothing at all. Their tweets, online postings, or

statements to undercover law enforcement can be used to show that they have "pledge[d] to

work under the direction of the organization." *Id.* at 152.

To be clear, we do not mean to suggest that Mr. Pugh was convicted of nothing.  But

even when viewed in the light most favorable to the government, Mr. Pugh's actions, in and

of themselves, are not acts of terrorism. Although there is no general, internationally

accepted definition of terrorism,[1] the United States defines international terrorism as follows:

> involve violent acts or acts dangerous to human life that are a violation of the
> criminal laws of the United States or of any State . . . [that] appear to be
> intended—to intimidate or coerce a civilian population; to influence the policy
> of a government by intimidation or coercion; or to affect the conduct of a
> government by mass destruction, assassination, or kidnapping; and occur
> primarily outside the territorial jurisdiction of the United States, or transcend
> national boundaries in terms of the means by which they are accomplished,
> the persons they appear intended to intimidate or coerce, or the locale in
> which their perpetrators operate or seek asylum.

---

[1] Geoffrey Levitt, Is "Terrorism" Worth Defining?, 13 OHIO N.U. L. REV. 97, 97 (1986)
("The search for a legal definition of terrorism in some ways resembles the quest for the
Holy Grail: periodically, eager souls set out, full of purpose, energy and self-confidence, to
succeed where so many others before have tried and failed.").

October 1, 2021
Hon. Nicholas G. Garaufis
Page 8 of 32

18 U.S.C. § 2331. Mr. Pugh's case, like many attempted material support cases, does not fit

that definition. A man with a documented history of mental illness, Mr. Pugh was found

guilty of wanting or wishing to join ISIL, and for attempting to travel to Turkey to

presumably achieve that goal. Yet in his case, the terrorism sentencing enhancement operates

to give a lengthy sentence to a person who has never before had a brush with the criminal

law and, an honorably discharged veteran who served this country with loyalty and

commitment in the U.S. Air Force for four years.

This is precisely why district courts have expressed discomfort with the use of the

material support statute to prosecute defendants for "attempt" crimes. A Ninth Circuit

dissent reasoned as follows:

> To paraphrase a famous line, in this case, the government has concluded that
> it is not for it to say what offense Hamid Hayat has committed, but it is
> satisfied that he committed some offense, for which he should be punished.
> This case is a stark demonstration of the unsettling and untoward
> consequences of the government's use of anticipatory prosecution as a
> weapon in the "war on terrorism." [T]he government asks a jury to deprive a
> man of his liberty largely based on dire, but vague, predictions that he might
> commit unspecified crimes in the future.

*United States v. Hayat*, 710 F.3d 875, 904 (9th Cir. 2013) (Tashima, J., dissenting). Similarly, in

*United States v. Farhane*, the majority found that defendant Sabir could be found guilty of

attempted material support for "swearing an oath of allegiance to al Qaeda" with a person

who was actually an undercover agent in the Bronx and "providing contact numbers for al

Qaeda members to reach him in Saudi Arabia." *United States v. Farhane*, 634 F.3d 127, 150 (2d

Cir. 2011). Sabir was a medical doctor and gave his phone number as a way to permit those

October 1, 2021
Hon. Nicholas G. Garaufis
Page 9 of 32

needing medical assistance to contact him when he was in Riyadh. *See Id.* at 133. As the

dissent pointed out, "I find no case, in any court, that even remotely supports the majority's

conclusion that a defendant attempts a crime simply by agreeing to commit the crime and

providing a phone number." *Id.* at 177 (Dearie, C.J., dissenting).

### IV.     Terrorist Propaganda and Mental Illness

One of the most remarkable and unprecedented features of ISIL's strategic

operations is its intensive and sophisticated use of social media to recruit new members and

supporters. On a variety of social media platforms, ISIL has engaged in an international

propaganda campaign, featuring glossy online magazines, videos with high production

values, drone images and multi-lingual, easily-relayed messages – propaganda efforts that are

"designed to target today's young," especially "those who may be disillusioned or wrestling

with their identity."[2] Despite its repugnant tactics, ISIL had "gotten one important thing

right: It … created a clear – and to some, compelling – idea of citizenship and state-building

in a region almost completely bereft of either."[3] As psychologist John G. Horgan adds, ISIL

---

[2] *See* Remarks by the President at the Summit on Countering Violent Extremism, Feb. 19, 2015 ("President Obama CVE Remarks"), available at https://www.whitehouse.gov/the-pressoffice/ 2015/02/19/remarks-president-summit-countering-violent-extremism-february-19-2015.
[3] *See* Thanassis Cambanis, *The Surprising Appeal of ISIS*, Boston Globe, June 29, 2014, available at https://www.bostonglobe.com/ideas/2014/06/28/the-surprising-appeal isis/l9YwC0GVPQ3i4eBXt1o0hI/story.html.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 10 of 32

says to its young audience, "[b]e part of something that's bigger than yourself and be part of it *now*."[4]

