EXHIBIT 1

**Sanford L. Drob, Ph.D.**
**Clinical and Forensic Psychology**
**26 Court Street**
**Brooklyn, NY 11242**
**347-497-5740**
**Cell Phone/Voice Mail: 917-385-7283**

### FOLLOW-UP FORENSIC PSYCHOLOGICAL EVALUATION (Draft)

Defendant: Tairod Pugh
Dates of Examinations: May 13, June 2, 2021
Date of Report: July 6, 2021

### Introduction and Confidentiality

Mr. Pugh is a 51-year-old African-American male referred for forensic psychological
examination in connection with his resentencing before the Federal District Court for the Eastern
District of New York.

I originally examined Mr. Pugh on August 30 and October 21, 2016 and submitted a forensic
psychological report on January 4, 2017. In this report, I will present the results of my updated
examinations on May 13 and June 2, 2021. This report should be read in conjunction with my
earlier report.

In 2017, I concluded that Mr. Pugh is a psychologically fragile individual who suffers from
chronic anxiety and depression, and who exhibits severe deficits in self-regard, identity
formation, mood regulation and interpersonal relationships. While he did not appear to suffer
from an ongoing psychotic disorder, he reported a history of posttraumatic and dissociative
symptoms as well as brief visual hallucinations. There were indications of a personality
disturbance with borderline, avoidant and schizoid/schizotypal features. As I noted in that earlier
report, Mr. Pugh describes a history of protracted physical abuse by his natural parents and
sexual abuse during childhood. He indicates that he was psychiatrically hospitalized at age 14,
and engaged in oppositional behavior during adolescence. I wrote in my earlier report Mr. Pugh
exhibited the signs and symptoms of complex posttraumatic stress disorder, which occurs in
individuals who experienced chronic abuse/trauma during childhood and disruptions in parental
attachment and typically results in the psychological deficits, signs and symptoms exhibited by
Mr. Pugh. Complex PTSD can present with significant problems in reality testing and psychotic-
like symptoms, but does not rise to the level of a more severe psychotic disorder such as
schizophrenia. In January 2017, I recommended that Mr. Pugh receive psychiatric consultation,
psychotherapy and medical attention for reported diabetes, tingling in his appendages and
weight-loss.

Mr. Pugh was informed that the examination was not completely confidential and that a report
would be issued to his attorneys, Susan G. Kellman, Esq. and Sarah Kunstler, Esq., and provided

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

to the prosecutor and the Court. Mr. Pugh understood the limits of confidentiality and agreed to participate in the psychological interview and testing procedures.

### Interview May 13, 2021

Mr. Pugh reports that he has been incarcerated for six-and-a-half years and that after his sentencing, he was transferred to FCI Schuylkill in Pennsylvania, but in January 2020, he was returned to New York and is now awaiting re-sentencing He indicates that he was originally sentenced to 35 years, but that this was reversed on appeal and he is to soon appear before the sentencing judge, Judge Garaufis, for his resentencing.

He says that incarceration at the MDC in Brooklyn has been very difficult for him. He says that he tested positive for COVID-19 in March 2021 and experienced a sore throat, but no fever. He is willing to be vaccinated against COVID-19 but the vaccine had yet to be offered to him. Because of the pandemic, movement outside one's cell has been limited and during the previous month he was allowed to leave his cell two hours each day. Mr. Pugh says that he does not go outside to the roof as he does not see a point in going out to a concrete yard as it is just air with no trees. He reports that Schuylkill had a big yard with a football field, soccer field, basketball court and picnic tables and his experience there was much better as, for example, he got to take off his socks and shoes and walk on the grass.

Mr. Pugh reports that he is mainly estranged from his mother, father, sisters, and children. He says that he hasn't spoken to his mother and father more than twice since his conviction, and has had no contact with his son (age 24) or daughter (age 21). Mr. Pugh recalls that prior to his arrest he had been in touch with them. He feels that they are judging him and are ashamed of him and that despite his continued assertion of his innocence, they believe he is guilty of the crimes he was convicted of.

Mr. Pugh reports that his father was present and supportive of him at his trial but has not been present in his life subsequent to his conviction. Mr. Pugh says that the prosecution put on "a good magic show" and he was convicted of a crime he never intended to commit. Mr. Pugh relates that he does not understand why his father does not write him, but doesn't push his parents to contact him.

Mr. Pugh reports that he has maintained contact with his maternal aunt, Mary Louise Smith who remains supportive of him. He says that he hasn't asked her about his parents.

Mr. Pugh reports that he continues to have contact with his wife in Egypt and they write one another and have spoken by telephone through an interpreter as he is not fluent in Arabic and his wife is not fluent in English. He reports that his wife is standing by him in their marriage and that she is a good woman. He relates that he wrote her a letter and asked his wife to call him so he could hear her voice and recite the Koran. Mr. Pugh states although he can now read Arabic there has been no way for him to learn to speak it in prison.

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

Mr. Pugh reports that during Ramadan he maintained his fast and the facility accommodated the inmates' request for group prayer.

Mr. Pugh relates that his weight has stabilized but that his diabetes remains problematic. He explains that his sugar level is low and has not been able to have erections because of diabetes. He reports that he is currently prescribed Metformin and insulin for diabetes and is also on a medication for his kidneys. He says that his feet are almost completely numb and he continues to experience tingling in both his hands and feet.

Mr. Pugh expresses the belief that he will soon be released from prison. He states that the law indicates that could never have been prosecuted for "material support" without demonstration of an association with a terrorist organization. Mr. Pugh thinks Judge Garaufis will struggle with this issue. Counsel has informed him that the only issue currently before the court is his resentencing but Mr. Pugh nonetheless believes that the judge will take up the issue of his guilt and release him.  He says (incorrectly according to counsel) that his lawyers are arguing as a matter of law that he should be released.

Mr. Pugh is thinking about what he believes is his impending release and says that when he gets out, he doesn't have a place to stay as his wife is in Egypt and he will not be able to obtain a passport because he is in $40,000 arrears for child support. Mr. Pugh hopes to obtain an airframe and powerplant license and obtain work in this field. He states that in spite of his lawyers' cautions, his mood is up. He talks about having to return to school and take out loans in order to study for a degree in electrical or industrial engineering. Mr. Pugh says that he attended a technology school which is now called Embry Riddle Aeronautical University but is now considering the possibility of attending a university for a more advanced degree in aeronautics. He speaks about an option for a PhD in engineering, physics, or airport management.

Mr. Pugh's current plan is to eventually leave the United States to be with his wife and understands that his felony record could impede his career. He wants to join his wife in Egypt.

Mr. Pugh reports that he has fewer physical and psychological symptoms than when I saw him in 2016.  He reports that his enuresis has cleared up and he now denies having anxieties about death. He says that his stress level is considerably lower than it had been. He relates that being in jail was in some ways a relief for him, because he was taking on way too much responsibility on the outside. Mr. Pugh says that while it is at times depressing that he does not have a relationship with his family, this is also a weight off his shoulders as his family relationships were always problematic and it is much easier for him to deal only with himself and his wife.

Mr. Pugh says that prior to his arrest he was trying to be a good father, son and American. He relates that he was under a great deal of stress working for the United States overseas and being a Muslim. He relates that Muslims thought he was being a traitor to Islam. Mr. Pugh says that he was a civilian contractor but was not living within the safe confines of a compound as none were available to him.

3

Pugh, Tairod            S Drob Ph.D. Forensic Psychological Report 6-21

Mr. Pugh reports that he was working for an air ambulance in Kuwait that was contracted to
airlift Americans who were injured in Iraq. He reports that the aircraft was not airworthy and that
he grounded it, causing his employer to terminate him. Mr. Pugh relates that the individual who
fired him showed up at his trial to say that he was a terrorist who was trying to go to Syria to join
ISIS. It was alleged that because he did not have a resume with him, and he came on a visitor's
visa, that he wasn't planning on staying to work in Turkey.

Mr. Pugh acknowledges that he has religious and political beliefs that some Americans don't
like, but that this doesn't mean he is a terrorist. He says that anytime the "Islamic State" is
mentioned, it is immediately assumed that one is talking about ISIS. Mr. Pugh says that he uses
the term generically to refer to a large swath of territory in the Middle East and that the best way
to create an "Islamic State" is to have a consensus of leaders to bind this territory together. Mr.
Pugh doesn't believe that ISIS has the political knowledge or ability for such an endeavor, and
also lacks the means to protect the citizens. He believes that Turkey could potentially lead such a
movement.

Mr. Pugh reports that he has had infrequent blackouts in the past but that the last one occurred
three days prior to the May 13 examination. He says that he awakened in bed and could not
figure out where he was. He recalls counting for 15-20 seconds before a door slammed and he
realized that he was still in jail. Mr. Pugh states that he had not had a blackout like that in years.
In the past he recalls driving and not recalling where he was and that these episodes, though rare,
are quite frightening for him.

Mr. Pugh says that he believes that he has put the abuse he experienced in childhood behind him.
He says that the abuse had not interfered with his sex life.

I asked Mr. Pugh if he recalled writing a letter to the judge in his case demanding that the judge
provide him with a "yacht or trawler for my wife… Minimum 100 feet. 3 state rooms, 2010 or
newer…"and expressed his desire, "to live in and travel the world." He stated that he recalled
writing this but is at a loss to explain why.  He then says, rather confusingly, that in his mind,
one of them looked like a circus tent or a Ferris wheel.

**Mental Status**

Mr. Pugh was oriented to person, date and location, stating that he was in the Metropolitan
Detention Center in Brooklyn on May 13, 2021. He correctly stated that "Di Blasio" is the mayor
of New York and "Cuomo" is the Governor. His comprehension, speech, grammar, and verbal
productivity are all adequate for normal conversation. He indicated that his mood was very good.
He denied thoughts of hurting himself or others. He denied current symptoms of depression, but
stated that he is anxious because of the violent environment he is in. He reports no problems with
impulse control and no phobias.  He says that he talks to himself when he thinks about what he is
going to say to the judge, and this simply appears to be his manner of rehearsal. Mr. Pugh denies
visions, hallucinations. He reports, however, that has been troubled by violent dreams, dreams of
dying or being killed, and dreams of "zombies." He thinks he might have suppressed his anger

4

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

about the way he has been treated.

Mr. Pugh reports that at times he becomes preoccupied for hours with unexpected thoughts that come to him, thoughts that have nothing to do with his situation. For example, he says that in 2008 an ex-girlfriend wanted to have a child, and thinks he may regret not having had a child with her. At times he thinks about how his parents abused him as a child and he wonders why they treated him that way. He wells up with tears, explaining that while he never speaks about it with anyone, it continues to trouble him. Mr. Pugh reflects:

> I still can't figure out why my parents tied me to a chair and beat me when I was five or six years old. My parents were young when they had me. My mother had dreams of being a nurse. I was born when she just turned 17. I feel she thinks I destroyed her life.

Mr. Pugh relates that as a child he created in his mind an imaginary family that he could always retreat to, a family that cared for and loved him. He explains, "As I think back, it was all lies. I had an unrealistic image of who they were." He again expresses his disappointment with his family members: "I thought my father would be there and my little sister, Katrina, and my daughter. I feel abandoned by all of them." Mr. Pugh says that he felt abandoned by his family even before his arrest and incarceration and that this was one reason that he left for Egypt. He reports that he had higher earnings than others in his family and the only time they contacted him was when they needed money.

Mr. Pugh reports that he frequently gets lost in his thoughts, explaining that he often gets "space out" in his own world, especially since being in jail. He says: "I go with my mind somewhere else if I don't have a book. I read a lot. I will read *Les Miserables*. I've read all of Alexander Dumas. I love the classics. I've always enjoyed classic literature. I tried *Moby Dick* and it was too dry."

Mr. Pugh indicates that his thoughts race ahead of him and that this makes communication difficult. He relates that he will get two subjects ahead of himself when he is speaking and writing and that sometimes thoughts blend together and he can't separate them. He reports that he is affected by his immediate environment and his mind will wander towards other's conversations and the thoughts will blend together. At other times he will be writing and his words will remind him of something that happened at a different time and he will lose his concentration.

Mr. Pugh says that he has been miserable these past few years, but sometimes it feels good to just sit in his cell and be left alone to think about his life, his past, and his future.

Mr. Pugh says that his memory and retention is not as good as it used to be. He was, however, able to recall three of three items after five minutes. He was able to subtract serial 3's from with 21, but in spite of demonstrating an ability to do the task he lost track at times when attempting to subtract serial 7s from 100, an indication that his concentration is impaired.

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

When asked to explain the meaning of the saying, "What goes around comes around," Mr. Pugh says, "Be careful of what you do to others. It might come back to you. Karma." When asked to explain the meaning of the saying, "People who live in glass houses shouldn't throw stones," he says, "Because you're vulnerable. Don't piss people off if you are vulnerable yourself." When asked what he should do if he found an envelope that is sealed and addressed and has a new stamp on it, Mr. Pugh says, "Leave it alone. None of my business." When asked what he should do if he were the first person to see smoke and fire in a movie theater he says, "Notify somebody, a worker in attendance, and then leave." When asked why one needs a doctor's prescription in order to buy certain drugs, he says, "I'm not a doctor. I don't know how it will affect me."

## Competency

Mr. Pugh has never had any difficulty understanding the roles of the participants in the legal process. He has, however, exhibited distortions in his perception and thinking which have resulted in disagreements with his attorneys and an unrealistic view of what can be accomplished at this point in his case. His current elevated mood appears to be predicated on the unrealistic belief that the judge will overturn his conviction or at any rate send him home with time served. He has in the past made grandiose and completely unrealistic demands on the system, and while he acknowledges having done this, and sees that this was unrealistic, he is at a loss to explain why he did this. He feels that he cannot get anyone, including counsel and the judge to listen to what he is saying and he believes that while the role of the prosecutor is to put guilty people in jail, they will attempt to incarcerate anyone they can.

Mr. Pugh continues to maintain that he was wrongly convicted at trial. He focuses upon a letter he wrote to his wife, which he says was never mailed, but which was obtained by the government and used at trial. He says that in the letter he wrote to her to say that he would use his abilities and sword to defend the Islamic State. He says that he was not speaking about ISIS. At one point he made reference to "States" in the plural, although in one letter it was "State" in the singular was singular. Mr. Pugh explains that when he was a child his psychologist taught him to write about the things that upset him. He says that he was instructed to pick someone he would like to communicate with and write them a letter and keep writing until the hurt goes away. He says that at Camelback Hospital in 1981-2 he had many such letter writing assignments and has continued to follow these instructions, He says: "I wrote the letter as a release but didn't send it. I take out all my violence on paper."

In spite of Mr. Pugh's disagreements with counsel and unrealistic view of his current possibilities he understands that counsel has a different view of things than he does and he is not so rigid as to hold that they *must* be wrong and should be dismissed.  For example, he says that while he feels that he is on a conveyor belt and no one wants to get him off; thus, he is not satisfied with counsel's hope that his sentence be reduced to 15 years and wants her to "fight to win." He expresses concern that he may be forcing his opinion on her. I am therefore of the view that he is capable of cooperating with counsel, that he will not allow his wishful thinking to

6

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

prevent counsel from making an argument at resentencing, and that he is competent to proceed to resentencing. However, should deeper conflicts arise between Mr. Pugh and his attorneys, and/or should he make or escalate what counsel believes are unreasonable demands which reflect a failure to grasp the realities of his situation, his competency should at that time be re-evaluated.

## Review of Medical Records

Counsel provided me with copies of Mr. Pugh's 2020 and 2021 medical records from the Bureau of Prisons.  These records note that Mr. Pugh reported a history of physical and emotional abuse throughout childhood. On January 30, 2020 he indicated that he had been diagnosed with depression in 1984, was hospitalized for three months and attended weekly mental health counseling for approximately six months that year. He further stated that he had a history of schizophrenia, explaining, I don't think like other people… I'm an out-of-the-box thinker. I don't believe my thoughts follow the same pattern of other people." However, he denied experiencing hallucinations or delusions. He indicated that he began to experience suicidal ideation in 1984, and while he has not had such ideation recently it was noted that during his presentence investigation interview, he disclosed that he had been preoccupied with thoughts and dreams of death and suicide. However, while he said that he "wants to know as much as he can about death" and spent a great deal of time thinking about this subject in January 2020 he denied that he had thoughts of hurting himself or others.

It was noted that during a 2017 screening intake Mr. Pugh stated that he had smoked marijuana six times in his life, and his PSR had indicated the history of weekly alcohol use. Mr. Pugh was expelled from a drug education course in 2018 due to poor attendance, but completed this course when he took it a second time later that year.

In January 2020, Mr. Pugh repeatedly endorsed a history of child and emotional and physical abuse as well as emotional neglect and indicated that he had been sexually assaulted by a family friend on one occasion as a child. He reported frequently experiencing morbid but non-suicidal ideation. He was not determined to exhibit a significant level of functional impairment associated with a mental illness. Generally, his mental status was unremarkable with no evidence of hallucinations delusions or suicidal ideation. However, under the heading "Mental Health History" a history of depressive disorder schizophrenia/psychotic disorder was noted, apparently based on Mr. Pugh's self-report.

