

U.S. Department of Justice

United States Attorney
Eastern District of New York

SPN
F. #2015R00079

271 Cadman Plaza East
Brooklyn, New York 11201

November 8, 2021

By Hand and ECF

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Tairod Nathan Webster Pugh
     Criminal Docket No. 15-00116

Dear Judge Garaufis:

   The government respectfully submits this letter in connection with defendant Tairod Pugh's resentencing, scheduled for January 7, 2022, and in response to the defendant's sentencing memorandum dated September 30, 2021, in which he requests a reduced sentence of time served. ("Def. Mem." (ECF Dkt. No. 182)). The defendant was convicted on March 9, 2016, following a jury trial, of attempting to provide material support to the Islamic State of Iraq and the Levant ("ISIL"), in violation of 18 U.S.C. § 2339B(a)(1) (Count One), and obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(1) and (c)(2) (Count Two). The crimes of conviction arose from the defendant's attempt to travel to Syria to join ISIL and his subsequent destruction of various electronic devices that were in his possession after he was stopped by Turkish authorities at the airport in Istanbul. The defendant's convictions were affirmed on appeal, but his sentence of 35 years' imprisonment was vacated and the case remanded for resentencing on the ground that this Court failed adequately to state its reasons for imposing the statutory maximum sentence on each count, to run consecutively. See generally United States v. Pugh, 945 F.3d 9 (2d Cir. 2019).

   For the reasons set forth below, and in light of certain factors referenced in the defendant's resentencing letter, the government respectfully submits that a sentence at the bottom of the applicable sentencing range of 360 to 420 months' imprisonment under the United States Sentencing Guidelines (hereinafter "USSG" and the "Guidelines") is sufficient

but not greater than necessary to satisfy the statutory sentencing factors. (See Pre-Sentence Investigation Report ("PSR") at ¶ 82.)

I. Background

    A. ISIL

ISIL is a foreign terrorist organization that has existed, in various iterations, since approximately 2004, when it was known as al-Qa'ida in Iraq or Jam'at al Tawhid wa'al-Jihad. (See PSR ¶¶ 4-5; Tr. at 850:25-851:24; GX 34.[1]) The group was formally designated a foreign terrorist organization by the United States Department of State in October 2004 and again, under the alias ISIL, among other names, in May 2014. (PSR ¶ 4; Tr. at 852:4-25; GX 34.) In late June 2014, the official spokesperson for ISIL released an audio recording declaring a "caliphate" consisting of territory under ISIL's control in Iraq and Syria. (Tr. at 861:14-16-862:4.) In a separate video recording released in early July 2014, the leader of ISIL announced the caliphate, called himself its caliph, and told all Muslims that it was necessary for them to pledge allegiance to the caliphate and to come and join it. (Tr. at 862:5-25; 1032:19-1033:19.)

Since its inception, ISIL has claimed credit for numerous terrorist activities. (Tr. at 860:23-861:9.) During the period relevant to the trial and the defendant's offense conduct, ISIL had gained control of large swaths of territory in Syria, as well as areas of Iraq. (PSR ¶ 5.) ISIL also had distinguished itself from other terrorist organizations by its violence and brutality, using beheadings and indiscriminate massacres to promote terror. (PSR ¶ 5.) ISIL had publicly executed individuals that the group believed were spies seeking to infiltrate the organization, and had then posted the videos online. (Tr. at 880:4-7.) In other instances, ISIL executed reporters and aid workers in retaliation for perceived Western aggression. For example, in mid-November 2014, ISIL claimed responsibility for the execution of Peter Kassig, an American humanitarian worker. (Tr. at 869:16-23; 1016:5-1017:17.)

    B. History and Characteristics of the Defendant/Offense Conduct

As established at trial, the defendant is a United States citizen and former member of the U.S. Air Force who attempted to join ISIL and, after his attempt was thwarted, obstructed justice by destroying various electronic storage devices.[2] The defendant served in Air Force from 1986 to 1990, during which time he worked as an avionics

---

[1] References to "Tr." are to the trial transcript; references to "GX" are to the government's trial exhibits.

