

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:ADR
F. #2015R00079

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 14, 2025

<u>By ECF</u>

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Tairod Pugh
>       <u>Criminal Docket No. 15-116 (NGG)</u>

Dear Judge Garaufis:

The government respectfully submits this letter in opposition to defendant Tairod Pugh's motion to vacate his conviction pursuant to Title 28, United States Code, Section 2255 ("Section 2255").  *See* ECF No. 223 ("Def. Mem." or the "Motion"); *see also* ECF No. 218 ("Def. *Pro Se* Mem.").

In March 2016, following a two-week trial, the defendant was convicted on both counts of a two-count indictment (the "Indictment") charging him with: (1) attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS"), a foreign terrorist organization, in violation of 18 U.S.C. § 2339B; and (2) obstruction and attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c).  As proven at trial, Pugh attempted to join ISIS by seeking to travel to ISIS-controlled Syria and, after his attempt was thwarted, he obstructed justice by destroying and attempting to destroy various electronic media devices containing evidence of that attempt.

Pugh now argues that his trial counsel was ineffective because they failed to investigate aspects of his case relating to his alleged use of a job-search platform prior to traveling to Turkey.  *See* Def. Mem. at 8-11.  In a separate *pro se* submission, Pugh also alleges prosecutorial misconduct and ineffective assistance of counsel at his resentencing hearing in 2022, discussed further below.  *See* Def. *Pro Se* Mem. at 5, 8, 24-29, 43.  For the reasons below, all three arguments are baseless, and the Motion should be denied.[1]

---

[1]   On March 7, 2025, the Court granted Pugh's motion to appoint counsel to represent him in connection with his Section 2255 petition, and counsel was appointed that same day.  *See*

I.      Factual Background and Procedural History

        A.      Arrest and Charges

        On January 10, 2015, Pugh, a United States citizen, flew from Cairo, Egypt, to Istanbul, Turkey, after spending several months viewing ISIS propaganda videos and researching various crossing points between Turkey and ISIS's strongholds in Syria. When Pugh was denied entry into Turkey, he was returned to Cairo, where Egyptian and United States law enforcement officers discovered several electronic media devices in his luggage, some of which Pugh had destroyed. *See* Presentence Report ("PSR") ¶¶ 8-10. On January 16, 2015, Pugh was arrested near his father's home in Neptune, New Jersey. *See id.* ¶ 13. On March 16, 2015, a grand jury sitting in the Eastern District of New York returned the Indictment described above. *See* ECF No. 11.

        B.      The Defendant's Trial

        At trial, the government called nearly twenty witnesses, including law enforcement officials involved in the recovery of Pugh's electronic media devices, Federal Bureau of Investigation ("FBI") examiners who were involved in the forensic examination of Pugh's electronic devices, an undercover agent from the FBI who met with Pugh on January 15, 2015 at John F. Kennedy International Airport ("JFK"), and an expert witness regarding ISIS.

        The evidence established that Pugh formerly served in the United States Air Force, during which time he worked as an avionics instrument system specialist and received training in the installation and maintenance of aircraft engine, navigation, and weapons systems. *See* GX1, 4. Following his military service, Pugh worked as an airplane mechanic at various companies, and eventually moved to the Middle East. *See* GX5, 6, and 7.

---

March 7, 2025 Docket Entry. Nevertheless, on March 27, 2025, Pugh made a *pro se* submission in support of his petition. *See* ECF No. 218. Appointed counsel thereafter informed the court that it would still be making a submission on Pugh's behalf, which it filed on August 8, 2025. *See* ECF No. 223. The submission argues only one of the three grounds raised in Pugh's *pro se* submission and purports to "supplement[]" Pugh's *pro se* submission. *Id.* at 2. However, Pugh cannot have it both ways. It is well established that a defendant has no right to simultaneous appointed counsel and *pro se* representation. *See, e.g.*, *United States v. Hage*, 74 F.4th 90, 94 (2d Cir. 2023) ("Requests for hybrid representation are [] disfavored . . . . Particularly where, as here, the defendant makes no claim 'that his counsel was not adequately representing him,' there is little reason to entertain *pro se* submissions.") (internal citations omitted); *United States v. Walker*, 243 F. App'x 621, 622 (2d Cir. 2007) ("This Court, like a trial court, is not obligated to allow [a party] to follow a course of hybrid *pro se* representation under which he files both a counseled and *pro se* brief."); *United States v. Ogbonna*, 184 F.3d 447, 449 (5th Cir. 1999) (*pro se* brief by counseled party, raising meritless argument, "plainly demonstrates" why courts should "discourage[ ]" such submissions). The Court should take the same approach here and decline to consider arguments not made in appointed counsel's submission. Nevertheless, the government addresses Pugh's *pro se* arguments briefly so that the Court may consider them on their merits if it chooses to.

In 2014 and continuing into early 2015, Pugh began actively interacting with ISIS propaganda on social media, *see* GX13a-m, 14c, 15b, 51a, 54a, began extensively viewing and downloading ISIS propaganda videos, *see* Trial Transcript ("Tr.") 1378-1403; GX51a, performed web searches related to traveling to Syria to join ISIS, *see* Tr. 1378-88, 1397-1408; GX54a, and drafted a letter to his wife referring to himself as a "mujahid" who intended to "establish and defend the Islamic State" and to martyr himself for that cause if necessary, *see* GX64.