Many of the people who are enticed by ISIL propaganda are, like Mr. Pugh, isolated or mentally ill.[5]  Like the young, people with mental illness are susceptible to this messaging, and are, in fact, actively targeted by it. Indeed, the assistant commissioner for specialist operations in London's Metropolitan Police Service acknowledges the Islamic State is actively trying to recruit, among others, "those with mental health issues."[6] Similarly, Australia's national counterterrorism coordinator, Greg Moriarty, has outlined that many cases involve individuals "not necessarily deeply committed to and engaged with the Islamist ideology but are nonetheless, due to a range of reasons, including mental health issues, susceptible to being motivated and lured rapidly down a dangerous path by the terrorist narrative."[7]

---

[4] *See* Scott Shane and Ben Hubbard, *ISIS Displaying A Deft Command of Varied Media*, New York Times, Aug. 31, 2014, available at http://www.nytimes.com/2014/08/31/world/middleeast/isis-displaying-a-deft-command-ofvaried-media.html ("ISIS Displaying A Deft Command") (emphasis added).

[5] *See* Patrick Tucker & Defense One, Why Join ISIS? How Fighters Respond When You Ask Them, ATLANTIC (Dec. 9, 2015), https://www.theatlantic.com/international/archive/2015/12/why-people-joinisis/419685/.

[6] Robert Windrem, "Ranks of ISIS recruits include mentally ill," NBC News, January 1, 2016.

[7] Paul Karp, "Counter-terrorism: Turnbull defends plan that may increase access to mental health records," Guardian, July 22, 2016.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 11 of 32

There should be opportunities for mentally ill defendants who have been indoctrinated by propaganda produced by ISIS or a different terror group – but have not joined terrorist groups or committed terrorist acts – to be rehabilitated. In the words of Seamus Hughes, a former National Counterterrorism Center official who once helped implement the Obama administration's strategy for countering violent extremism, "[t]his is an abject failure, that there is no system in place that doesn't result in spending 20 years in jail."[8] It is better to work with many of these individuals up front on rehabilitation, rather than to wait ten or twenty years after they are released from prison to do so.

As part of the rehabilitative process, we should work to understand what allure ISIS holds and study how they recruit people online. The realities of ISIS do not match the online advertising, so some who actually joined ISIS scramble to return home.[9] In one unusual case involving a young man called "John Doe" (for security reasons) joined ISIS and then became disillusioned and secretly reached out to the FBI.[10] What differentiated John Doe from so many other young American recruits was that the FBI had reached out to his family when he was intercepted on ISIS chatter, in an effort to alert his family as to a potential problem.

---

[8] *See* Matt Apuzzo, Only Hard Choices for Parents Whose Children Flirt With Terror, N.Y. TIMES (Apr. 9, 2016), https://www.nytimes.com/2016/04/10/us/parents-face-limited-options-to-keep-children-from-terrorism.html
[9] *See* Mark Berman, Young Men Left America to Join ISIS. They Ended Up Cooking and Cleaning for the Caliphate, WASH. POST (Feb. 8, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/02/08/young-men-left-america-to-join-isis-they-fled-when-it-didnt-live-up-to-their-expectations/
[10] *See* The Latest: Islamic State Cooperator Sentenced in NYC, AP NEWS (June 28, 2018), https://apnews.com/410785a8062c42018da5f381a2ebaa97.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 12 of 32

Determined, the young man made it to ISIS territory; however, he quickly became

disillusioned and reach out to the FBI for help. Ultimately, they were able to "rescue" him

and he, in turn, gave United States authorities intelligence about terror threats, so they

sought leniency for him and he was sentenced to ten years of supervised release.[11]

Even those in law enforcement, including former FBI Director James Comey, are

beginning to understand that many of these individuals should not even be in the criminal

justice system:

> What we're trying to do is, we're trying to use our good offices to connect providers. Social service providers, medical providers, counseling providers. Who may be in an appropriate situation able to take a referral from us of someone that we're looking at who we don't think we need to use the criminal justice system to incapacitate, and see if they can redirect. Especially that young person, troubled person. We see it as trying to foster some sort of off ramp. There won't be a lot of these cases, but in cases where we find someone we think, "Hope we don't have to lock that person up. Maybe we can get them the help that they need." That's the idea.[12]

As addressed in further detail below, and in Tairod Pugh's letter to your Honor, Mr.

Pugh has begun to understand how the ISIL propaganda he was consuming online

destroyed his life. This recognition is a crucial beginning to Mr. Pugh's rehabilitation, and

suggests that if he were provided with access to the type of support envisioned by former

---

[11] *Id.*

[12] Press Release, James Comey, Dir., Fed. Bureau of Investigation, Director Comey Remarks During May 11 'Pen and Pad' Briefing with Reporters (May 11, 2016), https://www.fbi.gov/news/pressrel/pressreleases/ director-comey-remarks-during-may-11-pen-and-pad-with-reporters.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 13 of 32

FBI Director Comey, he is capable of developing the tools necessary to protect himself from

such targeted indoctrination efforts in the future, and leading a productive life as a

contributing member of society.