In February 2021, it was noted that Mr. Pugh displayed no evidence of depression or suicidality and was not thought to be in need of mental health services. He was being treated with Metformin and insulin for diabetes and it was noted that he suffers from diabetic neuropathy.

## Psychological Testing

I orally administered the Millon Clinical Multiaxial Inventory IV (MCMI IV) to Mr. Pugh via telepsychology videoconference. The MCMI-IV is a self-report inventory that assesses

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

personality and psychological disturbances in individuals who are seeking or being evaluated for psychiatric or psychological treatment or who are being evaluated in a forensic context.  It is an updated version of the MCMI-III which I administered to Mr. Pugh in 2016. A number of "correction factors" are applied to adjust for an examinee's tendency to evaluate him or herself too positively or negatively and/or under-report or over-report symptomatology.  The MCMI-IV is closely coordinated with DSM-V but goes beyond the DSM-V categories by including within its purview several additional personality syndromes.  This test is somewhat less broad in its coverage of primary psychopathology but is helpful in distinguishing anxiety, depression, psychosis and other symptoms that inform diagnoses. The following interpretation is in part based upon and the language adapted from the <u>MCMI-IV Interpretive Report</u> by Theodore Millon, a computerized scoring and interpretive report.

The pattern of scores on the June 2021 MCMI-IV and October 2016 MCMI-III tests are similar with the following prominent exceptions: There are decreases from 2016 to 2021 on scale elevations that assess depressive symptomatology and increases on scales which assess paranoid and potentially delusional thinking. These changes comport with Mr. Pugh's clinical presentation, as he currently indicates that he feels significantly less depressed than in the past but presents with increasingly unrealistic thinking about the outcome of his case.

The current test results indicate that Mr. Pugh continues to exhibit a moderate degree of personality dysfunction characterized by lack of psychological cohesion and problems in formulating realistic intentions motivations and adequately interacting with others. The test indicates that his behavior and relationships are unpredictable and are a function of chaotic, varying and unrealistic inner thoughts and feelings. His reality testing is compromised and his sense of psychological coherence is often precarious. The MCMI-IV indicates that Mr. Pugh tends to act in self-defeating ways. While he may often function adequately, he is likely to have episodes of significant emotional, cognitive and/or behavioral dysfunction.

Mr. Pugh's inner world appears to be fragmented and his behavior a function of a chaotic, almost random and ineffective procession of thoughts feelings impulses and motivations.

There are indications that Mr. Pugh is quite fearful and socially anxious and that while he has needs to be accepted by others, he suffers from a deep fear of humiliation and rejection. He appears to be troubled by anxious and painful memories that are readily reactivated by minor social stressors. As noted above, there are indications of increasing the paranoid thinking characterized by a belief that he has been betrayed and forsaken by those he had hoped would support him. This may lead him to be quite irritable. His item endorsements suggest the possibility that he has entered into a period of behavioral withdrawal, highly idiosyncratic thinking and possibly psychotic, delusional ideation. He also continues to experience significant anxiety, sleep problems and fatigue.

While the MCMI-IV is suggestive of a more severe schizophrenic spectrum disorder than the schizotypy that had been suggested by the MCMI-III in 2016 (and Mr. Pugh has previously reported a history of Schizophrenia), I still do not see evidence of a severe and chronic psychotic

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

disorder. Rather Mr. Pugh's significant interpersonal and social alienation and unrealistic thinking appears to be the result of the complex posttraumatic stress syndrome I described in 2017.

## Conclusions and Formulation

The results of the current evaluation reveal that while Mr. Pugh's depression has improved since I examined him in 2016, he continues to experience significant anxiety and exhibit severe deficits in interpersonal functioning, self-regard, and identity formation. In addition, there is continued evidence of significantly impaired reality testing and reasoning. Many of his symptoms appear to have been conditioned by attachment issues in childhood and a reported history of physical and sexual abuse. In addition, Mr. Pugh indicates that he was raised in an environment which fostered confusion regarding his racial and ethnic identity. He explains:

> I am African American, but I like country and old classic rock-and-roll, not rap or hip hop. I don't like to party and I get along better with white people. I grew up in a white environment. I didn't know I was Black until I was 14. A girl, Laurie Rink, told me her father said she had to break up with me because I was Black. I didn't know what that meant. My parents had no real awareness. There were six Black families on the air force base. My eyes opened up at 14. I was into Rush, Led Zeppelin and Pat Benatar. At 18, I came to NYC and read about black identity and history.

Mr. Pugh's offense conduct can be better understood in the context of his impairments in parental attachment and identity formation. As noted above, Mr. Pugh reports that he could not understand why he was rejected and abused by his parents and he created in his mind an "imaginary family" that he could always retreat to, and in his mind this imaginary family was one that cared for and loved him.  Mr. Pugh's attraction to Islam, his search for a bride in Egypt and his desire to enter a new life in the middle east can be understood as an extension of this need to find a new identity and a loving, accepting "family" to compensate for the problematic identity and family trauma of his youth.

In addition, Mr. Pugh is a traumatized, schizoid and interpersonally isolated individual who is frequently absorbed in fantasized redress for the suffering he experienced as a child. His offense conduct itself appears to have followed a pattern of his becoming absorbed in a fantasy that would provide him with connection to a family, community and identity that he lacked in childhood. and was in my professional forensic psychological opinion to a considerable degree conditioned by his psychological impairments and deficits.

The results of the current evaluation also help to provide insight into Mr. Pugh's continued insistence upon his innocence. As I noted, there are indications that in addition to impaired reality testing and reasoning Mr. Pugh has considerable difficulty both in forming coherent intentions and motives and in retrospectively accounting for his own behavior. Rather, it appears that his behavior is itself a function of fragmentary thoughts, feelings, and intentions which do

Pugh, Tairod          S Drob Ph.D. Forensic Psychological Report 6-21

not coalesce into a fully adequate and consistent goal orientation. As such, Mr. Pugh has limited insight into his own actions, and because of this he is prone to ambiguity and confusion regarding motivations that were initially quite impulsive and fragmentary.  His report that the unmailed letter to his wife was an exercise in working through his emotions is one example of this.

The nature of Mr. Pugh's mental disorder has on the one hand rendered him prone to depressive, idiosyncratic and at times highly disordered thinking, and on the other hand produced an interpersonal isolation that prevented him from dialoging with and receiving helpful feedback from others. His alienation from family, residence in a foreign country where he did not speak the language, and marriage to an Egyptian woman, who he could barely communicate with, exacerbated his isolation and left him at the mercy of his fragmented and autistic thinking. In my interactions with Mr. Pugh, I have found him to be open, self-reflective, and moreover, highly interested in the kind of therapeutic dialogue that can serve as a valuable outlet for his feelings and corrective for his cognitive distortions. Psychological treatment to help him work through his family and interpersonal difficulties and to help him clarify his thinking, desires and intentions could be extremely helpful in both assisting Mr. Pugh in making a realistic,  productive and regarding adjustment to the next phase in his life and assuring that he will not engage in the kind of distorted thinking and actions that led to his offense conduct. Such treatment should begin as soon as possible and continue or resume subsequent to Mr. Pugh's release from prison.

While Mr. Pugh has a long history of behavioral oddities and cognitive distortions (e.g. as a child he went out in his father's armed forces uniform and acted as if he were his father when his actual father was away, and since his arrest wrote to counsel demanding that the judge in his case provide him with a "yacht or trawler for my wife… Minimum 100 feet. 3 state rooms, 2010 or newer…"), he is not currently actively psychotic. However, once in psychotherapy, a treating clinician will be in an excellent position to determine whether a referral for a psychotropic medication evaluation is needed.