[2] The government incorporates herein by reference additional details of the defendant's history, characteristics, and offense conduct set forth in the government's original sentencing submission dated May 24, 2017. (See ECF Dkt. No. 158.)

instrument system specialist and received training in the installation and maintenance of aircraft engine, navigation, and weapons systems. (PSR ¶ 52; Tr. at 599:5-603:16; GX 1, 4.)

Following his military service, the defendant worked as an airplane mechanic at various companies, and eventually moved to the Middle East. (PSR ¶¶ 7, 52, 56.) From approximately August 31, 2014 until mid-December 2014, the defendant worked as an airplane mechanic for Gryphon Airlines ("Gryphon"), a commercial charter airline in Kuwait City, Kuwait. (Tr. at 661:7-9; 665:6-7.) While working at Gryphon, the defendant made a number of pro-ISIL comments that drew the attention of his co-workers. On one occasion, the defendant told a co-worker that he had seen an advertisement that ISIL "was looking for pilots and mechanics, and they are paying big salaries." (Tr. at 664:9-22.)

From approximately October 2014 through early January 2015, the defendant began extensively viewing and downloading ISIL propaganda videos, performed web searches related to traveling to Syria to join ISIL, and drafted a letter to his wife referring to himself as a "mujahid" who intended to "establish and defend the Islamic State" and martyr himself for that cause if necessary. (GX 64.)

Evidence obtained from the defendant's laptop showed that on December 19, 2014, he performed multiple web searches for "borders controlled by Islamic State." (Tr. at 1398:1-17; GX 54a.) On or about January 5, 2015, the defendant downloaded a chart of crossing points between Turkey and Syria; the chart indicated which borders were controlled by ISIL. (Tr. at 1405:19-1407:24; GX 37, 53.) On or about that same day, the defendant drafted an unsent letter to his Egyptian wife, stating, in relevant part:

> I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to establish and defend the Islamic State. There is only 2 possible outcomes for me. Victory or Martyr. If Allah gives us Victory we will have a home in Al-sham. I will send for you when it is safe. You will have a nice home around believers. If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land. The land under a whip is worth more than the world and all it contains.
>
> . . .
>
> I calculated my worth in Dunya. I would usually sell myself for $1,000 dollars a week, that would be ½ a million dollars for 10 years. If I sell myself to Allah: 1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

(GX 64.)

On January 6, 2015, the defendant paid cash for a one-way ticket to fly on January 10, 2015 from Cairo, Egypt to Istanbul, Turkey. (Tr. at 700:6-702:17; GX 16.) On January 10, 2015, the defendant flew from Cairo to Istanbul. (GX 16.) When he arrived at

3

the airport in Istanbul, Turkey, however, the defendant was denied entry, and he was sent back to Cairo, Egypt that same day, where he was detained. (Tr. at 715:12-19; GX 18a-d, 19, 38.) The defendant's possessions at the time of his detention in Egypt included various electronic media devices, including four USB thumb drives that had been damaged and were missing their outer casings. (the "Electronic Devices") (Tr. at 779:9-24; 780:13-784:24.)

The defendant was deported from Egypt and arrived in the United States on January 15, 2015. (Tr. at 1053:4-20; 1054:23-1055:5.) Agents seized two backbacks from the defendant on or around the date of his arrest on January 16, 2015 and searched them pursuant to warrants. The backpacks contained items that appeared consistent with travel through, or living in, rugged areas such as war-torn Syria, including two compasses, a solar powered key-chain flashlight, a solar-powered power source, and a "Certificate of Embracing Islam." (Tr. at 1255, 1269:18-1289:13.)

C. Trial Conviction and Sentence

From February 29, 2016 until March 9, 2016, a jury trial was held before Your Honor. The government called 19 witnesses, including the agents who recovered the "Electronic Devices" from the defendant, FBI examiners who were involved in the forensic examination of the Electronic Devices, an undercover FBI agent, and an expert witness who testified about, among other things, the origins, development, goals, and reach of ISIL. On March 9, 2016, the jury convicted the defendant on both counts.