Pugh's social media posts reflected a strong pro-ISIS mindset. For example, on October 31, 2014, a Facebook friend of Pugh's posted an article about a man who had been arrested the prior August at JFK. *See* Tr. 1306. The article, titled "American man pleads guilty to helping the Islamic State after NYC arrest," described the man's attempt to travel to Syria to join ISIS and his resulting arrest on charges of attempted material support of a foreign terrorist organization. *See id.* After the article was posted, another Facebook user commented, "That is so messed up that we [sic] someone could do 15 years for going over there and fighting. its [sic] not on U.S. soil. Then they are going to start panicking when the loan [sic] wolf stuff starts to happen. So what if we just want to go over there to live? then what? I am confused on our rights." Tr. 1307; GX14c. Pugh responded to the comment on November 1, 2014, writing, "don't be confused listen closely 'you have no rights'. Going to Syria is a one way trip [sic]." *Id.* Pugh expressed similar sentiments in a number of other Facebook posts, including a post on August 11, 2014. *See* Tr. 1307-09; GX15b. In that post, Pugh wrote, in part: "people think they [Islamic State] can just walk over the border and say let me in. [P]eople the Mujahid must fight for new ground while defending their home ground. Islamic state is fighting a coalition of American, Syrian, British and many more. Quit putting the brothers down. Support them with your Bodies. If not your bodies then give your prayers." Tr. 1308-09; GX15b.

The evidence at trial established that ISIS was a foreign terrorist organization designated by the United States Department of State. *See* Tr. 851-55; GX34. The evidence established that ISIS had claimed credit for numerous terrorist activities as part of its broader goal of forming an Islamic state or "caliphate" in Iraq, Syria and beyond. *See* Tr. 860-80. ISIS distinguished itself from other terrorist organizations through the use of ultra-violent means to instill fear and terror, including through beheadings, crucifixions, drownings and targeted executions of reporters and aid workers. *See id.* at 860, 866. ISIS routinely posted videos of its public executions online. *See id.* at 880.

On December 19, 2014, Pugh downloaded an ISIS propaganda video showing ISIS members executing multiple prisoners by lining them up and shooting them in the head. Pugh's laptop computer also contained a video that showed maps of various regions of the world being swallowed up by spreading black ink, followed by the words, "Islamic State of Iraq and Sham." *See* Tr. 900-01; GX66b. The text "Virtues Of Seeking Martyrdom. Pledge To Die" appeared next to an image of the ISIL flag. GX66b. Another ISIS propaganda video on Pugh's laptop provided a detailed history of ISIS's formation and its ambitions; it depicted a man dressed in black known as "Jihadi John" standing over the severed head of American humanitarian aid worker Peter Kassig, who was murdered by ISIS. *See* GX66e.

Also on December 19, Pugh performed multiple web searches for "borders controlled by Islamic State" on his laptop. Approximately two weeks later, on or about January 5, 2015, Pugh downloaded a chart of crossing points between Turkey and Syria that identified the

border areas controlled by ISIS.  *See* GX37, 54a.  On or about that same day, Pugh drafted an unsent letter to his Egyptian wife, whom he addressed as "My Misha," stating, in relevant part:

> I am a Mujahid.  I am a sword against the oppressor and a shield for the oppressed.  I will use the talents and skills given to me by Allah to establish and defend the Islamic State.  There is only 2 possible outcomes for me.  Victory or Martyr.  If Allah gives us Victory we will have a home in Al-sham.  I will send for you when it is safe.  You will have a nice home around believers. If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land . . . .  1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

GX64 (the "My Misha Letter").

Only one day after downloading the chart of Turkey/Syria crossing points controlled by ISIS, on January 6, 2015, Pugh paid cash for a one-way ticket to fly from Cairo to Istanbul.  *See* GX16.  On January 10, 2015, Pugh boarded a flight from Cairo to Istanbul.  *See* GX16, 38.  After landing at the airport in Istanbul, however, Pugh was denied entry.  *See* Tr. 793-96, 1057, 1086; GX18a-d, 19.  Later that same day, Pugh was sent back to Cairo, where he was detained by Egyptian authorities.  *See* Tr. 794; GX19, 38.

When Pugh was detained in Egypt, he possessed various electronic media devices, including an HP laptop computer, an Apple iPod, a Samsung Galaxy S4 mobile telephone, a Pixel mobile telephone, and five USB thumb drives (the "Electronic Devices").  *See* GX21, 22, 24b-e, 25, 26, 27, 28, 29.  On or about January 11 and 12, 2015, FBI agents, after contact from Turkish and Egyptian authorities, obtained the Electronic Devices.  *See* Tr. 713-19, 775-79; GX21, 22, 24b-e, 25, 26, 27, 28, 29.  Four of the five USB thumb drives were damaged and were missing their outer casings.  *See* Tr. 780-84.  In addition, FBI agents noted broken pieces of USB thumb drives in one of Pugh's two backpacks.  *See id.* 788-90; GX23a.  On January 12, 2015, an FBI agent transported the Electronic Devices to the United States, where they were searched pursuant to a warrant.  *See* Tr. 1264.