### V.   Tairod Pugh's Lifelong Struggle with Childhood Trauma and Mental Illness

In connection with Mr. Pugh's original sentencing, we submitted a report authored by

Dr. Sanford Drob, a psychiatrist, who met with and evaluated Mr. Pugh. Dr. Drob's report

is attached as Exhibit A to the 2017 Memorandum.

In interviews with Dr. Drob, Tairod Pugh revealed a childhood history of profound

physical and sexual abuse, beginning at the age of five or six, when his parents began tying

him to a table leg and beating him. When he was 12 or 13 years old, his parents beat him so

badly that he had to be hospitalized. At age 14, Mr. Pugh was relocated from his parents'

home to New York, where he lived with his grandmother. Sadly, in New York, he was

routinely sexually abused by a male family friend whom he met at his grandmother's church.

After administering a number of clinical tests, interviewing several of Mr. Pugh's family

members, and reviewing approximately a dozen letters written by Mr. Pugh to counsel, Dr.

Drob found that Mr. Pugh:  (1) suffers from post-traumatic stress disorder (PTSD); (2) has

failed to develop an adequate sense of personal identity and psychological cohesion; (3) has a

precarious sense of psychological stability; and perhaps most importantly, (4) takes in a

limited amount of information and examines his experience less-thoroughly than would be

October 1, 2021
Hon. Nicholas G. Garaufis
Page 14 of 32

adequate for proper decision-making. Unfortunately, this presents as the mental picture of

the person who consumed ISIL propaganda, wrote an unsent letter to his wife about his

desire to defend the Islamic State, and, with no connections to ISIL and no plan as to how

he would ever get to ISIS territory, bought a one-way ticket and flew to Turkey.[13]

     We recognize that Mr. Pugh was, on the one hand, a highly skilled former member of

the U.S. Air Force, who worked for aerospace companies around the globe, doing complex

work. But Mr. Pugh's technical skills and professional accomplishments are not mutually

exclusive when it comes to his mental instability. As Dr. Drob noted in his initial report,

"[w]hile Mr. Pugh has a strong achievement orientation and is highly motivated to grasp

complex concepts," his thinking is nonetheless "impaired by his narrow attentional focus",

which puts him at risk for "coming to hasty conclusions and exercising poor judgment."

(Exhibit A to the 2017 Memorandum, at p. 11.) This dichotomy, and Mr. Pugh's difficulty

coping with the reality of his situation, were evident in counsel's dealings with Mr. Pugh, and

motivated our request to your Honor for the appointment of Dr. Drob. The conduct that

forms the basis for Mr. Pugh's conviction for attempted material support, coupled with the

window into Mr. Pugh's mental health that Dr. Drob's report provides, demonstrates why a

sentence at or, indeed, below the 15-year maximum on Count I is sufficient, but not greater

---

[13] In his own written submission to your Honor, Pugh explains that years of mental health treatment trained him to write down ideas that come into his head before acting on them. This way, he could, in a calmer moment, read his entry and decide whether this was the correct path. This, he has always maintained, was the impetus for his unmailed letter to his wife – it was his way of unburdening himself and attempting to put some distance between himself and his idea.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 15 of 32

than necessary, to meet the goals of sentencing in this case. Dr. Drob's report also provides

context for Mr. Pugh's decision to go to trial, rather than accept the government's offer to

plead guilty to Count I, which, critically, would have capped his sentencing exposure at 15

years, and further supports our prayer for a sentence at or below that maximum.

In preparation for Mr. Pugh's re-sentencing before your Honor, we asked Dr. Drob

to meet with Mr. Pugh again and prepare a follow-up report. Dr. Drob's follow-up report,

dated July 6, 2021, is attached as Exhibit 1. Dr. Drob administered additional clinical testing

to Mr. Pugh, including the Millon Clinical Multiaxial Inventory IV (MCMI IV), which he

also administered in 2017. After evaluating Mr. Pugh's responses to this testing, Dr. Drob

reported:

> The current test results indicate that Mr. Pugh continues to exhibit a moderate
> degree of personality dysfunction characterized by lack of psychological
> cohesion and problems in formulating realistic intentions motivations and
> adequately interacting with others. The test indicates that his behavior and
> relationships are unpredictable and are a function of chaotic, varying and
> unrealistic inner thoughts and feelings. His reality testing is compromised and
> his sense of psychological coherence is often precarious. The MCMI-IV
> indicates that Mr. Pugh tends to act in self-defeating ways. While he may often
> function adequately, he is likely to have episodes of significant emotional,
> cognitive and/or behavioral dysfunction.

(Exhibit 1, at p. 8.) Finding "continued evidence of significantly impaired reality testing and

reasoning" and noting that many of Mr. Pugh's symptoms "appear to have been conditioned

by attachment issues in childhood and a reported history of physical and sexual abuse" Dr.