Sanford L. Drob, Ph.D.
NYS Licensed Psychologist 009322-1

10

EXHIBIT 2

```
 NERBD  531.01 *                  INMATE HISTORY            *      02-10-2020
PAGE 001 OF 001 *                  WRK DETAIL               *      07:56:07


  REG NO..: 80975-053 NAME....: PUGH, TAIRODNATHAN WEBSTER
  CATEGORY: WRK          FUNCTION: PRT        FORMAT:


FCL     ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP  DATE/TIME
BRO     UNASSG     UNASSIGNED WORK ASSIGNMENT   01-22-2020 0143 CURRENT
CAA     H/O UNASSG HOLD OVER UNIT               01-21-2020 1710 01-21-2020 2224
SCH     UNC RECY 1 UNICOR RECYCLING 1           03-29-2019 1247 01-21-2020 1444
SCH     UNC RECY 4 UNICOR RECYCLING 4           12-13-2018 0907 03-29-2019 1247
SCH     UNC RECY 2 UNICOR RECYCLING 2           12-06-2018 0001 12-13-2018 0907
SCH     AM DINE    FCI F/S AM DINING RM         09-11-2018 1150 12-06-2018 0001
SCH     AM COOK    FCI F/S AM COOKS             08-01-2018 1514 09-11-2018 1150
SCH     AM DINE    FCI F/S AM DINING RM         05-16-2018 0001 08-01-2018 1514
SCH     FCI VTCULY VT CULINARY                  11-01-2017 0001 05-16-2018 0001
SCH     AM COOK    FCI F/S AM COOKS             09-28-2017 0001 11-01-2017 0001
SCH     PM DINE    FCI F/S PM DINING RM         08-26-2017 0001 09-28-2017 0001
SCH     AM DINE    FCI F/S AM DINING RM         08-23-2017 0001 08-26-2017 0001
SCH     PM DINE    FCI F/S PM DINING RM         08-16-2017 0001 08-23-2017 0001
SCH     FCI F/S    FCI FOOD SERVICE             08-11-2017 0001 08-16-2017 0001
SCH     UNASSG A/O UNASSIGNED A/O               08-10-2017 1047 08-11-2017 0001
SCH     FCI A/O    FCI  ADMISSION & ORIENTATION 07-24-2017 0959 08-10-2017 1047
CAA     H/O UNASSG HOLD OVER UNIT               07-19-2017 0715 07-24-2017 0600
BRO     UNASSG     UNASSIGNED WORK ASSIGNMENT   07-14-2017 1209 07-19-2017 0240
BRO     UNITHC ORD UNIT HC ORDERLY              07-10-2017 1510 07-14-2017 1209
BRO     UNITHC ORD UNIT HC ORDERLY              07-28-2015 1421 07-10-2017 1509
BRO     UNASSG     UNASSIGNED WORK ASSIGNMENT   01-17-2015 0446 07-28-2015 1421



  G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

EXHIBIT 3

BP-S324 . 052 WORK PERFORMANCE RATING - INMATE      P . S . 5251 . 04
U . S . DEPARTMENT OF JUSTICE      FEDERAL BUREAU OF PRISONS

| mate's Name: | Register No.: | Unit: |
|---|---|---|
| **PUGH, TAIROD** | **80975-053** | **D-A** |

| Evaluation Period: | Work Assignment: |
|---|---|
| 10/1/2018  -  10/31/2018 | AM COOK  (AM POT & PAN) |

**Bonus Justification:** Hard worker, very reliable, does a great job in pots and pans

**Signature / Date of Department Head approval:**

*Route to Department Head for review, then to Unit Team*

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 9/30 | 10/1 **7** | 10/2 **7** | 10/3 **7** | 10/4 **7** | 10/5 OFF | 10/6 OFF |
| 10/7 | 10/8 **7** | 10/9 **7** | 10/10 **7** | 10/11 **7** | 10/12 OFF | 10/13 OFF |
| 7/14 **7** | 10/15 **7** | 10/16 | 10/17 | 10/18 **7** | 10/19 OFF | 10/20 OFF |
| 10/21 **7** | 10/22 **7** | 10/23 **7** | 10/24 **7** | 10/25 **7** | 10/26 OFF | 10/27 OFF |
| 10/28 **7** | 10/29 **7** | 10/30 **7** | 10/31 **7** | 11/1 | 11/2 | 11/3 |

*For days reflecting less than 7 hours worked, explain by inserting applicable code:*

| | | |
|---|---|---|
| AD = Admin Detention / Disciplinary Segregation | H = Hospital | V = Visit |
| | HO = Holiday | VC = Vacation |
| C = Call Out | I = Medical Idle / Conval. | Z = Other (Staff Meeting, Fog, etc.) |
| E = Education | U = Unsatisfactory | |
| F = Furlough | UA = Unauthorized | |

$28.80

| Pay Grade: GH P : Y : Y   **4** | Hours Worked: 160 140 | Regular Pay: $~~16.80~~  17.20 |
|---|---|---|
| Supervisor's Signature: | | Date: 10/30/18 |
| Inmate's Signature: | | Date: |

WorkAssignmentManager v2.0

Instructions:  Circle the best statement in each area.  Base your rating on the inmate's overall performance for the rating period - neither the inmate's best nor worst day- as compared to what is satisfactory.

**A .**   **Quality of Work:**
1.   Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2.   Fair. Careless, makes mistakes and does not check work. Should do better work.
3.   Satisfactory. Makes some mistakes but no more than expected at this time.
4.   Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5.   Outstanding. Does superior work.

**B.**   **Quantity of Work:**
1.   Unsatisfactory. Lazy, wastes time, goofs off.
2.   Fair. Does just enough to get by. Has to be prodded occasionally.
3.   Satisfactory. Works steadily but does not push self.
4.   Good. Willing Worker. Does a full day's work and wastes little time.
5.   Outstanding. Drives self exceptionally hard all the time.

**C.**   **Initiative:**
1.   Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2.   Fair. Usually relies on others to say what needs to be done.
3.   Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4.   Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5.   Outstanding. Has good ideas on better ways of doing things.

**D.**   **Interest; Eagerness to Learn:**
1.   Poor. Shows no interest in job. Regards job as a drag or waste of time.
2.   Fair. Shows minimal interest but not very eager to learn.
3.   Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4.   Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5.   Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage.

**E.**   **Ability to Learn:**
1.   Poor. Has very low aptitude and is very slow to learn.  Even when given extra instruction, unable to learn no matter how hard he might try.
2.   Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most.
3.   Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4.   Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5.   Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.**   **Need for Supervision; Dependability; Safety; Care of Equipment:**
1.   Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2.   Needs closer supervision than most. Not very dependable.
3.   Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4.   Needs little supervision. Good record of dependability and promptness.
5.   No supervision required. Completely dependable in all things.

**G.**   **Response to Supervision and Instruction:**
1.   Poor. Negative, hostile, annoying to others.
2.   Fair. Resists or ignores suggestions.
3.   Satisfactory. Generally does what is told without any fuss.
4.   Good. No hostility or resentment. Tries to improve.
5.   Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H.**   **Ability to Work with Others:**
1.   Poor. Negative, hostile, annoying to others.
2.   Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3.   Satisfactory. Gets along okay with most co-workers and is accepted by them.
4.   Good. Friendly, congenial, helpful; others like to work with.
5.   Outstanding. Gets along well with everyone. Very popular.

**I.**   **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1.   Fire or lay off that individual?
2.   Transfer the person to a less demanding job at a lower pay scale?
3.   Continue to employ the person but without a raise or promotion at this time?
4.   Raise the person's pay but keep the person at the same job?
5.   Outstanding. Gets along well with everyone. Very popular.

**J.**   **Grades and Pay:**
1.   Performance Pay - Grade Class (circle one)   1 - 2 - 3 - ④ - M
2.   Hours of satisfactory work.   160
3.   Regular Pay.   $ 19.20
4.   Bonus Recommended:   ✓ Yes ___ No   50 %   $ 9.60
5.   Total  Pay.   $ 28.80

| Supervisor's Signature: | *[signature]* | Date: 10/20/18 |
|---|---|---|
| Inmate's Signature: | | Date: |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | | Date: |
|---|---|---|

BP-S324 . 052 WORK PERFORMANCE RATING - INMATE        P . S . 5251 . 04
U . S . DEPARTMENT OF JUSTICE        FEDERAL BUREAU OF PRISONS

| Inmate's Name:  PUGH, TAIROD | Register No.:  80975-053 | Unit:  D-A |
|---|---|---|
| Evaluation Period:  9/1/2018 - 9/30/2018 | Work Assignment:  AM COOK  (AM POT & PAN) | |

Bonus Justification:

Signature / Date of Department Head approval:

| Route to Department Head for review, then to Unit Team | | | | | | |
|---|---|---|---|---|---|---|
| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
| 8/26 | 8/27 | 8/28 | 8/29 | 8/30 | 8/31 | 9/1  OFF |
| 9/2  7 | 9/3  7 | 9/4  7 | 9/5  7 | 9/6  7 | 9/7  OFF | 9/8  OFF |
| 9  7 | 9/10  3 | 9/11  3 | 9/12  3 | 9/13  3 | 9/14  OFF | 9/15  OFF |
| 9/16  3 | 9/17  3 | 9/18  3 | 9/19  3 | 9/20  3 | 9/21  OFF | 9/22  OFF |
| 9/23  3 | 9/24  3 | 9/25  3 | 9/26  3 | 9/27  7 | 9/28  OFF | 9/29  OFF |
| 9/30  7 | 10/1 | 10/2 | 10/3 | 10/4 | 10/5 | 10/6 |

For days reflecting less than 7 hours worked, explain by inserting applicable code:

AD = Admin Detention /
    Disciplinary Segregation
C = Call Out
E = Education
F = Furlough

H = Hospital
HO = Holiday
I = Medical Idle / Conval.
U = Unsatisfactory
UA = Unauthorized

V = Visit
VC = Vacation
Z = Other (Staff Meeting,
    Fog, etc.)

| Pay Grade:  GH P : Y : Y | Hours Worked:  92 | Regular Pay:  $11.04 |
|---|---|---|
| Supervisor's Signature: | | Date: |
| Inmate's Signature: | | Date: |

WorkAssignmentManager v2.0

Instructions:  Circle the best statement in each ___a. Base your rating on the inmate's overall performan__ _r the rating period - neither the inmate's best nor worst day- as compared to what is satisfactory.

**A.**  **Quality of Work:**
1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2. Fair. Careless, makes mistakes and does not checkwork. Should do better work.
3. Satisfactory. Makes some mistakes but no more than expected at this time.
4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5. Outstanding. Does superior work.

**B.**  **Quantity of Work:**
1. Unsatisfactory. Lazy , wastes time, goofs off.
2. Fair. Does just enough to get by. Has to be prodded occasionally.
3. Satisfactory. Works steadily but does not push self.
4. Good. Willing Worker. Does a full day's work and wastes little time.
5. Outstanding. Drives self exceptionally hard all the time.

**C.**  **Initiative:**
1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2. Fair. Usually relies on others to say what needs to be done.
3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4. Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5. Outstanding. Has good ideas on better ways of doing things.

**D.**  **Interest; Eagerness to Learn:**
1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
2. Fair. Shows minimal interest but not very eager to learn.
3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage.

**E.**  **Ability to Learn:**
1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction, unable to learn no matter how hard he might try.
2. Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most inmates.
3. Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.**  **Need for Supervision; Dependability; Safety; Care of Equipment:**
1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2. Needs closer supervision than most. Not very dependable.
3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4. Needs little supervision. Good record of dependability and promptness.
5. No supervision required. Completely dependable in all things.

**G.**  **Response to Supervision and Instruction:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Resists or ignores suggestions.
3. Satisfactory. Generally does what is told without any fuss.
4. Good. No hostility or resentment. Tries to improve.
5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H.**  **Ability to Work with Others:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3. Satisfactory. Gets along okay with most co-workers and is accepted by them.
4. Good. Friendly, congenial, helpful; others like to work with.
5. Outstanding. Gets along well with everyone. Very popular.

**I.**  **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1. Fire or lay off that individual?
2. Transfer the person to a less demanding job at a lower pay scale?
3. Continue to employ the person but without a raise or promotion at this time?
4. Raise the person's pay but keep the person at the same job?
5. Outstanding. Gets along well with everyone. Very popular.

**J.**  **Grades and Pay:**
1. Performance Pay - Grade Class (circle one)          1 - 2 - 3 - ④ - M
2. Hours of satisfactory work.                                    92
3. Regular Pay.                                                          $ 11.04
4. Bonus Recommended:  ____Yes ____No _____%   $ _____
5. Total Pay.                                                              $ 11.04

| Supervisor's Signature: | Date: |
|---|---|
| Inmate's Signature: | Date: |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | Date: |
|---|---|

BP-S324 . 052 WORK PERFORMANCE RATING - INMATE        P . S . 5251 . 04
U . S . DEPARTMENT OF JUSTICE                         FEDERAL BUREAU OF PRISONS

| Inmate's Name: | Register No.: | Unit: |
|---|---|---|
| PUGH, TAIROD | 80975-053 | D-A |

| Evaluation Period: | Work Assignment: |
|---|---|
| 8/1/2018  -  8/31/2018 | AM COOK   (AM POT & PAN) |

Bonus Justification: *WORKS HARD IN POTS AND PANS. WILL DO ANY jobs.*

Signature / Date of Department Head approval:

**Route to Department Head for review, then to Unit Team**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 7/29 | 7/30 | 7/31 | 8/1 | 8/2 <br> 7 | 8/3 <br><br> OFF | 8/4 <br><br> OFF |
| 8/5 <br> 7 | 8/6 <br> 7 | 8/7 <br> 7 | 8/8 <br> 7 | 8/9 <br> 7 | 8/10 <br><br> OFF | 8/11 <br><br> OFF |
| 8/12 <br> 7 | 8/13 <br> 7 | 8/14 <br> 7 | 8/15 <br> 7 | 8/16 <br> 7 | 8/17 <br><br> OFF | 8/18 <br><br> OFF |
| 8/19 <br> 7 | 8/20 <br> 7 | 8/21 <br> 7 | 8/22 <br> 7 | 8/23 <br> 7 | 8/24 <br><br> OFF | 8/25 <br><br> OFF |
| 8/26 <br> 7 | 8/27 <br> 7 | 8/28 <br> 7 | 8/29 <br> 7 | 8/30 <br> 7 | 8/31 <br><br> OFF | 9/1 |

For days reflecting less than 7 hours worked, explain by inserting applicable code:

AD = Admin Detention /      H = Hospital            V = Visit
        Disciplinary Segregation    HO = Holiday          VC = Vacation
C = Call Out                I = Medical Idle / Conval.    Z = Other (Staff Meeting,
E = Education            U = Unsatisfactory            Fog, etc.)
F = Furlough           UA = Unauthorized

| Pay Grade: | Hours Worked: 147 ~~140~~ | Regular Pay: 17.64 88%  50% Total 7 26.96 |
|---|---|---|
| G H P : Y : Y | | $16.80 |

| Supervisor's Signature: | Date: |
|---|---|
| Inmate's Signature: | Date: 8-29-18 |

WorkAssignmentManager v2.0

Instructions: Circle the best statement in each area.   ...ase your rating on the inmate's overall performance fo. ...e rating period - neither the inmate's best nor worst day- as compared to what is satisfactory.

**A.** **Quality of Work:**
1.    Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2.    Fair. Careless, makes mistakes and does not checkwork. Should do betterwork.
3.    Satisfactory. Makes some mistakes but no more than expected at this time.
4.    Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5.    Outstanding. Does superior work.

**B.** **Quantity of Work:**
1    Unsatisfactory. Lazy, wastes time, goofs off.
2.    Fair. Does just enough to get by. Has to be prodded occasionally.
3.    Satisfactory. Works steadily but does not push self.
4    Good. Willing Worker. Does a full day's work and wastes little time.
5.    Outstanding. Drives self exceptionally hard all the time.

**C.** **Initiative:**
1.    Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2.    Fair. Usually relies on others to say what needs to be done.
3.    Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4    Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5.    Outstanding. Has good ideas on better ways of doing things.

**D.** **Interest; Eagerness to Learn:**
1.    Poor. Shows no interest in job. Regards job as a drag or waste of time.
2.    Fair. Shows minimal interest but not very eager to learn.
3.    Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4    Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5.    Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage.

**E.** **Ability to Learn:**
1.    Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction, unable to learn no matter how hard he might try.
2.    Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most.
3.    Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4    Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5.    Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.** **Need for Supervision; Dependability; Safety; Care of Equipment:**
1.    Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2.    Needs closer supervision than most. Not very dependable.
3.    Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4    Needs little supervision. Good record of dependability and promptness.
5.    No supervision required. Completely dependable in all things.

**G.** **Response to Supervision and Instruction:**
1.    Poor. Negative, hostile, annoying to others.
2.    Fair. Resists or ignores suggestions.
3.    Satisfactory. Generally does what is told without any fuss.
4    Good. No hostility or resentment. Tries to improve.
5.    Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H.** **Ability to Work with Others:**
1.    Poor. Negative, hostile, annoying to others.
2.    Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3.    Satisfactory. Gets along okay with most co-workers and is accepted by them.
4    Good. Friendly, congenial, helpful; others like to work with.
5.    Outstanding. Gets along well with everyone. Very popular.

**I.** **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1.    Fire or lay off that individual?
2.    Transfer the person to a less demanding job at a lower pay scale?
3.    Continue to employ the person but without a raise or promotion at this time?
4.    Raise the person's pay but keep the person at the same job?
5.    Outstanding. Gets along well with everyone. Very popular.

**J.** **Grades and Pay:**
1.    Performance Pay - Grade Class (circle one)     1 - 2 - 3 - 4 - M
2.    Hours of satisfactory work.          147
3.    Regular Pay.              $  17.64
4.    Bonus Recommended: ___Yes ___No  50 %   $  8.82
5.    Total Pay.              $  26.46

| Supervisor's Signature: | Date: 8-28-13 |
| Inmate's Signature: | Date: |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | Date: |

BP-S324 . 052 WORK PERFORMANCE . . . TING - INMATE          P . S . 5251 . 04
U . S . DEPARTMENT OF JUSTICE                                 FEDERAL BUREAU OF PRISONS

| Inmate's Name: | Register No.: | Unit: |
|---|---|---|
| PUGH, TAIROD | 80975-053 | D-A |

| Evaluation Period: | Work Assignment: |
|---|---|
| 7/1/2018  -  7/31/2018 | AM COOK   (AM POT & PAN) |

Bonus Justification:

Signature / Date of Department Head approval:

### Route to Department Head for review, then to Unit Team

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 7/1<br><br>7 | 7/2<br><br>7 | 7/3<br><br>7 | 7/4<br><br>7 | 7/5<br><br>7 | 7/6<br>7<br>OFF | 7/7<br><br>OFF |
| 7/8<br><br>OFF | 7/9<br><br>7 | 7/10<br><br>7 | 7/11<br><br>7 | 7/12<br><br>7 | 7/13<br>7<br>OFF | 7/14<br><br>OFF |
| 7/15<br><br>OFF | 7/16<br><br>7 | 7/17<br><br>7 | 7/18<br><br>7 | 7/19<br><br>7 | 7/20<br><br>OFF | 7/21<br><br>OFF |
| 22<br><br>7 | 7/23<br><br>7 | 7/24<br><br>7 | 7/25<br><br>7 | 7/26<br><br>7 | 7/27<br><br>OFF | 7/28<br><br>OFF |
| 7/29<br><br>7 | 7/30<br><br>7 | 7/31<br><br>7 | 8/1 | 8/2 | 8/3 | 8/4 |

For days reflecting less than 7 hours worked, explain by inserting applicable code:

AD =  Admin Detention /              H =  Hospital                V =  Visit
        Disciplinary Segregation     HO =  Holiday               VC =  Vacation
C =  Call Out                          I =  Medical Idle / Conval.  Z =  Other (Staff Meeting,
E =  Education                       U =  Unsatisfactory               Fog, etc.)
F =  Furlough                       UA =  Unauthorized

| Pay Grade:<br><br>GH P : Y : Y      4M | Hours Worked:   160<br>.140 | Regular Pay:   19.20<br>$16.80 |
|---|---|---|
| Supervisor's Signature:<br><br>R. Ulsh | | Date:<br><br>7/27/18 |
| Inmate's Signature: | | Date: |

WorkAssignmentManager v2.0

Instructions: Circle the best statement in each area. Base your rating on the inmate's overall performance ... the rating period - neither the inmate's best nor worst day- as compared to what is satisfactory.

**A.** **Quality of Work:**
1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2. Fair. Careless, makes mistakes and does not check work. Should do better work.
3. Satisfactory. Makes some mistakes but no more than expected at this time.
4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5. Outstanding. Does superior work.

**B.** **Quantity of Work:**
1. Unsatisfactory. Lazy, wastes time, goofs off.
2. Fair. Does just enough to get by. Has to be prodded occasionally.
3. Satisfactory. Works steadily but does not push self.
4. Good. Willing Worker. Does a full day's work and wastes little time.
5. Outstanding. Drives self exceptionally hard all the time.

**C.** **Initiative:**
1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2. Fair. Usually relies on others to say what needs to be done.
3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4. Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5. Outstanding. Has good ideas on better ways of doing things.

**D.** **Interest; Eagerness to Learn:**
1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