Your Honor sentenced the defendant on May 31, 2017 to 180 months of incarceration on Count One (attempt to provide material support) and 240 months of incarceration on Count Two (obstruction), the maximum sentence under each statute, to run consecutively. The sentence was within, but at the top of, the applicable Guidelines range.

D. Appeal

On appeal, Pugh challenged his convictions on various grounds, including that the evidence was insufficient to prove his guilt on either count. Pugh, 945 F.3d at 15. Pugh also challenged his sentence, arguing that it was both procedurally and substantively unreasonable. Id.

The Second Circuit affirmed Pugh's convictions but vacated his sentence and remanded for resentencing on procedural reasonableness grounds, holding that this Court's articulation of its reasons for imposing the maximum permissible sentence was insufficiently detailed to permit meaningful appellate review. Id. at 27. In a concurring opinion, Judge Calabresi suggested that the government's decision to bring an obstruction of justice charge, thereby more than doubling the maximum sentence otherwise available, was "ironical – more than ironical, potentially dangerous." Id. at 28. Judge Calabresi expressed some doubt as to the substantive reasonableness of the overall sentence, suggesting that the Court may have "imposed the sentence it did based on the heinousness of Defendant's attempted terrorism and simply used the obstruction conviction as a means to go beyond the statutory maximum of that terrorism count." Id. at 29.

4

II.  The Guidelines Calculation

In advance of sentencing, the Probation Department determined that the defendant's total offense level was 42, his criminal history category was VI, and the advisory Guidelines range was 360 months to life imprisonment.  (PSR at ¶¶ 18-42, 82.)  The government agrees with this calculation, which should apply at the defendant's resentencing.  Because the counts of conviction have a combined statutory maximum sentence of 35 years, the defendant's effective Guidelines range is 360 to 420 months' imprisonment.

The defendant did not dispute the Guidelines range on appeal and does not dispute it here, except to the extent he argues that application of the terrorism enhancement set forth in U.S.S.G. § 3A1.4 results in an advisory sentencing range out of proportion to the conduct at issue in this case.  (Def. Mem. at 8.)  As discussed below, the government disagrees.

III.  Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).  That said, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."  United States v. Ingram, 721 F.3d 35, 36 (2d Cir. 2013) (per curiam) (internal quotation marks and alterations omitted).

In determining the "particular sentence to be imposed," the court must consider the factors listed in 18 U.S.C. § 3553(a), which include: "the nature and circumstances of the offense and the history and characteristics of the defendant," id. § 3553(a)(1); "the kinds of sentences available," id. § 3553(a)(3); the range set out in the Sentencing Guidelines, id. § 3553(a)(4); "any pertinent policy statement," id. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," id. § 3553(a)(6); and "the need to provide restitution to any victims of the offense," id. § 3553(a)(7).  In addition, the court must consider the "need for the sentence imposed ... (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  Id. § 3553(a)(2).

After consideration of the section 3553(a) factors, the district court must impose a sentence that is sufficient, but not greater than necessary, to fulfill the purposes of

5

sentencing. Id. § 3553(a).  A judge need not utter "robotic incantations" referencing each factor that supports a particular sentence. United States v. Crosby, 397 F.3d 103, 113–14 (2d Cir. 2005) (abrogated on other grounds).  "Nonetheless, the judge must explain enough about the sentence for a reviewing court both to understand it and to assure itself that the judge considered the principles enunciated in federal statutes and the Guidelines." United States v. Corsey, 723 F.3d 366, 374 (2d Cir. 2013).  The Second Circuit provided the following guidance in its decision remanding this case for resentencing:

> A district court should explain the reasons justifying the total punishment as sufficient, but not greater than necessary, taking into account the particular characteristics of the defendant and the circumstances of the offense. That justification should guide the determination whether to impose sentences on multiple counts consecutively, partially consecutively, or concurrently. Explaining why concurrent sentences would not achieve a "sufficient" sentence is particularly important where, as here, each of the two sentences are quite long, the district court imposed the statutory maximum for each sentence, and, therefore, the defendant was sentenced to the longest legal sentence available.