Pugh was deported from Egypt and arrived in the United States on January 15, 2015.  *See* Tr. 1053-55.  At JFK, Pugh was detained by United States Customs and Border Protection officials for secondary inspection and for an interview by Department of State officials concerning his deportation from Egypt.  *See id.* 1054-55.  While waiting to be interviewed, Pugh began speaking to an individual who, unbeknownst to Pugh, was an FBI undercover agent (the "UC").  *See id.* 1055-56.  The UC and Pugh spoke for approximately one hour.  *See id.* 1056.  During this initial conversation, Pugh told the UC that he had travelled to Turkey and had been sent back to the United States from Egypt.  *See id.* 1057.  Pugh also told the UC multiple times that he had expected to be arrested when he arrived in the United States and thus had been surprised when he was not.  *See id.*  While sitting in the secondary inspection area, Pugh acted nervously every time a new officer walked into the area.  *See id.*

Pugh and the UC agreed to have coffee together after they were released from the secondary inspection area, and later met at a Dunkin' Donuts at JFK.  *See id.* 1057-58.  During

4

this meeting, the UC opened his own (undercover) Facebook page on his smart phone. *See id*. 1080-82. The UC's Facebook page included the ISIS flag as a banner. Upon seeing the UC's Facebook page, including the ISIS flag banner, Pugh indicated that he and the UC were "compatible." *Id*. 1071. The UC sent Pugh a friend request via Facebook. *See id*. Pugh explained, in substance, that he had been turned away by Turkish authorities because they did not like the way Pugh looked because he had been dressed in traditional Muslim clothing. *See id*. 1085-86. Pugh then proceeded to give the UC advice on how to "g[et] through" Turkey, including that it was essential to "blend in." *Id*. 1074, 1082-85. The UC and Pugh also discussed keeping in touch in the future. *See id*. 1069-71, 1078-80.

Pugh was arrested on January 16, 2015. *See id*. 1146-47. Law enforcement agents seized a backpack from Pugh on the night of his arrest and another backpack the following day. *See id*. 1146-49, 1255-56, 1265-69; GX100, 119. The backpacks, which matched the ones that were in Pugh's possession at the time of his detention in Egypt, were searched pursuant to warrants. Tr. 1265. Inside the backpacks were items that appeared to be consistent with travel through, or living in, rugged areas such as Syria. These items included: two compasses; a solar powered key-chain flashlight; a solar-powered power source; identification documents; a "Certificate of Embracing Islam"; two pairs of gloves; cargo pants; boxer shorts; multiple tunic shirts; a green fatigue jacket; two thermal shirts; and three scarves/head covers, including a balaclava. *See id*. 1255, 1269-89; GX100, 115-21.

After introducing all of the above-described evidence of Pugh's crimes, the government delivered its summation. The government summarized the overwhelming evidence at trial and argued that it demonstrated that Pugh had "answered ISIS's call to arms." Tr. 1652. The government argued to the jury that:

> [Pugh] immersed himself in pro-ISIS literature during the months before he bought a one-way ticket to Istanbul, the first leg on what was supposed to be a trip to Syria to join ISIS. He downloaded more than 70 ISIS videos, videos that made clear exactly what ISIS is, a violent terrorist organization that kills innocent people and whoever stands in its way. Then the defendant took action. He bought a one-way ticket to Turkey, the most common entry point for foreign fighters seeking to go to Syria. He packed his bags. He took things useful for a place that lacked electricity, like Syria. He packed a solar powered flashlight, a solar powered source, two compasses, a bungee cord. He took thumb drives full of maps of Syria, maps focusing on the border between Turkey and Syria and showing areas in Syria that ISIS controlled. He took papers showing his airplane mechanic credentials because he knew his skills as an airplane mechanic would be useful to ISIS. He'd seen videos showing that ISIS had captured fighter jets. He told a coworker that ISIS was hiring pilots and mechanics and was offering lots of money. He packed a certificate of embracing Islam showing that he'd officially converted to the Muslim faith, another important document, because ISIS had declared war against those it considered unbelievers,

5

Christians, Jews, the Shia, the other Muslim sect that you were told about by Aaron Zelin.

Now, as you know, the defendant didn't make it to Syria. He was stopped in Turkey and he was sent back to Egypt, and knowing that he had a backpack full of incriminating evidence, including what was on those four thumb drives, he tried to destroy evidence that could be used against him. He knew the United States had prosecuted people who attempt to join ISIS, and he knew he would be prosecuted. He ripped the plastic coverings off of four of the thumb drives, pried off the inner microchips. He wiped his iPod and his laptop showed signs of being exposed to water.

Now it is time for the defendant to be held responsible for his crimes. During the past week, you've heard testimony and seen evidence that proves beyond a reasonable doubt that the defendant is guilty of the crimes charged.

*Id.* 1652-54.