Drob wrote that "Mr. Pugh's offense conduct can be better understood in the context of his

October 1, 2021
Hon. Nicholas G. Garaufis
Page 16 of 32

impairments in parental attachment and identity formation." (*Id.* at p. 9.) Dr. Drob

continued:

> Mr. Pugh is a traumatized, schizoid and interpersonally isolated individual who
> is frequently absorbed in fantasized redress for the suffering he experienced as
> a child. His offense conduct itself appears to have followed a pattern of his
> becoming absorbed in a fantasy that would provide him with connection to a
> family, community and identity that he lacked in childhood. and was in my
> professional forensic psychological opinion to a considerable degree
> conditioned by his psychological impairments and deficits.

(*Id.*)

Despite Mr. Pugh's clear difficulties, Dr. Drob also found Mr. Pugh to be a good

candidate for treatment. He concluded:

> In my interactions with Mr. Pugh, I have found him to be open, self-reflective,
> and moreover, highly interested in the kind of therapeutic dialogue that can
> serve as a valuable outlet for his feelings and corrective for his cognitive
> distortions. Psychological treatment to help him work through his family and
> interpersonal difficulties and to help him clarify his thinking, desires and
> intentions could be extremely helpful in both assisting Mr. Pugh in making a
> realistic, productive and regarding adjustment to the next phase in his life and
> assuring that he will not engage in the kind of distorted thinking and actions
> that led to his offense conduct. Such treatment should begin as soon as
> possible and continue or resume subsequent to Mr. Pugh's release from
> prison.

(Exhibit 1 at p. 10.) Getting Mr. Pugh this much-needed help – help that is not otherwise

available to him in prison – will be crucial to his rehabilitation. Critical to any treatment

protocol, is the fact that Mr. Pugh is open and receptive to getting the help he needs.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 17 of 32

## VI.     Mr. Pugh's Life in Prison

### a.  Mr. Pugh's Post-Sentencing Rehabilitation

In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court held that when a
defendant's sentence has been set aside on appeal, at resentencing a district court may
consider evidence of post-sentencing rehabilitation and that such evidence may support a
downward variance from the Sentencing Guidelines. *Id.* at 481.

While Mr. Pugh has not had access to the type of psychological treatment Dr. Drob
recommends while in BOP custody, he has worked hard to devote his time to positive
pursuits.  At FCI Schuylkill, Mr. Pugh worked fulltime in the Schuylkill kitchen from August
11, 2017 to November 1, 2017, when he was selected to participate in an intensive, 6-month,
4,288-hour Culinary Arts apprenticeship program,[14] similar to a culinary school program
culinary arts apprenticeship program. (*See* Inmate Work History, attached as Exhibit 2.)
Candidates come in as apprentices and learn the nuts and bolts of working in a kitchen; how
to hold a knife, how to cut vegetables, sauces, soups, and basic food preparation. After
successfully completing that program, Mr. Pugh returned to work in the Schuylkill kitchen,
where he worked from May of 2018, until December of 2018, where he was assigned as an
"AM Cook in the Pot & Pan area. A BOP Work Performance rating for the month of May,

---

[14] *See* FCI Schuylkill Inspection Report, June 22, 2015, available at
https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/FCI%20Schuylkill%2
0Report%206.22.15.pdf

October 1, 2021
Hon. Nicholas G. Garaufis
Page 18 of 32

2018 states that "Pugh does a great job in the Pot & Pan area!" and recommends a 50%

bonus. (*See* Pugh Performance Evaluations, attached as Exhibit 3, at p. 11.) A performance

evaluation dated August, 2018 exclaims that Mr. Pugh "works hard in pots and pans" and

"will do all jobs." (*Id.* at p. 5.) An evaluation for the month of October, 2018 describes Mr.

Pugh as a "hard worker, very reliable, does a great job in pots and pans." (*Id.* at p. 1)

In December of 2018, Mr. Pugh accepted a transfer from the kitchen to UNICOR's

recycling plant – a higher paying job. (*See* Exhibit 2.) Counsel has not received work

performance evaluations for Mr. Pugh's time at the recycling plant.

In January of 2020, immediately prior to the COVID-19 pandemic, Mr. Pugh arrived

at MDC. Mr. Pugh has applied for jobs, but has been told that he cannot work because he

has only been transferred to the facility for a short period of time and won't be here long

enough to hold a job. The irony, of course, is that he has now been at MDC for almost two

years; however, in light of all of the pandemic related precautions, Pugh has basically been

unable to leave his cell.

**b. Disciplinary Record**

In over 6 years of incarceration, Mr. Pugh has four disciplinary sanctions on his

record. (See Inmate Disciplinary Record, attached as Exhibit 4.) Two sanctions took place

in 2015 at MDC Brooklyn, where Mr. Pugh was detained awaiting trial. (*Id.*) One sanction

was for not standing for a count, and one was for using an Egyptian-speaking inmate as a

October 1, 2021
Hon. Nicholas G. Garaufis
Page 19 of 32

translator in a telephone call with his wife.[15] (*Id.*) The most serious sanction, a loss of 27 days of good time credit, was for alleged inflammatory language used in an email with his attorneys while at FCI Schuylkill. (*Id.*) The report claims that Mr. Pugh wrote that he would take his talent and skills and use them against the United States for ISIS. Mr. Pugh's alleged statements, which were part of an attorney-client communication about the facts of his case and potential legal strategies for his appeal, should not have been used as the basis for disciplinary action. Indeed, they should not have even been read by BOP authorities, as they are privileged communications.