2. Fair. Shows minimal interest but not very eager to learn.
3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage.

**E.** **Ability to Learn:**
1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction, unable to learn no matter how hard he might try.
2. Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most.
3. Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.** **Need for Supervision; Dependability; Safety; Care of Equipment:**
1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2. Needs closer supervision than most. Not very dependable.
3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4. Needs little supervision. Good record of dependability and promptness.
5. No supervision required. Completely dependable in all things.

**G.** **Response to Supervision and Instruction:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Resists or ignores suggestions.
3. Satisfactory. Generally does what is told without any fuss.
4. Good. No hostility or resentment. Tries to improve.
5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H.** **Ability to Work with Others:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3. Satisfactory. Gets along okay with most co-workers and is accepted by them.
4. Good. Friendly, congenial, helpful; others like to work with.
5. Outstanding. Gets along well with everyone. Very popular.

**I.** **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1. Fire or lay off that individual?
2. Transfer the person to a less demanding job at a lower pay scale?
3. Continue to employ the person but without a raise or promotion at this time?
4. Raise the person's pay but keep the person at the same job?
5. Outstanding. Gets along well with everyone. Very popular.

**J.** **Grades and Pay:**
1. Performance Pay - Grade Class (circle one)  1 - 2 - 3 - ④ - M
2. Hours of satisfactory work.  _100_
3. Regular Pay.  $ _19.20_
4. Bonus Recommended: ____Yes ✓No _____% $ _____
5. Total Pay.  $ _19.20_

| Supervisor's Signature: | R. Ulsh | Date: 7/27/18 |
|---|---|---|
| Inmate's Signature: | | Date: |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | | Date: |
|---|---|---|

BP-S324.052  WORK PERFORMANCE RATING - INMATE  (P.S. 5251.04)
U.S. DEPARTMENT OF JUSTICE

***REVISED***
FEDERAL BUREAU OF PRISONS

| Inmate's Name: | Register No.: | Unit: |
|---|---|---|
| PUGH, TAIROD | 80975-053 | D-A |

| Evaluation Period: | Work Assignment: |
|---|---|
| 6/1/2018  -  6/30/2018 | AM COOK  (AM POT & PAN) |

Bonus Justification:

Signature / Date of Department Head approval:

Route to Department Head for review, then to Unit Team

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 5/27 | 5/28 | 5/29 | 5/30 | 5/31 | 6/1 OFF | 6/2 OFF |
| 6/3 7 | 6/4 7 | 6/5 7 | 6/6 7 | 6/7 7 | 6/8 OFF | 6/9 OFF |
| 10 7 | 6/11 7 | 6/12 7 | 6/13 7 | 6/14 7 | 6/15 OFF | 6/16 OFF |
| 6/17 7 | 6/18 7 | 6/19 7 | 6/20 7 | 6/21 7 | 6/22 OFF | 6/23 OFF |
| 6/24 7 | 6/25 7 | 6/26 7 | 6/27 7 | 6/28 7 | 6/29 OFF | 6/30 OFF |

For days reflecting less than 7 hours worked, explain by inserting applicable code:

AD = Admin Detention /
        Disciplinary Segregation
C = Call Out
E = Education
F = Furlough

H = Hospital
HO = Holiday
I = Medical Idle / Conval.
U = Unsatisfactory
UA = Unauthorized

V = Visit
VC = Vacation
Z = Other (Staff Meeting,
        Fog, etc.)

| Pay Grade: GH P : Y : Y  4 | Hours Worked: 140 | Regular Pay: $16.80 |
|---|---|---|

Supervisor's Signature: _[signature]_     Date: 6/28/18

Inmate's Signature: _[signature]_     Date:

WorkAssignmentManager v2.0

Instructions: Circle the best statement in each area. Base your rating on the inmate's overall performance the rating period - neither the inmate's best nor worst day- as compared to what is satisfactory.

**A.** **Quality of Work:**
1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2. Fair. Careless, makes mistakes and does not checkwork. Should do betterwork.
3. Satisfactory. Makes some mistakes but no more than expected at this time.
4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5. Outstanding. Does superior work.

**B.** **Quantity of Work:**
1. Unsatisfactory. Lazy , wastes time, goofs off.
2. Fair. Does just enough to get by. Has to be prodded occasionally.
3. Satisfactory. Works steadily but does not push self.
4. Good. Willing Worker. Does a full day's work and wastes little time.
5. Outstanding. Drives self exceptionally hard all the time.

**C.** **Initiative:**
1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2. Fair. Usually relies on others to say what needs to be done.
3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4. Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5. Outstanding. Has good ideas on better ways of doing things.

**D.** **Interest; Eagerness to Learn:**
1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
2. Fair. Shows minimal interest but not very eager to learn.
3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage.

**E.** **Ability to Learn:**
1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction, unable to learn no matter how hard he might try.
2. Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most.
3. Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.** **Need for Supervision; Dependability; Safety; Care of Equipment:**
1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2. Needs closer supervision than most. Not very dependable.
3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4. Needs little supervision. Good record of dependability and promptness.
5. No supervision required. Completely dependable in all things.

**G.** **Response to Supervision and Instruction:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Resists or ignores suggestions.
3. Satisfactory. Generally does what is told without any fuss.
4. Good. No hostility or resentment. Tries to improve.
5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H.** **Ability to Work with Others:**
1. Poor. Negative, hostile, annoying to others.
2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3. Satisfactory. Gets along okay with most co-workers and is accepted by them.
4. Good. Friendly, congenial, helpful; others like to work with.
5. Outstanding. Gets along well with everyone. Very popular.

**I.** **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1. Fire or lay off that individual?
2. Transfer the person to a less demanding job at a lower pay scale?
3. Continue to employ the person but without a raise or promotion at this time?
4. Raise the person's pay but keep the person at the same job?
5. Outstanding. Gets along well with everyone. Very popular.

**J.** **Grades and Pay:**
1. Performance Pay - Grade Class (circle one)      1 - 2 - 3 - 4 - M
2. Hours of satisfactory work.      140
3. Regular Pay.      $ 16.80
4. Bonus Recommended: ____ Yes ✓ No  N/A %   $
5. Total Pay.      $ 16.80

| Supervisor's Signature: | | Date: 6/29/18 |
|---|---|---|
| Inmate's Signature: | | Date: |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | | Date: |
|---|---|---|

BP-S324 . 052 WORK PERFORMANCE RATING - INMATE          P.S. 5251 . 04
U.S. DEPARTMENT OF JUSTICE                              FEDERAL BUREAU OF PRISONS

| Inmate's Name: | Register No.: | Unit: |
|---|---|---|
| PUGH, TAIROD | 80975-053 | D-A |

| Evaluation Period: | Work Assignment: |
|---|---|
| 5/1/2018  -  5/31/2018 | AM COOK   (AM POT & PAN) |

Bonus Justification:

DOES A GREAT JOB IN THE POT & PAN AREA!    I RECOMMEND A 50% BONUS R.Uhl 5/31/18

Signature / Date of Department Head approval:

### Route to Department Head for review, then to Unit Team

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| 5/13 | 5/14 | 5/15 | 5/16 7 ASSIGNED | 5/17 7 | 5/18 OFF | 5/19 OFF |
| 5/20 7 | 5/21 7 | 5/22 7 | 5/23 7 | 5/24 7 | 5/25 OFF | 5/26 OFF |
| 5/27 7 | 5/28 7 | 5/29 7 | 5/30 7 | 5/31 7 | 6/1 | 6/2 |

For days reflecting less than 7 hours worked, explain by inserting applicable code:

AD = Admin Detention / Disciplinary Segregation   H = Hospital   V = Visit
C = Call Out   HO = Holiday   VC = Vacation
E = Education   I = Medical Idle / Conval.   Z = Other (Staff Meeting, Fog, etc.)
F = Furlough   U = Unsatisfactory
UA = Unauthorized

| Pay Grade: GH P:Y:Y | Hours Worked: 84 | Regular Pay: $24.36 $10.08 |
|---|---|---|

| Supervisor's Signature: | Date: 5/31/18 |
|---|---|
| Inmate's Signature: X | Date: 5/31/18 |

WorkAssignmentManager v2.0

Instructions: Circle the best statement in each a    Base your rating on the inmate's overall performance    .he rating period - neither the inmate's best nor worst day - as compared to what is satisfactory.

A.  **Quality of Work:**
1.  Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
2.  Fair. Careless, makes mistakes and does not checkwork. Should do better work.
3.  Satisfactory. Makes some mistakes but no more than expected at this time.
4.  Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
5.  Outstanding. Does superior work. *(circled)*

B.  **Quantity of Work:**
1.  Unsatisfactory. Lazy , wastes time, goofs off.
2.  Fair. Does just enough to get by. Has to be prodded occasionally.
3.  Satisfactory. Works steadily but does not push self.
4.  Good. Willing Worker. Does a full day's work and wastes little time.
5.  Outstanding. Drives self exceptionally hard all the time. *(circled)*

C.  **Initiative:**
1.  Unsatisfactory. Always waits to be told what to do. Needs help getting started.
2.  Fair. Usually relies on others to say what needs to be done.
3.  Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
4.  Good. Can plan own work well. Acts on own in most things. Doesn't wait to be told what to do.
5.  Outstanding. Has good ideas on better ways of doing things. *(circled)*

D.  **Interest; Eagerness to Learn:**
1.  Poor. Shows no interest in job. Regards job as a drag or waste of time.
2.  Fair. Shows minimal interest but not very eager to learn.
3.  Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
4.  Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
5.  Outstanding. Eager to master job. Wants to know everything there is to know about it. May learn more about job on own time, volunteers to work overtime or extra shifts if needed for coverage. *(circled)*

E.  **Ability to Learn:**
1.  Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction, unable to learn no matter how hard he might try.
2.  Fair. Slow but if tries, eventually will pick up the skill. Needs more instructions than most.
3.  Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
4.  Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
5.  Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice. *(circled)*

F.  **Need for Supervision; Dependability; Safety; Care of Equipment:**
1.  Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
2.  Needs closer supervision than most. Not very dependable.
3.  Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
4.  Needs little supervision. Good record of dependability and promptness. *(circled)*
5.  No supervision required. Completely dependable in all things.

G.  **Response to Supervision and Instruction:**
1.  Poor. Negative, hostile, annoying to others.
2.  Fair. Resists or ignores suggestions.
3.  Satisfactory. Generally does what is told without any fuss.
4.  Good. No hostility or resentment. Tries to improve.
5.  Outstanding. Makes a real effort to please the instructor. Does exactly as is told. *(circled)*

H.  **Ability to Work with Others:**
1.  Poor. Negative, hostile, annoying to others.
2.  Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3.  Satisfactory. Gets along okay with most co-workers and is accepted by them.
4.  Good. Friendly, congenial, helpful; others like to work with.
5.  Outstanding. Gets along well with everyone. Very popular. *(circled)*

I.  **Overall Job Proficiency:** Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:
1.  Fire or lay off that individual?
2.  Transfer the person to a less demanding job at a lower pay scale?
3.  Continue to employ the person but without a raise or promotion at this time? *(circled)*
4.  Raise the person's pay but keep the person at the same job?
5.  Outstanding. Gets along well with everyone. Very popular.

J.  **Grades and Pay:**
1.  Performance Pay - Grade Class (circle one)    1 - ②- 3  4 - M
2.  Hours of satisfactory work.    84
3.  Regular Pay.    $ 24.36
4.  Bonus Recommended: ✓ Yes ___ No   50 %  $ 12.18
5.  Total  Pay.    $ 36.54

| Supervisor's Signature: | *(signature)* | Date: 5/31/18 |
|---|---|---|
| Inmate's Signature: | X | Date: 5/31/18 |

Inmate: _____ was requested to sign this rating, but refused, citing the following reason(s):

| Staff Witness Signature: | | Date: |
|---|---|---|

1 -A

BP-A0575
JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

**PERFORMANCE PAY DAILY RECORD - INMATE**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| DAY OF MO: | 2 | 3 | 4 | 5 | 6 | 7 |
| | OFF | OFF | OFF | 3 | OFF | OFF |
| DAY OF MO: | 9 | 10 | 11 | 12 | 13 | 14 |
| OFF | OFF | OFF | 7 | 7 | OFF | OFF |
| DAY OF MO: | 16 | 17 | 18 | 19 | 20 | 21 |
| OFF | OFF | OFF | 3 | 3 | OFF | OFF |
| DAY OF MO: | 23 | 24 | 25 | 26 | 27 | 28 |
| OFF | OFF | OFF | 4 | 4 | OFF | OFF |
| DAY OF MO: | 30 | | | | | |
| OFF | 7 | | | | | |

Note: For days reflecting less than 7 hours worked explain by inserting applicable code:

| | | |
|---|---|---|
| C = Callout | V = Visit | AD = Admin. Det./Discip. Seg |
| E = Education | HO = Holiday | U = Unsatisfactory |
| F = Furlough | I = Medical Idle | |
| H = Hospital | UA = Unauthorized | |

| Inmate's Name PUGH, T. | Register No. #14015-052 | Detail FCI VTCULY |
|---|---|---|
| Month: **April 2018** | Total Hours: 38 hours    $4.56 | |

**FILE IN SECTION 4 UNLESS APPROPRIATE FOR PRIVACY FOLDER**

# SECTION 4

Prescribed by P5251                      Replaces reverse of BP-324 of OCT 84

4/A

BP-A0575
JUN 10

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

**PERFORMANCE PAY DAILY RECORD - INMATE**

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| DAY OF MO: | | | | 1 | 2 | 3 |
| | | | | 7 | OFF | OFF |
| DAY OF MO: 5 | 6 | 7 | 8 | 9 | 10 | |
| OFF | 7 | 7 | 0 | 7 | OFF | OFF |
| DAY OF MO: 12 | 13 | 14 | 15 | 16 | 17 | |
| OFF | 7 | 0 | 0 | 0 | OFF | OFF |
| DAY OF MO: 19 | 20 | 21 | 22 | 23 | 24 | |
| OFF | 7 | 7 | 7 | 7 | OFF | OFF |
| DAY OF MO: 26 | 27 | 28 | 29 | 30 | 31 | |
| OFF | 7 | 7 | 7 | 7 | OFF | OFF |

Note: For days reflecting less than 7 hours worked explain by inserting applicable code:

| | | |
|---|---|---|
| C = Callout | V = Visit | AD = Admin. Det./Discip. Seg |
| E = Education | HO = Holiday | U = Unsatisfactory |
| F = Furlough | I = Medical Idle | |
| H = Hospital | UA = Unauthorized | |

| Inmate's Name | Register No. | Detail |
|---|---|---|
| PUGH, T. | #80975-053 | FCI VTCULY |

| Month: March 2018 | Total Hours: 91 hours   $10.92 |
|---|---|

**FILE IN SECTION 4 UNLESS APPROPRIATE FOR PRIVACY FOLDER**

# SECTION 4

4A

BP-A0575
JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

## PERFORMANCE PAY DAILY RECORD - INMATE

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| DAY OF MO: | | | | 1 | 2 | 3 |
| OFF | | | | 7 | OFF | OFF |
| DAY OF MO: 5 | 6 | 7 | 8 | 9 | 10 | |
| OFF | 7 | OFF | OFF | OFF | OFF | OFF |
| DAY OF MO: 12 | 13 | 14 | 15 | 16 | 17 | |
| OFF | OFF | 0 | OFF | OFF | OFF | OFF |
| DAY OF MO: 19 | 20 | 21 | 22 | 23 | 24 | |
| OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| DAY OF MO: 26 | 27 | 28 | | | | |
| OFF | 4 | 7 | 7 | | | |

Note: For days reflecting less than 7 hours worked explain by inserting applicable code:

| | | |
|---|---|---|
| C = Callout | V = Visit | AD = Admin. Det./Discip. Seg |
| E = Education | HO = Holiday | U = Unsatisfactory |
| F = Furlough | I = Medical Idle | |
| H = Hospital | UA = Unauthorized | |

| Inmate's Name | Register No. | Detail |
|---|---|---|
| Pugh, T. | #80975-053 | FCI VTCULY |
| Month: **February 2018** | Total Hours: **32 hours  /  $3.84** | |

**FILE IN SECTION 4 UNLESS APPROPRIATE FOR PRIVACY FOLDER**       **SECTION 4**

Prescribed by P5251                   Replaces reverse of BP-324 of OCT 84

BP-A0324
JUN 10

**WORK PERFORMANCE RATING - INMATE**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| Inmate's Name<br>Pugh, T. | Register No.<br>#80975-053 | Unit *HA* |
|---|---|---|
| Evaluation Period<br>January 2018 | Work Assignment<br>VT Culy | |

Bonus Justification




Signature and Date of Dept. Head Approval


---

Route to Dept. Head for Review, Then to Unit Team

---

Instructions: Check the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

**A. QUALITY OF WORK**
____1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
____2. Fair. Careless; makes mistakes and does not check work. Should do better work.
__✓_3. Satisfactory. Makes some mistakes but no more than expected at this level.
____4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
____5. Outstanding. Does superior work

**B. QUANTITY OF WORK**
____1. Unsatisfactory. Lazy, wastes time, goofs off.
____2. Fair. Does just enough to get by. Has to be prodded occasionally.
____3. Satisfactory. Works steadily but does not push self.
__✓_4. Good. Willing Worker. Does a full day's work and wastes little time.
____5. Outstanding. Drives self exceptionally hard all the time.

**C. INITIATIVE**
____1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
____2. Fair. Usually relies on others to say what needs to be done.
__✓_3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
____4. Good. Can plan own work well. Acts on own in most things.  Doesn't wait to be told what to do.
____5. Outstanding. Has good ideas on better ways of doing things.

**D. INTEREST; EAGERNESS TO LEARN**
____1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
____2. Fair. Shows minimal interest but not very eager to learn.
____3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
__✓_4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
____5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

**E. ABILITY TO LEARN**
____1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, no matter how hard trying.
____2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.
____3. Average. No slower and no faster to learn than most inmates.  Requires average amount of instruction.
__✓_4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
____5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F. NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT**
____1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
____2. Needs closer supervision than most. Not very dependable.
__✓_3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
____4. Needs little supervision. Good record of dependability an promptness.
____5. No supervision required. Completely dependable in all things.

Replaces BP-S324, OCT 94

Prescribed by P5251 Replaces BP-S324, OCT 94

**G. RESPONSE TO SUPERVISION AND INSTRUCTION**
___1. Poor. Resentful and hostile. May argue with supervisor.
___2. Fair. Resists or ignores suggestions.
___3. Satisfactory. Generally does what is told without any fuss.
_✓_4. Good. No hostility or resentment. Tries to improve.
___5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H. ABILITY TO WORK WITH OTHERS**
___1. Poor. Negativistic, hostile, annoying to others.
___2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
_✓_3. Satisfactory. Gets along OK with most co-workers and is accepted by them.
___4. Good. Friendly, congenial, helpful; others like to work with.
___5. Outstanding. Gets along well with everyone. Very popular.

**I. OVERALL JOB PROFICIENCY**
Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:

___1. Fire or lay off that individual?
___2. Transfer the person to a less demanding job at a lower pay scale?
_✓_3. Continue to employ the person but without a raise or promotion this time?
___4. Raise the person's pay but keep the person at the same job?
___5. Promote the person to a more demanding job at a higher pay rate?

**J. GRADES AND PAY**
1. Performance Pay - Grade Class (Check one) ___ 1 ___ 2 ___ 3 _✓_ 4 ___ M.
2. Hours of Satisfactory work _82_ .
3. Regular Pay _$9.84_ .
4. Bonus Recommended: ___ yes; _✓_ no
5. Total Pay _$9.84_ .

| Supervisor's Signature | Date 1-23-18 |
|---|---|
| Inmate's Signature   50975-053 | Date |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

**FILE IN SECTION 4 UNLESS APPROPRIATE FOR PRIVACY FOLDER**   **SECTION 4**

BP-A0575
JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

## PERFORMANCE PAY DAILY RECORD - INMATE

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| DAY OF MO: | 1 | 2 | 3 | 4 | 5 | 6 |
| | 0 | 4 | 7 | 7 | OFF | OFF |
| DAY OF MO: 8 | 9 | 10 | 11 | 12 | 13 | |
| OFF | 7 | 0 | 7 | 5 | OFF | OFF |
| DAY OF MO: 15 | 16 | 17 | 18 | 19 | 20 | |
| OFF | 3 | 0 | 0 | 0 | OFF | OFF |
| DAY OF MO: 22 | 23 | 24 | 25 | 26 | 27 | |
| OFF | 0 | 7 | 7 | 7 | OFF | OFF |
| DAY OF MO: 29 | 30 | 31 | | | | |
| OFF | 7 | 7 | 7 | | | |

Note: For days reflecting less than 7 hours worked explain by inserting applicable code:

| | | |
|---|---|---|
| C = Callout | V = Visit | AD = Admin. Det./Discip. Seg |
| E = Education | HO = Holiday | U = Unsatisfactory |
| F = Furlough | I = Medical Idle | |
| H = Hospital | UA = Unauthorized | |

| Inmate's Name<br>Pugh, T. | Register No.<br>#80975-053 | Detail<br>FCI VTCULY |
|---|---|---|
| Month:  January 2018 | Total Hours: 82 hours   $9.84 | |

FILE IN SECTION 4 UNLESS APPROPRIATE FOR PRIVACY FOLDER

# SECTION 4

Prescribed by P5251

Replaces reverse of BP-324 of OCT 84

EXHIBIT 4