Pugh, 945 F.3d at 27.

IV.     Analysis

The defendant argues that he should receive a sentence of time served based on a range of factors, including (1) the nature of his offense conduct viewed against the backdrop of the Second Circuit's opinion vacating the original sentence, (2) his purported psychological impairments, including a susceptibility to propaganda, (3) his remorse and rehabilitation, and (4) conditions at the Metropolitan Detention Center ("MDC").  The government agrees that Pugh's steps towards rehabilitation and aspects of his psychological profile are relevant to the Court's analysis but strongly disagrees that a sentence of time served is warranted.  Indeed, in the government's view, the 35-year sentence initially imposed by the Court fell within the range of permissible sentences and was supported by the applicable sentencing factors.  See United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008) ("[I]n the great majority of cases, a range of sentences—frequently extending well beyond the narrow ranges prescribed by the Guidelines—must be considered reasonable.").  The Circuit made no finding as to the substantive reasonableness of the sentence imposed; rather, it vacated and remanded the sentence for the Court to further explain its reasoning.  For the reasons discussed below, the government respectfully submits that a modest reduction in the sentence is appropriate.

6

### A. The Defendant's Offense Conduct and the Second Circuit's Remand Order

In urging the Court to resentence him to time served, Pugh offers a highly sanitized version of his offense conduct and relies on dictum from Judge Calabresi's concurring opinion (the "Concurrence") in support of his effort to minimize the gravity of his crimes. The Court should reject this effort and continue to recognize the crimes of conviction for what they were – a crime of terrorism that, but for the intervention of law enforcement, would have meaningfully strengthened a homicidal organization and put innocent lives at risk, coupled with obstructive conduct that all but certainly resulted in the destruction of important evidence.

In framing the material support offense, Pugh states that he was found guilty of "wanting or wishing to join ISIL, and for attempting to travel to Turkey to presumably achieve that goal." Def. Mem. at 8. Not so. The jurors did not presume Mr. Pugh's intentions. They found as a matter of fact, proved beyond a reasonable doubt, that Pugh intended and attempted to provide himself – including the benefit of his military and avionics training and capabilities – as personnel to be directed by a horrifically violent terrorist group committed to murdering innocents across the world. Pugh's conduct took him well past a "vague" prospect "that he might commit unspecified crimes in the future" and well past swearing an oath or sharing a telephone number. See Def. Mem. at 8 (quoting United States v. Hayat, 710 F.3d 875, 904 (9th Cir. 2013) (Tashima, J., dissenting) and United States v. Farhane, 634 F.3d 127, 150 (2d Cir. 2011)). Pugh made clear his commitment to wage violent jihad on behalf of ISIL, secured supplies helpful to life in war-torn Syria, researched methods of reaching ISIL-controlled areas of the Syrian border, bought a one-way ticket to Turkey, and began his journey to join the terrorist organization and subject himself to its direction and control. His attempt was interrupted by border officials in Turkey at nearly the last possible moment. See United States v. Crowley, 318 F.3d 401, 408 (2d Cir. 2003) ("[I]f the law punished only the very last act necessary to accomplish the criminal result, legal intervention would be delayed to a point at which it may well be too late to prevent harm." (internal quotation marks omitted)); see also United States v. Mumuni, 946 F.3d 97, 113 (2d Cir. 2019) ("[W]hen it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." (internal quotation marks omitted)). Pugh's statement that he "does not mean to suggest that [he] was convicted of nothing" only underscores the extent of his effort now to minimize his culpability.