As the Motion notes, the government also argued to the jury that Pugh's assertions that he was traveling to Turkey at least in part to search for a job were not supported by the evidence. The government stated:

I submit that there is absolutely no support for the defense's argument that the defendant went to Turkey to look for work first. There's not a single résumé in either of the defendant's backpacks. I submit, if you were looking for legitimate work you would carry extra résumés and a hard copy. You've probably all gone to interviews before. You bring extra copies of your résumé. You never know who's going to ask for it.

Now, there was not a single résumé or CV, which is just an abbreviation of the Latin term of curriculum vitae, which also means résumé on the defendant's laptop. The only digital copy of any resume that was found in any of the defendant's belongings was on Government Exhibit 24-A, the one thumb drive he did not destroy.

And you learned when Forensic Examiner Roth testified that résumé hadn't been updated since 2011 . . . . So if the defendant really went to Turkey to look for work, why would he not have an updated résumé in either of his backpacks or on the laptop?

Second, you've seen the defendant's web searches. You learned that there were nearly 20,000 searches in the Firefox browser alone and that was between October 2014 and January 2015. There is not a single web search about a job in Turkey, let alone an avionics job in Turkey.

Now, you also have all of the defendant's e-mails in evidence from November 1, 2014, and January 10, 2015. If you recall, he was fired December 11th. That would include the time period that if the defendant were inclined to send out resumes seeking jobs one would expect them to be in that pile of e-mails. Again, not a single e-mail sending out a résumé to an employer in Turkey or even inquiring about a job in Turkey.

You know the defendant's capable of sending out a résumé by e-mail. He did it in 2013 when you saw on that Samsung report that there was an attachment that said "Pughresume.doc." And you also heard testimony from Aamer Aslam that the defendant sent him his résumé by e-mail before the interview.

There's also no work visa for Turkey. The defendant had a tourist visa. You heard the testimony about the airline industry in Turkey is heavily regulated, you can't work in it as a foreigner unless you have a work visa.

And there's [] extensive evidence that the defendant worked as an airplane mechanic. That is his skill set. It is a specific skill set. [E]very job the defendant has had over the past 20 years, which you can check from his résumés, has been as an airplane mechanic.

So to the extent he was looking for a job, you can infer that it would be as an airplane mechanic. But you also learned that not a single U.S. company has a presence and not a single U.S. avionics company has any sort of plant in Turkey.

And remember the defendant's conversation with the undercover agent on January 15, 2015. Now, I think that recording was hard to understand but you had testimony as well to explain it. And whatever you think about the quality of that recording, nothing about that conversation is consistent with a guy who got stopped on his way to look for work []. The defendant told the undercover he didn't want to get into any specifics about anything or anyone about his experiences . . . .

The defendant went to Istanbul for one reason only. He went there on the first leg of his journey to Syria to join ISIS to establish and defend the Islamic State. Victor or martyr, those are the only two outcomes available. Those were his words, not mine. Those were the words he wrote to "My Misha." The words he wrote before buying his one-way ticket and the words he wrote before saving all of those maps to his laptop and to look at them from the thumb drives that he later destroyed.

*Id.* 1689-92.

Defense counsel subsequently delivered its summation on behalf of Pugh. Counsel argued, among other things, that there was insufficient evidence to demonstrate that Pugh's travel to Turkey was for the purpose of joining ISIS. Tr. 1705, 1721, 1744. As Pugh describes in his Motion:

> [Defense counsel] also pointed to Mr. Pugh's internet search history to argue that he traveled to Turkey as a tourist and/or to find a job. In particular, counsel observed that in the weeks before his trip, Mr. Pugh created or updated a computer file entitled "Best Avionics Resume" and that he conducted a "bunch of [web] searches for jobs" in the Middle East, including a search for aviation jobs on a site called JSFirm.com. [Tr.] at 1725-26, 1730-34, 1742; *see also* GX 54a (Firefox Web History Report) at 8-9, 11, 15-16. Finally, counsel explained that Mr. Pugh arrived in Istanbul carrying materials that would have assisted his job search, including his Air Force discharge papers and a professional reference letter. Trial Tr. at 1745.

Def. Mem. at 4.

With respect to the JSFirm searches, defense counsel argued to the jury:

> And you know, the government mentioned in its closing argument, hey, there are no searches for jobs in Turkey . . . . But if you take a look on pages 8 and 9 [of Pugh's internet search history], what you will find, and especially line 142 on November 8, 2014, Mr. Pugh did a search for aviation jobs in aviation employees [sic] JSfirm. And if you look at the URL, it says, "Job, all positions/all types/all states/all countries," okay. And then on the top of page 9, you can see on line 148, "Inventory parts job at L3 Vertex," okay. And you can see in that URL, going past what he's looking at, "dash-Kuwait international-job ID." And then on line 149, a maintenance job at Global Aerospace Logistics, you can see a search on "Abu Dhabi, Abu Zaby, United Arab Emirates International," so still looking for jobs in the Middle East. True, we don't see any search for Turkey. We also don't see any search for any placement with ISIS.

Tr. 1725-26.