Finally, in November of 2020, after his return to MDC to be resentenced before your Honor, Mr. Pugh was sanctioned for fighting with another inmate, a charge he unsuccessfully appealed. (*Id.*)  According to Mr. Pugh, a gang member tried to shake down a number of Muslim inmates for protection money, a fight broke out, and the inmates were pepper-sprayed. Mr. Pugh, who was not involved, was charged with fighting, as were many other inmates in Mr. Pugh's unit.

---

[15]  As your Honor may recall, and it is set out in our original sentencing submission, Mr. Pugh married an Egyptian woman, while he was working in an aeronauts enterprise in the Middle East. His wife spoke virtually no English and his Egyptian was quite limited. Thus, when given the opportunity to speak with his wife, Mr. Pugh told a fellow inmate that he needed help communicating over the phone and the inmate agreed to assist him. He understands that this action violated BOP rules; however, in context, he understands that this was a breach of prison protocol.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 20 of 32

### c. Mr. Pugh's Letter to the Court

Speaking with Dr. Drob, both before his initial sentence in 2017, and in preparing for his upcoming re-sentencing, has provided Mr. Pugh with an opportunity to think critically about his life. Motivated by these sessions, Mr. Pugh has spent considerable time reflecting on life, and the path that led him to where he sits today – convicted of a terrorism offense and sentenced to decades in prison.

It is because of the work that Mr. Pugh began with Dr. Drob that he was able to sit down and write a thoughtful letter to your Honor. Over the past six months, counsel has helped Mr. Pugh with this letter, reading drafts and helping Mr. Pugh say exactly what he wanted to communicate to your Honor. Like Dr. Drob, counsel has found Mr. Pugh to be open, self-reflective, and interested in coming to terms with his trauma, understanding his limitations, and getting the help he understands that he needs. Worlds apart from the rambling oration Mr. Pugh gave at his initial sentencing, the work he has done on this letter is an example of the progress he has made with Dr. Drob's guidance and the work he is committed to doing in order to heal.

In his letter, which is attached as Exhibit 5,[16] Mr. Pugh writes about the abuse he suffered as a child – and how it broke him. He explains the relief he experienced at age 13,

---

[16] While we have attached a typed version, our client is in the process of re-writing his handwritten original, which he would like us to share with the Court once it is completed.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 21 of 32

when Dr. Goodman gave him an outlet – a journal – to write down his thoughts. "Writing gives me a breather," he writes, "time to contemplate and reflect on what is going on in my life. Writing allows me to vent my negative emotions. As a result, I am more tolerant and this inevitably leads to being more forgiving..." (*See* Exhibit 5.) Writing his letter to your Honor was no different – it was an opportunity to gather his thoughts and attempt to understand them, and to let go of some of his pain.

It is through the process of writing that Mr. Pugh has come to understand that the propaganda he was ingesting via social media led to an emotional collapse that undermined his sense of reality and destroyed the life he was trying to build. He writes:

> In 2014, social media placed "war" and "terror" front and center in my life, much more so than during my tour of active duty in the U.S. Air Force. Call it bad timing, but I had finally made it to the Islamic States. At the time, I got a job as an avionic technician on an emergency medical evacuation aviation team in the Islamic state of Kuwait. In support of upcoming possible missions to the Islamic states within our aircraft's range, I viewed the American bombings and non-American bombings on the news, in the papers, and on social media, mostly from the perspective of 20,000 feet. I could see the cross hairs on my screens and then see a little "poof" (a cloud of dust and debris). The American news networks kept the people oblivious to the actual carnage – but social media and the cell phone changed all that. In 2014, I saw death and destruction in high definition color. Anguished, a man is viewed holding his limp toddler, sobbing. (It was) A sight one doesn't soon forget. Will someone please tell me, "what do children do that is so wrong to be targeted for abuse and death?" If you are angry at the father, do you have the right to target his children? Do the sins of the father pass on to the innocent children? I watched the videos. The videos gave me no pleasure. They disturbed me and I was horrified by the images. The violence I viewed plunged me into the deepest pit of depression that I have ever experienced.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 22 of 32

> When I look back, I realized that looking (at) all that violence was damaging to me and interfered with my ability to live work & pray and sustain a meaningful relationship. My plan was to marry and start a family. I left the United States committed to living an Islamic state. I married a beautiful woman from Egypt. I wanted and deserved a home with laughter and love. All I wanted was a home with laughter and love. (But) my peace was shattered by the videos I was watching on social media. They were tearing my heart to shreds.

> I want to thank your Honor for allowing Dr. Drob to perform the evaluation after my trial. I have been troubled trying to understand the real world, my emotions, and my actions. They didn't add up. Dr. Drob helped me to piece together a better understanding of why images of horror and pain affect me so much, and why I have never been able to find a place in the world. This understanding is just a beginning. I know I need help, and help is welcomed. Now that I have a fresh understanding of self, I can continue on with a clearer focus on life and the things that matter, and celebrate the good in people and life. I have always recognized the benefits of counseling, we all need help at one time or another.