```
BROBV            *        INMATE DISCIPLINE DATA        *        03-03-2021
PAGE 001 OF 001  *    CHRONOLOGICAL DISCIPLINARY RECORD  *        08:51:49


REGISTER NO: 80975-053 NAME..: PUGH, TAIRODNATHAN WEBSTER
FUNCTION...: PRT        FORMAT: CHRONO    LIMIT TO 14  MOS PRIOR TO 03-03-2021


-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3457831 - SANCTIONED INCIDENT DATE/TIME: 11-16-2020 1237
DHO HEARING DATE/TIME: 01-28-2021 1059
FACL/CHAIRPERSON.....: BRO/P. DELANEY
REPORT REMARKS.......: I/M STATED: I DIDN'T FIGHT OR HIT ANYONE
                       DHO FOUND I/M GUILTY OF 201
   201  FIGHTING WITH ANOTHER PERSON - FREQ: 1
        DIS GCT   / 27 DAYS / CS
        COMP:010 LAW:P   SANCTION IMPOSED TO DETER FUTURE MISCONDUCT
        DS        / 15 DAYS / CS / SUSPENDED 180 DAYS
        COMP:    LAW:    SANCTION IMPOSED TO DETER FUTURE MISCONDUCT
        LP COMM   / 90 DAYS / CS
                  FROM: 01-28-2021  THRU: 04-27-2021
        COMP:    LAW:    SANCTION IMPOSED TO DETER FUTURE MISCONDUCT
```