Pugh argues further, echoing arguments he advanced in his original sentencing submission, that application of the terrorism enhancement overstates the severity of his conduct and results in a sentence too harsh for "an honorably discharged veteran who served this country with loyalty and commitment in the U.S. Air Force for four years." (Def. Mem. at 8.) The argument fails for at least two reasons. First, Pugh's military background only makes the offense conduct worse. He sought to give the benefit of his military training to a terrorist group, betraying the country he once served by seeking to join in its violent

overthrow.  See, e.g., Tr. at 1036 (testimony of government expert that successful recruitment of former U.S. serviceman would constitute propaganda coup for ISIL).  Second, as argued at greater length in the government's initial sentencing brief, Pugh's conduct falls squarely within the scope of the terrorism enhancement set forth in Guidelines Section 3A1.4 in that he committed an offense "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A); see also United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003) (observing that Congress and the Sentencing Commission rationally concluded that "terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time").  Notably, the Court applied the terrorism enhancement in calculating the Guidelines range at the original sentencing, and Pugh did not contest the application of the enhancement on appeal.

        Pugh similarly seeks to minimize the significance of his conviction for obstruction of justice.  Quoting liberally from the Concurrence, he suggests that the obstruction charge was a mere add-on, brought to avoid the 15-year sentencing cap then in place on the material support charge.  See, e.g, Def. Mem. at 3-4 (quoting Concurrence's suggestion that the sentence imposed on the obstruction count reflected "prosecutorial or judicial dissatisfaction with the limits Congress placed" on the sentence available for the material support charge).  Such speculation about the government's motive in bringing the obstruction charge is unsupported by the record.  In fact, the government charged Pugh with obstruction of justice because he obstructed justice – a separate, albeit related, offense that, at the time, carried a higher statutory maximum sentence than the material support charge, reflecting Congress's considered judgment about the gravity of such conduct.  The government is puzzled by the Concurrence's conclusion that there was "no evidence to suggest that the destroyed USB drives or deleted iPod data contained information that was valuable or significant in itself or for ISIS." Pugh, 945 F.3d at 28.  The evidence established, beyond a reasonable doubt, that the defendant destroyed the Electronic Devices to obstruct a federal proceeding.  The only fair inference is that Pugh destroyed the devices precisely because they contained valuable evidence.  Indeed, the lost evidence may well have provided more insight into Pugh's plans to reach and cross the border into ISIL-controlled Syria or have contained technical information related to avionics.  Cf. Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.").[3]

---

[3] Pugh's suggestion that it would have been nearly impossible for him to enter Syria to join ISIL is contradicted by the trial record and common sense given the group's broad call for emigration to the "caliphate" and the flow of foreigners into Syria during the relevant period.

In sum, the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment as well as deter similar conduct by others all counsel in favor of a lengthy term of incarceration consistent with the advisory Guidelines range.  See 18 U.S.C. § 3553(a)(1), (2).

### B. The Defendant's Alleged Psychological Impairments Warrant Consideration but Not a Sentence of Time Served

In support of his argument that various psychological impairments warrant leniency at sentencing, the defendant relies primarily on two reports of Dr. Sanford Drob, a psychologist, one filed in advance of the first sentencing and another generated following the vacatur of the original sentence.  (Def. Mem., Ex. 1 (the "Drob Report")).  In his second report, Dr. Drob reiterates several of the earlier findings and concludes that Pugh continues to suffer from various mental impairments, including anxiety and "severe deficits in interpersonal functioning, self-regard, and identity formation."[4]  Drob Rep. at 9.  The report indicates that although Pugh remains intelligent and generally high-functioning, he continues to insist on his innocence and has "difficulty both in forming coherent intentions and motives and in retrospectively accounting for his own behavior."  Id.[5]  The Drob Report also indicates that Pugh's mental health has improved substantially during his period of incarceration, in that Pugh reports that he is experiencing "fewer physical and psychological symptoms," that "his stress level is considerably lower than it had been," and that "being in jail was in some ways a relief for him."  Id. at 3.

In the government's view, the Drob Report reinforces that a lengthy sentence is appropriate in this case, including to ensure specific deterrence of a defendant who continues to deny his offense conduct and who may still be susceptible to inspiration toward criminal ends.  The government applauds the progress the defendant has made to date, at least some of it apparently attributable to the structure and opportunities provided in his BOP facility, and agrees that the defendant would benefit from continued treatment.  The government submits that such treatment should be received while the defendant remains incarcerated and unable to further subject the community at large to the dangers posed by his erratic conduct and modes of thinking.