C.   <u>Conviction and Sentencing</u>

On March 9, 2016, the jury convicted Pugh on both counts of the Indictment. On May 31, 2017, this Court sentenced Pugh to 180 months' imprisonment on Count One and 240 months' imprisonment on Count Two, to be served consecutively, as well as concurrent terms of supervised release of five years and three years. *See* ECF No. 160. Pugh chose to make a statement during sentencing and spoke at length, virtually uninterrupted. During the course of his statement,

8

Pugh told the court, among other things: that he had not attempted to join ISIS, but had, instead, downloaded maps and completed various internet searches as part of a desire to fight against the Shia forces of Syrian leader Bashar Al-Assad; that he had served his country and that the United States owed him a debt of gratitude; that he did not intend to apologize for his actions; that Islamophobia and racism had made it unbearable for him to live in the United States; and that he had watched terrorist videos simply out of curiosity. *See* ECF No. 166.

D.      First Appeal

Pugh raised three arguments on his initial appeal. *First*, he challenged the district court's denial of his motion *in limine* to exclude the "My Misha Letter" from evidence at trial. *Second*, Pugh argued that the evidence was insufficient to sustain a conviction on either of the two counts. The Court of Appeals rejected both arguments and found that the evidence presented at trial supported the jury's conclusion that Pugh was guilty beyond a reasonable doubt of attempting to provide material support to a foreign terrorist organization and of obstruction of justice. *See United States v. Pugh*, 945 F.3d 9, 19-23 (2d Cir. 2019). Pugh's third argument was that the sentence was procedurally and substantively unreasonable. The Court of Appeals concluded that there were procedural errors at sentencing and remanded the case for resentencing.

E.      Resentencing

Following remand, this Court received additional submissions from the parties and held a resentencing hearing on August 2, 2022, during which it spoke at length about the seriousness of Pugh's offenses and the overwhelming evidence in the case. For example, among other things, the Court observed:

> The facts show us some very serious behavior on the part of the defendant and what he was thinking, rightly or wrongly, at that time.

> * * *

> [I]t is clear to the Court [the defendant] made an about-face toward a one-way ticket from Cairo to Turkey with a plan to join the enemy of this country.

> * * *

> [T]here is not an ounce of recognition by this defendant about the underlying truth that he is – in the court's view and in the view of the jury, that he intended to join a murderous, treacherous terrorist organization.

> * * *

> The court feels that the materials retrieved from the defendant's computer are not merely a consequence of the defendant's curiosity. They reflect, in the court's view, the defendant's determination to

embrace, assist and advance the objectives of a homicidal terrorist organization that is responsible for thousands of deaths.

ECF No. 199, Resentencing Tr. at 9-12.

The Court resentenced the defendant to 180 months' imprisonment on Count One and 60 months' imprisonment on Count Two, to be served consecutively, and concurrent terms of supervised release of ten years and three years on the respective counts. *See* ECF No. 196.

      F.      Second Appeal

Pugh thereafter appealed his revised sentence on both procedural and substantive grounds. On March 25, 2024, the Court of Appeals rejected his arguments and affirmed the sentence. This petition followed.

      G.      The Motion

In the instant Motion, filed on August 8, 2025, Pugh moves under Section 2255 to "vacate, correct, or set aside his sentence," Def. Mot. at 11, arguing that his trial counsel was ineffective because they failed to subpoena records from JSFirm after having already received those records from the government. Pugh's argument has no merit and should be rejected for the reasons below.

## II.     Applicable Law

      A.      Section 2255 Petitions

Section 2255 allows federal prisoners to challenge the constitutionality of their sentences, providing in pertinent part that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). To qualify for relief under Section 2255, it is the defendant's burden to show "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)). Despite the existence of procedural bars to certain other claims, "[a]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

10

B.        Ineffective Assistance of Counsel Claims

The "'purpose of the effective assistance guarantee of the Sixth Amendment is . . . simply to ensure that criminal defendants receive a fair trial.' Thus, '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 689 (1984)) (citation omitted). A claim of ineffective assistance of counsel requires a criminal defendant to demonstrate that counsel committed "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

To demonstrate ineffective assistance, a petitioner must meet the "highly demanding" two-prong test established by *Strickland*. *See Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001); *accord*, *e.g.*, *Cullen*, 563 U.S. at 190 ("We take a 'highly deferential' look at counsel's performance."); *Bierenbaum v. Graham*, 607 F.3d 36, 50-51 (2d Cir. 2010); *Bell v. Miller*, 500 F.3d 149, 156-57 (2d Cir. 2007). "Surmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted).

Under the first prong of *Strickland*, courts assess the reasonableness of counsel's performance, viewing the relevant conduct from counsel's contemporaneous perspective, without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (court "may not use hindsight to second-guess [counsel's] strategy choices"); *United States v. Jones*, 918 F.2d 9, 11 (2d Cir. 1990) (rejecting ineffectiveness claim "unacceptably based on hindsight"). A court must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Jones*, 918 F.2d at 11 (quoting *Strickland*, 466 U.S. at 689). Indeed, because there "are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, the lack of success of a chosen strategy should not cause a court to second-guess an attorney's judgments, *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir. 1986).