(Exhibit 5.)

Mr. Pugh's efforts to come to terms with the choices he made that precipitated his arrest in this case are no small feat. These efforts demonstrate that rehabilitation is possible, and that Mr. Pugh is ready and willing to do the work needed to change his life.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 23 of 32

### d.  COVID-19 at the MDC

Shortly after Mr. Pugh arrived at MDC Brooklyn, the first case of COVID-19 was

diagnosed in the United States. MDC reported its first positive inmate on March 21, 2020.[17]

According to the BOP, by May 14, 2020, 6 inmates and 39 staff members at MDC had

tested positive for COVID-19[18].  The number of positive cases identified at the MDC has

waxed and waned over the past year, with significant recent spikes in December of 2020 and

February of 2021. As the below graphic shows, the BOP website lists 1 active prisoner case

and 11 active staff cases of COVID-19[19]:



---

[17] *See* CBS New York, *Coronavirus Update: Inmate At Metropolitan Detention Center Tests Positive For COVID-19*, March 21, 2020 available at
https://newyork.cbslocal.com/2020/03/21/coronavirus-inmate-tests-positive-metropolitan-detention-center-brooklyn/
[18] *See* May 14, 2020 Letter from MDC Warden to Chief Judge Mauskopf, at
https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200514_034839.pdf; May 14, 2020
[19] Accessed at https://www.bop.gov/coronavirus/ on September 10, 2021.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 24 of 32

There are approximately 1,700 incarcerated people at MDC. Many, including Mr. Pugh, share small two-person cells originally designed for one person, with a shared toilet and sink. Throughout the pandemic, MDC has continued to double-cell its incarcerated population. Some people are confined in large, dormitory style settings with as many as 70 people sharing a large sleeping space and beds spaced only 3 to 5 feet apart. Since the onset of the COVID-19 pandemic, the facility has cycled in and out of full lockdown. At first, detainees were permitted to leave their cells for 15-20 minutes every other day to shower, -- excluding weekends, locked in never-ending solitary confinement with no access to programming and severely limited access to medical care. Throughout the pandemic, the "panic" buttons in each cell have been disabled, making it impossible to call for help in emergencies. Restrictions have relaxed to some degree; however, they remain quite onerous. In-persons visits with family were suspended for over a year, from March of 2020, until April 26, 2021, and even today, are severely limited. During lockdowns, the only drinking water available to inmates is from the faucet in their cells, which runs brown/rusty in many of the units, including Mr. Pugh's. For reasons that have never been satisfactorily explained, all soaps and cleaning supplies were removed from MDC units throughout most of the pandemic, making it impossible for prisoners to attempt to keep their own units and individual cells clean.

Since the onset of the COVID-19 pandemic, judges in the Eastern and Southern Districts have reduced sentences based on the pandemic and unduly harsh pretrial

October 1, 2021
Hon. Nicholas G. Garaufis
Page 25 of 32

conditions of detention at the MDC and MCC. *See e.g., United States v. Terrill Latney,* 18 Cr. 606 (JS)(E.D.N.Y. October 5, 2020) (downward variance from 360 months to life to 240 months for a violation of 18 U.S.C. § 1959, due in part to MDC conditions during the pandemic); *United States v. Juan Bravo-Mendez*, 18 Cr. 666 (DLI) (E.D.N.Y. August 28, 2020) (downward variance from 24 to 30 months to 18 months in an illegal re-entry case, taking into account the "difficult imprisonment conditions created by the COVID-19 Pandemic" during defendant's imprisonment at the MDC); *United States v. Americo Migliore*, 20 Cr. 131 (DRH) (E.D.N.Y. April 19, 2021) (downward variance from 57 to 71 to 40 months for a violation of 21 U.S.C. § 841 (b)(1)(C), due in part to MDC conditions during the pandemic); *United States v. Garland Battle,* 20 Cr. 349 (EK) (E.D.N.Y. April 22, 2021) (downward variance from 30 to 37 months to 27 months for a violation of 18 U.S.C. § 922(g), noting in the Statement of Reasons that "The conditions of Mr. Battle's detention are harsher than usual, given the ongoing pandemic."); *United States v. Saul Colon*, 15 Cr. 317 (MKB) (E.D.N.Y. November 20, 2020) (downward variance from 100 to 125 months to 18 months for a violation of 21 U.S.C. § 841 (b)(1)(C), due in part to MDC conditions during the pandemic.); *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic); *United States v. Morgan*, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020)(cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the

October 1, 2021
Hon. Nicholas G. Garaufis
Page 26 of 32

conditions at MCC and MDC prior to the current crisis); *United States v. Dayss*, 19 Cr. 863

(VSB),(S.D.N.Y. May 4, 2020)(reducing the length of the sentence in part based on

conditions at MCC during the COVID-19 crisis); and *United States v. Pierson*, 14 Cr. 855

(LTS)(S.D.N.Y. May 4, 2020)(same for defendant detained at MDC).