```
   G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

```
NERBD            *      INMATE DISCIPLINE DATA        *     02-10-2020
PAGE 001 OF 001  *   CHRONOLOGICAL DISCIPLINARY RECORD  *     07:55:36


REGISTER NO: 80975-053 NAME..: PUGH, TAIRODNATHAN WEBSTER
FUNCTION...: PRT      FORMAT: CHRONO    LIMIT TO ___ MOS PRIOR TO 02-10-2020


--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 3092131 - SANCTIONED INCIDENT DATE/TIME: 02-20-2018 1318
DHO HEARING DATE/TIME: 03-05-2018 0750           DHO REPT DEL: 03-27-2018 1420
FACL/CHAIRPERSON.....: SCH/JORDAN A
REPORT REMARKS.......: INMATE DENIED STATING THAT HE WILL "TAKE HIS TALENTS AND
                       SKILLS" AND USE THEM AGAINST THE UNITED STATES FOR ISIS
    299  DISRUPTIVE CONDUCT-HIGH - FREQ: 1
         DIS GCT   / 27 DAYS / CS
         COMP:010 LAW:P  MOST LIKE 203
         DS        / 30 DAYS / CS / SUSPENDED 180 DAYS
         COMP:     LAW:    MOST LIKE 203
         LP COMM   / 90 DAYS / CS
         COMP:     LAW:    MOST LIKE 203
         LP PHONE  / 90 DAYS / CS
         COMP:     LAW:    MOST LIKE 203
         LP VISIT  / 90 DAYS / CS
         COMP:     LAW:    MOST LIKE 203
--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2748203 - SANCTIONED INCIDENT DATE/TIME: 08-10-2015 1839
UDC HEARING DATE/TIME: 08-13-2015 1020
FACL/UDC/CHAIRPERSON.: BRO/H/RVEGA
REPORT REMARKS.......: I DIDN'T PLACE A CALL FOR ANOTHER INMATE. I HAD AN INMAT
                       E TRANSLATE FOR ME BECAUSE MY WIFE DOESN'T SPEAK ENGLISH
    328  GIVING/ACCEPTNG MONEY W/O AUTH - FREQ: 1
         LP VISIT  / 90 DAYS / CS
         COMP:     LAW:    LOSS OF VISIT 08-13-2015 - 11-10-2015
--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2733946 - SANCTIONED INCIDENT DATE/TIME: 07-03-2015 1015
UDC HEARING DATE/TIME: 07-06-2015 1030
FACL/UDC/CHAIRPERSON.: BRO/H/R.VEGA
REPORT REMARKS.......: THE INMATE STATED THAT HE DID NOT KNOW THERE WAS A COUNT
    307  REFUSING TO OBEY AN ORDER - FREQ: 1
         LP COMM   / 90 DAYS / CS / SUSPENDED 90 DAYS
         COMP:     LAW:
    321  INTERFERING WITH TAKING COUNT - FREQ: 1
         LP PHONE  / 90 DAYS / CS / SUSPENDED 90 DAYS
         COMP:     LAW:



G0005        TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

EXHIBIT 5

9-28-2021

TRUTHE

From the heart of

Tairod Pugh

I must have been 11 years old when my fraternal grandmother gave me a Jehovah Witness Children's book called "My Book of Bible Stories." I don't remember anything I read in the book. I remember spending countless hours staring at an artist's drawing of paradise – green grass, rolling hills, blue sky, and fruit trees. I recall seeing a lamb and a lion at peace with each other. I recall children and grown-ups of all different races. I imagined myself as the little Black boy with the Afro and the smile so big you could see his teeth.

My life was nothing like the images in the book.  That (artist's) paradise was the most beautiful (place) I have ever (seen). My earliest memories of my parents are of us living in Spain. My father was stationed there. He served in the U.S. Air Force. That was when I remember the abuse began; (my parents) tying my leg to the leg of the table and beating me. I was 5 or 6 years old – but it's the kind of thing that a kid doesn't forget.

A few years later in Arizona, If you had walked into the house, through the front door, on the wall you would have seen a key-chain holder. It had 5 little golden hooks. One of the hooks held an approximately 8-foot brown extension cord, folded in half, with 3 or 4 knots tied into it. This was the main instrument used to torture me and make me bleed. There were times when I thought I was going to die. All it takes is one hit too many. It happens to children all the time. I have been slapped, punched, kicked, beaten bloody and sent to the hospital. I was just a kid. I

lived a life of fear in my own home. One can only abuse a child for so long until something inside breaks.

I was broken by the age of 13 when I met Dr. Goodman. He wasn't my first psychologist nor my last – but he was the first to diagnose me with depression. The year was 1981. Much later, in 2017, I was diagnosed by Dr. Drob with chronic depression, PTSD, and borderline schizoid personality.

I get nervous and flushed when speaking (off-the-cuff) around strangers. Expressing negative emotions is troublesome for me – I tend to avoid people and situations that will cause conflict because conflict terrifies me.

I don't identify with aggressive and oppressive people, and I sometimes go overboard with empathy for the victims of abuse. (Yes, I do know the difference between sympathy and empathy.)

Once a week (Tuesday mornings) my father and I were ordered to attend therapy with Dr. Goodman. For weeks, I never had anything to say. At the time, I didn't understand "How can he/Dr. Goodman help me?" In less than an hour I would be alone in the car with my father on the way home. I was terrified, so I kept my mouth shut. During one session, Dr. Goodman gave me a pen and notebook and I was instructed to write a letter. Address the letter to the person I desired to talk to, and write to them. He assured me that it was ok to tell them whatever was on my mind – get this stuff off my chest. No one else is going to see the letter. The letter will not be graded, it will not be seen by anyone else, it will not be sent. The most important aspect of this therapeutic exercise he said I was safe.

I suffer from the inhibition of emotional expression, which is one of the characteristics of a schizoid personality

Through this exercise of writing, I am free to release the pain. After I write I feel so relieved. If I do not write, the negative emotion just builds until something inside me breaks and I can do nothing but cry – often – uncontrollably; for days, weeks, sometimes months. I learned to use writing in a similar way as a pressure-relief valve in a high pressure system. I have the type of depression that requires time for the negativity to ebb. In 2014, when I was obviously no longer a child, I suffered a breakdown. I could not handle the cruelty I was witnessing on social media. I cried every day for two whole years, from 2014 to 2016. I was completely dysfunctional. I did not think a person could weep so much. I literally created puddles on the floor of my cell.

The first letter I wrote in 1981 for Dr. Goodman felt unbelievably liberating. When I write, I am no longer frightened. I am bold, brave, fearless.  A hero. "I am a sword against oppression, and a shield for the oppressed." When writing, (I can) accomplish anything. An active fantasy life is another characteristic of a schizoid personality.

Some people, when angered, are instructed not to immediately react. They are instructed to give themselves a 10 count. This advice does not quite work for me. Anger, and other negative emotions, coupled with chronic depression, requires a count of thousands for the emotions to ebb. Writing gives me a breather, time to contemplate and reflect on what is going on in my life. Writing allows me to vent my negative emotions. As a result, I am more tolerant and this inevitably leads to being more forgiving. Dr. Goodman taught me that the pen is mightier than the sword. So write, allow time to cool my feelings, to write – [then] read what I wrote and learn. I have a peaceful outlet for negative emotions. If more people learned what I was taught there would be less guns and violence.

My letter to Dr. Goodman must have caused him concern because he made an emergency house call! He said he knew of a place where children can go to get the help they needed – a safe place. He asked– did I want to go? I was desperate to get out of my father's house – I was tired of being afraid. I was tired of the pain - so I accepted his offer. At the age of 13, I was admitted into Camelback Hospital in Phoenix, Arizona. The counselors at the hospital, under the guidance of Dr. Goodman, reinforced what he'd been teaching me – to channel my anger and negative energy into a creative expression - "writing."

In 2014, social media placed "war" and "terror" front and center in my life, much more so than during my tour of active duty in the U.S. Air Force.  Call it bad timing, but I had finally made it to the Islamic States. At the time, I got a job as an avionic technician on an emergency medical evacuation aviation team in the Islamic state of Kuwait. In support of upcoming possible missions to the Islamic states within our aircraft's range, I viewed the American bombings and non-American bombings on the news, in the papers, and on social media, mostly from the perspective of 20,000 feet. I could see the cross hairs on my screens and then see a little "poof" (a cloud of dust and debris). The American news networks kept the people oblivious to the actual carnage – but social media and the cell phone changed all that. In 2014, I saw death and destruction in high definition color. Anguished, a man is viewed holding his limp toddler, sobbing. (It was) A sight one doesn't soon forget. Will someone please tell me, "what do children do that is so wrong to be targeted for abuse and death?" If you are angry at the father, do you have the right to target his children? Do the sins of the father pass on to the innocent children? I watched the videos. The videos gave me no pleasure. They disturbed me and I was horrified by the images.  The violence I viewed plunged me into the deepest pit of depression that I have ever experienced.

When I look back, I realized that looking (at) all that violence was damaging to me and interfered with my ability to live work & pray and sustain a meaningful relationship. My plan was to marry and start a family. I left the United States committed to living an Islamic state. I married a beautiful woman from Egypt. I wanted and deserved a home with laughter and love. All I wanted was a home with laughter and love. (But) my peace was shattered by the videos I was watching on social media. They were tearing my heart to shreds.

I want to thank your Honor for allowing Dr. Drob to perform the evaluation after my trial. I have been troubled trying to understand the real world, my emotions, and my actions. They didn't add up. Dr. Drob helped me to piece together a better understanding of why images of horror and pain affect me so much, and why I have never been able to find a place in the world. This understanding is just a beginning.  I know I need help, and help is welcomed. Now that I have a fresh understanding of self, I can continue on with a clearer focus on life and the things that matter, and celebrate the good in people and life. I have always recognized the benefits of counseling, we all need help at one time or another.

As an ex-con, I will have my work cut out for me. I know I will face diminished opportunities for employment with my return to society. I have four strikes against me: my religion, my race, this conviction and my age. Nonetheless, hope blooms in my heart when I think about returning to school to complete my degree. I believe education overcomes all employment (obstacles).

Conclusion

My father was an aircraft mechanic retired from the U.S. Air Force. I attempted to follow in his footsteps; I was honorably discharged from the Air Force the day he retired. He was present when I learned to swim, he taught me to shoot pool and play racquetball. We had good

times and bad and despite the abuse I suffered, I love him and <u>forgave</u> him a long time ago. I am

proud of him and his accomplishments. It is not easy being a Black man in America. Whatever

life I am able to salvage I need my father to be a part of it.

      Today, I hope to give knowledge and the assurance to those who love me that I love them

more. I am grateful for this opportunity to appear before your Honor - I pray that you will give

me hope. Seven years without the harmful effects of social media has been a healing.

      I hope to reunite with my wife to create a home of love, laughter and faith. I have always

strove to obey the law, obey the law, help my neighbor, and be the best man I can be.

      Sincerely,


      T. Pugh

EXHIBIT 6

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            18 CR 669 (JPO)

5    DANIEL GONZALEZ,

6              Defendant.                    Sentence
     ------------------------------x
7
                                            New York, N.Y.
8                                           April 2, 2021
                                            11:10 a.m.
9

10   Before:

11
                         HON. J. PAUL OETKEN,
12
                                            District Judge
13
                              APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   BY:  MATHEW ANDREWS
          Assistant United States Attorney
17
     JESSE M. SIEGEL
18        Attorney for Defendant

19

20

21

22

23

24

25

```
 1              (Case called)
 2              MR. ANDREWS:  Good morning, your Honor, Matthew
 3   Andrews for the government.
 4              THE COURT:  Good morning.
 5              MR. SIEGEL:  Good morning, Judge, Jesse Siegel for
 6   Mr. Gonzalez.
 7              THE COURT:  Good morning.
 8              I just want to remind everyone to please stay seated
 9   and speak into the microphones.  It's a little hard to capture
10   everything we are saying with the masks on, so please try to
11   speak clearly right into the microphones.
12              We are here today for sentencing in this case.
13   Mr. Gonzalez pleaded guilty on September 21 of last year to
14   participating in a conspiracy to distribute crack cocaine and
15   heroin.
16              I want to start by making sure I have reviewed
17   everything I should have.  In preparation for today I have
18   reviewed the presentence report, with an addendum and
19   sentencing recommendation; the submission by defense counsel
20   from March 19, with letters from Chelsea Kraimer, a social
21   worker with a reentry program, and Angelica Gonzalez, the
22   defendant's sister; and I've read the submission by the
23   government, dated March 24.
24              Do I have everything I should have?
25              MR. ANDREWS:  Yes, your Honor.
```

```
 1                MR. SIEGEL:  I agree, your Honor.

 2                THE COURT:  Mr. Siegel, have you read the presentence

 3    report and discussed it with your client?

 4                MR. SIEGEL:  Yes, I have, Judge.

 5                THE COURT:  Mr. Gonzalez, have you had a chance to

 6    review the presentence report and talked to your lawyer about

 7    it?

 8                THE DEFENDANT:  Yes, your Honor.

 9                THE COURT:  Mr. Andrews, have you read the presentence

10    report?

11                MR. ANDREWS:  Yes, your Honor.

12                THE COURT:  Are there any objections?

13                MR. ANDREWS:  No, your Honor.

14                MR. SIEGEL:  Just to the sentencing recommendation,

15    but no factual objections.

16                THE COURT:  I adopt the facts in the presentence

17    report as my findings of fact and the starting point in

18    sentencing is, of course, the sentencing guidelines.  I think

19    the parties all agree and the probation department agrees, with

20    the guideline calculation, and I also agree that that's the

21    calculation under the sentencing guidelines.