---

[4]  The government notes, as it did in connection with the original sentencing, that Dr. Drob's report is largely based on the defendant's own statements, including in connection with Pugh's alleged abuse at the hands of his father and others.

[5]  Indeed, Pugh uses the report itself to minimize the gravity of his conduct, stating that his impairments present "the mental picture of the person who consumed ISIL propaganda, wrote an unsent letter to his wife about his desire to defend the Islamic State, and, with no connections to ISIL and no plan as to how he would ever get to ISIS territory, bought a one-way ticket and flew to Turkey."  (Def. Mem. at 14.)

C.  Additional Factors

The defendant raises a number of additional factors for the Court's consideration, including arguments related to his experiences while incarcerated. The defendant argues, for example, that his efforts at rehabilitation warrant consideration and that conditions in the MDC further support a reduction in his sentence. (Def. Mem. at 17-18, 23-27.) The government agrees that the defendant's work history as an inmate, including in the Schuylkill kitchen, is admirable and merits consideration. As for conditions in the MDC, Pugh has resided at the MDC during the period of time requested by his counsel to complete his evaluation. Whatever hardships he may have endured related to COVID precautions at the facility were common to all inmates, may have been exacerbated Pugh's own disciplinary infractions, see Def. Mem. at 19, and, in any event, do not justify more than modest adjustment in sentence, if any.

D.  The 3553(a) Factors and Guidelines

In its opinion remanding this case for resentencing, the Second Circuit advised that, "when a defendant has been convicted of multiple counts, the sentencing judge should set forth why a sentence equal to the statutory maximum on one count will not produce a sufficient sentence within the meaning of 18 U.S.C. § 3553(a)." The answer here is that a Guidelines sentence is sufficient but not greater than necessary to carry out the purposes of sentencing, and, in this case, consecutive sentences are required if a Guidelines sentence is to be imposed because the Guidelines are greater than the statutory maximum sentence on one count. Although the Guidelines are advisory, they are the starting point of any sentencing analysis and "reflect Congress' judgment as to the appropriate national policy for [the] crimes [of conviction]." United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006); see also Gall, 552 at 46 (holding that sentencing court "must give serious consideration to the extent of any departure from the Guidelines" because, "even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Pugh and the Concurrence both reference U.S.S.G. § 5G1.2(c), but that provision applies "only when 'the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment.'" United States v. Valerio, 765 F. App'x 562, 567 (2d Cir. 2019) (emphasis added) (quoting U.S.S.G. § 5G1.2(c)). It is entirely appropriate to run sentences consecutively when, as here – and as the Court found during the initial sentencing – the appropriate total punishment exceeds the statutory maximum sentence available under any one count. Id.; see also United States v. McLeod, 251 F.3d 78, 82 (2d Cir. 2001) (holding, pre-Booker, that if the "total punishment" determined after the Guidelines calculation has been made exceeds the highest statutory maximum on any count, the Guidelines require that the sentences run consecutively, to the extent necessary to achieve the "total punishment" (quoting U.S.S.G § 5G1.2(d)).

Based on the foregoing, the government respectfully submits that a custodial sentence within, but at the bottom, of the applicable Guidelines range would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a) while also recognizing the defendant's rehabilitative efforts and other aspects of his

10

incarceration to date. Specifically, a Guidelines sentence would properly reflect the seriousness of the defendant's conduct in attempting to provide material support to ISIL and his obstruction of an official proceeding, as described above, see 18 U.S.C. § 3553(a)(1), (a)(2)(A), promote respect for the law, see id., and provide adequate deterrence to the defendant and others contemplating similar acts, see id. § 3553(a)(2)(B).

V.  Conclusion

    For the reasons set forth above, the government respectfully submits that an adjusted sentence of 30 years' imprisonment is necessary and appropriate to fulfill the objectives of sentencing.

    Respectfully submitted,

    BREON PEACE
    United States Attorney

By:  /s/ _____
    Samuel P. Nitze
    Assistant U.S. Attorney
    (718) 254-7000