The second prong of *Strickland* focuses on the "reasonable probability" of prejudice, that is, whether "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Speculative arguments about an error's impact do not establish prejudice. *See United States v. Weiss*, 930 F.2d 185, 199 (2d Cir. 1991). Indeed, the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (citing *United States v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998)).

The prejudice prong need not be considered if a defendant has failed to demonstrate that counsel performed below an objective standard of reasonableness. *See United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994). However, because it is often "easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," a court may consider the

question of prejudice first. *Strickland*, 466 U.S. at 697; *see also Farrington v. Senkowski*, 214 F.3d 237, 242 (2d Cir. 2000).

### C.   Duty to Investigate

A criminal defense attorney has a "duty to investigate" the relevant facts and law. *United States v. Inniss*, 746 F. Supp. 3d 10, 21 (E.D.N.Y. 2024) (quoting *Strickland*, 466 U.S. at 690). However, defense attorneys are not required to investigate every possible lead when it is unreasonable to do so. *See Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")

"[C]ourts 'evaluate the reasonableness of an attorney's investigative choices with a 'heavy measure of deference to counsel's judgments.'"" *Rivera v. United States*, No. 09-CR-00619 (JMA), 2024 WL 3985677, at *14 (E.D.N.Y. Aug. 29, 2024) (quoting *Englert v. Lowerre*, 115 F.4th 69, 82 (2d Cir. 2024) (quoting *Strickland*, 466 U.S. at 691, and *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011))).

### III.   The Motion Should Be Denied

### A.   Trial Counsel Was Not Ineffective

Pugh argues that his counsel at trial failed to adequately investigate his case because counsel did not subpoena records from JSFirm and therefore did not obtain Pugh's "login history, search history or other activities on the JSFirm site" or any JSFirm records "from January 2015, prior to his January 10th trip to Turkey." Def. Mem. at 5. Pugh argues that "counsel's failure to investigate the efforts Mr. Pugh made to find employment before his January 2015 trip to Turkey fell short of prevailing professional standards. But for counsel's errors, there is a reasonable probability that the outcome of Mr. Pugh's trial would have been different." *Id.* at 1.

Pugh's assertions have no support in law or fact. Pugh fails to identify any purported error by his trial counsel that fell below an objective standard of reasonableness and, even if such an error had been made (it was not), Pugh falls far short of demonstrating that such a hypothetical error altered the outcome of his trial and therefore that he suffered any prejudice.

First, counsel's actions were not unreasonable, because Pugh already had the documents he claims counsel failed to seek. As Pugh concedes, the government served a trial subpoena on JSFirm in December 2015 and received a full production that it provided to the defense prior to trial. *See* Def. Mem. at 4-5; *see also* Exhibit A (trial subpoena sent to JSFirm on December 18, 2015). The production included what appear to be lists of employers he researched and matched with and corresponding dates and times. Pugh does not explain why counsel should have concluded that that production was incomplete, nor does he articulate why he believes that JSFirm possessed records of responsive account activity from early January 2015 that it simply declined to produce to the government. Tellingly, nowhere in either the Motion or in Pugh's attached affidavit does Pugh assert that he actually *did* conduct searches for jobs in Turkey through

12

JSFirm in January 2015. Counsel did not act unreasonably in not issuing another subpoena when there was no reason to believe JSFirm was in possession of additional relevant materials.[2]

Moreover, by Pugh's own admission, defense counsel did conduct an investigation into his assertion that he traveled to Turkey to seek out work. For example, as Pugh observes, "In the months before trial, Mr. Pugh's attorneys subpoenaed his records from Facebook, where he had a professional page, and from some of his prior employers." Def. Mem. at 5. Counsel also received from the government, and emphasized to the jury, Pugh's internet search history reflecting logins to JSFirm in late 2014 just before his trip to Turkey.

It is well settled that attorneys are not required to investigate every possible lead when it is unreasonable to do so. *See Strickland*, 466 U.S. at 690–91. In particular, the duty to investigate "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'" *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (quoting *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)); *see also Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980) (defense counsel "is not required to pursue every path until it bears fruit or until all conceivable hope withers"); *Clark v. Chappell*, 936 F.3d 944, 975 (9th Cir. 2019) (same); *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir. 1987) (same). Here, counsel's approach fell well within the acceptable range of professional representation. *See United States v. Jones*, 918 F.2d 9, 11 (2d Cir. 1990).[3]

In any event, had defense counsel served a subpoena on JSFirm, it plainly would not have changed the outcome of trial. *First*, there is no reason to believe that there were any additional responsive documents in JSFirm's possession that Pugh did not receive from the government. Pugh asserts, without any basis, that the production by JSFirm was "incomplete." *Id.* at 5. But the government's subpoena to JSFirm, which was so-ordered by the Court, had no limitations. *See* Exhibit A. The subpoena called for "*any and all records* concerning Tairod Nathan Webster Pugh [social security number] [birthday] including *but not limited to*: all resumes submitted by Pugh, email correspondence, account information, and recordings of any customer service calls." *Id.* (emphasis added). The request did not contain any date limit.[4] Pugh's motion

---

[2]     In fact, under these circumstances, a trial subpoena to JSFirm would have been legally improper. Rule 17(c) "was not intended to provide a means of discovery for criminal cases" and a Rule 17(c) subpoena may not be used to conduct a "general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683, 700 (1974); *see also Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) (same). A defendant seeking documents pursuant to a Rule 17(c) subpoena bears the burden of satisfying the "strict standard" set forth by the Supreme Court in *Nixon*, including "specifically identifying the materials sought." *United States v. Brown*, No. 95-CR-168 (AGS), 1995 WL 387698, at *9 (S.D.N.Y. June 30, 1995).