Many district courts have made explicit findings about the failures at MDC and MCC,

or have held that time spent at these facilities during COVID should count as 1.5 to 2 times

the actual time served. In *United State v. Daniel Gonzalez*, 18 Cr. 669, (JPO), Judge Oetken

reasoned as follows:

> Now, the defendant has already served 24 months of detention and that really
> has been under conditions that have been extraordinarily harsh. Most of the
> time has been in lockdown conditions 23 hours a day, basically like solitary
> confinement with no access to visitors for most of that time, virtually limited
> programming. And I do believe that because it's been harsher than a usual
> period that it's more punitive, that it's essentially the equivalent of either time
> and a half or two times what would ordinarily be served. So I think having
> served 24 months is equivalent to having served three years. That's what I
> believe in terms of how punitive it's been and how harsh it's been. As defense
> counsel points out, he has already served the equivalent of 28 months if you
> factor in good-time credit.

(Transcript from the sentencing in *United State v. Daniel Gonzalez*, 18 Cr. 669, (JPO),

S.D.N.Y., April 2, 2021, pp. 17-18, attached as Exhibit 6.) And in *United States v. Tiffany Days*,

19 Cr. 619 (CM), Judge MacMahon agreed with Judge Oetken that "we should be providing

some extra time for anybody who spent time in MCC or MDC during this lockdown,"

finding that the time that the defendant spent at MCC was "nothing short of inhumane" and

"worse than any time that anyone thought possible in the last 400 years in a federal jail in

October 1, 2021
Hon. Nicholas G. Garaufis
Page 27 of 32


America." (Transcript from the sentencing in *United State v. Tiffany Days*, 19 Cr. 619 (CM)

April 29, 2021, pp. 11-12, attached as Exhibit 7.)

We respectfully ask the Court to take into account that Mr. Pugh has been at the

MDC from the onset of the COVID-19 pandemic.

**Mr. Pugh's Future Plans**

Mr. Pugh hopes to continue his education and to get back to work so he can support

himself and hopefully raise a family. He writes:

> As an ex-con, I will have my work cut out for me. I know I will face
> diminished opportunities for employment with my return to society. I have
> four strikes against me: my religion, my race, this conviction and my age.
> Nonetheless, hope blooms in my heart when I think about returning to school
> to complete my degree. I believe education overcomes all employment
> (obstacles).

(Exhibit 5.)

It is through writing, that Mr. Pugh has been able to finally forgive his father for the

abuse he experienced as a child. He continues:

> My father was an aircraft mechanic retired from the U.S. Air Force. I attempted to
> follow in his footsteps; I was honorably discharged from the Air Force the day he
> retired. He was present when I learned to swim, he taught me to shoot pool and
> play racquetball. We had good times and bad and despite the abuse I suffered, I
> love him and <u>forgave</u> him a long time ago. I am proud of him and his
> accomplishments. It is not easy being a Black man in America. Whatever life I am
> able to salvage I need my father to be a part of it.

(Exhibit 5.)

October 1, 2021
Hon. Nicholas G. Garaufis
Page 28 of 32

Coming to a place of forgiveness has helped Mr. Pugh understand that can finally put let go of the pain and the anger he has been carrying for his entire life . He views his re-sentencing as an opportunity for hope and a chance at a meaningful life in society where he can be a contributing member. He concludes his letter as follows:

> Today, I hope to give knowledge and the assurance to those who love me that I love them more. I am grateful for this opportunity to appear before your Honor - I pray that you will give me hope. Seven years without the harmful effects of social media has been a healing.
>
> I hope to reunite with my wife to create a home of love, laughter and faith. I have always strove to obey the law, obey the law, help my neighbor, and be the best man I can be.

(Exhibit 5.)

The work Mr. Pugh has done – and the continuing work he understands and acknowledges is needed – demonstrate that he is not a person who needs to be incapacitated for 35 years, and that a consecutive sentence for the obstruction count is significantly greater than necessary to achieve the goals of sentencing. Mr. Pugh is mentally ill. But he is also an intelligent person who is only now beginning to understand that his life has value. He contributed much to this country while serving as a member of the U.S. Air Force, and he wants to continue to contribute to his community. Our system has failed many mentally ill people like Mr. Pugh by locking them away for decades instead of helping them. And today, your Honor has the opportunity to give Tairod Pugh a chance to be rehabilitated and to use his human capital for positive social good in the world.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 29 of 32

## The Appropriate Sentence

This case no doubt presents a difficult sentencing calculus, taking into account the

appropriate punishment, deterrence and public safety. Yet sentencing is always a difficult

calculus. As the Second Circuit has recently reminded us:

> "Sentencing, that is to say punishment, is perhaps the most difficult task of a
> trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal
> Sentencing?,* 23 Touro L. Rev. 539, 539 (2007). While there are many competing
> considerations in every sentencing decision, a sentencing judge must have
> some understanding of "the diverse frailties of humankind." *See Woodson v.
> North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)
> (plurality opinion). In deciding what sentence will be "sufficient, but not
> greater than necessary" to further the goals of punishment, 18 U.S.C. §
> 3553(a), a sentencing judge must have a "generosity of spirit, that compassion
> which causes one to know what it is like to be in trouble and in pain." Guido
> Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.,* 142 U. Pa. L.
> Rev. 513, 513 (1993); see also Edward J. Devitt, *Ten Commandments for the New
> Judge*, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be
> kind. If we judges could possess but one attribute, it should be a kind and
> understanding heart. The bench is no place for cruel or callous people
> regardless of their other qualities and abilities. There is no burden more
> onerous than imposing sentence in criminal cases.").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017)

The heightened sentencing exposure presented by the Sentencing Guidelines'

terrorism enhancement is purportedly based on the notion that, "even terrorists with no

prior criminal behavior are unique among criminals in the likelihood of recidivism, the

difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319F.3d

88, 92 (2d Cir. 2003). Critically, however:

October 1, 2021
Hon. Nicholas G. Garaufis
Page 30 of 32

> There is no published statistical data demonstrating that defendants convicted
> of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes—and
> especially those convicted of financing offenses—are any more likely to be
> recidivists than any other first offenders. Nothing in the history of U.S.S.G. §
> 3A1.4 would indicate that any reliable data was used to determine if a person
> convicted of a material support offense is more likely to be a recidivist.

James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4:*

*Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq.

51, 114-15 (2010) (footnotes omitted).

In our 2017 sentencing memorandum, we prepared a survey of sentences in

attempted material support cases which demonstrated that individuals convicted of the same

offense as Mr. Pugh largely receive sentences at or below 10 years, including recent

sentences in the Eastern District of New York. Your Honor was not persuaded by this

presentation, reminding counsel that it was not the Court's practice to tie its sentences to

what "another court does or what another judge has done under different circumstances

with no knowledge of the details of that situation." (Sentencing Transcript, pp. 39-40.) We

do not ask the Court to sentence Mr. Pugh on the basis of these other sentences today;

nonetheless, those sentences provide a backdrop of the kinds of sentences meted out for

defendants convicted of similar offenses in this district. Against that backdrop but standing

on his own merits, Mr. Pugh's sentence stands out as staggeringly long, especially given the

following facts:

- Mr. Pugh served honorably in the U.S. Air Force;
- He was severely abused – physically, sexually and emotionally as a child;

October 1, 2021
Hon. Nicholas G. Garaufis
Page 31 of 32

- He has long struggled with mental illness related to that abuse;
- He has no history of violence – either before his incarceration or since;
- He has four decades of life history prior to his arrest that do not involve this type of offense conduct – or any type of offense conduct, as he has zero criminal history points and his criminal history category is I.
- There is no evidence of any connection between Mr. Pugh and ISIS or any other terrorist group;
- No evidence that the destroyed drives contained information that was valuable or significant in itself or for ISIS; and
- No evidence that he had any way of reaching ISIS-controlled territory beyond using a publicly-available map from a major circulation newspaper, which, according to the government's own expert would have been nearly impossible.

Tairod Pugh has already served a lengthy term of incarceration. He was arrested on January 18, 2015. At the time of this writing, he has served more than 80 months in prison, which, with good time, is the equivalent of 92-month sentence, or a sentence of 7 years and 8 months. The imposition of a further term of imprisonment on a previously law abiding veteran who suffers from mental illness, like Mr. Pugh, serves one purpose only – incapacitation. It presumes that there is no hope for him to be rehabilitated.

Hopefully counsel will succeed in persuading your Honor that there is no reason, in Mr. Pugh's case, to assume that all hope is lost. Mr. Pugh's efforts, since his incarceration, to improve himself, and to understand the deluded thinking that got him to this place, demonstrate that there is great hope for his future. Mr. Pugh has hope. He hopes for a future where he can work and contribute to a society, reconnect with his wife, and build a home filled with love and laughter – the kind of home he never had. He recognizes that he needs mental health treatment and relishes the idea of getting that help.

October 1, 2021
Hon. Nicholas G. Garaufis
Page 32 of 32

It is for these reasons that we respectfully urge your Honor to consider a sentence of

time served, with 10 years of post-release supervision, and a condition requiring mental

health treatment.  Mr. Pugh is ready to get the treatment he so badly needs and to commit

himself to accomplishing the rehabilitation goals he has envisioned during his sessions with

Dr. Drob. It is his hope that with appropriate treatment he can go on to live a productive life

– a life that is filled with the love he has for his family and for life. Delaying this treatment

and rehabilitation is not in society's best interest, much less Mr. Pugh's. We pray that your

Honor will agree that it is high time for Mr. Pugh's healing to begin.

The Court's kind consideration of this letter is greatly appreciated.

Respectfully submitted,

Susan G. Kellman
Sarah Kunstler
Attorneys for Tairod Pugh

CC:    AUSA Sam Nitze, Esq.

Tairod Pugh