22                The total offense level after the adjustment for

23    acceptance of responsibility is 27.  The defendant's criminal

24    history category is II.  And, therefore, the guidelines

25    recommend a sentence of 78 months to 97 months.  Of course,
```

1   that's not binding and there is no mandatory minimum sentence

2   in this case.

3          I've read all your submissions, so you don't need to

4   repeat everything, but I'd like to give you an opportunity to

5   speak, and I'll start with defense counsel.

6          Mr. Siegel.

7          MR. SIEGEL:  Thank you, Judge.  Yes.  I'll try not to

8   repeat very much what's in our sentencing submission and try to

9   be thorough.

10          Just two, perhaps, responses to the government's

11   sentencing submission.

12          First of all, I would note that I appreciate that the

13   government recognizes that a below-guidelines sentence is

14   appropriate here, as they say, due to Mr. Gonzalez's limited

15   role in the offense and the circumstances of his upbringing,

16   and I do appreciate that.  It's actually very unusual.  I

17   haven't seen too many instances of the government agreeing that

18   a below-guidelines sentence is appropriate.

19          There are a couple of factual matters that I might

20   take exception to.  The government says that he was a member of

21   the gang known as the 2200 Block Crew.  I'm actually not that

22   clear on the extent to which this was actually a formal gang,

23   like with meetings and dues and leadership structure and that

24   type of thing.

25          And the reason I'm not that clear on that is because

1    Mr. Gonzalez was not a gang member.  So if in fact they were

2    that type of gang, he was not actually a member of it.  He was

3    an associate, certainly, of them.  He worked for members of the

4    gang or other people as the lowest person on the totem pole

5    making hand-to-hand transactions with end users.

6           The government says that he has two prior felony

7    convictions.  Actually, he has one prior felony conviction.

8    The other conviction for petit larceny is not a felony.  It's a

9    misdemeanor.  It's a nonviolent taking of property not from a

10   person of another.

11          The government does not address our sentencing

12   disparities argument that we made vis-a-vis the sentence of

13   Jonathan Espinal.  I realize that there may be aspects of

14   Mr. Espinal's sentencing that we are simply not aware of

15   because there was a lot in the submission that was blacked out

16   there.  But to the extent that had something to do with his

17   background, personal background, I would stand very firmly

18   behind our sentencing disparities argument.  I don't think it's

19   possible that anybody had any worse background and upbringing

20   than Mr. Gonzalez and certainly, as we argued, his role in this

21   offense was far less than Mr. Espinal's.

22          The other thing the government doesn't address at all

23   are the conditions under which Mr. Gonzalez has been detained

24   for the last year.  That I take strong exceptions to because

25   it's really extremely relevant here.  I think it's possible

1    that Mr. Gonzalez for the last year has been detained under the

2    worst conditions of detention in United States history.

3    Certainly I've been a defense attorney for 35 years now and

4    it's certainly the worst conditions of detention in the last 35

5    years.  I guess I would imagine that earlier in the country's

6    history there were even worse conditions of detention, but

7    certainly the conditions of detention have been horrible, and I

8    think that needs to be recognized by the sentence that the

9    Court imposes.

10           As to his role in the offense, it bears emphasizing

11   that the quantity on which his sentencing guidelines are based

12   is not in any way an estimate of how much drugs he himself

13   distributed.  It's sort of an estimate on how much of the drugs

14   distributed by the overall group he should be held responsible.

15   That was part of the plea offer, and we accept that.  But the

16   Court should not be confused that he's somebody that was out

17   there and distributed 280 grams of crack.

18           Even the sales that he did to an undercover officer

19   were sales in which other individuals were arrested.  In one of

20   the sales it was one other person.  In another sale it was two

21   other people.  So even that quantity is not truly indicative of

22   what his own liability was or should have been.

23           To look at the positives, we have the letter from the

24   Getting Out Staying Out program, which I thought was really

25   informative in terms of who Mr. Gonzalez really is and his

1    potential.

2         THE COURT:  You said it's the Getting Out Staying Out

3    program?

4         MR. SIEGEL:  Yes.

5         THE COURT:  Is it a reentry program?  I know he was

6    involved with it and that's where he was involved with

7    gardening, horticulture teaching.

8         MR. SIEGEL:  Yes.

9         THE COURT:  Is it a reentry program or do you know

10   what it is exactly?

11        MR. SIEGEL:  It's actually beyond that.  It's not only

12   for people getting out of jail, but it's for people who have

13   been -- it's just sort of a social services group that provides

14   types of programs and guidance and things to people in the

15   community, probably a lot of people wind up going there because

16   they are referred in connection with criminal cases, but not

17   only.

18        Ultimately, Judge, I just think that a sentence of

19   time served that is equivalent to a sentence of 28 months is

20   appropriate for Mr. Gonzalez.

21        THE COURT:  Thank you.

22        Mr. Andrews.

23        MR. ANDREWS:  Your Honor, I'll be brief.  I just want

24   to push back on one point, which is that defense counsel

25   indicated that the offense conduct was not as serious in this

1   instance because Mr. Gonzalez -- defense counsel referred to

2   him as not a member of the gang, but was rather an associate of

3   the gang.

4   The title that you want to ascribe to him really

5   doesn't matter.  It's about what the offense conduct was.  Over

6   an extended period of time he sold narcotics for the gang, he

7   contributed to the financial well being of the gang, and he

8   sold those narcotics in the community in which he was living,

9   which has real and serious consequences.

10   I think your Honor should focus less on this

11   member/associate role and what the submission points out was

12   his role in furthering the activities of a really violent gang

13   that's controlled an area of the Bronx and terrified residents

14   for years.

15   Unless the Court has any other questions, we will rest

16   on our submission.

17   THE COURT:  Let me just ask a little more about that.

18   I know with some of these cases you'll see indicia of

19   membership, like social media, gang symbols, a lot of times

20   it's on Instagram or something like that.  I don't know if they

21   have formal meetings, but you will see that there is sort of a

22   leadership structure.

23   In terms of any of that, do you know if any of the

24   evidence showed any of that for Mr. Gonzalez?

25   MR. ANDREWS:  For Mr. Gonzalez, I do not know, your

1   Honor.  My knowledge of the case is more limited to his actual

2   sales.  Of course, he associated with members quite

3   extensively.  The gang had most of their activities in the

4   lobby of the building within the building, and he's captured on

5   surveillance footage associating with them selling narcotics.

6          To your Honor's point, whether there are these sort of

7   gang signs and things like that, I'm not aware of that, your

8   Honor.

9          THE COURT:  He was not involved in any of the violence

10  of the gang.

11         MR. ANDREWS:  Correct.

12         THE COURT:  The other question I wanted to ask you is,

13  in terms of the disparities, I take these guilty pleas in these

14  cases, and I see very little in terms of what the actual

15  evidence is, unless there is a trial, and there hasn't been a

16  trial, of course, in this case.  I was wondering if you could

17  give me a little more background about where you think this

18  defendant stands in relation to the other defendants in terms

19  of culpability.

20         I know Mr. Espinal, whom I sentenced, was kind of in a

21  different position and there were some unique considerations as

22  to him which I remember and am very aware of.  In some ways,

23  it's apples and oranges as to him.  In terms of this defendant

24  overall with the other defendants in the case, where would you

25  place it?

1          MR. ANDREWS:  I would say there are, of course,

2     exceptional circumstances with Mr. Espinal, which I won't go

3     into the record on here.  His offense conduct, Mr. Gonzalez's

4     offense conduct, I would say, was less culpable than

5     Mr. Espinal's to the extent to which Mr. Espinal engaged in

6     both really violent acts in addition to the narcotics

7     trafficking.

8          In terms of the relative culpability, yes, I would say

9     that Mr. Gonzalez is less culpable than the other defendants

10    charged in this case, which is not to, at the same time,

11    minimize the seriousness of his offense conduct, but to your

12    Honor's question as to where he sort of falls within the

13    relative hierarchy and seriousness in the case.

14         THE COURT:  The other defendants, remind me -- I know

15    I have taken some guilty pleas in the other ones.  I don't

16    think I have sentenced anyone yet except for Mr. Espinal.

17         MR. ANDREWS:  That's correct.

18         THE COURT:  Are the other ones that have pled, have

19    they pled to an 841(b)(1)(C) or a (b)(1)(B) or a (b)(1)(A), or

20    sort of the whole gamut?

21         MR. ANDREWS:  I believe that Mr. Gonzalez is the only

22    one that pled to a (b)(1)(C), or at least a standalone

23    (b)(1)(C).  I'm aware of other defendants at least pleading to

24    (b)(1)(B)s.  Off the top of my head, I do not know to the

25    extent anyone pled to (b)(1)(A)s.  I believe a lot of the pleas

1  also involved very significant violence, as your Honor is

2  aware.

3        There is some negotiation back and forth between the

4  government and defense counsel as to what the end plea will be,

5  regardless of the strength of the evidence and what the

6  government would show at trial.

7        THE COURT:  I really appreciate the fact that the

8  government has actually acknowledged that a below-guidelines

9  sentence is appropriate here, which, as Mr. Siegel points out,

10  the government doesn't always do.  I think it's important for

11  the government to do that.

12        To be clear, the government's position here is that

13  the 24 months he has served in admittedly harsh conditions is

14  not enough but that something below the 78 months is what the

15  government thinks is right, but above the time he has served?

16        MR. ANDREWS:  Correct.

17        THE COURT:  Why do you think 24 months isn't enough?

18        MR. ANDREWS:  I suppose that's the most difficult

19  question in any sentencing, your Honor, how you make sort of

20  the distinction between how many months is enough.

21        I think really the deciding factor here that the

22  government was looking at was the extent to which the

23  defendant's activity was helping further the activities of this

24  gang.  He wasn't just selling narcotics and not contributing

25  financially to the overall activity of the gang.  He was

1   receiving narcotics.  He was either paying for them or

2   receiving them on consignment.

3        It's hard to really distinguish his conduct from the

4   rest of the conduct of this gang, which really had a terrible,

5   terrible impact on this neighborhood with regard to the total

6   amount of narcotics distributed, but also the violent

7   activities as well.

8        I guess, to your Honor's point, what is the difference

9   between 24 months and 28 months and 32 months?  I can't really

10   articulate a metric.  It is really just the government's view

11   of the offense conduct and how much time he has served and the

12   government's sort of general sense of where other similarly

13   situated defendants in other cases which, of course, are not

14   before your Honor, what types of sentences they received and

15   how we view Mr. Gonzalez here.

16        THE COURT:  That's a completely fair answer, and it's

17   a hard question.  Other than being tethered to the guidelines,

18   which in drug cases sometimes I feel are not connected to the

19   3553(a) factors very reasonably, you know, these are just

20   numbers of months, and there is kind of nothing objective about

21   them other than a person's sense of what's enough to serve

22   those purposes.  It's a good-enough answer.

23        MR. SIEGEL:  Judge, can I just interject something on

24   that?

25        THE COURT:  Sure.

1          MR. SIEGEL:  There is actually an answer on that

2    provided by the parsimony clause.  The parsimony clause says,

3    basically that there has to be a reason why a greater sentence

4    is more appropriate than a lesser sentence and that if it can't

5    be articulated, then the Court must impose the lesser sentence.

6    Basically, the upshot of that clause is that the Court is to

7    impose the lowest sentence that achieves the purposes of

8    sentencing.

9          THE COURT:  Right.  That achieves the purposes of

10   general deterrence, protecting the public, etc., just

11   punishment.  That's right.  Those are all sort of amorphous

12   categories.  In every single sentencing I pretty much struggle

13   with what is enough.  I agree with you that at end of the day

14   the parsimony clause answers any indeterminacy on the side of

15   less rather than more.  I think you are right.

16          Did you want to add anything else, Mr. Siegel?

17          MR. SIEGEL:  No.  Thank you, Judge.

18          THE COURT:  Thank you.

19          Mr. Gonzalez, I want to give you a chance to speak, if

20   you want to.  You are not required to.  I have read the

21   presentence report, I have read your sister's letter.  Your

22   lawyer did a really good job of making arguments for a sentence

23   of time served.  If there is anything you want to say today,

24   you are welcome.

25          THE DEFENDANT:  First and foremost, I just hope

 1    everyone is in this courtroom is feeling happy and healthy.

 2         THE COURT:  If you could pull the microphone a little

 3    closer and if you could speak a little bit slower.

 4         THE DEFENDANT:  First and foremost, I hope everyone in

 5    this courtroom is feeling happy, as well as healthy, even under

 6    these severe conditions and circumstances.  I'm optimistic to

 7    be alive, and today I will get a second chance at life.

 8         I didn't come here today to justify my actions because

 9    I knew I was in the wrong.  I'm here today to accept the

10    punishment I did for actions years ago.

11         My stay here at MCC, I would pronounce it as chaotic,

12    with my health deteriorating since I've been here.  I have

13    suffered from a foot infection due to unsanitary showers, and

14    also that goes and returns frequently.

15         Also, as we know, a gun was retrieved here last year

16    and the result has made me nervous and paranoid, wondering, am

17    I really safe here?  Will I really make it safe home to my

18    sons?  Is this the end?

19         Being in this pandemic, I'm locked in my cell 23 hours

20    a day, and sometimes we go days without showering and days

21    without phone calls, which is really hard not seeing my

22    children in over a year and the lack of movement that I need to

23    better my blood clots.

24         But one thing I did do in this time confined to myself

25    is reevaluate my life for the future, of not only myself, but

1    children, family, and community.  Even with the problems I

2    found peace within myself knowing that my life has a brand-new

3    state after this.  I plan on using my time wisely and to set an

4    example for my offspring so that they don't make the same

5    choices I made.

6         Like I said today, I didn't come here to justify my

7    actions.  I am here to apologize for putting my sons in a

8    position where they lost me, and my friends and family for also

9    wasting their time on my foolishness, and apologizing to my

10   community for making it bad in my area.

11        I hope everyone has a blessed day.

12        THE COURT:  Thank you.

13        Is there any reason why sentence cannot be imposed at

14   this time?

15        MR. ANDREWS:  No, your Honor.

16        MR. SIEGEL:  No, Judge.

17        THE COURT:  In preparing the sentence, Mr. Gonzalez, I

18   have considered the presentence report, probation's

19   recommendation, and the written and oral statements of defense

20   counsel and the defendant and the government.  Of course, I

21   have considered all the factors in the statute, Section 3553(a)

22   of Title 18, which I won't repeat, but I have considered all of

23   them.  And, of course, one of them is the sentencing guidelines

24   which calls for a sentence at the low end, 78 months, and

25   that's what probation recommended.  But that is only one

1    factor, and the other ones are important as well.

2         As Mr. Siegel points out, at the end of the day I am

3    required to impose a sentence that is sufficient but not

4    greater than necessary to serve the purposes of sentencing,

5    considering all the circumstances and all the purposes of

6    sentencing and the defendant's history and characteristics and

7    the nature and circumstances of the offense here.

8         The defendant got involved in or was associated with a

9    gang that was selling drugs in the Bronx and really was

10   terrorizing a neighborhood.  Mr. Gonzalez does not appear to

11   have been involved in any of the violent activity of the gang.

12   He was a low-level, street-level drug dealer.  But it is a

13   serious crime, both because these are dangerous drugs that

14   destroy lives, as Mr. Gonzalez knows as well as anybody, given

15   his upbringing and the effect that drugs had on his family,

16   including his mom, but also because of the connection to a

17   dangerous gang.

18        The defendant is a 24-year-old man who has two

19   children.  To say that he had a difficult childhood would be an

20   understatement.  He had no parental guidance.  He faced abuse,

21   lack of stability, periods in foster homes.  It was an

22   extremely difficult childhood and that should be taken into

23   account.

24        It's pretty clear that he has substance abuse issues

25   and likely untreated mental health issues.  He needs treatment

1    and I'm going to order treatment during his term of supervised

2    release.

3            It's also clear that he has people who care about him,

4    and he, I think, is remorseful.  I think he has the ability to

5    change his life.

6            And it's up to you to change your life, obviously.

7    You have to be committed to it.  When you get out, there are

8    going to be temptations.  You are going to run into some of the

9    same people, and you are just going to have to think about your

10   boys.  You are going to have to think about, do I want to

11   change my life?  You are just going to have to stay away from

12   people and temptations.  Because if you go back to dealing

13   drugs, or any other kind of illegal activity like that, you are

14   going to be back in here.  That is just what happens.  But I do

15   believe you are remorseful and you want to change, and I

16   believe you have the ability to if you stick to it.

17           Now, the defendant has already served 24 months of

18   detention and that really has been under conditions that have

19   been extraordinarily harsh.  Most of the time has been in

20   lockdown conditions 23 hours a day, basically like solitary

21   confinement with no access to visitors for most of that time,

22   virtually limited programming.  And I do believe that because

23   it's been harsher than a usual period that it's more punitive,

24   that it's essentially the equivalent of either time and a half

25   or two times what would ordinarily be served.  So I think

1    having served 24 months is equivalent to having served three

2    years.  That's what I believe in terms of how punitive it's

3    been and how harsh it's been.  As defense counsel points out,

4    he has already served the equivalent of 28 months if you factor

5    in good-time credit.

6            Now, that is significantly below the guidelines, but I

7    think that's a long period of time.  I think that is sufficient

8    but not greater than necessary to serve the purposes of

9    sentencing in terms of all the factors I have mentioned.  I

10   acknowledge that it's a serious crime, that deterrence and just

11   punishment, respect for the law require a significant term of

12   incarceration, but he has served that significant term of

13   incarceration, and, therefore, I tend to impose a sentence of

14   time served as a variance below the guidelines, for all the

15   reasons well stated by Mr. Siegel's submission.  I do intend to

16   impose a term of three years' supervised release.

17           Is there any legal reason that sentence may not be

18   imposed?

19           MR. ANDREWS:  No, your Honor.

20           THE COURT:  Mr. Siegel.

21           MR. SIEGEL:  No, your Honor.

22           THE COURT:  Mr. Gonzalez, it is the judgment of this

23   Court that you be sentenced to time served.  Following release

24   you will be placed on supervised release for three years.

25           The following conditions will apply to your supervised

1    release:  You will not commit another federal, state, or local

2    crime.  You will not possess or use any illegal controlled

3    substance.  You will submit to one drug testing within 15 days

4    of placement on supervised release and at least two drug tests

5    thereafter as directed by probation.  You will cooperate in the

6    collection of DNA as directed by probation.

7         The standard conditions are imposed with the following

8    special conditions:  You will submit your person, residence,

9    place of business, vehicle, and any property or electronic

10   devices under your control to a search, to the extent that

11   probation has reasonable suspicion that contraband or evidence

12   of a violation may be found.  The search must be conducted at a

13   reasonable time and in a reasonable manner and failure to

14   submit to a search may be grounds for revocation.  You will

15   warn any other residents about the search condition.

16        You shall participate in an outpatient substance abuse

17   treatment program approved by the probation office which may

18   include testing to determine whether you have reverted to using

19   drugs or alcohol.  I authorize the release of available

20   treatment, evaluations, and reports, including the presentence

21   report, to the substance abuse treatment provider.  And I'm

22   also imposing a condition that you will participate in a mental

23   health treatment program approved by the probation department.

24   You will continue to take any prescribed medications as

25   directed by the provider, and I authorize the release of

1    treatment reports, including the presentence report, to the

2    treatment provider.

3          You will report to the nearest probation office within

4    72 hours of release, and I recommend that you be supervised by

5    the district of your residence.

6          I'm waiving a fine because I find you are not in a

7    position to pay a fine.  However, there is a $100 special

8    assessment which is mandatory and which is hereby imposed.

9          Mr. Gonzalez, you have the right to appeal from your

10   conviction and sentence, except to the extent that you have

11   waived that right as part of your guilty plea and plea

12   agreement.  If you can't pay the cost of an appeal, you may

13   apply for leave to appeal without payment of costs, and any

14   appeal must be filed within 14 days.  I am directing that a

15   complete copy of the presentence report be provided to the BOP

16   and sentencing commission, and the clerk will prepare the

17   judgment.

18          Are there any open counts or underlying indictments?

19          MR. ANDREWS:  Yes, your Honor.

20          THE COURT:  You move to dismiss them?

21          MR. ANDREWS:  Yes, your Honor.

22          THE COURT:  Any open and underlying counts and

23   indictments are hereby dismissed.

24          Anything further from the government?

25          MR. ANDREWS:  No, your Honor.

```
 1              THE COURT:  Anything further for Mr. Siegel?

 2              MR. SIEGEL:  No, thank you, Judge.

 3              THE COURT:  Let me just say, I'm ordering your release

 4     based on the time you have already served, Mr. Gonzalez.  I do

 5     want to say that you'll have a probation officer assigned to

 6     you and all those conditions that I read will apply to you.