[3]     Pugh was represented by highly competent and skilled counsel. At the close of trial, the Court thanked counsel "for their professionalism and attention to the case" and told them that the Court appreciated their efforts. Tr. 1856.

[4]     JSFirm's sworn declaration identified that the responsive records themselves were "from July 2013 to December 2014," not that its *search* was limited to that range. There is no

13

presumes that defense counsel would have obtained more records from JSFirm than the government did, but he provides no explanation as to why that would have been the case. "Such speculation satisfies neither *Strickland's* deficient performance nor prejudice prongs." *United States v. Gushlak*, No. 03-CR-833 (NGG), 2017 WL 888301, at *5 (E.D.N.Y. Mar. 6, 2017) (quoting *Rosario v. Bennett*, No. 01-CV-7142 (RMB) (AJP), 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002)); *see also Polanco v. United States*, No. 94-CR-453 (CSH), 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) ("Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either Strickland prong."); *Yannai v. United States*, 346 F. Supp. 3d 336, 342 (E.D.N.Y. 2018) ("Speculative, conclusory, or self-serving allegations are insufficient."). And, as described above, Pugh does not even allege that he did conduct searches for jobs in Turkey on JSFirm in January 2015. Rather, Pugh's affidavit states only that he "told defense counsel that before his trip to Turkey, he used a website called JSFirm.com to search for jobs in the Middle East." *See* Affidavit of Tairod Pugh (Aug. 6, 2025) ("Pugh Aff.") ¶ 7. Pugh's internet search history confirmed this fact, showing multiple logins to JSFirm in late 2014, and defense counsel emphasized that evidence to the jury.

*Second*, even if Pugh could demonstrate that a subpoena to JSFirm would have resulted in relevant and admissible evidence demonstrating job searches in January 2015—which he cannot—he still cannot establish that that information would have changed the outcome of his trial. To make such a showing, "*Strickland* specifically directs that the totality of the evidence be considered." *Fernandes v. United States*, 583 F. Supp. 3d 403, 412 (W.D.N.Y. 2022) (alteration and internal quotation marks omitted). Counsel presented to the jury multiple sources of evidence about Pugh's job searches prior to his Turkey trip. Meanwhile, the government presented overwhelming evidence of Pugh's intention to ultimately join ISIS, whether or not he was also searching for jobs in Turkey. This evidence included, among other things, Pugh's collection of ISIS propaganda, his possession of maps of ISIS-controlled Syria, his suspicious destruction of evidence, his interactions with the UC, and his letter to his wife stating quite plainly, "I will use the talents and skills given to me by Allah to establish and defend the Islamic State. There is only 2 possible outcomes for me. Victory or Martyr. If Allah gives us Victory we will have a home in Al-sham. I will send for you when it is safe." GX64. Given this evidence, even if Pugh were able to articulate what the JSFirm evidence showed, the argument that he was looking for a job "would have conflicted with other witnesses' statements and 'added little weight to his defense." *Sahadeo v. Kirkpatrick*, No. 18-CV-4094 (ERK), 2019 WL 1208790, at *5 (E.D.N.Y. Mar. 14, 2019).

Additionally, as described above, the government made numerous arguments to rebut Pugh's "traveling for work" theory that were unrelated to his job-search history. Among other things, the government pointed out that the defendant had no résumés in his backpacks or on his laptop (and a résumé on his surviving thumb drive had not been updated since 2011), that he did not have the required work visa for Turkey, that he did not mention anything about work to

---

indication that it was. Indeed, the declaration stated that the production constituted "*the* records for Tairod Nathan Webster Pugh," not particular records from a particular timeframe.

the UC, and that there are no American avionics companies in Turkey.[5]  The jury clearly did not find that these arguments were defeated by evidence of Pugh's job searches in late 2014; there is no reason to believe it would have felt differently if it had seen evidence of job searches in January 2015.  Importantly, the standard under *Strickland* is not whether evidence could have bolstered a defense, but instead whether the defendant has demonstrated "a reasonable probability" that, absent the purportedly deficient performance, the "the result of the proceeding would have been different."  466 U.S. at 694.  Here, the overwhelming evidence at trial showed that Pugh planned to join ISIS, and additional evidence that he searched for jobs in Turkey, even if it existed, would not have changed that result.  The Court should reject Pugh's arguments to the contrary.

> B.    Defendant's Additional *Pro Se* Arguments Are Meritless

For the reasons described above, the Court should decline to consider the additional arguments made in Pugh's separate *pro se* submission, which were not made by appointed counsel in the Motion.  However, even if that were not the case, they would fail in any event.