 7              They are not there to get you in trouble.  They are

 8     there to help you.  I want you to try to think of your

 9     probation officer as someone who can help you learn about

10     programs.  You have this program that you were involved in

11     before.  I encourage you to go back to them and try to get with

12     them again because the person, the social worker, who wrote on

13     your behalf spoke very highly of you, and I think she indicated

14     that she would be happy to get you back on track with that

15     program, which I think would be really helpful.  Try to take

16     advantage of that.

17              And, again, I have given you a break in terms of the

18     sentencing guidelines.  I have given you less than that, for

19     the reasons I explained, and I really want you to try to stay

20     away from going back to dealing drugs because if you do do it,

21     you are going to be back here before me, and then you won't get

22     the leniency the second time.

23              Thanks, everyone.  This matter is adjourned.

24              (Adjourned)

25
```

EXHIBIT 7

L4TPDAYS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                            19 CR 0619(CM)
                                      Videoconference

TIFFANY DAYS,

            Defendant.

------------------------------x

                                 New York, N.Y.
                                 April 29, 2021
                                 11:23 a.m.

Before:

                HON. COLLEEN McMAHON,

                                 District Judge

             APPEARANCES VIA VIDEOCONFERENCE

AUDREY STRAUSS,
    United States Attorney for the
    Southern District of New York
BY:  NICHOLAS W. CHIUCHIOLO
    Assistant United States Attorney

DONALDSON, CHILLIEST & McDANIEL, LLP
    Attorneys for Defendant
BY:  XAVIER R. DONALDSON

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L4TPDAYS

1              (The Court and all parties appearing via videoconference)

2              THE COURT:  19 CR 619, United States of America v.

3    Tiffany Days.  Your appearances, counsel?

4              MR. CHIUCHIOLO:  Good morning, your Honor.  Nicholas

5    Chiuchiolo on behalf of the government.

6              THE COURT:  Good morning, Mr. Chiuchiolo.

7              MR. DONALDSON:  Good morning, your Honor.  Xavier R.

8    Donaldson on behalf of Ms. Days.  Good morning, Mr. Chiuchiolo.

9    Good morning, everyone else.

10             THE COURT:  Good morning, Mr. Donaldson.

11             Good morning, Ms. Days.

12             THE DEFENDANT:  Good morning, Judge.

13             THE COURT:  The court reporter.

14             I'm very sorry about the technical difficulty.

15   Mr. O'Neil may be looking at himself on five screens.

16             THE DEPUTY CLERK:  I'm going to try again, Judge.

17             THE COURT:  I'm going to proceed.  This matter is on

18   for sentencing under docket number 19 CR 619, United States of

19   America v. Tiffany Days.

20             Ms. Days, having pled guilty to one count of

21   conspiracy to distribute and to possess with intent to

22   distribute narcotics, a class B felony, in violation of 21,

23   United States Code, Section 846, 841(b)(1)(B) and 841(a)(1).

24   This crime carries a statutory mandatory minimum sentence of

25   five years, to a statutory mandatory -- not mandatory,

L4TPDAYS

1    statutory maximum of 40 years' imprisonment, a minimum term of

2    four years to a maximum term of lifetime supervised release, a

3    maximum fine of $5 million, and a $100 special assessment.

4           In connection with this matter, I have received and

5    reviewed the presentence sentence investigation report prepared

6    by United States Probation Officer Sandra Vella Garcia.  It was

7    filed with the Court on October 15, 2020.  I have a letter on

8    the stationery of the United States Attorney's Office dated

9    March 27, 2020.  That looks to me like the plea agreement.  So

10   I have a copy of the plea agreement.  I have a memo dated

11   April 22nd, 2021, on the stationery of the United States

12   Attorney's Office, which is in the nature of a sentencing

13   memorandum from the government.  I have a sentencing memorandum

14   filed on April 21st, 2021 from Mr. Donaldson.

15          Aside from the waiver, which we'll talk about in one

16   minute, is there anything else I should have seen in writing

17   prior to today's proceeding?  I should note that

18   Mr. Donaldson's memorandum has, I believe, some attachments to

19   it.  No, it doesn't.  It does not.  That's the other one.

20   Okay.

21          Is there anything else I should have seen in writing

22   prior to today's proceeding from the government?

23          MR. CHIUCHIOLO:  Not from the government, your Honor.

24          THE COURT:  From the defense?

25          MR. DONALDSON:  No, I don't believe so, your Honor.

L4TPDAYS

1    Thank you.  You have everything.

2           THE COURT:  Okay.  Now, I have in front of me a

3    document entitled Waiver of Right to be Present at Criminal

4    Proceeding and Consent to Proceed Via Video or Telephone

5    Conference.

6           I make the findings required of me under the CARES

7    Act.  I make the findings required of me under the CARES Act

8    that it is necessary to hold this proceeding remotely, and I

9    understand, by the way, that this is also being done at

10   Ms. Days' request.

11          Is that correct, Mr. Donaldson?

12          MR. DONALDSON:  That is correct, your Honor.  Yes.

13          THE COURT:  Okay.  So, Ms. Days, I have in front of me

14   this waiver of your right to be present at this proceeding.  Do

15   you understand that you have the right to be in the courtroom

16   physically present with me, physically present, at the time of

17   your sentence?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Do you understand that you have the right

20   to speak directly in that courtroom to me?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Is it your wish to proceed with your

23   sentencing via this video and teleconference?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Have you discussed these issues with

L4TPDAYS

1    Mr. Donaldson?

2            THE DEFENDANT:  Yes, several times.

3            THE COURT:  And have you authorized Mr. Donaldson to

4    sign this document in which you waive your right to be present

5    in the courtroom at your sentencing?

6            THE DEFENDANT:  Yes.  Yes, your Honor.

7            THE COURT:  Mr. Donaldson, did you, in fact, sign this

8    document on behalf of your client?

9            MR. DONALDSON:  I did, your Honor.

10           THE COURT:  Ms. Days, you should understand that you

11   will have the right, anytime you want to, to speak privately to

12   Mr. Donaldson.  One of the ways in which this device works,

13   this CourtCall works, is we can put you in a breakout room with

14   your lawyer if you need to speak to him privately during the

15   sentencing.  Do you understand that?

16           THE DEFENDANT:  Yes.

17           THE COURT:  All right.  Has the government reviewed

18   the presentence report?

19           MR. CHIUCHIOLO:  Yes, your Honor.

20           THE COURT:  Any additions, deletions or corrections?

21           MR. CHIUCHIOLO:  No, your Honor.

22           THE COURT:  Does the government wish to be heard on

23   sentencing?

24           MR. CHIUCHIOLO:  Your Honor, the government will rely

25   on its sentencing submission, which the Court has reviewed.

L4TPDAYS

1          As the Court is aware, this is the defendant's fourth

2     felony conviction for narcotics offense, and we agree with the

3     probation office that a guidelines sentence would be

4     appropriate in this case.

5          THE COURT:  Thank you very much.

6          Mr. Donaldson, have you reviewed the presentence

7     report?

8          MR. DONALDSON:  Yes, I have, your Honor.

9          THE COURT:  Have you gone over it with Ms. Days?

10         MR. DONALDSON:  Several times, your Honor.

11         THE COURT:  I will hear you on sentencing, sir.

12         MR. DONALDSON:  Thank you very much, your Honor.

13         As the Court is aware, the Court read the PSR, as we

14    all did, and the guideline range that came back from the PSR

15    was 63 to 78 months, similar to what we agreed to in our plea

16    agreement.  The probation department recommended 63 months of

17    incarceration.

18         We are recommending -- requesting that the Court

19    sentence Ms. Day to 60 months, approximately three months below

20    what the probation department is recommending and which would

21    be the statutory minimum.

22         In our writing to the Court, we tried to provide the

23    Court a background of Ms. Days and, we hope, some indication of

24    why we believe 60 months is appropriate, rather than 63 months

25    or rather than a guidelines sentence.

L4TPDAYS

1           First and foremost, we believe, I think, this case
2    pretty much revolves around deterrence and whether Ms. Days
3    will be a productive member of society when she returns or when
4    she gets released.  I think that's probably the central issue
5    for the sentencing proceeding.
6           We do agree -- there's no way we can disagree -- that
7    Ms. Days does have several prior convictions.  That's a given,
8    and we agree that Ms. Days has been convicted of a felony
9    narcotics, that's a given as well.  I guess, it's my opinion in
10   doing these sentencing proceedings so many times, I think the
11   focus of this particular case, if we isolate it, would be
12   whether or not -- or what would be deterrence to Ms. Days and
13   what we believe would be sufficient to ensure that when she
14   comes back out, that she's productive.  The minimum of that,
15   not the maximum.  What the least we can do to make sure she's
16   deterred.
17          In our opinion, we believe the 60 months is
18   appropriate for a number of reasons.  One, we believe that,
19   like most defendants when they get arrested in Federal Court,
20   we believe that rehabilitation starts at the time that they are
21   arrested and, generally, if they're detained, at the time when
22   they are detained.
23          In this particular situation, we think that Ms. Days'
24   rehabilitation and her deterrence started at that time, while
25   in MCC and MDC.  Start with MCC.  Ms. Days made sure that she

L4TPDAYS

1  got involved in as many programs as she could to make sure that

2  she was preparing herself for when she got released.

3         I think as soon as she got arrested and as soon as she

4  got detained and as soon as she was at MCC, she realized that

5  it's time to start making herself a better person.  So in order

6  to do that, as I indicated on page 6 of my writing submission,

7  she must have completed at least nine or ten different

8  programs.

9         Just to name a few, the first one I thought was really

10  important was the inmate companion program.  The reason why I

11  put that first, and I think that's probably, in my opinion, the

12  most important, is because not only does it help herself out,

13  but she was trying to help others.  And I think that's

14  important going forward, that Ms. Day understands that's

15  important to better herself while she's incarcerated.

16         If she can help someone else out, that's good as well,

17  and we need those kind of people when we get outside, people

18  who not only help themselves but people who help others.  So

19  the fact that she participated in this inmate companion program

20  for at least 16 or 17 months is very important.

21         She also completed the Focus Forward project, which I

22  know the courts in this district really take some good solace

23  and put some weight behind that.  She completed that program as

24  well.

25         She completed the Alternative to Drug Dealing, which

L4TPDAYS

1    is important because she has a drug-selling history; so she

2    participated in a program to help her understand the

3    alternatives to that.  So she did that program as well.

4          She did the Square One program, Trauma in Life

5    workshop.  That's important because Ms. Days suffered

6    significant trauma while she was growing up.  That's

7    articulated in my writing.  I won't go through that again, but

8    there is no doubt that Ms. Days suffered significant trauma

9    while she was growing up.

10          Did that participate into why she committed crimes?

11    Yes, it did.  When I do my case -- when I represent my clients,

12    I try to figure out the why and at least articulate the why to

13    the Court.  The why, I think, is stated in my papers why she

14    began this track or this road towards criminality.

15          I think -- I'm sure that this time at MCC has cut that

16    and stopped that.  We'll get to that in a second, but I'm sure

17    that that's stopped at this point.  Women in the 21st Century

18    program, she did that, creative arts and several other

19    programs, a lot involving actually reading, understanding and

20    appreciating literature, which I think is significantly

21    important.  I think the more folks read different books, read

22    literature, it's like going on vacation to that particular

23    place, they learn more and they learn more about themselves.

24          I was very interested in knowing that she read books

25    by very good authors.  Actually, one of my favorites is

L4TPDAYS

1    Mr. Coates, but she read some books by Mr. Coates.  She read a

2    few books by Mr. Baldwin.  So those are fantastic books to

3    read.  The fact that she's reading those books and

4    participating in discussing the topics and the subject matters

5    of those books means a lot.

6         It can take weeks to talk about why, but those books

7    and books like that, when you read them and you talk about

8    them, you discuss them, it opens your mind up and it takes you

9    away from the criminality and more to thought processing and

10   understanding how life really works.  So I thought those were

11   very important.

12        She also has significant community support.  Her

13   mother is in support of -- albeit, very ill, but still

14   supportive.  Her brother is, her aunts are, her uncle is.  I

15   believe some other people, maybe one or two, are on the line

16   right now.  But she does have that family support, and I think

17   and I'm sure will assist her, when she gets released, to ensure

18   that she doesn't come back to court.

19        Finally, and this is most important -- not most

20   important but very important to me.  This Covid-19 lockdown,

21   and she even participated in the other lockdown regarding a

22   particular inmate.  MCC, over the last 18, 19 months, have been

23   nothing short of -- I mean, I'll say it on the record -- I

24   think it's been inhumane.

25        I don't think our society is being as just as it is.

L4TPDAYS

1    I'm a firm believer that any society should be judged and can

2    be, I guess, rated by how they treat its poorest citizens and

3    by how it treats those that are incarcerated.

4         MCC is not a good, for lack of a better word, a good

5    look for America.  Its treatment of its prisoners, the inmates,

6    in the last 14 months have been nothing short, in my opinion,

7    of inhumane, cruel and harsh and unreasonably unjust.  If

8    there's -- if I can say, unreasonably unjust.

9         She has suffered immensely.  She can tell you more

10   about that, and Ms. Days is one of the few clients of mine that

11   can articulate very well what she's experienced and what's

12   going on in there.

13        I firmly agree with Judge Oetken when he ruled just

14   recently in *U.S. v. Gonzalez*, that we should be providing some

15   extra time for anybody who spent time in MCC or MDC during this

16   lockdown.  I will note that several years ago we used to try to

17   articulate, when people spent time in prisons in other

18   countries related to a crime, that they were going to be

19   brought back to America, we sometimes used that to say, well,

20   he spent a year or two in a harsh, Mexico or El Salvadoran

21   prison and that's significantly different than U.S.A.

22        The time that she's spent in MCC is significantly

23   worse than any time that anyone thought possible in the last

24   400 years in a federal jail in America.  It's just been, again,

25   nothing short of inhumane, in my opinion.  And to bring that

L4TPDAYS

1    point home, Ms. Days -- although she's never had a single

2    ticket since she's been locked up in MCC or MDC, and I would be

3    remiss if I didn't say that's been difficult and challenging

4    because the inmates, the officers, everyone is frustrated and

5    their frustrations breeds hostility and breeds, you know,

6    people just coming at each other.

7         She has resisted any of that and has not had any

8    tickets.  In fact, she's tried to help people instead of get

9    tickets, but nonetheless, she spent 75 days in the SHU.  Now,

10   the SHU is normally reserved for persons who get tickets.  It's

11   a disciplinary action.  And I think society, we know that, is

12   now moving away from the isolation because we know that it

13   causes significant mental hardship.  It's debilitating.  It

14   causes future mental hardship once you get released from the

15   SHU.

16        Ms. Days has spent 75 days in the SHU.  That is

17   absolutely, positively incredible, in my opinion, because I've

18   not had a client do that who has not had a ticket.  So because

19   of that, because of the other reasons I've articulated, I

20   firmly believe that Ms. Days has been specifically deterred.

21        I don't like to talk about general deterrence because

22   I don't think that works.  I think it's -- well, that's my own

23   issues, but I do think she's been specifically deterred.  I

24   think that she has been really punished.  I think the five

25   years will be significantly more than time she's spent before.

L4TPDAYS

1   I think it will serve to ensure that she does not come back to

2   court.

3          If the Court has any other questions, I'd be happy to

4   answer them, but I do believe 60 months is appropriate and

5   sufficient for Ms. Days for this particular case.

6          THE COURT:  Thank you very much, Mr. Donaldson.

7          Anything else from the government?

8          MR. CHIUCHIOLO:  No, your Honor.

9          THE COURT:  Ms. Days, is there anything that you want

10  to say to me before I sentence you?

11         THE DEFENDANT:  Yes, your Honor, I would like to.

12         First, I would like to say thank you for even allowing

13  me to be on video court.  I haven't been in your courtroom

14  since 2019, and it's been a long haul, the time that I've spent

15  in federal prison.

16         Your Honor, I just would like to focus a couple of

17  things and reiterate in my letter and speak to you because I

18  haven't seen you in all this time, in all these years.  Doing

19  time in MCC has been very hard for me.  It seems like doing

20  time in MCC was three times harder than doing time in MDC's

21  dorm setting.

22         In MCC, we were locked in for anything from minor to

23  major.  I was locked up during the Jeffrey Epstein

24  investigation, and I went straight to being locked in a cell,

25  unable to speak to my family or my son.  I was arrested and

L4TPDAYS

1    kept inside of the cell and unable to even make a phone call to

2    speak to anyone.

3           In February 2020, during the firearm lockdown, we were

4    locked down for 14 days.  In those 14 days we were given three

5    showers, and that's because we begged for them.  We kicked and

6    screamed on the doors, and the exact words were "Use the sink."

7    No phones, no computers, or things that we used to communicate

8    with the outside world were denied to us.

9           We were totally ignored.  No water, no sanitary

10   napkins.  Girls that caught their period, were bleeding and had

11   to sleep in garments and stay in those sheets, and were unable

12   to use the laundry.  And for the most part, we just got totally

13   ignored every time we would scream and bang and ask for anybody

14   to tell us what was going on.

15          When George Floyd got killed, we were locked in for

16   another ten days.  We were not given showers again, no phone

17   calls, no recreation, no commissary.

18          I also survived the disgusting feces flood that we

19   were actually told to clean with our own hands.  It was

20   humiliating.  Floating, dead water bugs, mice, chunks of

21   defecation coming out of the pipes and urine-filled water

22   gushing all through the area.  The water was as high as my

23   ankles, and the smell was as bad.  It was so bad, the inmates

24   were vomiting due to nausea.  Chunks of feces.  And officers

25   telling us that we had to clean it and clean it quick because

L4TPDAYS

1    lunch was on the way.

2            I froze in a cell for seven-and-a-half months with no

3    heat, sleeping with a hat, gloves, sweat pants and sweatshirts.

4    The cell that they put me in MCC, the ventilation was totally

5    broke.  I would cry myself to sleep, teeth chattering, thinking

6    at times I would die.  I would wake up with white lines on my

7    eyes.  The tears I cried, they were frozen on my face.

8            My roommates were mice.  They would come out of large

9    holes in the wall that were as big as tennis balls, jumping

10   around, running around the cells, just playing on the vents.

11           On April 20th -- excuse me -- on April 20th, 2020, I

12   was the first female inmate to catch Covid-19.  I was put in a

13   room, a SHU room that's used for disciplinary, with no water,

14   no medication, and I wasn't seen for six days.  It wasn't until

15   five days after I was sick that the women in the unit were

16   provided with facemasks.

17           I was so sick and dehydrated that my lips were

18   cracking and bleeding through the mask.  When a nurse noticed,

19   she asked the officer if I could have a cup because cups are

20   not provided in SHU.  So I was unable to take in water like I

21   needed.  Two days later, she came back and said she had given

22   me the wrong medication.

23           I was so weak from suffering from fever and diarrhea,

24   that I was even unable to be on the phone for my own bail

25   hearing that was conducted with all of you guys.  They had me

L4TPDAYS

1    on full quarantine and full isolation and said I was not going

2    to be able to use the phone because I was infected.

3            During the lockdown and the time that I was in SHU, I

4    was without a cup to drink water.  I was fed frozen boxes of

5    baloney sandwiches that most of the time came molded because it

6    was expired.  They gave us frozen peanut butter, lunch and

7    dinner, jelly sandwiches that were frozen -- they hurt your

8    teeth -- potato chips that had expiration dates of 2019.

9            At MCC, no matter how much I complained or told them

10   the pain that I was going through, nobody cared.  I was left in

11   the SHU cell and people would just come by to see the person

12   that was sick from Covid.  They wasn't trying to help me.  They

13   just wanted to see who was the person in the cell that was

14   infected so they know who to stay away from.  The solitude of

15   lockdown drove me insane, and came to the point that I started

16   talking to myself and seeing shadows.

17           After being transferred to MDC Brooklyn, I was tested

18   for Covid-19, and I tested positive again in December 2020.  I

19   was put in SHU for five days.  I was there for five days, on a

20   23-hour lockdown, handcuffed to come out and shower, fed

21   through a hole in the door, in a cell with no windows, mentally

22   broken inside out again.

23           Later, they came back and said it was a false

24   positive.  Anytime the doctors called me for anything, I'm

25   paranoid, I'm nervous, my hands start sweating, I get dry

L4TPDAYS

1    mouth, and I just think, for some reason, I was going to be
2    brought back to the SHU again.
3            I've been incarcerated since August 2019, and I never
4    received a disciplinary ticket, but I've been housed in SHU for
5    over 75 days.  MCC and MDC are the most degrading and
6    humiliating memories of my life.  I will hold onto these
7    memories forever, but these memories are my motivation to stay
8    out of trouble, your Honor.
9            I want to apologize directly to the Court.  I want to
10   apologize to you, and I want to take full responsibility for my
11   actions.  I am guilty.  I am guilty for the crimes committed,
12   but through this experience, I've matured.  I recognize my
13   values, and I promise to live my life with integrity.
14           I'm asking you to please give me a chance to do
15   something with my life.  In life, you come across so many
16   challenges, but the truth will always persevere.  Everything I
17   suffered, everything I shared in this horrific place will be a
18   reminder and strength to me to do the right thing.  My
19   incarceration has been very painful.
20           I have suffered tremendously, and I'm still suffering.
21   Your Honor, I have not been outside since February 2020.  I
22   don't see the sun.  I don't feel the rain.  I don't feel the
23   snow.  We are locked in here all day.  That is one of the
24   rights that we are supposed to have, to even be able to go out
25   for rec, but I have not been outside since February 2020.  I

L4TPDAYS

1    have not seen my family.  We're not allowed visits.

2            But even through all I've been through, I still

3    focused on taking all the programs that I'm allowed, and I try

4    to keep myself as busy in a positive way, educate myself even

5    more for the reentry into society.  My biggest goal has been

6    staying drug free and not using drugs.

7            I am also in the RDAP program, which has taught me how

8    to recognize my criminal thinking errors and has strengthened

9    me by teaching me and incorporating my learning to focus on

10   smart goals, smart goals and positive ways of thinking,

11   principles to apply to my daily life that will help me to avoid

12   repeated problematic behaviors.

13           I want to thank my lawyer, and I want to thank you,

14   your Honor, for giving me a chance to express myself.  I've

15   been compliant ever since I've been locked up.  I've tried to

16   help people ever since I've been in here, and I've been taking

17   courses to prepare myself for reentry, and I'm truly sorry for

18   my mistakes.

19           THE COURT:  So I can't give Ms. Days a just sentence.

20   I can give her a five-year sentence.  My hands are tied.  I

21   have to give her a five-year sentence and that I will do, 60

22   months.  The 75 days that she spent in the SHU takes care of

23   the other three.  Ms. Days is a very educated and eloquent

24   woman, and I have, sadly, heard, both as a sentencing judge and

25   in my capacity as the chief judge that I've just relinquished,

L4TPDAYS

1   entirely too many stories like the one she just recounted on

2   the record.

3           I wish that the Attorney General, whoever, head of the

4   Bureau of Prisons and the leader of the Congress, would have

5   heard that presentation.  The single thing in the five years

6   that I was chief judge of this court that made me the craziest

7   was my complete and utter inability to do anything meaningful

8   about the conditions at the MCC, especially at the MCC and the

9   MDC, two federal correctional facilities located in the City of

10  New York that are run by morons, which wardens cycle

11  repeatedly, never staying for longer than a few months or even

12  a year.  So there is no continuity, there is no leadership,

13  there is no ability to get anything done.  They lurch from

14  crisis to crisis, from the gun smuggling to Jeffrey Epstein,

15  none of which is the fault of Ms. Days or any of the other

16  inmates I have sentenced or will sentence.

17          It is the finding of this Court that the conditions to

18  which she was subjected are as disgusting, inhuman as anything

19  I've heard about any Colombian prison, but more so because

20  we're supposed to be better than that.

21          So if I could, Ms. Days, I would say you've been

22  punished enough, and I would send you home, but I can't.  The

23  law doesn't allow me to sentence you to less than five years.

24  Some of what you've endured has been endured by prisoners even

25  in well-run facilities, some of it.

L4TPDAYS

1          The fact that you haven't been out for a year is a

2   result of the pandemic.  Nobody's been out for a year.

3   Nobody's had visitors.  People have gotten locked up all over

4   the country in the SHU when they've gotten sick, and you had

5   the great misfortune to not only to get Covid but to get Covid

6   in the earliest days, when we didn't know what we were doing.

7   And that being so, I think you've suffered triply as a result.

8          But there is no excuse for the conditions in those two

9   institutions.  There is no excuse for the serial leadership

10  that does not allow the office of warden to take control and

11  get control of those facilities, that they just cycle through,

12  most of them at the end of their careers, and it is unfair and

13  unjust.  You shouldn't have to suffer for the incompetence of

14  the United States Department of Justice and its subsidiary

15  agency, the Bureau of Prisons.

16          I will do what I can to bring your situation to the

17  people who, if they give a damn, might do something.

18          You have committed a serious crime under circumstances

19  that were particularly difficult for me to swallow what was

20  done and everything, but I am convinced that no good would be

21  served by keeping you incarcerated for one minute more than I

22  am required to do by law.  And so I conclude that a mandatory

23  minimum sentence of 60 months is hardly any different from the

24  guidelines lower end sentence of 63 months.  It is sufficient

25  but not greater than necessary to punish you for your sins.

L4TPDAYS

1        I have reviewed the presentence report.  I accept and

2   adopt as my findings the described offense and offense conduct,

3   the calculation of the guidelines.  The total offense level is

4   25.  The defendant's criminal history category is II.  I accept

5   and adopt as my findings the description of the offender

6   characteristics as are set forth beginning at paragraph 56 of

7   the presentence report.

8        I want to thank Mr. Donaldson for his eloquent

9   memorandum.  I'm not going to put all of the details on the

10  record, but it is pretty clear to me that Ms. Days' life might

11  have been very, very different if she had not been subjected to

12  the abuse she was subjected to as a young teenager.  I have no

13  reason to believe that she was on that path.

14       I have considered all of the section 3553(a) factors,

15  and I conclude that the mandatory minimum sentence meets the

16  parsimony goals of the statute and is sufficient to provide

17  deterrence to this defendant and to punish her for the crimes

18  committed.

19       Accordingly, under docket number 19 CR 619, a total

20  offense level of 25 and a criminal history category of II, I

21  hereby sentence you, Tiffany Days, to the mandatory minimum

22  term of 60 months' imprisonment, to be followed by a term of

23  four years' supervised release.  I am not imposing a fine.  The

24  defendant has no ability to pay.  Restitution is not

25  applicable.

L4TPDAYS

1          Is the government seeking forfeiture?

2          MR. CHIUCHIOLO:  No, your Honor.

3          THE COURT:  Ms. Days, you're required to pay $100 in

4     court costs.  That will be taken out of your prison wages at

5     the rate of $25 per calendar quarter, or 50 percent of your

6     gross monthly earnings if you're in a Unicor grade one through

7     four program.

8          I should interrupt myself to say that Ms. Days has

9     done two very admirable things.  First of all, she's

10    accomplished a pretty impressive record, under pandemic

11    circumstances, of coursework; and, second, she has completed

12    this Court's Focus Forward program, run by our pretrial

13    division, and I'm a big fan of that program.  It was started on

14    my watch, and I'm a big supporter of that program.

15         I'm glad, Ms. Days, that they let you into the

16    program, and I'm proud of you for having completed the program.

17    I believe that it is one of the best tools that you will have

18    going forward.

19         Mr. Donaldson, did you have any recommendation for

20    place of incarceration?

21         MR. DONALDSON:  Yes, your Honor.  We are asking for as

22    near to New York City as possible, and I would say that one

23    very near, but that has problems sometimes; so I say the

24    nearest one to New York City as possible.  I'm sure, hopefully,

25    at some point, Tiff will start getting some family visits so

L4TPDAYS

1     she can see somebody.

2            I also neglected to mention that I would ask the Court

3     to strongly suggest to the Bureau of Prisons that Ms. Days be

4     allowed to continue with any of her drug treatment.  She's

5     taking drug treatment programs, as well as any vocational or

6     educational programs that she is allowed to participate in.  I

7     think it will only help.  She is going to try to get into any

8     program she can as much as she can, but --

9            THE COURT:  It is my recommendation that she be

10    incarcerated at Danbury, but as close as possible to the

11    New York City Metropolitan area in order to have facilitate

12    family visitation, which as a result of the pandemic, she has

13    been denied for over a year.

14           It's my recommendation that Ms. Days be considered for

15    the RDAP program.  It's my recommendation that Ms. Days be

16    given continuing drug treatment, and as Ms. Days has proven

17    that she is someone who benefits from coursework and from being

18    put in a position to assist other inmates, it is my hope that

19    the Bureau of Prisons will take note of that and make sure that

20    she has plenty to do, both education-wise and mentoring-wise.

21           MR. DONALDSON:  Thank you.

22           THE COURT:  Ms. Days, when you are released, you will

23    have 72 hours to report to a United States probation officer

24    here at the courthouse on the sixth floor, and for four years

25    you'll meet on a regular basis with your probation officer.

L4TPDAYS

1    You'll do everything the probation officer tells you to do.

2    You can't do anything the probation officer tells you you're

3    not allowed to do.  Do you understand that?

4              THE DEFENDANT:  Yes.  Yes, your Honor.

5              THE COURT:  Okay.  During your period of supervised

6    release, you may not commit another federal, state or local

7    crime, unlawfully possess a controlled substance, and you must

8    comply with all of the standard conditions that have been

9    adopted by this Court.

10             You'll be required to participate in an outpatient

11   treatment program approved by the probation office, which will

12   include testing to determine whether you've reverted to the use

13   of drugs or alcohol.  You must contribute to the cost of

14   services rendered based on your ability to pay or the

15   availability of third-party payments.  And I authorize release

16   of available drug treatment evaluations and reports, including

17   the presentence investigation report, to the substance abuse

18   treatment provider.

19             You must participate in a cognitive behavioral

20   treatment program under the guidance and supervision of your

21   probation officer, until your probation officer decides that's

22   no longer necessary.

23             You must submit your person and any property,

24   residence, vehicle, papers, computer, electronic

25   communications, data storage devices, cloud storage or media

L4TPDAYS

1    and your personal effects to a search by the United States

2    probation officer, if needed with the assistance of law

3    enforcement, as long as there is reasonable suspicion that you

4    have violated a condition of supervision or engaged in unlawful

5    conduct.

6         Your failure to submit to a search will be grounds for

7    revocation of your supervised release and could result in your

8    re-incarceration.  You need to warn the people that you live

9    with that the place where you live can be subject to searches.

10   I've effectively just signed the warrant pursuant to this

11   condition.

12        It is my recommendation that the defendant be

13   supervised in her district of residence.

14        I want to emphasize a couple of the standard

15   conditions.  Obviously, you can't lie to your probation

16   officer.  You can't leave the judicial district where you're

17   authorized to reside without getting permission from the

18   probation officer.

19        The probation officer gets to have approval rights

20   over where you live and who you live with and where you go to

21   work, what kind of job you have.  And the probation officer can

22   visit you at home at anytime.

23        You're not to communicate or interact with people who

24   are engaged in criminal activity.

25        You have to notify your probation officer if you're

L4TPDAYS

1    arrested or even questioned by a law enforcement officer.

2    You've got to tell your probation officer within 72 hours.

3    This is a big important one.

4         You must not own, possess or have access to a firearm,

5    ammunition, destructive device or any dangerous weapon.  There

6    are no excuses.

7         And you can't act or make any agreement with law

8    enforcement to act as a confidential informant or a human

9    source without getting the permission of the Court.

10        Was there an appeal waiver in the plea agreement?

11             MR. DONALDSON:  Yes, there was.

12             MR. CHIUCHIOLO:  Yes, your Honor.

13             THE COURT:  So, Ms. Days, do you recall that at the

14   time you took your plea of guilty, you also signed a letter of

15   agreement with the government?  It's dated April of last year.

16             THE DEFENDANT:  Yes.

17             THE COURT:  Okay.  In that letter it says that if I

18   sentenced you to 78 months or less in prison, you wouldn't take

19   an appeal from your sentence or file a lawsuit challenging the

20   legality of your sentence.  Do you recall that?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Did Mr. Donaldson explain to you before

23   you signed the letter that you were giving up your right to

24   take an appeal, as long as I didn't sentence you to more than

25   78 months?

L4TPDAYS

1                THE DEFENDANT:  Yes, your Honor.

2                THE COURT:  And did you sign that letter of your own

3       free will?

4                THE DEFENDANT:  Yes, your Honor.

5                THE COURT:  I've sentenced you to 60 months, which is

6       the absolute minimum term I can give you, Ms. Days, and it's my

7       understanding that you have waived your right to take an appeal

8       from that sentence.  Is that also your understanding?

9                THE DEFENDANT:  Yes.

10               THE COURT:  Mr. Donaldson, is there anything else that

11      we need to do for your client today?

12               MR. DONALDSON:  No, your Honor.  I thank the Court for

13      its time.  Thank you very much.

14               THE COURT:  Let me just put on the record that I have

15      countersigned the waiver of Ms. Days' right to be present

16      personally at her sentencing.

17               Is there anything else from the government?

18               MR. CHIUCHIOLO:  Yes, your Honor.  There is an open

19      count; so at this time, the government would move to dismiss

20      all open counts.

21               THE COURT:  Open counts are dismissed as against

22      Ms. Days.

23               Thank you, all, for being here today.

24               Ms. Days, good luck to you.

25               THE DEFENDANT:  Your Honor, can I --

L4TPDAYS

1              THE COURT:  I hope we'll never meet again.

2              THE DEFENDANT:  Can I just say one thing?

3              THE COURT:  Yes, ma'am.

4              THE DEFENDANT:  I just want to thank you for your time

5    today and thank you for the things that you do to help us here

6    in federal prison and the programs and the conditions that

7    we're going through, that you do fight for to make things

8    better.  It is appreciated.  Thank you so much.

9              THE COURT:  Well, I wish I had done something that you

10   could appreciate.  That's one of the great frustrations of my

11   life.  Good luck to you, ma'am.

12             These proceedings are closed.

13             THE DEFENDANT:  Thank you.

14             MR. DONALDSON:  Thank you very much.

15             THE DEFENDANT:  Have a good day.

16             (Adjourned)

17

18

19

20

21

22

23

24

25