> 1.    There Was No Misconduct by the Government

Pugh alleges prosecutorial misconduct on the grounds that the government failed to provide him with JSFirm records that, as described above, there is no reason to believe existed.  Def. *Pro Se* Mem. at 5, 24-29.  In the first instance, Pugh's claim is barred because he failed to raise it when he appealed his conviction (despite knowing prior to trial exactly the extent of the JSFirm documents that had been produced).  Where a claim could have been raised on appeal and was not, it is procedurally forfeited unless the defendant can show "(1) cause for failing to raise the issue, and prejudice resulting therefrom; or (2) actual innocence." *Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005) (internal quotation marks omitted).  Pugh has not made either showing. *See, e.g.*, *Linick v. United States*, No. 13-CR-120 (JMA), 2022 WL 17065998, at *8 (E.D.N.Y. Nov. 16, 2022) (finding that certain "claims of prosecutorial misconduct—including his claims that the prosecution withheld exculpatory evidence . . . —were not raised on direct review and are, therefore, procedurally barred"); *McCullough v. United States*, No. 14-CV-01920 (AMD), 2020 WL 869118, at *6 (E.D.N.Y. Feb. 21, 2020) ("The petitioner's prosecutorial misconduct claims are procedurally barred because he did not raise them on direct appeal"); *Rios v. United States*, No. 13-CV-5577 (CBA), 2016 WL 3702966, at *5 (E.D.N.Y. July 7, 2016) (dismissing prosecutorial misconduct claim where the defendant "did not raise this claim on direct appeal and suggests no valid reason why this claim is not therefore procedurally defaulted").

Nor can Pugh demonstrate any prosecutorial misconduct or withholding of exculpatory information in any event.  A conviction is set aside when prosecutorial misconduct causes "substantial prejudice" to the defendant, thereby depriving him of his right to a fair trial. *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987).  In *Brady v. Maryland*, "[the Supreme Court] held 'that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Strickler v. Greene*, 527 U.S. 263,

---

[5]    These arguments are also in tension with the inference Pugh now advances, that any additional records actually do exist.

15

280 (1999) (quoting *Brady*, 373 U.S. 83, 87 (1963)).  To establish a *Brady* violation, a Section 2255 petitioner must show: (1) the evidence at issue is favorable to the defendant, either because it is exculpatory or it is impeaching; (2) the evidence was suppressed by the prosecution, willfully or inadvertently; and (3) prejudice." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  The prejudice requirement demands that the defendant show a "reasonable probability of a different result" had the material been timely disclosed.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, the government did not ever possess the evidence Pugh claims it withheld, and indeed there is no reason to believe it even existed, as discussed above.  Even if it did exist, the evidence was not exculpatory, nor was Pugh prejudiced, because Pugh very well could have searched for jobs prior to his trip to Turkey and that would not in any way have foreclosed the conclusion that he ultimately intended to join ISIS.  In fact Pugh did argue, based on other evidence, that he conducted job searches shortly before his trip to Turkey.  The jury nonetheless concluded, based on overwhelming evidence (including Pugh's own admissions to his wife), that he intended to join ISIS.

### 2.    Resentencing Counsel Was Not Ineffective

Pugh also alleges that he received ineffective assistance of counsel at his resentencing hearing in 2022 because his sentence of ten years' supervised release on Count One of the Indictment was improper under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *See* Def. *Pro Se* Mem. at 8, 43.  This argument fails because the ten-year term was entirely proper.  As set forth in the PSR, *see* ¶ 83, Title 18, United States Code, Section 3583(j) provides that "Notwithstanding subsection (b), the authorized term of supervised release for any offense listed in section 2332b(g)(5)(B) is any term of years or life."  Title 18, United States Code, Section 2332b(g)(5)(B) explicitly includes violations of Section 2339B, the statute charged in Count One of the Indictment.  Guidelines Section 5D1.2(b)(1) similarly states that the length of supervised release "may be up to life" for violations of any offense listed in Section 2332b(g)(5)(B), the commission of which "created a foreseeable risk of[] death or serious bodily injury to another person."  There can be no doubt that attempting to join ISIS, a vicious and deadly terrorist organization, with the explicit goal of "establish[ing] and defend[ing] the Islamic State" until either "[v]ictory or [m]artyr[dom]," creates such a risk.  Defense counsel has no obligation to make non-meritorious claims on behalf of a defendant.  *See United States v. Noble*, 363 F. App'x 771, 773 (2d Cir. Feb. 2, 2010) (summary order) ("An attorney's failure to make a meritless argument does not amount to ineffective assistance.").

16

IV.    Conclusion

  In sum, the defendant has not met his heavy burden of demonstrating that he received ineffective assistance of counsel at trial or resentencing, or that the government committed misconduct, resulting in prejudice to him.  The Motion should be denied in its entirety.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: s/ Andrew D. Reich
   Andrew D. Reich
   Assistant U.S. Attorney
   (718) 254-6452

cc: Clerk of the Court (NGG) (by ECF and Email)
  Counsel of Record (by ECF and Email)